JOSEPH H. HUNT
Assistant Attorney General
MCGREGOR SCOTT
United States Attorney
BRINTON LUCAS
Counsel to the Assistant Attorney General
JAMES J. GILLIGAN
Acting Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch
DAVID SHELLEDY
Civil Chief, Assistant United States Attorney
JOSEPH BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Tel. (202) 305-0924
Kevin.Snell@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF CALIFORNIA; EDMUND GERALD BROWN JR., Governor of California, in his Official Capacity; and XAVIER BECERRA, Attorney General of California, in his Official Capacity, <br><br> Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.   History of Federal Internet Regulation ........................................................................ 2

     A.   Broadband Internet Access Service  ................................................................ 2

     B.   The Commission's Historic Approach to Internet Regulation ............................ 3

     C.   The 2015 Order ................................................................................................ 4

     D.   The 2018 Order ................................................................................................ 6

II.  California's Internet Regulation Law .......................................................................... 10

LEGAL STANDARD......................................................................................................... 12

ARGUMENT ..................................................................................................................... 13

I.   The United States is Likely to Prevail on the Merits. ................................................. 13

     A.   The 2018 Order preempts virtually all of SB-822.  ........................................ 13

     B.   The Court must presume the validity of the 2018 Order in this proceeding........ 16

II.  The Equitable Factors Strongly Militate in Favor of Injunctive Relief. ......................... 18

     A.   SB-822's enforcement would irreparably harm the government and the
          public interest.................................................................................................. 18

     B.   A preliminary injunction would not cause California any harm......................... 20

CONCLUSION.................................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**

*California v. FCC*,
   75 F.3d 1350 (9th Cir. 1996) ..................................................................... 9

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
   883 F.3d 459 (4th Cir. 2018) ..................................................................... 17

*CE Design, Ltd. v. Prism Bus. Media, Inc.*,
   606 F.3d 443 (7th Cir. 2010) ..................................................................... 17

*Charter Advanced Servs. (MN), LLC v. Lange*,
   No. 17-2290, 2018 WL 4260322 (8th Cir. Sept. 7, 2018) ..................... 9, 15

*City of New York v. FCC*,
   486 U.S. 57 (1988) .................................................................................... 13

*Comcast Corp. v. FCC*,
   600 F.3d 642 (D.C. Cir. 2010) .................................................................... 4

*FCC v. ITT World Commc'ns, Inc.*,
   466 U.S. 463 (1984) .................................................................................. 16

*Federal Home Loan Bank Board v. Empie*,
   778 F.2d 1447 (10th Cir. 1985) ............................................................ 19, 20

*Fober v. Mgm't & Tech. Consultants, LLC*,
   886 F.3d 789 (9th Cir. 2018) ..................................................................... 16

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) .................................................................................... 9

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   768 F.3d 1110 (11th Cir. 2014) ................................................................. 17

*Minnesota Pub. Utilities Comm'n v. FCC*,
   483 F.3d 570 (8th Cir. 2007) ................................................................... 6, 9

*Nack v. Walburg*,
   715 F.3d 680 (8th Cir. 2013) ..................................................................... 17

*National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .................................................................................. 3, 4

Memorandum in support of motion
for preliminary injunction
      - ii -

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
   491 U.S. 350 (1989) ........................................................................ 18

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................ 21

*United States Telecom Ass'n v. FCC,*
   825 F.3d 674 (D.C. Cir. 2016) ........................................................... 6

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) ............................................ 18, 19, 20

*United States v. Any & All Radio Station Transmission Equip.,*
   207 F.3d 458 (8th Cir. 2000) ............................................................ 17

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011),
   *aff'd in part, rev'd in part,* 567 U.S. 387 (2012) ..............................*passim*

*United States v. California,*
   314 F. Supp. 3d 1077 (E.D. Cal. 2018) ....................................2, 18, 19, 20

*United States v. Dunifer,*
   219 F.3d 1004 (9th Cir. 2000) ...................................................... 17, 18

*US West Commc'ns, Inc. v. Jennings,*
   304 F.3d 950 (9th Cir. 2002) ........................................................... 16

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ......................................................... 13

*Verizon v. FCC,*
   740 F.3d 623 (D.C. Cir. 2014) ...................................................2, 3, 4

*Western Radio Servs. Co. v. Qwest Corp.,*
   678 F.3d 970 (9th Cir. 2012) ........................................................... 16

*Wilson v. A.H. Belo Corp.,*
   87 F.3d 393 (9th Cir. 1996) ............................................................. 16

*Winter v. NRDC,*
   555 U.S. 7 (2008) ........................................................................... 13

**STATUTES**

28 U.S.C. § 2342 ..................................................................2, 16, 17

47 U.S.C. § 153 .................................................................................................3

47 U.S.C. § 230 .................................................................................................3

Cal. Bus. & Prof. Code § 17200 ......................................................................12

Cal. Bus. & Prof. Code § 17203 ......................................................................12

Cal. Bus. & Prof. Code § 17204 ......................................................................12

Cal. Bus. & Prof. Code § 17206 ......................................................................12

Cal. Civ. Code § 3101 ..............................................................................*passim*

Cal. Civ. Code §§ 3100-3104 ............................................................................1

**RULES**

Fed. R. Civ. P. 65 ...............................................................................................1

**UNITED STATES CONSTITUTION**

U.S. Const., art. VI, cl. 2 .................................................................................13

**OTHER AUTHORITIES**

Cal. Assembly Comm. on Commc'ns & Conveyance,
    SB 822 Analysis (2018) ........................................................................11, 15

Cal. S. Comm. on Energy, Utils., & Commc'ns,
    SB 460 Analysis (2018) ........................................................................10, 12

Cal. S. Comm. on Judiciary,
    SB 822 Analysis (2018) .............................................. 1, 10, 12, 13, 14, 15

Compl., *United States v. California*,
    No. 2:18-cv-721-WBS-DB (E.D. Cal. Apr. 2, 2018), ECF No. 1 ...........1

Compl., *United States v. California*,
    No: 2:18-cv-490-JAM-KJN (E.D. Cal. Mar. 6, 2018), ECF No. 1..........1

*In re Federal-State Joint Bd. on Universal Serv.*,
    13 FCC Rcd 11,501 (1998).......................................................................3

*Protecting & Promoting the Open Internet*,
   30 FCC Rcd 5601 (2015) ............................................................................ 4, 5, 14, 15

*Restoring Internet Freedom*,
   33 FCC Rcd 311 (2018) ....................................................................................*passim*

*Restoring Internet Freedom*, Notice of Proposed Rulemaking,
   32 FCC Rcd 4434 (2017) ............................................................................................ 6

*Restoring Internet Freedom Memorandum of Understanding* (Dec. 14, 2017), https://www.ftc.
   gov/system/files/documents/cooperation_agreements/fcc_fcc_mou_internet_freedom_order_
   1214_final_0.pdf ...................................................................................................... 7

In order to avoid ongoing, irreparable harm to the United States and its interests, the United States moves this Court under Federal Rule of Civil Procedure 65 to preliminarily enjoin enforcement of the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Civ. Code §§ 3100-3104, enacted through Senate Bill 822 ("SB-822"). As detailed in the accompanying proposed order, the United States respectfully requests that this Court preliminarily enjoin Defendants (collectively, "California") from enforcing Sections 3100, 3101 and 3102 of the California Civil Code.

## INTRODUCTION

This case involves California's attempt to nullify the Federal Government's regulatory scheme for interstate broadband communications. The Constitution resolves this dispute. Pursuant to the Supremacy Clause and federal statutes, the Federal Communications Commission ("FCC" or "Commission") sets uniform, national policies governing interstate communications, and contrary state laws—like the one challenged here—are preempted.

In 2018, the FCC released an order establishing a new regulatory framework for the Internet and repealing the rules governing broadband Internet access it had adopted in 2015. *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("2018 Order"). Invoking multiple sources of authority, the 2018 Order expressly preempted "any state or local measures that would effectively impose rules or requirements that [the FCC] ha[d] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements." 2018 Order ¶ 195. Despite the plain text of the 2018 Order, California enacted legislation that both "codif[ies] portions of the recently-rescinded [FCC] rules," and imposes additional bright-line rules that not even "the FCC opted" to embrace in 2015. Cal. S. Comm. on Judiciary, SB 822 Analysis 1, 19 (2018) ("Judiciary Analysis"). This enactment is part of a pattern of recent actions by the State that purport to nullify federal law and have been challenged as being preempted. *See* Compl. ¶ 53, *United States v. California*, No. 2:18-cv-721-WBS-DB (E.D. Cal. Apr. 2, 2018), ECF No. 1; Compl. ¶ 3, *United States v. California*, No: 2:18-cv-490-JAM-KJN (E.D. Cal. Mar. 6, 2018), ECF No. 1.

California is currently challenging the 2018 Order, including its preemption provision, in the D.C. Circuit, which has "exclusive jurisdiction" under the Hobbs Act to "determine the validity" of that order, 28 U.S.C. § 2342(1). But the State was not content to await final judgment in that matter and proceeded to enact this preempted legislation, thereby creating a collateral—and entirely needless—constitutional controversy. Because the Hobbs Act and Ninth Circuit precedent require this Court to presume here that the 2018 Order is valid, the only question before the Court is whether SB 822 conflicts with the 2018 Order—a point that California has admitted.

California thereby has countermanded the FCC's decision—by itself reason to preliminarily enjoin SB-822. Indeed, this Court recently recognized the injury suffered by the United States when, as here, its "federal authority [is] undermined by impermissible state regulations." *United States v. California*, 314 F. Supp. 3d 1077, 1112 (E.D. Cal. 2018). The attendant "[f]rustration of federal statutes and prerogatives are not in the public interest." *Id.* And here, due to its size and weighty impact on the Internet economy, California effectively has dictated a broadband Internet access policy for the entire Nation. Given the nature of Internet communications, which frequently straddle multiple jurisdictions, Internet Service Providers ("ISPs") cannot apply two separate and conflicting legal frameworks to Internet communications—one for California and one for everywhere else. This means that California's rules in this area, for all practical purposes, are the only ones that matter. California's nullification of federal law—with the concomitant regulatory uncertainty and instability of the Internet marketplace created—is not in the public's interest, not otherwise justified, and thus should be immediately enjoined.

## BACKGROUND

### I.    History of Federal Internet Regulation

####    A.    Broadband Internet Access Service

Internet users generally connect to "backbone networks"—"interconnected, long-haul fiber-optic links and high-speed routers capable of transmitting vast amounts of data"—via local access providers "who operate the 'last-mile' transmission lines." *Verizon v. FCC*, 740 F.3d 623,

628-29 (D.C. Cir. 2014). In the early days of the Internet, most users relied on dial-up connections via local telephone lines to connect. *Id.* at 629. Today, however, users generally access the Internet "through 'broadband,' i.e., high-speed communications technologies, such as cable modem service." *Id.* Both "edge providers" ("those who, like Amazon or Google, provide content, services, and applications") as well as "end users" ("those who consume edge providers' content, services, and applications") usually rely on broadband Internet access service. *Id.* Over the past two decades, the FCC has issued a series of orders addressing the appropriate regulatory treatment of broadband Internet access service.

### B. The Commission's Historic Approach to Internet Regulation

In the Telecommunications Act of 1996 ("1996 Act"), Congress comprehensively reformed and amended the Communications Act of 1934 ("Communications Act") to "promote competition and reduce regulation" so as to "secure lower prices and higher quality services for American telecommunications consumers" and to "encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104 (preamble), 110 Stat. at 56. As amended, the Communications Act distinguishes between lightly regulated "information services" and more heavily regulated "telecommunications services." 47 U.S.C. § 153(24), (53); *see National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 973, 975-76 (2005) ("*Brand X*"); 2018 Order ¶ 9. It further established that "[i]t is the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services"—including any "information service"—"unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2), (f)(2). For much of the next two decades, the FCC therefore "repeatedly adopted a light-touch approach to the Internet that favored discrete and targeted actions over pre-emptive, sweeping regulation of Internet service providers." 2018 Order ¶ 9; *see id.* ¶¶ 9-16. In 1998, for instance, the FCC informed Congress that Internet access service should be classified as an information service, not a telecommunications service. *In re Federal-State Joint Bd. on Universal Serv.*, 13 FCC Rcd 11,501, 11,536 (1998). In 2002, consistent with that conclusion, the Commission classified broadband Internet access service over cable systems as an

"interstate information service" rather than a "telecommunications service." 2018 Order ¶ 10. In 2005, the Supreme Court upheld that classification, concluding that it was based on a permissible reading of ambiguous language in the Telecommunications Act's definitional provisions. *Brand X*, 545 U.S. at 986-1000. The FCC later classified broadband Internet access service via other channels, such as wireline facilities and power lines, as information services as well. 2018 Order ¶¶ 12-13. The thriving, rapidly expanding, and ubiquitous Internet that we know today was created in this regulatory environment.

Starting in 2008, the FCC asserted certain regulatory authority over broadband Internet access providers. *Id.* ¶¶ 14-17. With the exception of a 2010 transparency rule, which required providers of broadband Internet access services to disclose their network-management practices, the D.C. Circuit rejected these efforts as falling outside of the Commission's authority over information services. *See Verizon*, 740 F.3d at 627; *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010). At no point during this time did the FCC seek to justify these actions by invoking its Title II authority over telecommunications services. *See* 2018 Order ¶¶ 14-17.

### C.    The 2015 Order

In 2015, in a sharp (but brief) departure, the FCC issued an order classifying, for the first time, broadband Internet access service, whether fixed or mobile, as a telecommunications service subject to the Commission's Title II authority. *Protecting & Promoting the Open Internet*, GN Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) ("2015 Order").

Relying on this authority, the FCC adopted several rules. To start, it banned broadband Internet access service providers from engaging in the following conduct:

1) *Blocking*: A provider "shall not block lawful content, applications, services, or nonharmful devices, subject to reasonable network management." *Id.* ¶ 15.

2) *Throttling*: A provider "shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management." *Id.* ¶ 16.

3) *Paid Prioritization*: A provider "shall not engage in paid prioritization," which "refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶ 18.

The 2015 Order also adopted the following Internet conduct standard, directing that providers "shall not unreasonably interfere with or unreasonably disadvantage" either:

(i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule.

*Id.* ¶¶ 21, 136. In addition to these new substantive rules, the 2015 Order "enhance[d]" the transparency rule adopted by the FCC in 2010 by imposing additional reporting requirements. *Id.* ¶¶ 24, 162-71.

The FCC declined, however, to impose "bright-line" prohibitions on "other practices" to which some commentators objected. *Id.* ¶¶ 151-52. For example, the Commission refused to ban "zero-rating"—the practice of exempting certain Internet traffic from users' data "usage allowances," *id.* ¶ 151—because some uses of this practice "could benefit consumers and competition," *id.* ¶ 152. Similarly, the Commission did not apply any bright-line rules to so-called interconnection or Internet traffic exchange agreements—generally, commercial arrangements between ISPs and edge providers concerning Internet traffic at connections between the backbone networks and the last-mile transmission lines (although it asserted authority to review interconnection disputes under Title II on a case-by-case basis). *Id.* ¶¶ 30-31, 202-06. And the Commission declined to apply the rules to separate non-Internet services—sometimes referred to as "specialized services"—offered by a broadband provider, such as "facilities-based VoIP offerings, heart monitors, or energy consumption sensors," except for narrow circumstances where it could be subject to limited oversight under the Internet conduct standard. *Id.* ¶¶ 35, 207-13.

The FCC also promised that it would "exercise [its] preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with [its] carefully tailored regulatory scheme." *Id.* ¶ 433. As it observed, "[c]ompetition and deregulation are valid federal interests the FCC may protect through preemption of state regulation." *Id.* ¶ 433 n.1286 (quoting *Minnesota Pub. Utilities Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007) ("*Minnesota PUC*")).

In 2016, a divided panel of the D.C. Circuit upheld the 2015 Order against legal challenges. *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016). Petitions for certiorari remain pending before the Supreme Court.

### D. The 2018 Order

In May 2017, the FCC issued a proposal to restore the information services classification and return to a light-touch, market-based framework for regulating broadband Internet access. *Restoring Internet Freedom*, Notice of Proposed Rulemaking, 32 FCC Rcd 4434 (2017). Following public comment, the FCC released in January its 2018 Order, which reestablished its longstanding regulatory framework of classifying broadband Internet access service as an "information service," 2018 Order ¶ 20, and its historic practice of less intrusive forms of Internet governance, *see id.* ¶ 207. In doing so, the FCC repealed the 2015 Order's bans on blocking, throttling, and paid prioritization, *id.* ¶ 239; the Internet conduct standard, *id.*; oversight of Internet traffic exchange agreements, *id.* ¶¶ 246-52; and enhancements to the transparency rule, *id.* ¶ 225. The 2018 Order instead opted for a more tailored regulatory approach that relied on a combination of disclosure requirements, market forces, and enforcement of pre-existing antitrust and consumer protection laws. *See, e.g.*, *id.* ¶¶ 140-54, 240-45.

First, the FCC reinstated its 2010 transparency rule, with limited modifications, but eliminated the additional reporting requirements of the 2015 Order. *Id.* ¶¶ 215-31. The FCC recognized that "transparency substantially reduces the possibility that ISPs will engage in harmful practices, and it incentivizes quick corrective measures by providers if problematic conduct is identified." *Id.* ¶ 209; *see also id.* ¶¶ 217, 237, 240-44. In addition, "[a]ppropriate disclosures" can "help consumers make informed choices about their purchase and use of broadband Internet

access services." *Id*. ¶ 209; *see also id*. ¶¶ 216-18, 237. At the same time, the FCC concluded that the additional disclosure requirements had "significantly increased the burdens imposed on ISPs without providing countervailing benefits to consumers or the Commission." *Id*. ¶ 215. The current transparency rule requires broadband Internet access service providers to "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings." *Id.* The rule also provides that "[s]uch disclosure shall be made via a publicly available, easily accessible website or through transmittal to the Commission." *Id.*

Second, the FCC recognized that "[o]ther legal regimes—particularly antitrust law and the [Federal Trade Commission's ("FTC")] authority under Section 5 of the FTC Act to prohibit unfair and deceptive practices—provide protection for consumers, *id*. ¶ 140; *see id*. ¶¶ 141-54, and that these protections are especially potent because the transparency rule "amplifies the power of antitrust law and the FTC Act to deter and where needed remedy behavior that harms consumers," *id*. ¶ 244. To that end, the FCC entered into a memorandum of understanding with the FTC enabling the two agencies to share information, thereby facilitating the FTC's ability to police specific unfair or deceptive practices. *Restoring Internet Freedom Memorandum of Understanding* (Dec. 14, 2017), https://www.ftc.gov/system/files/documents/cooperation_agreements/fcc_fcc _mou_internet_freedom_order_1214_final_0.pdf. In the FCC's view, these preexisting laws are better suited to address violations of net-neutrality principles, in part because "antitrust and consumer protection laws . . . apply to the whole of the Internet ecosystem, including edge providers," and draw "guidance from [an] ample body of precedent" from across industries, thereby avoiding "economic distortions by regulating only one side of business transactions on the Internet." *Id.* ¶ 140.

As the FCC explained, this shift from the 2015 Order was necessary for several independent reasons. First, based on its comprehensive review of the administrative record and its

policy expertise, the FCC concluded that "the costs of [the repealed] rules to innovation and investment outweigh any benefits they may have," *id.* ¶ 4, and thus their elimination "is more likely to encourage broadband investment and innovation, furthering [the] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem," *id.* ¶ 86; *see also id.* ¶ 245 ("[T]he substantial costs [of the 2015 rules]—including the costs to consumers in terms of lost innovation as well as monetary costs to ISPs—are not worth the possible benefits" (footnote omitted)). Second, the FCC found that the repealed rules were "unnecessary," *id.* ¶ 4, because "the transparency rule . . . in combination with [market forces] and the antitrust and consumer protection laws, obviates the need for conduct rules by achieving comparable benefits at lower cost," *id.* ¶ 239; *see id.* ¶¶ 240-66. Third, separate and apart from these policy considerations, the Commission also independently concluded that its prior approach was "legally flawed" because it had "not identified any sources of legal authority that could justify the comprehensive conduct rules governing ISPs adopted in the [2015 Order]." *Id.* ¶¶ 2, 4; *see id.* ¶¶ 267-96. In the Commission's view, its "legal analysis concluding that broadband Internet access service is best classified as an information service" thus "is sufficient grounds alone" for repealing the 2015 rules. *Id.* ¶ 86.

Like the 2015 Order upheld by the D.C. Circuit, the 2018 Order also included a preemption provision. Specifically, it expressly preempted "any state or local measures that would effectively impose rules or requirements that [the FCC] ha[d] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that [it] address[ed] in this order." *Id.* ¶ 195. This includes "any so-called 'economic' or 'public utility type' regulations, including common-carriage requirements akin to those found in Title II of the [Communications] Act and its implementing rules, as well as other rules or requirements that [the FCC] repeal[ed] or refrain[ed] from imposing" in the 2018 Order. *Id.* (footnote omitted). The 2018 Order was careful to provide, however, that it did "not disturb or displace the states' traditional role in generally policing such matters as fraud, taxation, and general commercial

dealings," and noted that "the continued applicability of these general state laws is one of the considerations" for why "ISP conduct regulation is unnecessary." *Id.* ¶ 196.[1]

As the FCC explained, this preemption provision was necessary given its conclusion that "regulation of broadband Internet access service should be governed principally by a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements." *Id.* ¶ 194; *see id.* ¶¶ 197-204. As it noted, "[a]llowing state and local governments to adopt their own separate requirements, which could impose far greater burdens" than the 2018 Order's "calibrated federal regulatory regime," would threaten to "significantly disrupt the balance" the FCC has struck. *Id.* In addition, permitting "state or local regulation of broadband Internet access service could impair the provision of such service by requiring each ISP to comply with … separate and potentially conflicting requirements across all of the different jurisdictions in which it operates." *Id.* Given the interstate nature of Internet communications, ISPs may be forced to adopt a lowest-common-denominator approach whereby they apply the strictest jurisdiction's approach to all of its operations nationwide. *Cf. id.* ¶ 127 ("Accordingly (and unsurprisingly), most ISPs actively try to minimize the discrepancies in their terms of service, network management practices, billing systems, and other policies").

Multiple parties challenged the validity of the 2018 Order, which took effect on June 11, 2018, by petitioning for review in the D.C. Circuit. Among them was a coalition of various state and local entities, the District of Columbia, and 20 States, including California. Last month, the

---

[1]    As the FCC observed, the preemption provision rests on multiple independent sources of authority. *See* 2018 Order ¶¶ 197-204. First, the "'impossibility' exception" to state jurisdiction allows the Commission "to preempt a state regulation" of a service that would otherwise be subject to both federal and state regulation "where it is 'not possible to separate the interstate and intrastate components'" of the particular service. *California v. FCC*, 75 F.3d 1350, 1359 (9th Cir. 1996) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 n.4 (1986)). Second, the FCC has authority to preempt any conflicting state effort to regulate the "information service" of broadband Internet access service. *See, e.g.*, *Charter Advanced Servs. (MN), LLC v. Lange*, No. 17-2290, 2018 WL 4260322, at *2 (8th Cir. Sept. 7, 2018) ("'[A]ny state regulation of an information service conflicts with the federal policy of nonregulation,' so that such regulation is preempted by federal law.") (quoting *Minnesota PUC*, 483 F.3d at 580)).  Here, the Court need not and cannot address these issues because the D.C. Circuit has exclusive jurisdiction to resolve these questions under the Hobbs Act.

coalition filed a brief contending that the entire 2018 Order, including its preemption provision, should be vacated as unlawful. Br. for the Govt. Pets., *Mozilla v. FCC*, Nos. 18-1051 et al. (D.C. Cir. Aug. 20, 2018), Doc. 1746554 ("States Br."). Briefing is set to end by late November 2018, and oral argument is scheduled for February 1, 2019.

## II.    California's Internet Regulation Law

While California's challenge to the 2018 Order was pending before the D.C. Circuit, the State Legislature passed SB-822 on August 31, 2018. California's Governor signed it into law on September 30, 2018. SB-822 will take effect on January 1, 2019. Cal. Gov't Code § 9600(a). As the legislative history expressly acknowledges, SB-822 "codif[ies] portions of the recently-rescinded [FCC] rules." Judiciary Analysis 1; *see also* Cal. S. Comm. on Energy, Utils., & Commc'ns, SB 460 Analysis 1 (2018) ("Energy Analysis") (noting that it "adopts the main components of the net neutrality rules repealed by [the FCC]"). Like the repealed 2015 Order, SB-822 renders it "unlawful" for a provider of broadband Internet access service "to engage in":

1) *Blocking*: "Blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management." Cal. Civ. Code § 3101(a)(1); *see also id.* § 3101(a)(3)(B) (prohibiting charges to avoid blocking).

2) *Throttling*: "Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, subject to reasonable network management." *Id.* § 3101(a)(2); § 3100(j); *see also id.* § 3101(a)(3)(C) (prohibiting charges to avoid throttling).

3) *Paid Prioritization*: "Engaging in paid prioritization," *id.* § 3101(a)(4), which "means the management of an Internet service provider's network to directly or indirectly favor some traffic over other traffic, including, but not limited to, through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity," *id.* § 3100(r).

SB-822 also reinstates the 2015 Order's general Internet conduct standard by prohibiting:

Unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or

devices available to end users. Reasonable network management shall not be a violation of this paragraph.

*Id.* § 3101(a)(7).

And although the 2018 Order eliminated the 2015 Order's oversight of Internet traffic exchange agreements, "return[ing] Internet traffic exchange to the longstanding free market framework," 2018 Order ¶¶ 163-73, SB-822 appears to regulate such exchanges by prohibiting ISPs from charging edge providers for delivering traffic to end users and by prohibiting any traffic-exchange agreements that could be construed as having the purpose or effect of evading other prohibitions, Cal. Civ. Code §§ 3101(a)(3)(A), (a)(9).

In addition, SB-822 categorically prohibits conduct that not even the 2015 Order reached. To start, it outlaws "zero-rating"—which "means exempting some Internet traffic from a customer's data usage allowance," *id.* § 3100(t)—either (1) "in exchange for consideration, monetary or otherwise, from a third party," *id.* § 3101(a)(5), or (2) "some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category," *id.* § 3101(a)(6). Similarly, SB-822 bars offering or providing other services "that are delivered over the same last-mile connection as the broadband Internet access service" if they "have the purpose or effect of evading" its prohibitions or "negatively affect the performance of broadband Internet access service." *Id.* § 3102(a). Through such measures California legislators "establish[ed] additional bright-line rules that prohibit preferential treatment to some services but not others, including prohibiting ISPs from charging website fees for access to users and incorporating net-neutrality protections at the point of interconnection," even though in the 2015 Order, "the FCC [had] opted to adopt a case-by-case approach" in these areas. Cal. Assembly Comm. on Commc'ns & Conveyance, SB 822 Analysis 9 (2018) ("Assembly Analysis").

SB-822 also contains a transparency rule that prohibits ISPs from "[f]ailing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device

providers to develop, market, and maintain Internet offerings." *Id.* § 3101(a)(8). Although this language resembles a portion of the FCC's transparency rule, 47 C.F.R. § 8.1(a), it conspicuously omits the 2018 Order's specific guidance addressing what disclosures are and are not required, *see* 2018 Order ¶¶ 215-31.

SB-822 is expected to be enforced through litigation under California's Unfair Competition law, which authorizes courts to issue an injunction against and impose civil penalties of up to $2,500 per violation on anyone who "engages, has engaged, or proposes to engage in unfair competition," which is defined to "include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §§ 17200, 17203; *see id.* § 17206(a). "[B]y making the various practices unlawful," SB-822 "automatically provide[s] a right of action under the Unfair Competition Law." Judiciary Analysis 21. The California Attorney General, among others, is authorized to bring such enforcement actions, Cal. Bus. & Prof. Code § 17204, and he has promised that "preserving net neutrality protections for California's consumers" will be "a priority for his office," Judiciary Analysis 22.

In adopting this regime, California legislators were put on notice of criticisms that SB-822 "would create a patchwork of regulation that could stymie the marketplace since California would have rules that are different from other states and the federal government." Energy Analysis 14. They likewise were advised that, "[d]ue to the nature of the internet traffic travelling across state lines, it would be ideal to have one rule to address the issue of net neutrality." *Id.* They also were notified that the 2018 Order's "provision concerning preemption" on its face "explicitly preempt[s] state attempts to restore net neutrality, such as this [law]," and thus expected that "[l]itigation would likely result from any attempt to enforce the provisions of this bill pursuant to the Restoring Internet Freedom Order." Judiciary Analysis 23-24. Nevertheless, California proceeded with enacting SB-822's preempted measures.

## LEGAL STANDARD

A preliminary injunction is warranted if the movant establishes that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the

balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). Generally, when the United States has shown a likelihood of success on the merits in a preemption challenge, the equities similarly favor an injunction. *See, e.g.*, *id.*; *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part on other grounds*, 567 U.S. 387 (2012).

**ARGUMENT**

**I.**   **The United States is Likely to Prevail on the Merits.**

    **A**.   **The 2018 Order preempts virtually all of SB-822.**

The preemption analysis here is straightforward. When a state law "conflict[s] or [is] at cross-purposes" with a federal exercise of authority, "[t]he Supremacy Clause [of the U.S. Constitution, art. VI, cl. 2,] provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const., art. VI, cl. 2). It is thus settled that valid FCC orders can "pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988); *see* Judiciary Analysis 23 ("[F]ederal regulations may also supersede state law.").

It is also beyond dispute that the 2018 Order directly preempts virtually all of SB-822. That order explicitly "preempt[s] any state or local requirements that are inconsistent with the federal deregulatory approach [it] adopt[s]," including "any state or local measures that would effectively impose rules or requirements that [it] ha[s] repealed or decided to refrain from imposing … or that would impose more stringent requirements for any aspect of broadband service that [it] address[ed]." 2018 Order ¶¶ 194-95. That language unquestionably covers SB-822, which not only

codifies the federal requirements the 2018 Order eliminated, but goes so far as to ban conduct that not even the repealed 2015 Order prohibited.[2]

To start, SB-822 resurrects the vague Internet conduct standard and the bans on blocking, throttling, and paid prioritization that the 2015 Order created and the 2018 Order abolished, *compare* 2015 Order ¶¶ 15, 16, 18, 21, *and* 2018 Order ¶ 239, *with* Cal. Civ. Code § 3101(a)(1), (a)(2), (a)(3)(B), (a)(3)(C), (a)(4), & (a)(7)—one of SB-822's primary objectives. *See* Judiciary Analysis 1 (noting that SB-822 "codif[ies] portions of the recently-rescinded [FCC] rules"). Further, SB-822 apparently reinstates oversight of Internet traffic exchange agreements, which the 2018 Order eliminated in returning to "the longstanding free market framework." *Compare* Cal. Civ. Code §§ 3101(a)(3)(A), (a)(9), *with* 2018 Order ¶¶ 163-73. By seeking to recodify under state law many of the same regulatory requirements that the FCC eliminated, these provisions "effectively impose rules or requirements that [the 2018 Order] repealed," 2018 Order ¶ 195, and therefore should not be given effect under the Supremacy Clause.

SB-822 also "impose[s] rules or requirements that [the FCC] . . . decided to refrain from imposing" in the 2018 Order, including "more stringent requirements for any aspect of broadband service" that the order "address[ed]." *Id.* Most starkly, SB-822 prohibits "zero-rating"— "exempting some Internet traffic from a customer's data usage allowance"—either in "exchange for consideration … from a third party" or only a subset of "Internet content, applications, services, or devices in a category." Cal. Civ. Code §§ 3100(t), 3101(a)(5), (a)(6). But not even the 2015 Order went so far, as it refused to ban "zero-rating" because some uses of this practice "could benefit consumers and competition." 2015 Order ¶ 152. Similarly, SB-822 appears to subject specialized services to all of the bright line "prohibitions in Section 3101," Cal. Civ. Code § 3102 (a)(1), and to prohibit outright any specialized services perceived to "negatively affect the

---

[2] These conclusions apply equally to fixed or mobile broadband Internet access services. *Compare* 2018 Order ¶¶ 65, 82 (making clear that "broadband Internet access service, regardless of whether offered using fixed or mobile technologies, is an information service under the Act," and that such information services should "develop free from common carrier regulations") *with* SB-822 §§ 3101(b), 3102(b) (applying same common carrier rules to providers of mobile broadband Internet access service as apply to fixed broadband Internet access service).

performance of broadband Internet access service," *id.* § 3102(a)(2), but the 2015 Order expressly declined to apply these rules to specialized services, *see* 2015 Order ¶¶ 35, 207-13. By categorically outlawing zero-rating and applying its bright-line rules to specialized services, SB-822 reflects a decision to impose "more stringent requirements" than those in either the 2015 or 2018 Orders, 2018 Order ¶ 195, by "establishing additional bright-line rules" in areas where "the FCC opted" for "a case-by-case approach" in its 2015 Order. Assembly Analysis 9.

In addition, contrary to the 2018 Order's decision to eliminate the 2015 Order's oversight of Internet traffic exchange agreements and "return Internet traffic exchange to the longstanding free market framework," 2018 Order ¶¶ 163-73, SB-822 appears to regulate traffic exchange by prohibiting ISPs from charging edge providers for delivering traffic to end users and by prohibiting any traffic-exchange agreements that could be construed as having the purpose or effect of evading other prohibitions, Cal. Civ. Code § 3101(a)(3)(A), (a)(9).

In sum, SB-822 consists almost entirely of "state . . . requirements that are inconsistent with the federal deregulatory approach" the 2018 Order adopted. 2018 Order ¶ 194. California cannot dispute this fact. Indeed, its legislators knew that SB-822 "codif[ies] portions of the recently-rescinded [FCC] rules"; that the terms of the 2018 Order's "provision concerning preemption" would "explicitly preempt state attempts to restore net neutrality, such as this [law]"; and that "[l]itigation would likely result from any attempt to enforce the provisions of this bill pursuant to the Restoring Internet Freedom Order." Judiciary Analysis 1, 23-24. Under the Supremacy Clause, the State thus cannot enforce most of SB-822's provisions. *See, e.g.*, *Charter Advanced Servs. (MN), LLC*, 2018 WL 4260322, at *2, 4 (holding state regulation preempted because it was an "attempted regulation of an information service [that] conflicts with the federal policy of nonregulation").[3]

---

[3] Although SB-822's transparency rule, Cal. Civ. Code § 3101(a)(8), facially mirrors the 2018 Order's transparency rule, the United States reserves the right to challenge the former if, in application, that section is inconsistent with the 2018 Order. *Cf. Arizona*, 567 U.S. at 415 ("At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law.").

**B**.      **The Court must presume the validity of the 2018 Order in this proceeding.**

It is well settled that the 2018 Order's legal validity cannot be adjudicated in this Court. Instead, under the Hobbs Act, this Court must presume that the 2018 Order, including its preemption provision, is valid and resolve only whether SB-822 violates the 2018 Order.  The Hobbs Act vests "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to *determine the validity* of . . . all final orders of the Federal Communications Commission" in "[t]he court of appeals" sitting in direct review of the challenged order—here, the D.C. Circuit. 28 U.S.C. § 2342(1) (emphasis added). Because the Hobbs Act provides that "'parties seeking to challenge the validity of FCC orders must do so through actions in the circuit courts,'" *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir. 1996) (brackets omitted), "[p]roperly promulgated FCC regulations currently in effect must be presumed valid" in district court actions such as this one, as district courts "lack[] jurisdiction to pass on the validity" of such rules, *US West Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002); *accord Fober v. Mgm't & Tech. Consultants, LLC*, 886 F.3d 789, 792 n.2 (9th Cir. 2018); *Western Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012). In short, "[l]itigants may not evade" the Hobbs Act by contending that an "FCC action is ultra vires" in a district court. *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984).

The Hobbs Act's protections fully apply to the FCC's preemption determinations as well. In *Wilson*, for example, various political candidates advanced state-law claims against television stations that the FCC had determined were preempted. *Wilson*, 87 F.3d at 395. The Ninth Circuit held that the district court lacked jurisdiction under the Hobbs Act to address these claims, even though the candidates insisted that the Commission's "ruling on preemption" was "unauthorized." *Id.* at 400. As the Ninth Circuit explained, "[i]f the district court disagreed" with the FCC, "the effect of the proceeding would have been to enjoin, set aside, or suspend" the Commission's ruling in contravention of the Hobbs Act. *Id.* Conversely, "[e]ven if the district court agreed with" the FCC, "that result would have required a determination of the validity" of its ruling, "which also would violate § 2342." *Id.* If the candidates believed the FCC's preemption ruling was illegitimate,

the Ninth Circuit explained, they should have "follow[ed] the statutory procedure for obtaining review" of that decision in the court of appeals. *Id.*

Nor does it matter that any challenge by California to the Order's validity in this case would be a *defensive* one. By its terms, the Hobbs Act deprives district courts of jurisdiction "to determine the validity" of an FCC order, 28 U.S.C. § 2342(1), whether they are asked to do so by the plaintiff or the defendant. Accordingly, "[a] defensive attack on the FCC regulations is as much an evasion of the exclusive jurisdiction of the Court of Appeals as is a preemptive strike by seeking an injunction." *United States v. Dunifer*, 219 F.3d 1004, 1007 (9th Cir. 2000) (quoting *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000)). In *Dunifer*, for instance, the United States sought an injunction prohibiting an individual from engaging in unlicensed radio broadcasting. *Id.* at 1005. In response, the broadcaster "challenge[d] the statutory validity and constitutionality of FCC licensing regulations as a defense to the government's action." *Id.* The Ninth Circuit held that "[w]hile the district court had jurisdiction to entertain the government's action for injunctive relief, it lacked jurisdiction to adjudicate [the broadcaster's] affirmative defenses." *Id.* at 1009. As the Ninth Circuit explained, the Hobbs Act's "jurisdictional limitations apply as much to affirmative defenses as to offensive claims"; in either situation, a party cannot "contest the validity of the [FCC's] implementing regulations" in district court. *Id.* at 1007.[4]

California therefore cannot challenge the validity of the 2018 Order—including its preemption provision—in this proceeding. Indeed, the State urged the D.C. Circuit to vacate the Order for this reason, explaining that, absent such relief, one "could argue that the Hobbs Act's jurisdictional limitations preclude state and local governments from contesting conflict preemption in challenges to individual laws and enforcement actions." States Br. 49 (internal citation omitted).

---

[4] Other circuits agree that under the Hobbs Act the validity of an FCC order cannot be challenged regardless of posture. *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 464-66 (4th Cir. 2018); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014); *Nack v. Walburg*, 715 F.3d 680, 685-86 (8th Cir. 2013); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448 (7th Cir. 2010).

Nevertheless, California chose to adopt SB-822 while its challenge in the D.C. Circuit remains pending. That decision comes with consequences under the Hobbs Act. Because California did not wait until its challenge in the D.C. Circuit had ended, its preempted legislation must "be subjected to injunctive relief" in the interim. *Dunifer*, 219 F.3d at 1009 ("Dunifer decided to evade this carefully crafted [judicial review] process by concededly violating the regulatory framework implemented by the FCC."). California cannot short-circuit the Hobbs Act's framework by passing legislation that undisputedly conflicts with an FCC order under review in the D.C. Circuit and then question that order's validity in this Court.

## II. The Equitable Factors Strongly Militate in Favor of Injunctive Relief.

The remaining preliminary-injunction factors—irreparable injury, the balance of the equities, and the public interest—weigh strongly in favor of injunctive relief here. The enforcement of SB-822 would irreparably injure both the United States and the public interest, whereas California will suffer no cognizable harm from being unable to disrupt the status quo by enforcing an invalid law.

### A. SB-822's enforcement would irreparably harm the government and the public interest.

Because its regulatory approach directly conflicts with the FCC's, SB-822 inflicts irreparable harm on both the United States as well as the public interest more generally. As this Court recently noted, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations," and "[f]rustration of federal statutes and prerogatives are not in the public interest." *California*, 314 F. Supp. 3d at 1112 (quoting *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012)); *cf. New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that irreparable injury inherently results from enforcement of preempted state law). After all, "an alleged constitutional infringement will often alone constitute irreparable harm," and that is no less true when a State attempts "to violate the requirements of federal law" in the face of "the Supremacy Clause." *Arizona*, 641 F.3d at 366 (citations omitted). Accordingly, courts have recognized that enjoining

the enforcement of preempted laws is necessary to protect the United States from actions by States that undermine its sovereignty. *See id.*; *Alabama*, 691 F.3d at 1301; *California*, 314 F. Supp. 3d at 1112.

Here, SB-822 does not merely "undermine[]" or "frustrate[e]" the 2018 Order, *California*, 314 F. Supp. 3d at 1112; it effectively negates it. In the 2018 Order, the FCC expressly adopted an affirmative "deregulatory policy" and "deregulatory approach" to Internet regulation. *E.g.*, 2018 Order ¶¶ 39, 61, 194-96. The 2018 Order does not constitute an absence of regulation for States to fill; it is a uniform, national regulatory framework, the metes and bounds of which were carefully considered by the Commission in exercising its lawfully delegated authority. Effectuating its preference for a single, national framework, the Commission not only repealed the rules it adopted in 2015, but also "preempt[ed] any state or local measures that would effectively impose rules or requirements that [it had] repealed or decided to refrain from imposing in this order." *Id.* ¶ 195; *see id.* ¶¶ 194-204. In the face of this clear exercise of federal authority, California has tried not only to reinstate the same rules the FCC repealed, but to impose new requirements that have never existed at the federal level. And given that ISPs cannot realistically comply with one set of standards in this area for California and another for the rest of the Nation—especially when Internet communications frequently cross multiple jurisdictions—the effect of this state legislation would be to nullify federal law across the country. Only an injunction from this Court can address that unlawful result.

Indeed, this case is in important respects like *Federal Home Loan Bank Board v. Empie*, 778 F.2d 1447 (10th Cir. 1985), in which the Tenth Circuit affirmed an injunction sought by a federal agency (the Bank Board) against a state "statute . . . expressly forbidding something that the federal regulations expressly permit"—in that case, the use of the word "bank" in advertising by federally chartered savings institutions. *Id.* at 1454. As the court explained, "the Bank Board's concern with protecting its turf from inroads by state regulation is a legitimate expression of the public interest," as that agency "properly may be concerned that its own authority is being undermined and that all entities in its regulatory domain, as well as the general public, may suffer

from the regulatory uncertainty created." *Id.* at 1450. The Tenth Circuit thus confirmed that an injunction was necessary so that parties who oppose "the federal scheme will not have a colorable claim to bring vexatious lawsuits" *Id.* at 1454. So too in this case—which likewise concerns "the stability and smooth operation of a nationwide network" (specifically, the Internet rather than a group of savings institutions). *Id.* at 1452.

In sum, "[i]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law"; instead, "the interest of preserving the Supremacy Clause is paramount." *California*, 314 F. Supp. 3d at 1111 (quoting *Arizona*, 641 F.3d at 366). And that is particularly true here given the significant public interest in having the FCC maintain its federal "deregulatory approach" to Internet regulation, which it could not do if California (and others) enacted measures that contradict the Commission's judgment in this area. *See* 2018 Order ¶¶ 39, 61, 194-96; *see also id.* ¶¶ 194, 200 (explaining that states and local governments could impose far greater burden, disrupt the balance struck by 2018 Order, and interfere with the FCC's regulation of interstate traffic); *cf. California*, 314 F. Supp. 3d at 1112 ("Frustration of federal statutes and prerogatives are not in the public interest.") (quoting *Alabama*, 691 F.3d at 1301)).[5]

**B**. **A preliminary injunction would not cause California any harm.**

California, by contrast, will not suffer any legitimate injury if SB-822's enforcement is preliminarily enjoined. As this Court has explained, there is "no harm from the state's nonenforcement of invalid legislation." *California*, 314 F. Supp. 3d at 1112 (quoting *Alabama*, 691 F.3d at 1301); *see also Arizona*, 641 F.3d at 366 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially

---

[5] In addition to undermining the federal deregulatory scheme, allowing California and other separate state and local jurisdictions "to impose separate regulatory requirements on [broadband providers]" would not be in the public interest because it "could inhibit broadband investment and deployment and would increase costs to consumers." 2018 Order ¶ 194 n.727. Requiring broadband providers to track and adhere to a patchwork of separate state and local requirements in every individual jurisdiction in which they operate would "place an undue burden on the provision of broadband Internet access service." *Id.* ¶ 195; *cf. id.* ¶ 127 ("Accordingly (and unsurprisingly), most ISPs actively try to minimize the discrepancies in their terms of service, network management practices, billing systems, and other policies").

when there are no adequate remedies available.") (citations, ellipses, and emphasis omitted)). Instead, an injunction here simply would maintain the status quo that has existed since the 2018 Order took effect and preserve the framework that successfully governed this area for more than a decade before 2015. Indeed, that California chose to forgo requesting a stay of the 2018 Order from the D.C. Circuit further demonstrates that it would not "be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Against that background, California should not be permitted to effectively shift its burden by enacting preempted legislation while its D.C. Circuit challenge is pending and then argue that the equities cut against an injunction.

In short, a preliminary injunction against the enforcement of SB-822 is warranted. Granting such relief would not deprive California of an opportunity to contest the validity of the entire 2018 Order, including its preemption provision, in a judicial proceeding. Indeed, the State already has availed itself of that opportunity in the D.C. Circuit, just not to its conclusion. If California ultimately prevails in that litigation, the State can ask this Court to dissolve the injunction at that time. But in the interim, California should not be allowed to circumvent settled principles of equity, the jurisdictional framework of the Hobbs Act, and the Supremacy Clause of the Constitution.[6]

## CONCLUSION

The Court should grant the United States' motion for a preliminary injunction.

---

[6] While the effective date of SB-822 is January 1, 2019, *see* Cal. Gov't Code § 9600(a), the United States moves for preliminary injunctive relief at this time so that this issue can be fully briefed, argued, and decided before the law is to take effect.

DATED: September 30, 2018

JOSEPH H. HUNT
Assistant Attorney General

MCGREGOR SCOTT
United States Attorney

BRINTON LUCAS
Counsel to the Assistant Attorney General

JAMES J. GILLIGAN
Acting Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch

DAVID SHELLEDY
Civil Chief, Assistant United States Attorney

/s/ Kevin Snell
JOSEPH BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Telephone: (202) 305-0924
Fax: (202) 616-8460
E-mail: Kevin.Snell@usdoj.gov

*Attorneys for the United States*