Cal. S. Comm. on Judiciary, SB 822 Analysis (2018)

**SENATE JUDICIARY COMMITTEE**
**Senator Hannah-Beth Jackson, Chair**
**2017-2018 Regular Session**

SB 822 (Wiener)
Version: April 19, 2018
Hearing Date: April 24, 2018
Fiscal: Yes
Urgency: No
CK

## SUBJECT

Communications: broadband Internet access service

## DESCRIPTION

This bill would codify portions of the recently-rescinded Federal Communications Commission rules protecting "net neutrality." This bill would prohibit Internet service providers (ISPs) from engaging in certain practices, including blocking lawful content, applications, services, or nonharmful devices, discriminating between lawful Internet traffic on specified bases, engaging in "third-party paid prioritization," engaging in application-specific differential pricing, and engaging in deceptive or misleading marketing practices. This bill would provide the parameters within which ISPs could offer different levels of quality of service to end users or to "zero-rate" certain Internet traffic.

The Attorney General would be authorized to investigate certain violations on its own motion or in response to complaints and to bring an action to enforce these provisions, pursuant to the Unfair Practices Act and the False Advertising Law. This bill would also prohibit state agencies from purchasing, or providing funding for the purchase of broadband Internet access services from an ISP in violation of these provisions.

## BACKGROUND

*Overview of the Internet: Understanding the Series of Tubes*

There are four major participants in the operation of the Internet marketplace that are relevant herein: backbone networks, Internet service providers (ISPs), edge providers, and end users--the customers. Backbone networks are interconnected, long-haul fiber-optic links, high-speed routers, and data centers capable of transmitting vast amounts of data. These networks are operated by many independent companies from around the world. Customers wishing to access the Internet generally connect to these networks through local ISPs, such as Verizon or Comcast. ISPs are said to provide the "on-ramp" to the Internet. Whereas users previously relied on dial-up connection over telephone lines, most customers now generally access the Internet through much faster

"broadband Internet access services," high-speed communication technologies such as cable modem service. Edge providers provide content, services, and applications over the Internet that are consumed by the end users. Companies like Amazon, Google, and Facebook are examples of edge providers.

One federal court provided a simplified example of how this all works together:

> when an edge provider such as YouTube transmits some sort of content—say, a video of a cat—to an end user, that content is broken down into packets of information, which are carried by the edge provider's local [ISP] to the backbone network, which transmits these packets to the end user's local [ISP], which, in turn, transmits the information to the end user, who then views and hopefully enjoys the cat.
>
> These categories of entities are not necessarily mutually exclusive. For example, end users may often act as edge providers by creating and sharing content that is consumed by other end users, for instance by posting photos on Facebook. Similarly, broadband providers may offer content, applications, and services that compete with those furnished by edge providers.

(*Verizon v. FCC* (D.C. Cir. 2014) 740 F.3d at 645-647.)

It should be noted that some edge providers can bypass or take shortcuts along the backbone networks and provide their content more directly to ISPs through "peering connections" and "content delivery networks" (CDNs). For example, Netflix has built its own CDN to deliver all of its video traffic, including 90 percent of it being delivered through direct connections between its CDN and local ISPs. (*See* Netflix Media Center, *How Netflix Works With ISPs Around the Globe to Deliver a Great Viewing Experience* (Mar. 17, 2018) <https://media.netflix.com/en/ company-blog/how-netflix-works-with-isps-around-the-globe-to-deliver-a-great-viewing-experience> [as of Apr. 17, 2018].)

*"Net Neutrality"*

Net neutrality is the concept that the Internet should be an open and level playing field. The theory is that ISPs should not discriminate against lawful content, but treat all Internet traffic the same regardless of source and whether the content is in competition with that of the ISP. There is reasonable concern, explained in further detail below, that without rules against it, ISPs will limit, block, or degrade the quality of the content being transmitted to the end user, or create special "fast lanes" for the ISP's preferred content. Another troubling practice is known as "third-party paid prioritization," in which ISPs will offer to prioritize Internet traffic for some edge providers for compensation and at the detriment of other edge providers and end users. Under commonly-accepted net neutrality principles, these practices are anathema to an open Internet.

As discussed in more detail below, these are not simply speculative concerns.  One major ISP admitted to a federal appellate court that without FCC rules prohibiting accepting fees from edge providers in return for either excluding their competitors or for granting prioritized access to end users, it "would be exploring those commercial arrangements."  (*Verizon v. FCC* (D.C. Cir. 2014) 740 F.3d 623, 645-646.)  There is also extensive evidence that major BIAS providers have intentionally interfered with customers' access to certain Internet content and have threatened to withhold the free flow of traffic from certain edge providers unless compensated. (*See Comcast Corp. v. FCC* (D.C. Cir. 2010) 600 F.3d 642; Peter Svensson, *Comcast Blocks Some Internet Traffic* (Oct. 19, 2007) Washington Post <http://www.washingtonpost.com/wpdyn/content/article/2007/10/19/AR2007101900842.html> [as of Apr. 17, 2018]; Timothy Lee, *Five big US Internet providers are slowing down Internet access until they get more cash* (May 5, 2014) Vox <https://www.vox.com/2014/5/5/5683642/five-big-internet-providers-are-slowing-down-internet-access-until> [as of Apr. 17, 2018]; Sam Thielman, *Major Internet providers slowing traffic speeds for thousands across US* (June 22, 2015) The Guardian <https:// www.theguardian.com/technology/2015/jun/22/major-internet-providers-slowing-traffic-speeds> [as of Apr. 17, 2018]; Timothy Karr, *Net Neutrality Violations: A Brief History* (Apr. 25, 2017) < https://www.freepress.net/blog/2017/04/25/net-neutrality-violations-brief-history> [as of Apr. 17, 2018].)

The Federal Communications Commission (FCC), under President Obama, implemented robust net neutrality rules in a 2015 Open Internet Order that included prohibitions on blocking access to legal content, applications, and services; impairing or degrading lawful Internet traffic; and favoring some Internet traffic over other traffic in exchange for consideration (paid prioritization).  However, earlier this year, the FCC, under the current President, released its order rescinding these rules and again exposing end users and edge providers to these troubling practices.

In response, 28 states have introduced their own legislation to protect net neutrality. (National Conference of State Legislatures, *Net Neutrality Legislation in States* (Apr. 4, 2018) < http://www.ncsl.org/research/telecommunications-and-information-technology/net-neutrality-legislation-in-states.aspx> [as of Apr. 17, 2018].)  The governors of Hawaii, New Jersey, New York, Vermont, and Montana have all signed executive orders in response to the FCC's repeal.  In California, Senator Kevin de León has introduced SB 460 (de León, 2018), which would restore some of the protections of the 2015 Order, prohibit state agencies from contracting with ISPs unless they commit to net neutral practices, and provides enforcement mechanisms to ensure those harmed by violations are able to seek redress.  This bill is currently in the Assembly Rules Committee.

The author has introduced this bill in order to recast and implement the "bright line rules" regarding net neutrality established in the 2015 Open Internet Order for ISPs providing broadband Internet access services within California.  The bill would prohibit state agencies from purchasing, or providing funding for the purchase of broadband Internet access services from an ISP in violation of these provisions.  The Attorney

General would be authorized to investigate certain violations on its own motion or in response to complaints and to bring an action to enforce these provisions, pursuant to the Unfair Practices Act and the False Advertising Law.

This bill passed out of the Senate Energy, Utilities, and Communications Committee on an 8-3 vote.

## <u>CHANGES TO EXISTING LAW</u>

<u>Existing federal law</u>, the Communications Act of 1934 (the Act), as amended, establishes the Federal Communications Commission (FCC) for the purpose of regulating interstate and foreign communication by various means. (47 U.S.C. Sec. 151 et seq.)

<u>Existing federal law</u> defines "information service" to mean the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service. Federal law defines "telecommunications" to mean the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received and defines "telecommunications carrier" to mean any provider of telecommunications services, except that such term does not include aggregators of telecommunications services, as defined. A telecommunications carrier is treated as a common carrier only to the extent that it is engaged in providing telecommunications services, except that the FCC shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage. (47 U.S.C. Sec. 153.)

<u>Existing federal law</u> states that it is the policy of the United States to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by federal or state regulation, and to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services. (47 U.S.C. Sec. 230.)

<u>Existing federal law</u> authorizes the FCC, with some exceptions, to forbear from applying any regulation or any provision of the Act to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, if the FCC makes specified determinations. It requires the FCC, in making such a determination, to consider whether the forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. It also states that a state commission may not continue to apply or enforce any provision of this chapter that the FCC has determined to forbear from applying under this section. (47 U.S.C. Sec. 160.)

<u>Existing federal law</u> requires that all charges, practices, classifications, and regulations for and in connection with common carrier interstate communication service by wire or radio be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.  Existing law authorizes the FCC to prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act.  (47 U.S.C. Sec. 201.)

<u>Existing federal law</u> prohibits any common carrier from making any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.  (47 U.S.C. Sec. 202.)

<u>Existing federal law</u> requires every telecommunications carrier to protect the confidentiality of proprietary information of its customers, with some specified exemptions.  (47 U.S.C. Sec. 222.)

<u>Existing federal law</u> establishes duties on telecommunications carriers regarding interconnectivity, including an obligation to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers.  (47 U.S.C. Secs. 251, 256.)

<u>Existing federal law</u> establishes procedures for negotiation, arbitration, and approval of interconnection agreements among telecommunications carriers.  (47 U.S.C. Sec. 252.)

<u>Existing federal law</u> requires every telecommunications carrier that provides interstate telecommunications services to contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the FCC to preserve and advance universal service.  Existing federal law states that only eligible telecommunications carriers, as provided, shall be eligible to receive specific federal universal service support.  Federal law authorizes a state to adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that state.  (47 U.S.C. Sec. 254.)

<u>Existing federal law</u> requires the FCC and each state commission with regulatory jurisdiction over telecommunications services to encourage the deployment, on a reasonable and timely basis, of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.  (47 U.S.C. Sec. 1302.)

<u>Existing federal law</u> empowers the Federal Trade Commission (FTC) to prevent persons, partnerships or corporations, except common carriers, and specified others, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts of practices in or affecting commerce. (15 U.S.C. Sec. 45(a).)

<u>Existing California law</u>, the Consumers Legal Remedies Act (CLRA), protects consumers against unfair and deceptive business practices and provides procedures to secure such protection. (Civ. Code Sec. 1750 et seq.)

<u>Existing California law</u> makes unlawful certain unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction that are intended to result, or that result in, the sale or lease of goods or services to any consumer, including misrepresentations of the person's products or those of competitors and false or misleading advertising. (Civ. Code Sec. 1770.)

<u>Existing California law</u> provides that any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 of the Civil Code may bring an action against that person to recover or obtain any of the following:

- actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000);
- an order enjoining the methods, acts, or practices;
- restitution of property;
- punitive damages; and
- any other relief that the court deems proper. (Civ. Code Sec. 1780(a).)

<u>Existing California law</u> additionally provides that consumers who are senior citizens or disabled persons, as defined, may seek and be awarded, in actions pursuant to Section 1780(a) of the Civil Code (CLRA actions), in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact makes certain findings. (Civ. Code Sec. 1780(b).)

<u>Existing California law</u> provides that CLRA actions may be commenced in the county in which the person against whom it is brought resides, has the person's principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred. Courts are required to award court costs and attorney's fees to a prevailing plaintiff in such actions. Reasonable attorney's fees may be awarded to a prevailing defendant upon a finding by the court that the plaintiff's prosecution of the action was not in good faith. (Civ. Code Sec. 1780(d)-(e).)

<u>Existing California law</u> provides that any consumer entitled to bring a CLRA action may, if the unlawful method, act, or practice has caused damage to other consumers similarly situated, bring an action on behalf of the consumer and such other similarly situated consumers to recover damages or obtain other relief as provided. (Civ. Code Sec. 1781.)

Existing California law defines "unfair competition" to mean and include any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue, or misleading advertising, and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code (False Advertising Law).  (Bus. & Prof. Code Sec. 17200 (Unfair Competition Law).)

Existing California law, the False Advertising Law, makes it unlawful to engage in false or misleading advertising and requires certain disclosures, including in direct customer solicitations.  (Bus. & Prof. Code Sec. 17500 et seq.)

Existing California law, the False Advertising law, makes it unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Existing law makes any violation of these provisions a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both imprisonment and fine.  (Bus. & Prof. Code Sec. 17500.)

Existing California law provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Business and Professions Code Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.  (Bus. & Prof. Code Sec. 17203.)

<u>Existing California law</u> requires actions for relief pursuant to the Unfair Competition Law be prosecuted exclusively in a court of competent jurisdiction and only by the following:

- the Attorney General;
- a district attorney;
- a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance;
- a city attorney of a city having a population in excess of 750,000;
- a city attorney in a city and county;
- a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association with the consent of the district attorney; or
- a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.  (Bus. & Prof. Code Sec. 17204.)

<u>Existing California law</u>, the Public Contract Code, requires that bidders or persons entering into contracts with the state to sign various statements or certify various matters under penalty of perjury. For example, the existing code:

- authorizes a state entity to require, in lieu of specified verification of a contractor's license before entering into a contract for work to be performed by a contractor, that the person seeking the contract provide a signed statement which swears, under penalty of perjury, that the pocket license or certificate of licensure presented is his or hers, is current and valid, and is in a classification appropriate to the work to be undertaken.  (Pub. Contract Code Sec. 6100(b).)
- requires specified departments under the State Contract Code to require from all prospective bidders the completion, under penalty of perjury, of a standard form of questionnaire inquiring whether such prospective bidder, any officer of such bidder, or any employee of such bidder who has a proprietary interest in such bidder, has ever been disqualified, removed, or otherwise prevented from bidding on, or completing a federal, state, or local government project because of a violation of law or a safety regulation, and if so to explain the circumstances. (Pub. Contract Code Sec. 10162.)
- requires every bid on every public works contract of a public entity to include a noncollusion declaration under penalty of perjury under the laws of the State of California, as specified.  (Pub. Contract Code Sec. 7106.)
- requires every contract entered into by a state agency for the procurement of equipment, materials, supplies, apparel, garments and accessories and the laundering thereof, excluding public works contracts, to require a contractor to certify that no such items provided under the contract are produced by sweatshop labor, forced labor, convict labor, indentured labor under penal sanction, abusive forms of child labor, or exploitation of children in child labor.  The law further requires contractors ensure that their subcontractors comply with the Sweat Free Code of Conduct, under penalty of perjury.  (Pub. Contract Code Sec. 6108.)

This bill would state that it is adopted pursuant to the police power inherent in the State of California to protect and promote the safety, life, public health, public convenience, general prosperity, and well-being of society, and the welfare of the state's population and economy, that are increasingly dependent on an open and neutral Internet.

This bill would define "broadband Internet access service" (BIAS) to mean a mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data from, all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. BIAS would also encompass any service provided to customers in California that provides a functional equivalent of that service or that is used to evade the protections set forth in this chapter. "Mass market" would be defined to mean a service marketed and sold on a standardized basis to residential customers, small businesses, and other end-use customers, including, but not limited to, schools, institutions of higher learning, and libraries. The term would also include BIAS purchased with support of the E-rate and Rural Health program and similar programs at the federal and state level, regardless of whether they are customized or individually negotiated, as well as any BIAS offered using networks supported by the Connect America Fund or similar programs at the federal and state level.

This bill would provide definitions for the following terms:
- "Internet service provider" would mean a business that provides BIAS to an individual, corporation, government, or other customer in California;
- "end user" would be defined to mean any individual or entity that uses BIAS;
- "edge provider" would be defined to mean any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet;
- "content, applications, or services" would be defined to include all Internet traffic transmitted to or from end users of a broadband Internet access service, including traffic that may not fit clearly into any of these categories;
- "ISP traffic exchange" would mean the exchange of Internet traffic destined for, or originating from, an ISP's end users between the ISP's network and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator;
- "application-agnostic" would mean not differentiating on the basis of source, destination, Internet content, application, service, or device, or class of Internet content, application, service, or device;
- "class of Internet content, application, service, or device" would be defined as Internet content, or a group of Internet applications, services, or devices, sharing a common characteristic, including, but not limited to, sharing the same source or destination, belonging to the same type of content, application, service, or device, using the same application- or transport-layer protocol, or having similar technical

characteristics, including, but not limited to, the size, sequencing, or timing of packets, or sensitivity to delay;

- "application-specific differential pricing" would mean charging different prices for Internet traffic to customers on the basis of Internet content, application, service, or device, or class of Internet content, application, service, or device, but does not include zero-rating";

- "zero-rating" would mean exempting some Internet traffic from a customer's data limitation;

- "third-party paid prioritization" would mean the management of an ISP's network to directly or indirectly favor some traffic over other traffic, including through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity; and

- "network management practice" would be defined to mean a practice that has a primarily technical network management justification, but does not include other business practices. A "reasonable network management practice" would mean a network management practice that is primarily used for, and tailored to, achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the BIAS, and that is as application-agnostic as possible.

This bill would add Section 1776 to the Civil Code to make it unlawful for an ISP engaging in the provision of BIAS to engage in any of the following activities:

- blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management practices;

- speeding up, slowing down, altering, restricting, interfering with, or otherwise directly or indirectly favoring, disadvantaging, or discriminating between lawful Internet traffic on the basis of source, destination, Internet content, application, or service, or use of a nonharmful device, or of class of Internet content, application, service, or nonharmful device, subject to reasonable network management practices;

- requiring consideration from edge providers, monetary or otherwise, in exchange for access to the ISP's end users, including requiring consideration for transmitting Internet traffic to and from the ISP's end users or for the ISP to refrain from the prohibited activities above;

- engaging in third-party paid prioritization, application-specific differential pricing, and application-specific differential pricing or zero-rating in exchange for consideration, monetary or otherwise, by third parties;

- zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category;

- unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or lawful Internet content, applications, services, or devices of the end user's choice, or an edge

provider's ability to make lawful content, applications, services, or devices available to an end user, subject to reasonable network management practices;

- engaging in practices with respect to, related to, or in connection with, ISP traffic exchange that have the purpose or effect of circumventing or undermining the effectiveness of this section;

- engaging in deceptive or misleading marketing practices that misrepresent the treatment of Internet traffic, content, applications, services, or devices by the ISP, or that misrepresent the performance characteristics or commercial terms of the BIAS to its customers;

- advertising, offering for sale, or selling broadband Internet access service without prominently disclosing with specificity all aspects of the service advertised, offered for sale, or sold;

- failing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings; and

- offering or providing services other than BIAS that are delivered over the same last-mile connection as the BIAS, if those services are marketed, provide, or can be used as a functional equivalent of BIAS, have the purpose or effect of circumventing the effectiveness of this bill, or negatively affect BIAS performance.

This bill would provide certain exceptions to these prohibitions.  It would authorize an ISP to zero-rate Internet traffic in application-agnostic ways, without violating Section 1776, provided that no consideration, monetary or otherwise, is provided by any third party in exchange for the ISP's decision to zero-rate or to not zero-rate traffic.  This bill would also allow an ISP to offer different levels of quality of service to end users as part of its BIAS, without violating Section 1776, where the following conditions exist:

- the different levels of quality of service are equally available to all Internet content, applications, services, and devices, and all classes of Internet content, applications, services, and devices, and the ISP does not discriminate in the provision of the different levels of quality of service on the basis of Internet content, application, service, or device, or class of Internet content, application, service, or device;

- the ISP's end users are able to choose whether, when, and for which Internet content, applications, services, or devices, or classes of Internet content, applications, services, or devices, to use each level of quality of service;

- the ISP charges only its own BIAS customers for the use of the different level of quality of service; and

- the provision of the different levels of quality of service does not degrade the quality of the basic default service that Internet traffic receives if the customer does not choose another level of quality of service.

This bill would authorize the Attorney General to bring an action to enforce Section 1776, pursuant to the False Advertising Law or the Unfair Competition Law.  The Attorney General would be required to review complaints on a case by case basis to

determine if an ISP's actions violate Section 1776 or the provisions regarding the provision of different levels of quality of service.  The Attorney General would be authorized to investigate and enforce violations of those sections on its own motion or in response to complaints.

This bill would prohibit a public entity, as defined, from purchasing, or providing funding for the purchase of, any fixed or mobile BIAS from an ISP that is in violation of Section 1776.  Every contract between a public entity and an ISP for BIAS would need to include a provision requiring that the service be rendered consistent with the requirements of Section 1776.  The public entity would be authorized to declare such a contract void and require repayment if it determines that the ISP has violated Section 1776 in providing service to the public entity.  These remedies would be in addition to any remedy available pursuant to the Unfair Competition Law.  This bill would provide an exception for a public entity in a geographical area where Internet access services are only available from a single broadband Internet access service provider.

This bill would require an ISP that provides fixed or mobile BIAS purchased or funded by a public entity to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its BIAS that is sufficient to enable end users of those purchased or funded services, including a public entity, to fully and accurately ascertain if the service is conducted in a lawful manner pursuant to Section 1776.

This bill would make clear that nothing therein supersedes or limits any obligation, authorization, or ability of an ISP to address the needs of emergency communications or law enforcement, public safety, or national security authorities.

This bill would make its provisions severable.

## COMMENT

1. Stated need for the bill

According to the author:

> Senate Bill 822 puts California at the national forefront of ensuring an open internet. It establishes comprehensive and enforceable net neutrality standards to ensure that all California residents have the right to choose whether, when, and for what purpose they use the internet.

> SB 822 stands for the basic proposition that the role of internet service providers (ISPs) is to provide neutral access to the internet, not to pick winners and losers by deciding (based on financial payments or otherwise) which websites or applications

will be easy or hard to access, which will have fast or slow access, and which will be blocked entirely.

Under the state's police power, SB 822 prohibits any practice that hinders or manipulates consumer access to the Internet to favor certain types of content, services, or devices over others. This includes prohibiting all of the following: blocking or speeding up or slowing down of favored data, paid prioritization, charging services (whether businesses, nonprofits, government agencies, advocacy organizations, etc.) access fees to reach certain consumers, and economic discrimination practices that distort consumer choice.

SB 822 also prohibits misleading marketing practices and enacts strong disclosure requirements to better inform consumers. The bill further requires that any ISP that contracts with the State of California, receives public infrastructure grants to build out broadband service, or applies for or holds a state franchise for video service must comply with these standards.

Without net neutrality, ISPs have the power to manipulate which business, media, nonprofit, or political websites are accessible and by whom. SB 822 contains strong, comprehensive, and enforceable policies that will position California as a leader in the fight for net neutrality.

2.  Evolution of BIAS oversight

The Federal Communications Commission (FCC) is a federal agency created by the Communications Act of 1934, which was later amended by the Telecommunications Act of 1996.  The enabling statute and those providing the FCC's mission and operation are found in Chapter 5 of Title 47 of the United States Code.  The purpose of the FCC is to regulate interstate and international communications by radio, television, wire, satellite and cable in the United States.  The agency is directed by five commissioners appointed by the President of the United States and confirmed by the United States Senate, with no more than three commissioners from the same political party.  The FCC is tasked with promoting the development of competitive networks, as well as ensuring universal service, consumer protection, public safety, and national security.

The FCC's authority to regulate Broadband Internet Access services (BIAS) has hinged on the official classification of such services as either "information services" or as "telecommunications services," as those terms are understood by the Communications Act of 1934, as amended (the Act). The importance of the classification to the role of the FCC is paramount:

The Act, as amended by the Telecommunications Act of 1996, 110 Stat. 56, defines two categories of regulated entities relevant to these cases: telecommunications carriers and information-service providers. The Act regulates telecommunications carriers, but not information-service providers, as common carriers.

Telecommunications carriers, for example, must charge just and reasonable, nondiscriminatory rates to their customers, 47 U.S.C. §§ 201-209, design their systems so that other carriers can interconnect with their communications networks, § 251(a)(1), and contribute to the federal "universal service" fund, § 254(d). These provisions are mandatory, but the Commission must forbear from applying them if it determines that the public interest requires it. §§ 160(a), (b). Information-service providers, by contrast, are not subject to mandatory common-carrier regulation under Title II, though the Commission has jurisdiction to impose additional regulatory obligations under its Title I ancillary jurisdiction to regulate interstate and foreign communications, *see* §§ 151-161.

(*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* (2005) 545 U.S. 967, 975-976.)

Guided by the principles of open access, competition, and consumer choice, the FCC, in 2005, adopted the "Internet Policy Statement." The Internet Policy Statement detailed four guiding principles designed to carry out the policy of the United States as stated in the Act, namely the preservation of the competitive free market for the Internet and the fostering of widespread deployment of advanced telecommunications capability to all Americans. The adopted principles were:

- to encourage broadband deployment and preserve and promote the open and interconnected nature of the public Internet, consumers are entitled to access the lawful Internet content of their choice;
- to encourage broadband deployment and preserve and promote the open and interconnected nature of the public Internet, consumers are entitled to run applications and use services of their choice, subject to the needs of law enforcement;
- to encourage broadband deployment and preserve and promote the open and interconnected nature of the public Internet, consumers are entitled to connect their choice of legal devices that do not harm the network; and,
- to encourage broadband deployment and preserve and promote the open and interconnected nature of the public Internet, consumers are entitled to competition among network providers, application and service providers, and content providers.

The Internet Policy Statement guided the FCC's subsequent handling of Broadband Internet Access services (BIAS). In fact, the principles espoused therein were incorporated into several merger orders and licensing agreements. The FCC conditioned its approval of these transactions on compliance with the Internet Policy Statement. However, BIAS was classified as an "information service" at that time, limiting the basis for FCC oversight to its ancillary authority pursuant to Title I of the Act.

In 2010, the FCC, in furtherance of Internet Policy Statement principles, took action against Comcast for interfering with its customers' use of peer-to-peer networking applications, and Comcast brought suit, contending the FCC acted outside of the authority vested in it by the Act. (*See Comcast Corp. v. FCC* (D.C. Cir. 2010) 600 F.3d

642.)  The FCC argued it had authority to so regulate Comcast, then classified as an information service provider, under its Title I ancillary authority. The D.C. Circuit Court disagreed and found the agency's actions were outside the parameters of its authority.  It found the general statements of policy upon which the FCC relied did not create the "statutorily mandated responsibilities" that would justify the agency's action against Comcast.

In response, the FCC issued a "Notice of Inquiry," which, among other things, contemplated the possible reclassification of BIAS.  The FCC received written feedback from over 100,000 commenters, held public workshops, and convened a "Technological Advisory Process with experts from industry, academia, and consumer advocacy groups."  As a result of that process, the FCC issued the "2010 Open Internet Order."  In that order, the FCC found that "the Internet has thrived because of its freedom and openness—the absence of any gatekeeper blocking lawful uses of the network or picking winners and losers online."  While the 2010 Open Internet Order maintained BIAS as an information service, it codified the principles laid out in the Internet Policy Statement in order to provide "greater clarity and certainty regarding the continued freedom and openness of the Internet."  The order established three rules:

- Transparency. Fixed and mobile broadband providers must disclose the network management practices, performance characteristics, and terms and conditions of their broadband services;
- No blocking. Fixed broadband providers may not block lawful content, applications, services, or non-harmful devices; mobile broadband providers may not block lawful websites, or block applications that compete with their voice or video telephony services; and
- No unreasonable discrimination. Fixed broadband providers may not unreasonably discriminate in transmitting lawful network traffic.

The 2010 Open Internet Order made the case for these rules by laying out the real and present danger to an open Internet, arguing that "broadband providers endanger the Internet's openness by blocking or degrading content and applications without disclosing their practices to end users and edge providers, notwithstanding the Commission's adoption of open Internet principles in 2005."  The FCC pointed to the financial incentives for ISPs to engage in these activities and the limited choices most consumers have for the provision of BIAS.

However, Verizon challenged the 2010 Open Internet Order in the D.C. Circuit Court, again with an argument that the FCC had exceeded its regulatory authority and violated the Act.  (*See Verizon v. FCC* (D.C. Cir. 2014) 740 F.3d 623.)  The D.C. Circuit vacated the no-blocking and antidiscrimination rules because it found that they impermissibly regulated broadband providers as common carriers, which conflicted with the FCC's prior classification of BIAS as an "information service" rather than a telecommunications service, again exceeding their ancillary authority.  However, the court upheld the transparency rule as within the FCC's Title I authority.  It also ruled that the FCC reasonably interpreted the Act to empower the FCC "to promulgate rules

governing broadband providers' treatment of Internet traffic." Particularly relevant here, the D.C. Circuit Court also found the FCC provided ample justification for the rules in the 2010 Open Internet Order and that the need for them was supported by substantial evidence:

> Equally important, the Commission has adequately supported and explained its conclusion that, absent rules such as those set forth in the Open Internet Order, broadband providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment. First, nothing in the record gives us any reason to doubt the Commission's determination that broadband providers may be motivated to discriminate against and among edge providers. The Commission observed that broadband providers — often the same entities that furnish end users with telephone and television services — "have incentives to interfere with the operation of third-party Internet-based services that compete with the providers' revenue-generating telephone and/or pay-television services.". . . Broadband providers also have powerful incentives to accept fees from edge providers, either in return for excluding their competitors or for granting them prioritized access to end users. Indeed, at oral argument Verizon's counsel announced that "but for [the Open Internet Order] rules we would be exploring those commercial arrangements." . . . Although Verizon dismisses the Commission's assertions regarding broadband providers' incentives as "pure speculation," . . . those assertions are, at the very least, speculation based firmly in common sense and economic reality.

> Moreover, as the Commission found, broadband providers have the technical and economic ability to impose such restrictions. Verizon does not seriously contend otherwise. In fact, there appears little dispute that broadband providers have the technological ability to distinguish between and discriminate against certain types of Internet traffic. . . . The Commission also convincingly detailed how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers. Because all end users generally access the Internet through a single broadband provider, that provider functions as a "'**terminating monopolist**'" with power to act as a "gatekeeper" with respect to edge providers that might seek to reach its end-user subscribers. As the Commission reasonably explained, this ability to act as a "gatekeeper" distinguishes broadband providers from other participants in the Internet marketplace — including prominent and potentially powerful edge providers such as Google and Apple — who have no similar "control [over] access to the Internet for their subscribers and for anyone wishing to reach those subscribers."

> To be sure, if end users could immediately respond to any given broadband provider's attempt to impose restrictions on edge providers by switching broadband providers, this gatekeeper power might well disappear. . . . For example, a broadband provider like Comcast would be unable to threaten Netflix that it would slow Netflix traffic if all Comcast subscribers would then immediately switch to a

competing broadband provider. But we see no basis for questioning the Commission's conclusion that end users are unlikely to react in this fashion. . . . Moreover, the Commission emphasized, many end users may have no option to switch, or at least face very limited options: "[a]s of December 2009, nearly 70 percent of households lived in census tracts where only one or two wireline or fixed wireless firms provided" broadband service.

(*Verizon v. FCC*, 740 F.3d at 645-647 (internal citations omitted; emphasis added).)

Following this ruling, the FCC issued a Notice of Proposed Rulemaking in May 2014, to respond to the lack of conduct-based rules to protect and promote an open Internet. The FCC took proactive steps to facilitate public engagement in response to the Notice, including the establishment of a dedicated email address to receive comments, a mechanism for submitting large numbers of comments in bulk, and the release of the entire record of comments and reply comments in a machine-readable format, so that researchers, journalists, and other parties could analyze and create visualizations of the record. The FCC also hosted a series of roundtables covering a variety of topics related to the open Internet proceeding, including events focused on different policy approaches to protecting the open Internet, mobile broadband, enforcement issues, technology, broadband economics, and the legal issues surrounding the Commission's proposals. The result of this process was the "2015 Open Internet Order."

The FCC hailed the order as putting into place "strong, sustainable rules, grounded in multiple sources of our legal authority, to ensure that Americans reap the economic, social, and civic benefits of an open Internet today and into the future." As discussed above, these rules made clear that BIAS providers could not block or throttle lawful Internet traffic or engage in paid prioritization.

However, just five months into the Trump Administration, the FCC, led by the newly appointed Commissioner Ajit Pai, issued another notice of proposed rulemaking, starting the process for overturning the carefully crafted provisions of the 2015 Open Internet Order. In December 2017, in a break from the decade of working to ensure an open Internet free from discrimination and interference, the FCC voted to reclassify BIAS back to an information service and roll back the net neutrality protections. The official order, the dubiously entitled "Restoring Internet Freedom Order," was published on January 4, 2018.

Despite the FCC's commitment over the last decade and a half to maintaining an open and free Internet, the recent order removes the rules that protect edge providers and end users from discriminatory practices by ISPs. As the D.C. Circuit Court found, without these rules, "broadband providers represent a threat to Internet openness." This bill would seek to fill the void in order to respond to that threat. This bill would add Section 1776 to the Civil Code to make it unlawful for an ISP engaging in the provision of BIAS to engage in any of the following activities:

- blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management practices;
- speeding up, slowing down, altering, restricting, interfering with, or otherwise directly or indirectly favoring, disadvantaging, or discriminating between lawful Internet traffic on the basis of source, destination, Internet content, application, or service, or use of a nonharmful device, or of class of Internet content, application, service, or nonharmful device, subject to reasonable network management practices;
- requiring consideration from edge providers, monetary or otherwise, in exchange for access to the ISP's end users, including requiring consideration for transmitting Internet traffic to and from the ISP's end users or for the ISP to refrain from the prohibited activities above;
- engaging in third-party paid prioritization, application-specific differential pricing, and application-specific differential pricing or zero-rating in exchange for consideration, monetary or otherwise, by third parties;
- zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category;
- unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to an end user, subject to reasonable network management practices;
- engaging in practices with respect to, related to, or in connection with, ISP traffic exchange that have the purpose or effect of circumventing or undermining the effectiveness of this section;
- engaging in deceptive or misleading marketing practices that misrepresent the treatment of Internet traffic, content, applications, services, or devices by the ISP, or that misrepresent the performance characteristics or commercial terms of the BIAS to its customers;
- advertising, offering for sale, or selling broadband Internet access service without prominently disclosing with specificity all aspects of the service advertised, offered for sale, or sold;
- failing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings; and
- offering or providing services other than BIAS that are delivered over the same last-mile connection as the BIAS, if those services are marketed, provide, or can be used as a functional equivalent of BIAS, have the purpose or effect of circumventing the effectiveness of this bill, or negatively affect BIAS performance.

These protections are central to preserving net neutrality and maintaining an open and free Internet. They ensure that everyone is given the ability to communicate and access information on a level playing field.

Similar to the 2015 Open Internet Order, this bill would still allow for "reasonable network management practices" in several of its provisions, including the prohibitions on blocking or throttling lawful content.  However, this bill would also require such practices to be "as application-agnostic as possible."  This would ensure that such practices do not interfere with an end user's freedom to choose which content, applications, services, or devices to use.

3.  <u>Narrow exceptions to the bright line rules</u>

This bill would provide two exceptions to the general prohibitions laid out in Section 1776.  The first relates to "zero-rating," which is the practice of exempting some Internet traffic from a customer's data limitation.  In the 2015 Open Internet Order, the FCC discussed the benefits and drawbacks of allowing such a practice:

> Sponsored data plans (sometimes called zero-rating) enable broadband providers to exclude edge provider content from end users' usage allowances. On the one hand, evidence in the record suggests that these business models may in some instances provide benefits to consumers, with particular reference to their use in the provision of mobile services. Service providers contend that these business models increase choice and lower costs for consumers.  Commenters also assert that sophisticated approaches to pricing also benefit edge providers by helping them distinguish themselves in the marketplace and tailor their services to consumer demands.  Commenters assert that such sponsored data arrangements also support continued investment in broadband infrastructure and promote the virtuous cycle, and that there exist spillover benefits from sponsored data practices that should be considered.  On the other hand, some commenters strongly oppose sponsored data plans, arguing that "the power to exempt selective services from data caps seriously distorts competition, favors companies with the deepest pockets, and prevents consumers from exercising control over what they are able to access on the Internet," again with specific reference to mobile services.  In addition, some commenters argue that sponsored data plans are a harmful form of discrimination.  The record also reflects concerns that such arrangements may hamper innovation and monetize artificial scarcity.

Ultimately, the FCC opted not to include an explicit allowance or prohibition on zero-rating, but rather expressed its intent to "look at and assess such practices under the no-unreasonable interference/disadvantage standard, based on the facts of each individual case, and take action as necessary."

This bill would prohibit zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category.  However, it would allow ISPs to zero-rate Internet traffic in application-agnostic ways, without violating Section 1776, so long as there is no consideration provided by any third party in exchange for the decision to zero-rate or to not zero-rate traffic.  By ensuring that such zero-rating does not discriminate based on

the basis of source, destination, Internet content, application, service, or device, this bill would enable end users to receive the benefits of the practice, while putting clear limitations on it to prevent abuse.

The other exception would allow an ISP to offer different levels of quality of service to end users as part of its BIAS, without violating Section 1776, where the following conditions exist:

- the different levels of quality of service are equally available to all Internet content, applications, services, and devices, and all classes of Internet content, applications, services, and devices, and the ISP does not discriminate in the provision of the different levels of quality of service on the basis of Internet content, application, service, or device, or class of Internet content, application, service, or device;
- the ISP's end users are able to choose whether, when, and for which Internet content, applications, services, or devices, or classes of Internet content, applications, services, or devices, to use each level of quality of service;
- the ISP charges only its own BIAS customers for the use of the different level of quality of service; and
- the provision of the different levels of quality of service does not degrade the quality of the basic default service that Internet traffic receives if the customer does not choose another level of quality of service.

By allowing for such tiers of service, there is concern the bill may create two worlds, with those able to afford the higher "quality of service" given easy access to the Internet, and those who cannot are given another barrier to access.

The author asserts that this section "allows Internet service providers to offer a new kind of Internet service product that can be beneficial to consumers – where Internet service customers can choose different levels of service for specific activities, instead of receiving the same kind of service for everything they do online."

The author states:

> This kind of product lets consumers choose whether they want to pay extra to use a different level of service for some of their traffic. Subscribers get to choose which activity gets a different level of service, which could be a game from an indie computer game developer, a streaming video feed of their local school board meeting, or watching the NBA Finals on Hulu.
>
> Under the FCC's 2015 Open Internet Order, these kinds of products would have been evaluated case-by-case under the general conduct rule. This bill is less restrictive, since it allows ISPs to offer this kind of product as long as it meets four conditions, creating a clear standard for what is legal. The first two conditions ensure that consumers remain in control of their Internet experience and prevent ISPs from using the different levels of service to distort competition and interfere with user choice.

However, the author does acknowledge that "this kind of product creates an inherent incentive for ISPs to degrade the regular level of service in order to encourage consumers to buy the better level of service for more of their Internet traffic." However, they contend the bill prohibits this from happening.

4. Enforcement mechanisms

Section 1776 would make various practices by ISPs unlawful. This bill would charge the Attorney General with reviewing complaints on a case by case basis to determine if an ISP's actions violate that section or the sections regarding the provision of different levels of quality of service. The Attorney General would be authorized to investigate and enforce violations on its own motion or in response to complaints. In order to carry out that enforcement function, the bill would authorize the Attorney General to bring an action to enforce Section 1776, pursuant to the False Advertising Law or the Unfair Competition Law.

These laws have a broad scope. The Unfair Competition Law provides remedies against defendants who engage in "unfair competition," which is broadly defined to mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising. (Bus. & Prof. Code Sec. 17200.) Unfair competition also includes any act prohibited by the False Advertising Law, which makes it unlawful to engage in false or misleading advertising and requires certain disclosures, including in direct customer solicitations. (Bus. & Prof. Code Secs. 17200, 17500 et seq.)

The Unfair Competition Law provides that a court "may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code Sec. 17203; see also Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1146.) The law also permits courts to award injunctive relief and, in certain cases, to assess civil penalties against a violator. (Bus. & Prof. Code Sec. 17203; 17206.)

However, by making the various practices unlawful, this bill would have automatically provided a right of action under the Unfair Competition Law, and where applicable, the False Advertising Law, without this provision. In fact, the bill would likely be limiting the ability to bring an Unfair Competition Law claim to only the Attorney General, whereas such actions can generally be brought by any of the following:

- the Attorney General;
- a district attorney;
- a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance;
- a city attorney of a city having a population in excess of 750,000;
- a city attorney in a city and county;

- a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association with the consent of the district attorney; or
- a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.  (Bus. & Prof. Code Sec. 17204.)

This enforcement mechanism would curtail the ability to enforce the principles of net neutrality codified in this bill.  Writing in support, Attorney General Xavier Becerra communicates that preserving net neutrality protections for California's consumers is a priority for his office.  However, he urges the author "to consider adding a provision that would allow consumers who are harmed by a violation of SB 822 to bring an action under the existing provisions of the Consumer Legal Remedies Act to protect their right to an open Internet."

Such an amendment would greatly increase the likelihood and incidence of violations being checked.  The Consumer Legal Remedies Act (CLRA) was enacted "to protect the statute's beneficiaries from deceptive and unfair business practices," and to provide aggrieved consumers with "strong remedial provisions for violations of the statute." (*Am. Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 11.)  With such an amendment, these "strong remedial provisions" would be extended to end users in California when ISPs fail to follow the bright line rules laid out in Section 1776. Consumers who suffer any damage as a result of the unlawful practices specified in this bill would have a right of action under the CLRA to recover damages and other remedies, including actual damages; an order to enjoin the unlawful practices; restitution; punitive damages; or any other relief that the court deems proper.  (Civ. Code Sec. 1780.)  Additionally, with such an amendment, mechanisms for securing remedies on a class wide basis would be provided to consumers, and courts would be authorized to award attorney's fees to prevailing plaintiffs.  (Civ. Code Secs. 1780, 1781.)  For these reasons, the following Committee amendment is suggested:

<u>Amendment</u>

Insert as Section 1779(b) the following provision:  "Violation of Section 1776 or 1777 shall be subject to the remedies and procedures established pursuant to Chapter 4 (commencing with Section 1780)."

With this amendment, this bill would place power in the hands of consumers, and even edge providers, to hold BIAS providers responsible for violations of net neutrality.

5. <u>Preemption</u>

The supremacy clause of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

(U.S. Const., art. VI, cl. 2.)  This provision forms the basis of Congress' authority to preempt state laws.  There are several forms such preemption may take.

The simplest form is "express preemption," which occurs when Congress explicitly preempts state law in its enactment of federal law.  Congress can also preempt state law implicitly.  Field preemption exists when federal law creates "a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" (*Barnett Bank, N.A. v. Nelson* (1996) 517 U.S. 25, 31 (quoting *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230).) "Conflict preemption" exists where federal law actually conflicts with state law and compliance with both state and federal law is impossible or where the state law impedes the realization of the full purposes and objectives of Congress.  (*California v. ARC America Corp.* (1989) 490 U. S. 93, 100.)

Federal preemption is not limited to federal statutes, as federal regulations may also supersede state law.  (*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 612.) However, an agency may only preempt state law when the relevant regulations are within the scope of the agency's statutory authority and are not arbitrary.  (*Id.; see also Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1475, fn. 6.)

As part of the Restoring Internet Freedom Order, the FCC included a provision concerning preemption:

> [W]e conclude that we should exercise our authority to preempt any state or local requirements that are inconsistent with the federal deregulatory approach we adopt today.

> We therefore preempt any state or local measures that would effectively impose rules or requirements that we have repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that we address in this order.  Among other things, we thereby preempt any so-called "economic" or "public utility-type" regulations, including common-carriage requirements akin to those found in Title II of the Act and its implementing rules, as well as other rules or requirements that we repeal or refrain from imposing today because they could pose an obstacle to or place an undue burden on the provision of broadband Internet access service and conflict with the deregulatory approach we adopt today.

Clearly this provision represents an attempt by the FCC to explicitly preempt state attempts to restore net neutrality, such as this bill.   Litigation would likely result from

any attempt to enforce the provisions of this bill pursuant to the Restoring Internet Freedom Order. However, as indicated above, an agency may only preempt state law when the relevant regulations are within the scope of the agency's statutory authority and are not arbitrary. (*Id.*; *see also Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1475, fn. 6.) Courts are required to hold unlawful and set aside agency action, findings, and conclusions that are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." (5 U.S.C. Sec. 706.)[1]

The Ninth Circuit has made clear that although the FCC has "broad discretionary authority to change its regulatory mind," the FCC cannot expect the courts "simply to rubberstamp its change in policy." (*California v. FCC* (9th Cir. 1990) 905 F.2d 1217, 1230.) The Ninth Circuit made clear that a reviewing court cannot accept an agency's change of course uncritically, but rather it must "set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (*Ibid.*)

The policy goals set for the FCC by statute are "to preserve the vibrant and competitive free market that presently exists for the Internet" and "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services." (47 U.S.C. Sec. 230.) As seen above, these policy goals have guided the FCC for years. These principles are supported by the 2005 Internet Policy Statement, the 2010 Open Internet Order, and the 2015 Open Internet Order. In contrast, the recent Restoring Internet Freedom Order breaks from these policy goals in clear ways. Rather than maximizing user control over what information is received, the order strips away the protections of an open Internet and allows BIAS providers to be "terminating monopolists" acting as the "gatekeepers" of the Internet without any rules to check their unique power. (*Verizon v. FCC*, 740 F.3d at 645-647.) As the D.C. Circuit Court of Appeals has indicated, without net neutrality rules, "broadband providers represent a threat to Internet openness." In addition, the Restoring Internet Freedom Order provides its own demise. By determining that the FCC does not have authority to regulate BIAS, and handing that authority to the Federal Trade Commission, the order has undermined the FCC's own ability to preempt state-level regulation.

Concerns about these new rules and their legality are shared by many across the country. On January 16, 2018, the Attorneys General for the District of Columbia, the States of California, New York, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, Mississippi, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia, filed a protective petition for review in the United States

---

[1] An example of this is found in a Sixth Circuit case from February 2015 in which the court overturned the FCC's attempt to preempt state laws restricting the growth of municipal broadband networks as outside of their statutory authority. (*Tennessee v. FCC* (6th Cir. 2016) 832 F.3d 597.)

Court of Appeals for the District of Columbia Circuit, initiating the states' legal battle against the FCC and the recent Order. A host of public interest organizations have also filed suits challenging the recent FCC order. Underlying these legal challenges is the contention that the FCC's decision to rescind the 2015 Open Internet Order was unlawful and must be overturned. Specifically, the States' Attorneys General allege the order was:

> arbitrary, capricious and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq.; violates federal law, including but not limited to, the Constitution, the Communications Act of 1934, as amended, and FCC regulations promulgated thereunder; conflicts with the notice-and-comment rulemaking requirements of 5 U.S.C. Sec. 553; and is otherwise contrary to law.

Certain issues with the FCC's process in implementing the Restoring Internet Freedom Order may also make it susceptible to legal challenge and repeal. There have been reports, including statements from FCC commissioners, that the public comment system was compromised. In addition, the preemption provision may be particularly vulnerable because the required notice of proposed rulemaking that the FCC put out did not seek public comment on preemption of state action.

Given these robust legal challenges and the incongruence between the FCC's recent order and the policies set forth in the Act, there is a reasonable chance the Restoring Internet Freedom Order will be struck down, in whole or in part. Such an outcome will further undercut any challenges to this bill based on federal preemption.

Many stakeholders have weighed in on this issue. The California Cable and Telecommunications Association writes in opposition:

> SB 822's proposal to establish a California specific Internet neutrality law is bad policy and contrary to federal law. When the FCC adopted the "Restoring Internet Freedom" Order, it included clear federal preemption language to prohibit states from regulating the Internet inconsistent with the federal regulatory objectives. In fact, the majority of the provisions the bill proposes would be equally preempted by the 2015 Open Internet Order (until it is superseded by the RIF Order), as it, too, recognized that state-level regulation of the Internet is unworkable.

> Allowing state or local regulation of broadband Internet access service could impair the provision of such service by requiring each ISP to comply with a patchwork of potentially conflicting requirements across all of the different jurisdictions in which it operates.

An article from the Stanford Center for Internet and Society analyzes this issue with respect to the bill and comes to the following conclusion:

> The bill is on firm legal ground.

While the FCC's 2017 Order explicitly bans states from adopting their own net neutrality laws, that preemption is invalid. According to case law, an agency that does not have the power to regulate does not have the power to preempt. That means the FCC can only prevent the states from adopting net neutrality protections if the FCC has authority to adopt net neutrality protections itself.

But by re-classifying ISPs as information services under Title I of the Communications Act and re-interpreting Section 706 of the Telecommunications Act as a mission statement rather than an independent grant of authority, the FCC has deliberately removed all of its sources of authority that would allow it to adopt net neutrality protections. The FCC's Order is explicit on this point.

Since the FCC's 2017 Order removed the agency's authority to adopt net neutrality protections, it doesn't have authority to prevent the states from doing so, either.

(Barbara van Schewick, *SB 822 would secure net neutrality for California* (March 14, 2018) Stanford Center for Internet and Society Blog <https://cyberlaw.stanford.edu/blog/2018/03/sb-822-would-secure-net-neutrality-california> [as of Apr. 17, 2018].)

6. <u>State contracting with BIAS providers</u>

The Public Contract Code places various requirements on bidders or persons entering into contracts with the state.  These usually entail entities signing various statements or certifying various matters under penalty of perjury. For example, the Public Contract Code currently:

- authorizes a state entity to require, in lieu of specified verification of a contractor's license before entering into a contract for work to be performed by a contractor, that the person seeking the contract provide a signed statement which swears, under penalty of perjury, that the pocket license or certificate of licensure presented is his or hers, is current and valid, and is in a classification appropriate to the work to be undertaken.  (Pub. Contract Code Sec. 6100(b).)
- requires specified departments under the State Contract Code to require from all prospective bidders the completion, under penalty of perjury, of a standard form of questionnaire inquiring whether such prospective bidder, any officer of such bidder, or any employee of such bidder who has a proprietary interest in such bidder, has ever been disqualified, removed, or otherwise prevented from bidding on, or completing a federal, state, or local government project because of a violation of law or a safety regulation, and if so to explain the circumstances. (Pub. Contract Code Sec. 10162.)
- requires every bid on every public works contract of a public entity to include a noncollusion declaration under penalty of perjury under the laws of the State of California, as specified.  (Pub. Contract Code Sec. 7106.)
- requires every contract entered into by a state agency for the procurement of equipment, materials, supplies, apparel, garments and accessories and the laundering thereof, excluding public works contracts, to require a contractor to

certify that no such items provided under the contract are produced by sweatshop labor, forced labor, convict labor, indentured labor under penal sanction, abusive forms of child labor, or exploitation of children in child labor.  The law further requires contractors ensure that their subcontractors comply with the Sweat Free Code of Conduct, under penalty of perjury.  (Pub. Contract Code Sec. 6108.)

Courts have repeatedly recognized a distinction between states acting as market regulators and states operating as market participants, recognizing the states' ability to themselves operate freely in the free market.  (*Dep't of Revenue v. Davis* (2008) 553 U.S. 328, 339.)

This bill would prohibit a public entity, as defined, from purchasing, or providing funding for the purchase of, any fixed or mobile BIAS from an ISP that is in violation of Section 1776.  Every contract between a public entity and an ISP for BIAS would need to include a provision requiring that the service be rendered consistent with the requirements of Section 1776.  The public entity would be authorized to declare such a contract void and require repayment if it determines that the ISP violated Section 1776 in providing service to the public entity subsequent to the contract's formation.

The bill would make clear that these remedies are in addition to any remedy available pursuant to the Unfair Competition Law.  This enforcement mechanism would not be limited to the Attorney General, as with general enforcement of Section 1776.  This bill would provide an exception for a public entity in a geographical area where Internet access services are only available from a single broadband Internet access service provider.

As a further protection for public entities and other end users, this bill would require an ISP that provides fixed or mobile BIAS purchased or funded by a public entity to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its BIAS that is sufficient to enable end users of those purchased or funded services, including a public entity, to fully and accurately ascertain if the service is conducted in a lawful manner pursuant to Section 1776.  This essentially puts knowledge in end users' hands alerting them to when their rights are being violated.  In conjunction with the amendment above regarding the remedies of the CLRA, this provision would further ensure that net neutrality is maintained and all violations thereof appropriately addressed.

These provisions of the bill would harness the state's power as a market participant to decide the terms upon which it will enter into a contract or expend funds in order to protect the principles of net neutrality.

Many other states are looking to implement net neutrality at the state level, with a number of states, such as New York and Tennessee, including similar rules for state government contracts.  In addition, on January 22, 2018, Governor Steve Bullock of Montana signed an executive order declaring that any ISP with a state government

contract cannot block or charge more for faster delivery of websites.  (Cecilia Kang, *Montana Governor Signs Order to Force Net Neutrality* (Jan. 22, 2018) New York Times <https://www.nytimes.com/2018/01/22/technology/montana-net-neutrality.html> [as of Apr. 17, 2018].)  In response to concerns about the legality of such an action, a former enforcement chief for the FCC stated:  "There is a long history of government using its procurement power to get companies to adopt requirements, and this is no different.  This action by Governor Bullock will provide immediate relief."

While the sections of this bill that make it unlawful for ISPs to engage in certain practices directly conflict with the preemption clause of the Restoring Internet Freedom Order and would therefore be more susceptible to arguments regarding federal preemption, the section governing purchasing or funding the purchase of BIAS would be far more insulated from such challenges.  States generally have control over their decisions when contracting for goods and services.  Because this bill would make clear that its provisions are severable, even if the former sections are struck down as preempted, California could still protect net neutrality through its role as a market participant.

"In general, Congress intends to preempt only state regulation, and not actions a state takes as a market participant. (Jo*hnson v. Rancho Santiago Cmty. College Dist.* (9th Cir. 2010) 623 F.3d 1011, 1022.)  Federal law ordinarily preempts only state regulation of a defined field. Not all state law constitutes regulation. There may be no regulation and hence no preemption in circumstances when the state is acting in the marketplace in a proprietary rather than regulatory mode.  (Fri*ends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 705.)  These provisions of the bill would specifically target the use of state funds for any fixed or mobile BIAS from an ISP.  These provisions would not regulate the industry, but simply place parameters for entities purchasing these services.

7.  <u>Arguments for and against net neutrality in California</u>

The California Labor Federation writes in support of the bill, expressing the importance to its members:

> Fair and equal access to information is vital to our democracy. It is important to union members and to the millions of workers who do not have unions who may want to learn about their rights at work or how to seek help with labor violations. In this climate, so many Californians turn to the Internet to learn how to get politically active and make a difference.

> We use apps to find marches and to meet other activists, to learn about candidates, and to find a movement where we feel represented. All of this depends upon unfiltered access to the information we seek. That is all this bill will provide.

The National Hispanic Media Coalition explains its support for the bill:  "These strong Net Neutrality protections are necessary to ensure that every Californian can connect, innovate, and organize online no matter the size of their wallets or the color of their skin."

A coalition of groups, including New America's Open Technology Institute and Free Press, write in support of specific provisions of the bill:

> Including oversight of ISP traffic exchange in SB 822 is also critical. In recent years, some of the most egregious network discrimination by ISPs occurred at the points where they interconnect with transit providers, content delivery networks, and edge services. Based largely on research from OTI, which documented significant and sustained end-user harms as a result of interconnection disputes from 2013 to 2014, the FCC developed a strong body of evidence to support its conclusions about interconnection in the 2015 Open Internet Order.  Interconnection points between ISPs' access networks and other entities' transit networks are a vulnerable and manipulable part of the internet's architecture. The impact interconnection disputes have on internet users is devastating: when interconnection disputes arise, millions of people end up not receiving the broadband service they paid for, in some past disputes experiencing speeds that fell to nearly unusable levels for months on end.

Writing in opposition, the San Gabriel Valley Economic Partnership states:  "SB 822 is unlawful, discriminatory and unnecessary.  It would increase costs to ISPs and broadband customers and would stifle or delay investments for Internet development and innovation."  The California Communications Association writes in opposition to the bill:

> A national regulatory framework and enforcement policy is better suited for a service that crosses state boundaries. The Federal Communications Commission has preserved the core principles of no blocking and no throttling, and the Federal Trade Commission actively investigates and punishes discriminatory and anticompetitive behavior by all actors in the Internet ecosystem, not just ISPs.  Both of these federal regulators are in a better position to provide regulatory oversight of interstate broadband service delivery.

In their letter of opposition, Frontier Communications states:

> SB 822 would dampen broadband investment in rural California. SB 822 would introduce significant compliance costs for service providers operating in California. Given that providers have finite budgets, and rural areas are generally the most expensive in which to deploy broadband with challenging payback economics, increased regulatory expenditures necessarily drain the capital available for rural broadband deployment.

Support:  3scan; 8 Circuit Studios; 18MillionRising.org; Access Humboldt; AD Hoc Labs; AdRoll; ADT Security Services; Agribody Technologies, Inc.; Aixa Fielder, Inc.; Alameda Motor; American Civil Liberties Union of California; American Sustainable Business; Analysis of Motion; Angel Investment Capital; appliedVR; Barnes Insurance; BentonWebs; Bioeconomy Partners; Brian Boortz Public Relations; Brightline Defense Project; C, Wolfe Software Engineering; Califa; California Alarm Association; California Association of Competitive Telecommunications Companies; California Association of Realtors; California Attorney General Xavier Becerra; California Common Cause; California Freedom Coalition; California Labor Federation; CALPIRG; Cartoonland; CCTV Center for Media & Democracy; Center for Democracy & Technology; Center for Media Justice; Center for Rural Strategies; Change Beings With ME; Cheryl Elkins Jewelry; Chris Garcia Studio; Chute; City and County of San Francisco; City of Emeryville; City of Los Angeles; City of Oakland; City of Sacramento; City of San Jose; Climate Solutions Net; Coalition for Humane Immigrant Rights; Cogent Communications; Color Of Change; Common Cause; Community Tech Network; Computer-Using Educators; Corporate Host Services; Constituent Records; Consumer Action; Consumer Attorneys of California; Consumers Union; Contextly; County of Santa Clara; Courage Campaign; Creative Action Network; CREDO Action; CreaTV San Jose; Cruzio Internet; Daily Kos; David's Amusement Company; Degreed; Demand Progress Action; Democracy for America; Digital Deployment; Disability Rights Education & Defense Fund; DLT Education; Dragon's Treasure; DroneTV.com; dsherman design; Electronic Frontier Foundation; Engine; Evensi; EveryLibrary; Equal Rights Advocates; Faithful Internet; Former Federal Communications Commission Commissioners Michael Copps, Gloria Tristani, and Tom Wheeler; Fight for the Future; Founder Academy; FREE GEEK; Free Press; Friends of the Millbrae Public Library; Gabriel Quinto, Mayor, City of El Cerrito; Girl Groove; GitHub; GoGo Technologies; Gold Business & IP Law; Golden; Goodlight Natural Candles; Grass Fed Bakery; Greenpeace USA; Grocery Outlet of Lompoc; Gusto; Hackers/Founders; Heartwood Studios; HelloSign; High Fidelity; Homebrew; Horticultrist; Iam Bloom; iFixit; iHomefinder, Inc.; Indivisible CA: StateStrong; Indivisible Sacramento; Indivisible SF; Indivisible Sonoma County; Inflect; inNative; Intex Solutions, Inc.; IR Meyers Photography; Johnson Properties; Kahl Consultants; Kaizena Karma+; Langlers WebWorks; Lat13; Leatherback Canvas; Leet Sauce Studios, LLC; Leverata, Inc.; Libib, Inc.; Lisa LaPlaca Interior Design; Logical Computer Solutions; LoungeBuddy; Lyft; Magical Moments Event Planning & Coordinating; Mallonee&Associates; Manargy; May First/People Link; Mechanics' Institute Library; Media Alliance; Media Mobilizing Project; Medium; Melbees; Merriman Properties LLC; MGCC; Milked Media; Milo Magnus; Mindhive; MinOps; Mixt Media Art; MM Photo; Mobile Citizen; Mogin Associates; NARAL Pro-Choice California; Narrow Bridge Candles; National Consumer Law Center; National Digital Inclusion Alliance; National Hispanic Media Coalition; New American's Open Technology Institute; New Media Rights; Nobody Cares Media; Nonprofit Technology Network; Oakland Privacy; Obscure Engineering; Office of Ratepayer Advocates; Onfleet; OpenMedia; Oregon Citizens' Utility Board; Orthogonal, LLC; Pacific Community Solutions, Inc.; Pactio; Paper Pastiche; Patreon; Patty's Cakes and Desserts; PEN America; People Demanding

Action; Personhood Press; Pilotly; Point.com; Pony Named Bill Tack; Pretty Me Store;
Progressive Technology Project; Prosenergy; Public Knowledge; Reddit; REELY; Reid
Case Management; RI Lopez Interpreter Services; RootsAction.org; Silicon Harlem;
Silver Lining Unlimited; SNAP Cats; Sonic.net, LLC; Sonos; spamedfit.com; Spiral;
Starsky Robotics; Stauter Flight Instruction; Sternidae Industries; SumOfUs; Suzi
Squishies; SV Angel; Tarragon Consulting Corporation; Tech Goes Home; Tesorio; The
Butcher Shop; The Greenlining Institute; The Monger; The Radio Doctor; The Run
Experience; The Utility Reform Network; Thinkshift Communications;  Tostie
Productions; Trader Ann's Attic; Tribd Publishing Co.; TWB & Associates; Twilio; UHF;
Underdog Media; Unwired; Upgraded; UX Consulting; Vic DeAngelo IT Consulting;
Venntive; Voices for Progress; Wallin Mental Medical; Western Center on Law &
Poverty; Whoopie Media; Wonderlandstudios; Words 2 Wow Life Science Marketing;
World Wide Web Foundation; Writers Guild of America West; XPromos Marketing
Mastery, LLC; 3 individuals

Opposition:  2-1-1 Humboldt Information and Resource Center; Asian Pacific Islander
American Public Affairs Association; AT&T; Athletes and Entertainers For Change;
Benefit Tomorrow Foundation; Black Business Association; Black Chamber of Orange
County; Black Women Organized for Political Action; Boys and Girls Club of El Dorado
County; Brotherhood Crusade; California Cable & Telecommunications Association;
California Communications Association; California State Conference of the National
Association for the Advancement of Colored People; Camp Fire Inland Southern
California; Chambers of Commerce of Alhambra, California Asian Pacific Islander,
California Black, California Hispanic, El Dorado County,  Escondido, Fresno, Fresno
Metro Black, Greater Coachella Valley, Greater Los Angeles African American, InBiz
Latino/North County Hispanic, Korean American Central Mariposa County
Oceanside, Orange County Hispanic, Sacramento Asian Pacific Islander, Sacramento
Black, Sacramento Hispanic, Sacramento Metropolitan, Slavic American; Coachella
Valley Economic Partnership; Community Women Vital Voices; Computing
Technology Industry Association; Concerned Black Men of Los Angeles; Concerned
Citizens Community Involvement; Congress of California Seniors; CONNECT;
Consolidated Board of Realtists; DeBar Consulting; Entrepreneurs of Tomorrow
Foundation Eskaton; Fresno Area Hispanic Foundation; Fresno County Economic
Development Corp.; Frontier Communications; Guardians of Love; Hacker Lab;
Hispanic 100; Inland Empire Economic Partnership; International Leadership
Foundation; International Leadership Foundation Orange County Chapter; KoBE
Government Contracting Alliance; Krimson and Kreme; Latin Business Association;
Latino Service Providers; LightHouse Counseling & Family Resource Center; LIME
Foundation; Mandarin Business Association; Merced Lao Family Community, Inc.;
National Association for the Advancement of Colored People, Ventura County; North
Bay Leadership Council; North Orange County Chamber; OCA East Bay Chapter; OCA
Sacramento Chapter; OCA Silicon Valley; OCA National; Orange County Business
Council; Puertas Abiertas Community Resources Center; RightWay Foundation; San
Gabriel Valley Economic Partnership; Sierra College Foundation; Society for the Blind;

SB 822 (Wiener)
Page 32 of 32

TechNet; The Fresno Center; UFCW Local 648; USTelecom; Valley Industry and
Commerce Association; Young Visionaries Youth Leadership Academy

## <u>HISTORY</u>

<u>Source</u>:  Author

<u>Related Pending Legislation</u>:  SB 460 (de León, 2017) would codify portions of the
recently-rescinded Federal Communications Commission rules protecting "net
neutrality."  This bill would prohibit broadband Internet access service providers from
engaging in certain practices, including impairing or degrading lawful Internet traffic,
engaging in "paid prioritization," and engaging in deceptive or misleading marketing
practices.  It would also provide persons damaged by violations of this bill access to the
robust enforcement mechanisms laid out in the Consumer Legal Remedies Act. This bill
would also prohibit state agencies from contracting with such providers unless they
commit to not engage in the prohibited practices.  This bill is currently in the Assembly
Rules Committee.

<u>Prior Legislation</u>:  None Known

<u>Prior Vote</u>:  Senate Energy, Utilities, and Communications Committee (Ayes 8, Noes 3)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\***