Cal. S. Comm. on Energy, Utils., & Commc'ns,
SB 460 Analysis (2018)

**SENATE COMMITTEE ON ENERGY, UTILITIES AND COMMUNICATIONS**
Senator Ben Hueso, Chair
2017 - 2018  Regular

| | | | |
|---|---|---|---|
| **Bill No:** | SB 460 | **Hearing Date:** | 1/11/2018 |
| **Author:** | De León | | |
| **Version:** | 1/3/2018   As Amended | | |
| **Urgency:** | Yes | **Fiscal:** | Yes |
| **Consultant:** | Nidia Bautista | | |

**SUBJECT:** Guidelines:  Broadband Internet access service

**DIGEST:**  This bill adopts the main components of the net neutrality rules repealed by a vote of the Federal Communications Commission (FCC) in December 2017.  This bill would prohibit internet service providers (ISPs) in the state from taking certain actions to interfere with a customer's ability to access content on the internet, namely actions such as impairing or degrading, blocking, or paid prioritization, of lawful internet traffic.  This bill requires the California Public Utilities Commission (CPUC) to adopt an order by July 1, 2018 to implement the provisions of this bill.

**ANALYSIS:**

Existing law:

1) Defines "information service" to mean the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

   Defines "telecommunications" to mean the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

   Defines "telecommunications carrier" to mean any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title).  A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the FCC shall determine whether the

provision of fixed and mobile satellite service shall be treated as common carriage.

(47 United States Code §153)

2) Authorizes the FCC, with some exceptions, to forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the FCC makes specified determinations. Requires the FCC in making such a determination to consider whether the forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. States that a state commission may not continue to apply or enforce any provision of this chapter that the FCC has determined to forbear from applying under subsection. (47 United States Code §160)

3) Requires that all charges, practices, classifications, and regulations for and in connection with such common carrier interstate communication service by wire or radio be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful. Authorizes the FCC to prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter. (47 United States Code §201) 332(c)(1)(A))

4) Prohibits any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. (47 United States Code §202)

5) Requires every telecommunications carrier to protect the confidentiality of proprietary information of its customers, with some specified exemptions. (47 United States Code §222)

6) Requires the FCC to ensure that, with respect to common carriers, interstate and intrastate telecommunications relay services are available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in the United States. Provides that any state desiring to establish

a state program under this section shall submit documentation to the FCC that makes available to hearing-impaired and speech-impaired individuals, either directly, through designees, through a competitively selected vendor, or through regulation of intrastate common carriers, intrastate telecommunications relay services in such state in a manner that meets or exceeds the requirements of regulations prescribed by the FCC. (47 United States Code §225)

7) Requires a utility to provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it. Authorizes, with some exceptions, a utility providing electric service to deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes. (47 United States Code §226)

8) States it is the policy of the United States to preserve the vibrant and competitive free market that presently exists for the internet and other interactive computer services, unfettered by federal or state regulation. (47 United States Code §230)

9) Establishes duties on telecommunications carriers regarding interconnection to other telecommunications carriers, among other duties and responsibilities. (47 United States Code §251)

10) Establishes procedures for negotiation, arbitration, and approval of interconnection agreements among telecommunications carriers. (47 United States Code §252)

11) Requires every telecommunications carrier that provides interstate telecommunications services to contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the FCC to preserve and advance universal service. States that only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific federal universal service support. Authorizes a state to adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that state. (47 United States Code §254)

12) Requires the FCC and each state commission with regulatory jurisdiction over telecommunications services to encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans

(including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment. (47 United States Code §1302 *(§706 of the 1996 Federal Telecommunications Act)*

13) Finds and declares that the policies for telecommunications in California include, among others: universal service commitment by assuring the continued affordability and widespread availability of high-quality telecommunications services to all Californians; encouraging the development and deployment of new technologies and the equitable provision of services in a way that efficiently meets consumer need and encourages the ubiquitous availability of a wide choice of state-of-the-art services; assisting in bridging the "digital divide" by encouraging expanded access to state-of-the-art technologies for rural, inner-city, low-income, and disabled Californians; promoting lower prices, broader consumer choice, and avoidance of anticompetitive conduct; encouraging fair treatment of consumers through provision of sufficient information for making informed choices, establishment of reasonable service quality standards, and establishment of processes for equitable resolution of billing and service problems. (California Public Utilities Code §709)

14) Prohibits the CPUC from exercising regulatory jurisdiction or control over Voice over Internet Protocol and Internet Protocol-enabled services, except as required or expressly delegated by federal law or expressly directed to do so by statute or as set forth in statute, including enforcement of 47 United States Code §§251 and 252, and several other requirements. (Public Utilities Code §710)

15) States the CPUC is the sole franchising authority for a state franchise to provide video service under this division. Neither the CPUC nor any local franchising entity or other local entity of the state may require the holder of a state franchise to obtain a separate franchise or otherwise impose any requirement on any holder of a state franchise except as expressly provided in this division. Sections 53066, 53066.01, 53066.2, and 53066.3 of the Government Code shall not apply to holders of a state franchise. (Public Utilities Code §5840 (a))

16) Authorizes the State Attorney General to prosecute for unfair business competition, false advertising, or fraudulent business practices any business that violates any of California's privacy protection laws. (Business & Professions Code §17200)

17) Authorizes actions for relief provisions to be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or a district attorney or by a county, as specified, as a result of the unfair competition. (Business and Professions §17204)

18) Establishes laws prohibiting the use of untrue or misleading in advertisements by any person, firm, corporation or association selling a product or service. (Business & Professions Code §17500)

19) Empowers the Federal Trade Commission (FTC) to prevent persons, partnerships or corporations, except common carriers, and specified others, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts of practices in or affecting commerce which give rise to a claim, as set forth. (15 United States Code §45 (a)(1))

This bill:

1) Finds and declares that the FCC has repealed net neutrality rules intended to protect consumers and to ensure fair and reasonable access to the internet.

2) States the intent of this bill to ensure that corporations do not impede competition or engage in deceptive consumer practices, and that they offer service to residential broadband internet customers on a nondiscriminatory basis.

3) States the intent of the Legislature to ensure the specified principles are met regarding the deployment of new technologies and equitable provisions of service, among others.

4) Defines "broadband Internet access service (BIAS)" to mean a mass-market retail service by wire or radio in California that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. Provides that the definition encompass any service in California that provides a functional equivalent of that service or is used to evade the protections set forth in this division, as determined by the CPUC.

5) Defines "edge provider" to mean any individual or entity in California that provides any content, application, or service over the internet, and any individual or entity in California that provides a device used for accessing any content, application, or service over the internet.

6) Defines "Internet service provider" to mean a business that provides BIAS to an individual, corporation, government, or other customer in California.

7) Defines "paid prioritization" to mean the management of an ISP's network to directly or indirectly favor some traffic over other traffic, including through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity.

8) Prohibits an ISP from engaging in the following activities:
    a) Blocking lawful content.
    b) Impairing or degrading lawful internet traffic.
    c) Engaging in paid prioritization.
    d) Unreasonably interfering with, or unreasonably disadvantaging, either a customer's ability to select, access, and use BIAS or lawful internet content.
    e) Engaging in deceptive or misleading marketing practices that misrepresent the treatment of internet traffic or content to its customers.

9) Authorizes the Attorney General, a district attorney, or a city attorney to enforce any violation of this division.

10) Requires the CPUC to adopt an order on or before July 1, 2018, with specified requirements, including:
    a) Establishing rules to implement this bill and by which the CPUC shall enforce the provisions of this bill.
    b) Identifying this state government's role as an internet customer and uses that customer power to ensure implementation of this division.
    c) Establishing statewide consumer protection rules and guidelines that can be easily accessed by the public and that include "ground truth" testing for broadband internet speeds to create a single objective statewide internet speed test, which permits customers to test their own broadband internet speed and submit its results to the CPUC.
    d) Ensuring that public purpose program funding, such as funding under the lifeline service program, California Advanced Services Fund, and others, is expended in a manner that will maximize internet neutrality and ensure the fair distribution of service to low-income individuals and communities.
    e) Amending CPUC rules pertaining to eligible telecommunications carrier status which is necessary to participate as a provider in the lifeline

      service program and to receive other federal funding, to ensure compliance with consumer protection and internet neutrality standards provided by this bill.

    f) Establishing a process whereby an ISP shall certify to the CPUC that it is providing BIAS in accordance with the requirements set forth in this division.

11) States that the provisions of the division are severable, so that if any provision or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

12) States this is an urgency statute necessary for the immediate preservation of the public peace, health, or safety and shall go into immediate effect.

**Background**

This bill adopts the main components of the FCC's 2015 Open Internet rules which have been subsequently repealed by a vote of the FCC in December 2017.

*Oversight of Communications Service*: To inform the discussion, below is an overview of the government agencies with roles related to regulation and enforcement of communications-related service.

The FCC is an independent federal agency overseen by Congress to regulate interstate and international communications by radio, television, wire, satellite and cable in the United States. The agency is directed by five commissioners who are appointed by the President of the United States and confirmed by the United States Senate, with no more than three commissioners from the same political party. The FCC is tasked with promoting the development of competitive networks, as well as ensuring universal service, consumer protection, public safety, and national security. Among its duties, the FCC regulates all interstate and foreign communications by wire and radio, with nearly exclusive authority, in combination with state commissions, communications services that are classified as common carriers under Title II of the Federal Telecommunications Act, specifically those classified as "telecommunication services."

The FTC is a bipartisan federal agency with a dual mission to protect consumers and promote competition. The agency is directed by five commissioners who are appointed by the President of the United States and confirmed by the United States Senate, with no more than three commissioners from the same political party. The FTC protects consumers by stopping unfair, deceptive or fraudulent practices in the marketplace. By enforcing antitrust laws, the FTC helps ensure markets are

open and free. Federal law empowers the FTC to prevent corporations from using unfair methods of competition and unfair or deceptive acts of practices affecting commerce. However, federal law explicitly exempts the FTC's authority as it relates to various classes of businesses, including common carriers, which telecommunications services. FTC can only take enforcement action once harm has occurred and been demonstrated.

In California, the CPUC is the main state agency responsible for oversight and regulation of the telecommunications industry by developing and implementing policies to ensure fair, affordable universal access to necessary services, developing rules and regulatory tools, removing barriers that prevent a competitive market, and reducing or eliminating burdensome regulations, as authorized by federal statute and rules, or authorized by the California Constitution or directed by state statutes.

The Attorney General and local district attorney (as specified in statutes) can take enforcement action against corporations for deceptive and misleading advertisement and other violations of unfair business competition statutes.

*Broadband Internet Access Service (BIAS).* BIAS is generally high-speed internet access that is faster than the traditional "dial-up" service. This service includes transmission over digital subscriber line, cable modem, and fiber. The companies that provide the access are known as ISPs (also BIAS providers). ISPs range in size from well-known companies like AT&T, Comcast, Frontier and Verizon to smaller, regional firms like Pacific Internet and Sonic. ISP companies provide the "on-ramp" to the internet, usually with a required monthly subscription fee for the service.

*About the Internet.* As explained in *U.S. Telecom v. FCC*:

> The internet has four major participants: end users, broadband providers, backbone networks, and edge providers. Most end users connect to the internet through a broadband provider, which delivers high-speed internet access using technologies such as cable modem service, digital subscriber line (DSL) service, and fiber optics. Broadband providers interconnect with backbone networks – "long haul fiber-optic links and high speed routers capable of transmitting vast amounts of data." Edge providers, such as Netflix and Google, "provide content, services, and applications over the Internet." To bring this all together, when an end user wishes to check last night's baseball scores on ESPN.com, his computer sends a signal to his broadband provider, which in turn transmits it across the backbone to ESPN's broadband provider, which transmit the signal to ESPN's computer. Having received the scores into packets of information which travel back

across ESPN's broadband provider network to the backbone and then across the end user's broadband provider network to the end user. In recent years, some edge providers, such as Netflix and Google, have begun connecting directly to broadband provider's networks, thus avoiding the need to interconnect with the backbone, and some providers, such as Comcast and AT&T have begun developing their own backbone networks.

*Net Neutrality & Open Internet Access.* Net neutrality, also known as an open internet, is the principle that ISPs should not discriminate against lawful content and should, instead, treat all internet traffic the same regardless of source. Proponents of internet openness and net neutrality principles worry about the relationship between broadband providers and edge providers. These proponents generally express concerns that ISPs will limit, block, or degrade the quality of the content being transmitted to the end-user. Under net neutrality principles, ISPs cannot block, impair or degrade access, or create special "fast lanes" for the ISP's preferred content. For example, net neutrality runs counter to an ISP blocking or slowing down traffic of TV shows streamed by a competitor video company over its broadband service as compared to TV shows from one of its own content companies.

*Obama Administration 2015 Open Internet Order.* In February 2015, the FCC adopted Open Internet rules which established three "bright-line" rules banning certain practices that the FCC considers to harm open access to the internet. The bright-line rules include:

a) No Blocking: Broadband providers may not block access to legal content, applications, services, or non-harmful devices.

b) No Throttling: Broadband providers may not impair or degrade lawful internet traffic on the basis of content, applications, services, or non-harmful devices.

c) No Paid Prioritization: Broadband providers may not favor some lawful internet traffic over other lawful traffic in exchange for consideration of any kind.

In adopting the Open Internet Order, the FCC classified ISPs as "telecommunications service providers" subject to Title II of the Telecommunications Act of 1996, instead of "information service" under Title I, as they had historically been classified. The classification under Title II of the Telecommunications Act provides the FCC with authority to regulate the service as a common carrier, as they might with telephone service. However, when the FCC adopted the 2015 Open Internet rules it exercised its authority to forbear provisions of law, specifying that many provisions of Title II would not apply to broadband

services, these included those related to rate regulation. The Order also included additional transparency requirements.

*A Brief History: Classification of Broadband Service.* ISPs have historically, mostly, been classified as "information services" and, therefore, subject to Title I of the Communications Act.

   *1996 Telecommunications Act.* In enacting the 1996 Telecommunications Act, Congress borrowed heavily from the 1980 Computer II Order which distinguished between "basic services" and "enhanced services." Basic services, such as telephone service, offered "pure transmission capability over a communication path that is virtually transparent in terms of its interaction with customer supplied information." Enhanced services consisted of any offering over the telecommunications network which is more than a basic transmission service. The rules subjected basic services, but not enhanced services, to common carrier treatment under Title II of the Communications Act. The rules also recognized a third category of services, adjunct-to-basic services, such as speed-dialing, that facilitated use of basic services. The FCC treated them as basic because of their role in facilitating basic services.[1] Under the Telecommunications Act, "basic service" was now succeeded by "telecommunications service" as a common carrier regulated service and "enhanced service" was succeeded by "information service" not subject to common carrier Title II.

   *FCC Takes Varied Approaches.* In subsequent years, the FCC took varied action on adjunct-to-basic service, in 1998 it classified a portion of DSL service as a telecommunications service and in 2002 the FCC classified cable modem service as solely an information service. The FCC's classification of cable modem service as an information service was upheld by the Supreme Court in *National Cable & Telecommunications Association v. Brand X Internet Services,* 545 U.S. 967, 986 (2005). In that decision, the court stated the FCC would need to define what the word "offering" means in the definition of telecommunications service, whether the information service and telecommunications components are functionally equivalent or separate. The court, utilizing *Chevron v. NRDC,* deferred to the FCC to resolve the question based on the FCC's investigation of the factual particulars of who the technology works.

   *Open Internet Principles.* In the following years, the FCC generally spared broadband providers from Title II common carrier obligations. However, the FCC made clear it would seek to preserve principles of internet openness. These principles, embodied in the *Internet Policy Statement,* were incorporated as

---

[1] United States Telecom Association v. FCC, 825 F.3d 674 (D.C. Cir. 2016) reh'g denied, 855 F.3d 381

conditions by the FCC into several merger orders and a key 700MHz license, including the SBC/AT&T, Verizon/MCI, and Comcast/NBCU mergers where FCC approval of these transactions was expressly conditioned on compliance with the *Internet Policy Statement*. [*Open Internet Order 2015*, p. 20]

*Comcast v. FCC.* In 2007, customers accused Comcast of interfering with their ability to access certain content. The FCC took action against Comcast for violating the open internet polices. Comcast subsequently filed suit. The Circuit decision invalidated the FCC's exercise of ancillary authority to provide consumers basic protections in using broadband internet services. The Court noted the FCC failed to tie its assertion of ancillary authority to any statutory mandated responsibility.

*2010 Notice of Inquiry.* Following the D.C. Circuit decision, the FCC initiated a *Notice of Inquiry* to seek comment on the framework for broadband internet service. The Notice of Inquiry recognized that the "current legal classification of broadband internet service is based on a record that was gathered a decade ago." It sought comment on three separate alternative legal frameworks for classifying and regulating broadband internet service: (1) as an information service, (2) as a telecommunications service "to which all the requirements of Title II of the Communications Act would apply," and (3) solely as to the "Internet connectivity service," as a telecommunication service with forbearance from most Title II obligations.

*2010 Open Internet Order.* In December 2010, the FCC adopted the 2010 Open Internet Order, a codification of the policy principles contained in the Internet Policy Statement. The Order adopted three fundamental rules governing ISPs: (1) no blocking; (2) no unreasonable discrimination; and (3) transparency. The anti-discrimination rule operated on a case-by-case basis. The order did not entirely rule out the possibility of paid prioritization arrangements. However, it made clear that such pay for priority deals were likely to be problematic in a number of respects. The Order maintained BIAS under the classification of information service.

*Verizon v. FCC*. A 2014 U.S. Court of Appeals for the D.C. Circuit case vacating portions of the FCC Open Internet Order 2010 that the court determined could only be applied to common carriers. The court ruled that the FCC did not have the authority to impose the order in its entirety. Since the FCC had previously classified broadband providers under Title I of the Communications Act of 1934, the court ruled that the FCC had relinquished its right to regulate them like common carriers. Of the three orders that make up the FCC Open Internet Order 2010, two were vacated (no blocking and no unreasonable discrimination)

and one was upheld (transparency). The case was largely viewed as a loss for network neutrality supporters and a victory for the cable broadband industry. However, the court sustained the FCC's findings that "absent rules such as those set forth in the Open Internet Order, the broadband providers represent a threat to internet openness and could act in ways that would ultimately inhibit the speed and extent of the future broadband deployment."

*2015 Open Internet Order.* Following the D.C. Circuit's ruling, in May 2014, the FCC issued a Notice of Proposed Rulemaking (2014 Open Internet NPRM) to respond to the lack of conduct-based rules to protect and promote an open internet. The public submitted an unprecedented 3.7 million comments by the close of the reply comment period in September 2014. In February 2015, the FCC voted to adopt the *2015 Open Internet Order* and reclassified ISPs as "common carriers" – much like other utilities – subject to Title II of the Telecommunications Act, but with forbearance of many common carrier requirements, including those related to tariffs and rate regulation. The 2015 Open Internet rules were challenged and upheld by the courts in *United States Telecommunications v. FCC*.

*2016 Presidential Election.* During the Presidential election campaign, then-candidate Donald Trump commented on his desire to do away with Obama-era net neutrality rules. As such, after the 2016 Presidential election, the tide quickly shifted on the issue of net neutrality and most experts believed the privacy rules adopted in late 2016, and the Open Internet Order, were vulnerable to a repeal by the Trump Presidential Administration. In March of 2017, the process for repealing the privacy rules began with the introduction of Senate Joint Resolution (SJR) 34 introduced by Senator Jeff Flake pursuant to the Congressional Review Act (CRA), which gives Congress an expedited means to review and overrule new federal regulations. The CRA also prohibits agencies from issuing a new rule substantially similar to the revoked one unless specifically authorized by Congress – which has highly significant implications for ongoing FCC authority in this area. By the end of March, SJR 34 had been passed, and on April 3, 2017 the measure was signed by President Trump – revoking the FCC ISP privacy rules and preventing the FCC from regulating further on the matter.

*Restoring Internet Freedom Order.* In May 2017, the FCC issued a notice of proposed rulemaking to repeal the 2015 Open Internet rules that classified ISPs under Title II and revert the classification of the service back to an "information service" under Title I of the Telecommunications Act. In December 2017, the FCC voted, in another partisan vote, on a framework to repeal the rules. The FCC argued for a "light-touch framework" for broadband service, support for FTC oversight of anti-trust and anti-competitive behavior instead of FCC common

carrier regulation, and largely revert to the 2010 Open Internet transparency rules with some modifications.

*Voted, ordered, but not, yet, taken effect.* Just last week, on January 4th, the FCC issued the full order – 200+ pages. However, the new order is pending review by the Office of Management and Budget and pending final publishing of the order in the Federal Register at which time it would then officially take effect. The future legal obligations of ISPs remain in flux at the federal level as it is highly expected the courts will be asked to weigh-in on the merits of the order and assess whether the action meets the standard for agency review or whether the action is "capricious and arbitrary." Already the New York state attorney general has filed a lawsuit challenging the integrity of the public comment process. There have been news reports and statements by FCC Commissioners that the public comment system may have been compromised. More lawsuits are expected once the order takes official effect, including potential challenges to the preemption provisions. Perhaps less likely, although possible, is a Congressional repeal of the new order via the Congressional Review Act that authorizes Congress to overrule actions taken by federal agencies by a simple majority in the Senate and House within 60 legislative days of the order going into effect.

*The Net Neutrality Debate.* Proponents of net neutrality argue that the FCC needs to reclassify ISPs as common carriers (e.g. a private company that is required to sell their services to everyone under the same terms) under Title II of the Act in order to prevent anticompetitive behaviors. As noted above, previous court cases have limited the FCC's regulation of the issues related to unfair blocking and discrimination when the internet service has been classified under Title I as an "information service." The lack of success in those court cases promulgated the FCC to reclassify the service under Title II as a telecommunications service. Opponents of the FCC's decision argue that although they are not opposed to the general principles of net neutrality, they believe the FTC already has the authority to prevent anticompetitive business practices and that Title II is an archaic provision created to regulate telecommunications services long before the internet existed. Opponents of the Open Internet rules also argue that regulating ISPs under Title II would have the opposite effect of impeding innovation and investment. Those against a Title II classification, including the current majority of the FCC, argue for a "light-touch regulatory framework."

*Not likely to be resolved.* This bill proposes to adopt the net neutrality rules for California intrastate internet traffic. The language of this bill largely reflects the rules adopted in the 2015 Open Internet Order concerning no blocking, no throttling, and no paid prioritization, as well as, conduct rules, which were repealed by the Trump FCC in December. Under the Order that was just issued, the FCC

states they "preempt any state or local measures that would effectively impose rules or requirements that we have repealed or decided to refrain from imposing in this order." As such, the success of implementing this bill is largely hinged on the new order being repealed or rejected, in whole or in part. Considering the high likelihood that the courts will be asked to weigh in, it seems within the realm of possibilities that the new order may not withstand a court challenge. However, the issue is not resolved prior to this committee hearing this bill.

*CPUC: Spread too thin?*  This bill proposes to have the CPUC adopt rules by July 1, 2018 that include new responsibilities for the agency. As this committee knows, in recent years there have been questions raised concerning whether the CPUC is spread too thin and handling too many varied areas. Just last year, the legislature passed SB 19 (Hill, 2017) which removed some of the transportation-related functions away from the CPUC to other agencies. This bill would expand to the CPUC's existing responsibilities. While it is not immediately clear whether it is feasible for the CPUC to take on these responsibilities, in terms of staff and resources, the responsibilities are potentially consistent with the CPUC's role in regulating utility-style services. While existing statute, Public Utilities Code §710, prohibits the CPUC from exercising regulatory jurisdiction or control over Internet Protocol-enabled services, it only does so in so far as not directed by federal or state statute. Therefore, the Legislature retains the opportunity to pass statute to direct the CPUC in this space, granted such statutes are able to withstand any legal challenges, particularly those regarding federal preemption.

*Patchwork of regulation.* One of the criticisms of this bill by the opponents is that this bill would create a patchwork of regulation that could stymie the marketplace since California would have rules that are different from other states and the federal government. Due to the nature of the internet traffic traveling across state lines, it would be ideal to have one rule to address the issue of net neutrality. However, the FCC's vote in December has resulted in other states also proposing action to institute their own net neutrality rules, including Washington State. In this case, California may not be alone in adopting its own net neutrality rules.

*Feasibility.* This bill requires a uniform and customer-accessible internet speed test. Currently, the CPUC utilizes CalSpeed testing at nearly 2000 points in the state to test mobile broadband internet speeds. Conceivably, this test might satisfy the requirements of this bill for one uniform test. However, the CPUC would need to ensure the test can be utilized for fixed broadband service and ensure the integrity of the test can not be manipulated by providers. This bill also requires the CPUC to adopt rules to ensure that public purpose program funding is expended in a manner that will maximize internet neutrality and ensure the fair distribution of services to low-income individuals and communities. Many of these programs

already include criteria directing funding to low-income individuals and communities, such as the Lifeline Program and California Advanced Services Fund. This bill's efforts to leverage these funds in order to incentivize ISPs to commit to net neutrality rules seems very reasonable and an important leveraging opportunity for the state.

*Amendments needed.* In order to maintain consistency with the Open Internet Order, the bill needs some clarifying amendments, including some related to reasonable network management. Additionally, in order to establish a more realistic timeline for CPUC action, the deadline by which the CPUC would adopt the rules required by this bill should be moved to no earlier than December 31, 2018.

- Replace "customer" with "end-user" throughout as noted in the original FCC rules.
- Add language from FCC rules related to Reasonable Network Management (FCC Open Internet Rule Section 8.2 Definitions (f)).
- Add the exception provided in the FCC rules to authorize the CPUC to waive the ban on paid prioritization "only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the Internet." (FCC Open Internet Rules Section 8.9 No paid prioritization (c)) - Add to SB 460. Section 5982 (c).
- Add "Reasonable network management shall not be considered a violation of this rule." Per FCC Open Internet Rules Section 8.11. Add to SB 460 Section 5982 (d)
- Move the date from July 1, 2018 to December 31, 2018.
- Technical clean-up replacing "network" with "internet" in the urgency section and other technical clean-up

**Prior/Related Legislation**

SB 822 (Wiener, 2018) the bill would state the intent of the Legislature to enact legislation to effectuate net neutrality in California utilizing the state's regulatory powers and to prevent ISPs from engaging in practices inconsistent with net neutrality, including through four specified means. The bill was introduced on January 4, 2018 and is awaiting referral.

AJR 7 (Mullin, Chapter 151, Statutes of 2017) urged the President of the United States and Members of the United States Congress to protect specified broadband communications-related policies and rules, including: net neutrality and open internet access, however, with no reference to Title II regulation. The resolution also calls on the President to support the Federal Lifeline Program that provides

discounted telephone service for qualifying low-income consumers, and the E-Rate program's discounted telecommunication and internet access services for schools and libraries.

**FISCAL EFFECT:**   Appropriation: No   Fiscal Com.:   Yes   Local: Yes

**SUPPORT:**

ADT Security Services
The Greenlining Institute
The Utility Reform Network

**OPPOSITION:**

AT&T
Black Business Association
California Cable & Telecommunications Association
California Chamber of Commerce
California Manufacturers & Technology Association
Central City Association of Los Angeles
Consolidated Communications
CTIA
Greater Los Angeles African American Chamber of Commerce
Frontier Communications
Sprint
T Mobile
TechNet
Tracfone
Valley Industry & Commerce Association
Verizon

**ARGUMENTS IN SUPPORT:**   The author states:

> We cannot allow the profits and political interests of internet service providers to outweigh the public interest in a free and open internet – it's too important to our economy and our way of life. And if the Trump Administration won't protect consumers, the State of California will. SB 460 will prevent ISP's from using deceptive, discriminatory or anti-competitive business practices. It preserves the heart of the FCC's net neutrality rules and prohibits ISP's from blocking, throttling, and paid prioritization. And it gives consumers greater transparency about the services we all depend on in

everyday life. Net Neutrality is just common sense. It's good for consumers and protects a level playing field for internet companies.

**ARGUMENTS IN OPPOSITION:** Opponents generally express concerns that this bill would result in a patchwork of state regulations that will stymie innovation. Many express concerns about the appropriateness of placing the responsibility to implement this bill on the CPUC. Many of the opponents also express concerns that this bill is inconsistent with the federal regulatory framework governing ISPs, is federally preempted, and will likely result in costly litigation.

ISPs, including CCTA, AT&T, Frontier Communications, generally express support for net neutrality principles, but share the concerns stated above and, therefore, oppose the bill. Additionally, CCTA states that "ISPs are required to keep consumers clearly informed of their open internet practices and will be held accountable for any harmful conduct." Some of the opponents state their concerns that the bill is being rushed through the legislative process.

-- END --