# Cal. Assembly Comm. on Commc'ns & Conveyance, SB 822 Analysis (2018)

Date of Hearing:  August 22, 2018

ASSEMBLY COMMITTEE ON COMMUNICATIONS AND CONVEYANCE
Miguel Santiago, Chair
SB 822 (Wiener) – As Amended August 20, 2018

**SENATE VOTE**:  23-12

**SUBJECT**:  Communications: broadband Internet access service

**SUMMARY:** Establishes net neutrality rules by prohibiting Internet Service providers (ISPs) from engaging in activities that interfere with a user's ability to access content on the internet. Specifically, **this bill**:

1) Makes it unlawful for a fixed and mobile ISP, insofar as the provider is engaged in providing fixed broadband Internet access service (BIAS), to engage in any of the following activities:

   a) Blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management;

   b) Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, subject to reasonable network management;

   c) Requiring consideration, monetary or otherwise, from an edge provider, including, but not limited to, in exchange for any of the following:

      i)   Delivering Internet traffic to, and carrying Internet traffic from, the ISP's end users;

      ii)  Avoiding having the edge provider's content, application, service, or nonharmful device blocked from reaching the ISP's end users; or,

      iii) Avoiding having the edge provider's content, application, service, or nonharmful device impaired or degraded;

   d) Engaging in paid prioritization;

   e) Engaging in zero-rating in exchange for consideration, monetary or otherwise, from a third party;

   f) Zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category;

   g) Unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use BIAS or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users. Specifies that reasonable network management is not a violation, as specified;

a) Specifies that zero-rating Internet traffic in application-agnostic ways is not a violation, as specified, provided that no consideration, monetary or otherwise, is provided by any third party in exchange for the ISP's decision whether to zero-rate traffic;

h) Failing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its BIAS sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings; and,

i) Engaging in practices, including, but not limited to, agreements, with respect to, related to, or in connection with, ISP traffic exchange that have the purpose or effect of evading specified prohibitions. Specifies that nothing in the specified provision shall be construed to prohibit ISPs from entering into ISP traffic exchange agreements that do not evade specified prohibitions.

2) Prohibits a fixed and mobile ISP to offer or provide services other than BIAS that are delivered over the same last-mile connection as the BIAS, if those services satisfy either of the following conditions:

a) They have the purpose or effect of evading specified prohibitions; or,

b) They negatively affect the performance of BIAS.

3) Specifies that nothing in the specified provision shall be construed to prohibit a fixed or mobile ISP from offering or providing services other than BIAS that are delivered over the same last-mile connection as the BIAS and do not violate specified provisions.

4) Specifies that nothing in this bill supersedes any obligation or authorization a fixed or mobile ISP may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.

5) Specifies that nothing in this bill prohibits reasonable efforts by a fixed or mobile ISP to address copyright infringement or other unlawful activity.

6) Defines the following terms:

a) "Application-agnostic" means not differentiating on the basis of source, destination, Internet content, application, service, or device, or class of Internet content, application, service, or device.

b) "Broadband Internet access service" means a mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data from, all or substantially all Internet endpoints, including, but not limited to, any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. "Broadband Internet access service" also encompasses any service provided to customers in California that provides a

functional equivalent of that service or that is used to evade the protections set forth in this title.

c) "Class of Internet content, application, service, or device" means Internet content, or a group of Internet applications, services, or devices, sharing a common characteristic, including, but not limited to, sharing the same source or destination, belonging to the same type of content, application, service, or device, using the same application- or transport-layer protocol, or having similar technical characteristics, including, but not limited to, the size, sequencing, or timing of packets, or sensitivity to delay.

d) "Content, applications, or services" means all Internet traffic transmitted to or from end users of a BIAS, including, but not limited to, traffic that may not fit clearly into any of these categories.

e) "Edge provider" means any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

f) "End user" means any individual or entity that uses a BIAS.

g) "Enterprise service offering" means an offering to larger organizations through customized or individually negotiated arrangements or special access services.

h) "Fixed broadband Internet access service" means a BIAS that serves end users primarily at fixed endpoints using stationary equipment. Fixed BIAS includes, but is not limited to, fixed wireless services including, but not limited to, fixed unlicensed wireless services, and fixed satellite services.

i) "Fixed Internet service provider" means a business that provides fixed BIAS to an individual, corporation, government, or other customer in California.

j) "Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device" means impairing or degrading any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices. The term includes, without limitation, differentiating, positively or negatively, between any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices.

k) "Internet service provider" means a business that provides BIAS to an individual, corporation, government, or other customer in California.

l) "ISP traffic exchange" means the exchange of Internet traffic destined for, or originating from, an ISP's end users between the ISP's network and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator.

m) "ISP traffic exchange agreement" means an agreement between an ISP and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator, to exchange Internet traffic destined for, or originating from, an ISP's end users between the ISP's network and the other individual or entity.

n) "Mass market" service means a service marketed and sold on a standardized basis to residential customers, small businesses, and other customers, including, but not limited to, schools, institutions of higher learning, and libraries. "Mass market" services also include BIAS purchased with support of the E-rate and Rural Health Care programs and similar programs at the federal and state level, regardless of whether they are customized or individually negotiated, as well as any BIAS offered using networks supported by the Connect America Fund or similar programs at the federal and state level. "Mass market" service does not include enterprise service offerings.

o) "Mobile broadband Internet access service" means a BIAS that serves end users primarily using mobile stations. Mobile BIAS includes, but is not limited to, BIAS that use smartphones or mobile-network-enabled tablets as the primary endpoints for connection to the Internet, as well as mobile satellite broadband services.

p) "Mobile Internet service provider" means a business that provides mobile BIAS to an individual, corporation, government, or other customer in California.

q) "Mobile station" means a radio communication station capable of being moved and which ordinarily does move.

r) "Paid prioritization" means the management of an ISP's network to directly or indirectly favor some traffic over other traffic, including, but not limited to, through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity.

s) "Reasonable network management" means a network management practice that is reasonable. A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for, and tailored to, achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the BIAS, and is as application-agnostic as possible.

t) "Zero-rating" means exempting some Internet traffic from a customer's data usage allowance.

7) Makes the following findings and declarations:

a) This act is adopted pursuant to the police power inherent in the State of California to protect and promote the safety, life, public health, public convenience, general prosperity, and well-being of society, and the welfare of the state's population and economy, that are increasingly dependent on an open and neutral Internet;

    b) Almost every sector of California's economy, democracy, and society is dependent on the open and neutral Internet that supports vital functions regulated under the police power of the state, including, but not limited to, each of the following:

        i) Police and emergency services;

        ii) Health and safety services and infrastructure;

        iii) Utility services and infrastructure;

        iv) Transportation infrastructure and services, and the expansion of zero- and low-emission transportation options;

        v) Government services, voting, and democratic decision-making processes;

        vi) Education;

        vii) Business and economic activity;

        viii) Environmental monitoring and protection, and achievement of state environmental goals; and,

        ix) Land use regulation.

    c) This act shall be known, and may be cited, as the California Internet Consumer Protection and Net Neutrality Act of 2018.

**EXISTING LAW**:

1) Specifies policies for telecommunications in California including; to promote lower prices, broader consumer choice, and avoidance of anticompetitive conduct; to remove the barriers to open and competitive markets and promote fair product and price competition in a way that encourages greater efficiency, lower prices, and more consumer choice; and to encourage fair treatment of consumers through provision of sufficient information for making informed choices, establishment of reasonable service quality standards, and establishment of processes for equitable resolution of billing and service problems. (Public Utilities Code (PUC) Section 709)

2) Prohibits the California Public Utilities Commission (CPUC) from exercising regulatory jurisdiction or control over Voice over Internet Protocol and Internet Protocol enabled services except as required or expressly delegated by federal law or expressly directed to do so by statute, as specified. (PUC Section 710)

3) Establishes the Digital Infrastructure and Video Compeition Act of 2006 which specifies that the CPUC is the sole franchising authority for a state franchise to provide video service, as specified. (PUC Section 5800 et seq.)

4) Defines unfair competition to mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited, as specified. (Business and Professions Code (BPC) Section 17200)

5) Specifies that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction, as specified. (BPC Section 17203)

6) Authorizes actions for relief provisions to be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or a district attorney or by a county, as specified, as a result of the unfair completion. (BPC Section 17204)

7) Prohibits the use of untrue or misleading advertisements by any person, firm, corporation or association selling a product or service, as specified. (BPC Section 17500)

**FISCAL EFFECT**: Unknown. This bill is keyed non-fiscal by the Legislative Counsel.

**COMMENTS**:

1) **Authors Statement:** According to the author, "As of June 11th, 2018 the federal government under Donald Trump's FCC has abandoned net neutrality protections and abdicated it's responsibility to protect all Americans. When the federal government decides to walk away from this duty and its authority to regulate this industry, it is up to the states to protect their residents. Senate Bill 822 steps in and puts California at the national forefront of ensuring an open internet. It establishes comprehensive and enforceable net neutrality standards to ensure that all California residents have the right to choose whether, when, and for what purpose they use the internet. SB 822 stands for the basic proposition that the role of internet service providers is to provide neutral access to the internet, not to pick winners and losers by deciding (based on financial payments or otherwise) which websites or applications will be easy or hard to access, which will have fast or slow access, and which will be blocked entirely."

2) **Background:** There are a number of federal and state agencies that play a role in the regulation and enforcement of communications-related services including the Federal Communications Commission (FCC), the Federal Trade Commission (FTC), and the CPUC. The FCC is an independent federal agency overseen by Congress to regulate interstate and international communications by radio, television, wire, satellite and cable in the United States. The FCC is tasked with promoting the development of competitive networks, as well as ensuring universal service, consumer protection, public safety, and national security.

In addition, the FTC is an independent federal agency tasked with promoting consumer protection and preventing anticompetitive business practices. The FTC enforces antitrust laws, and protects consumers by stopping unfair, deceptive or fraudulent practices in the marketplace. In California, the CPUC regulates the telecommunications industry by developing and implementing policies to ensure fair, affordable universal access to necessary services, developing rules and regulatory tools, removing barriers that prevent a competitive market, and reducing or eliminating burdensome regulations.

3) **Net Neutrality & the Internet:** There are several major players in the operation of the Internet for data to be delivered from one point to another. Edge providers, such as Amazon, Google, and Facebook, develop and provide content, services, and applications over the Internet. End users are internet customers that consume content from edge providers. In order for products to be delivered from an edge provider to an end user, the product travels through backbone networks which are capable of transmitting vast amounts of data. End users and edge providers typically connect to these backbone networks through local ISPs, such as AT&T, Comcast, or Verizon. Such ISPs serve as the gatekeepers and provide the "on-ramp" to the internet.

   Net neutrality is the principle that ISPs should not discriminate against legal content and applications, by charging edge providers different delivery speeds to deliver their content. Hence, ISPs cannot block, throttle, or create special "fast lanes" for certain content. Net neutrality rules serve the purpose of maintaining open access to the internet and limited the degree to which ISPs can interfere with a customer's ability to access legal content on the internet. It can also serve to promote greater competition between content providers by limiting the degree in which better resourced companies can pay to have their content prioritized and distributed to consumers at optimal speeds. Maintaining competition in the internet marketplace provides greater choices and reduced cost to consumers and new services entering the marketplace.

4) **Bright-line Rules and the 2015 Open Internet Order:** After a series of court cases in which the FCC attempted to enforce net neutrality rules were overturned, in May 2014 the FCC began a rulemaking to respond to the lack of conduct-based rules to protect and promote an open internet. In February 2015, the FCC adopted the Open Internet Order which established three "bright-line" rules banning certain practices that the FCC considers to harm open access to the Internet. The bright-line rules include:

   a) No Blocking: ISPs may not block access to legal content, applications, services, or non-harmful devices;

   b) No Throttling: ISPs may not impair or degrade lawful Internet traffic on the basis of content, applications, services, or non-harmful devices; and,

   c) No Paid Prioritization: ISPs may not favor some lawful Internet traffic over other lawful traffic in exchange for consideration of any kind.

   In addition, recognizing that there may exist other current or future practices that cause the type of harms the bright-line rules are intended to address, the 2015 Open Internet Order also included a no unreasonable interference or unreasonable disadvantage Standard for Internet Conduct rule. The Internet Conduct Standard servers as a catch-all by prohibiting practices that unreasonably interferes with, or unreasonably disadvantages, an end users ability to access, or an edge providers ability to deliver, content over the internet. Furthermore, the Order also reaffirmed the importance of ensuring transparency and adopted enhanced transparency rules so that consumers would have accurate information sufficient for them to make informed choices of available services.

   Within the FCC's 2015 Open Internet rules included provisions to reclassify ISPs from an "information service" under Title I of the Telecommunications Act of 1996 (the Act), to a

"telecommunications service" under Title II of the Act. This would allow the FCC to regulate ISPs similar to traditional public utilities, which may include rate of return regulation. However, when the FCC adopted the 2015 Open Internet rules it specified that certain provisions of Title II would not apply to broadband services. Proponents of net neutrality argue that the FCC needs to reclassify ISPs as common carriers (e.g. a private company that is required to sell their services to everyone under the same terms) under Title II of the Act, in order to prevent anticompetitive behaviors. While opponents argue that the FTC already has the authority to prevent anticompetitive business practices and that Title II is an archaic provision created to regulate telecommunications services long before the Internet existed.

5) **2017 Restoring Internet Freedom Order & State Response:** In December 2017, following the election of President Trump, the FCC adopted the Restoring Internet Freedom Order which repealed the 2015 Open Internet Order. The new FCC argued that net neutrality rules were unnecessary because ISPs have publicly stated their opposition to violating such principles, and if an ISP were to engage in such activities, consumer expectations, market incentives, and the deterrent threat of enforcement actions by antitrust and consumer protection agencies, such as the FTC, will constrain such practices ex ante. To enact such changes the FCC reclassified ISPs under Title I of the Act and asserted significant preemption over state and local regulations, and laws. In June 2018, the repeal took effect.

In response to the 2017 Restoring Internet Freedom Order, Legislators in 29 states have introduced over 65 bills requiring ISPs to ensure various net neutrality principles. In 13 states and the District of Columbia, 23 resolutions have been introduced expressing opposition to the FCCs repeal of net neutrality rules and urging the U.S. Congress to reinstate and preserve net neutrality. In California, the Legislature passed AJR 7 (Mullin) Chapter 151, Statutes of 2017, which urged the President and Members of Congress to continue to protect net neutrality, open Internet access, the federal Lifeline program, and the E-rate program.

Currently, Governors in six states have signed executive orders and three states have enacted net neutrality legislation, including Oregon, Vermont, and Washington. Legislation introduced typically includes one or more of the following:

- Prohibiting blocking, throttling and paid prioritization of internet traffic, usually by invoking state consumer protection laws;

- Requiring ISPs to be transparent about their network management practices; or,

- Requiring state contractors for ISP service to abide by net neutrality rules.

6) **2015 Open Internet Final Rules vs. Order:** The 2015 Open Internet Order included with it prescribed final rules, as well as the attached larger report which includes debates on specific issues, guidance and elaborations, and the FCC assertions and expectations. The mere assertion of jurisdiction over such matters was enough to serve as a deterrent for ISPs to avoid violations of the prescribed final rules.

Recognizing competing narratives, the FCC opted to prescribe rules for some issues while taking a case-by-case approach on others. The FCC did however stipulate that it could enforce other violations under one of the bright-line rules or the Internet Conduct Standard if it does have the effect of circumventing the intent of the prescribed rules. However, there are

always inherent difficulties when trying to implement a federal regulation into state law. Absent placing the final rules under a comparable state agency that has the expertise to prescribe additional regulations to conform to the Order, significant details may be necessary to ensure that the Attorney General has the additional clarity necessary to enforce such provisions in litigation.

This bill seeks to codify the prescribed rules and provide additional clarity by establishing additional bright-line rules that prohibit preferential treatment to some services but not others, including prohibiting ISPs from charging website fees for access to users and incorporating net-neutrality protections at the point of interconnection. The bill seeks to capture the intent of the Order by prescribing additional provisions based on the narratives that were debated and the FCC's assertions and expectations.

*Interconnection:* The connection points between and among the various groups that allows for the flow of information through the internet have many names: peering, transit, proxy services, interconnection, or traffic exchange. On the one hand some edge and transit providers assert that large ISPs are creating artificial congestion by refusing to upgrade interconnection capacity at their network entrance points, thus forcing edge providers to agree to paid peering arrangements. On the other hand, large ISPs assert that edge providers are imposing a cost on ISPs who must constantly upgrade their infrastructure to keep up with the demand, especially as the demand for products that require large quantity of data such as online streaming services continue to increase.

While the FCC opted to adopt a case-by-case approach in dealing with interconnection agreements, this bill prohibits an ISP from engaging in practices that evade net neutrality protections at the point of interconnection. The bill does not prohibit interconnection agreements, but seeks to ensure that net neutrality protections are not circumvented and are applied throughout the Internet highway.

*Zero-Rating:* Sponsored data plans, sometimes called zero-rating, allows ISPs to exclude certain edge provider content from end user's data usage allowances. The Order states that on the one hand, evidence in the record suggests that these business models may in some instances provide benefits to consumers, with particular reference to their use in the provision of mobile service. On the other hand, some commenters strongly oppose sponsored data plans, arguing that the power to exempt selective services from data caps seriously distort competition, favors companies with deepest pockets, and prevents consumers from exercising control over what they are able to access on the Internet, again with specific reference to mobile services.

The FCC also opted to adopt a case-by-case approach to zero-rating, but specified that it would assess such practices under the Internet Conduct Standard. According to the author, the FCC was preparing to enforce anti-competitive zero-rating plans before it reversed course following the 2016 election. This bill prohibits an ISP from zero-rating some internet content, applications, services or devices in a category, but not the entire category. The bill allows an ISP to zero-rate in application-agnostic ways, provide that no consideration, monetary or otherwise, is provide by any third party in exchange for the provider's decision whether to zero-rate traffic.

7) **Arguments in Support:** According to the ACLU of California, "Strong, enforceable net neutrality provisions ensure an open Internet for all Californians, free from interference by ISPs that would otherwise be empowered to hinder competition and limit choices. Net neutrality is the simple principle that ISP customers, not the ISP itself, should choose what apps, services, and websites they want to use. It enables competition by ensuring that small start-ups have a level playing field with incumbent services with deep pockets. It prevents ISPs from choosing winners and losers online based on their own interests. And it allows marginalized voices, who often have the fewest resources to 'pay to play,' to leverage the Internet to build communities and create societal change."

8) **Arguments in Opposition:** According to a coalition of industry groups, "Despite characterizations that SB 822 is intended to align with the FCC's 2015 Open Internet Order, this legislation still establishes requirements that go well beyond the Order's net neutrality principles. The amended bill continues to create policies that will have negative impacts on both investment and consumers […] The uncertainty, conflicts, and confusion caused by SB 822 would harm consumers and stifle innovation in California's broadband infrastructure. In addition, such unpredictability raises the cost of compliance for all ISPs, regardless of size, and will likely have a negative effect on consumers, including public agencies."

9) **Related Legislation:** AB 1999 (Chau) of 2018 establishes net neutrality rules for local agencies that provide broadband services and expands the types of local agencies that may provide broadband infrastructure and/or services. *Status: Pending on the Senate Floor.*

   SB 460 (De Leon) of 2018 prohibits a state agency from contracting with an ISP for the provision of BIAS unless the ISP certifies in writing that it is in full compliance with, and the service provided to the state agency is rendered consistent with, specified net neutrality rules. *Status: Pending in the Assembly Communications and Conveyance Committee.*

10) **Previous Legislation:** AJR 7 (Mullin) of 2017 urged the President of the United States and Members of the United States Congress to continue to protect net neutrality, open Internet access, the federal Lifeline program, and the E-rate program. *Status: Chaptered by the Secretary of State, Resolution Chapter 151, Statutes of 2017.*

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Access Humboldt
ACLU of California
ADT Security Services
California Association of Competitive Telecommunications Companies
California Association of Realtors
California Clean Money Campaign
California Common Cause
CallFire
CALPIRG
Center for Media Justice
Color of Change

Communications Workers of America, District 9
Computer-Using Educators
Consumer Federation of California
Consumer Union
Contextly
Electronic Frontier Foundation
Engine
Etsy
Eventbrite
Expa
Fight for the Future
Founder Academy
Foursquare
GitHub
Greenlining Institute
Gusto
Hellosign
Honorable Dave Jones, State Insurance Commissioner
Indivisible CA: StateStrong
Mapbox
Media Alliance
Medium
New America's Open Technology Institute
NextGen California
Oakland Privacy
Patreon
Placer Independent Resource Services
Public Knowledge
Reddit
Sonos
The Utility Reform Network
Twilio
Vimeo
Vivid Seats
Voices for Progress
Writers Guild of America West
Numerous Individuals

**Opposition**

100 Black Men of Long Beach
Actiontec Electronics
Affordable Living for the Aging
African American Male Education Network and Development Organization
Alhambra Chamber of Commerce
American Legion Post 290
Asian Pacific Islander American Public Affairs Association – Greater Sacramento
Asian Pacific Islander American Public Affairs Association – Solano County
Asian Resources Inc.

AT&T
Athletes and Entertainers for Change
Brotherhood Crusade
Burbank Chamber of Commerce
CalCom
California Asian Pacific Chamber of Commerce
California Cable & Telecommunications Association
California Chamber of Commerce
California Hispanic Chamber of Commerce
California League of United Latin American Citizens
California Manufacturers & Technology Association
California State Conference of the NAACP
CenturyLink
Chinese American Association of Solano County
Civil Justice Association of California
Community Women Vital Voices
CompTIA
Concerned Citizens Community Involvement
Congress of California Seniors
CONNECT
Consolidated Communications Inc.
CTIA
East Bay Leadership Council
Frontier Communications
Gamma Zeta Boule Foundation
Greater Coachella Valley Chamber of Commerce
Greater Los Angeles African American Chamber of Commerce
Greater Riverside Chamber of Commerce
Inglewood / South Bay NAACP
Inland Empire Economic Partnership
Janet Goeske Foundation
Korean American Central Chamber of Commerce
Korean American Seniors Association of Orange County
La Canada Flintridge Chamber of Commerce and Community Association
Los Angeles African American Women's Public Policy Institute
Los Angeles NAACP
Marjaree Mason Center
Mexican American Opportunity Foundation
Monterey County Business Council
Monterey County Hospitality Association
Mother Lode Rehabilitation Enterprises Inc.
Music Changing Lives
NAACP – Venture County
National Asian American Coalition
National Diversity Coalition
Oceanside Chamber of Commerce
Orange County Business Council
Organization of Chinese Americans – Sacramento
Organization of Chinese Americans – San Mateo County

Organization of Chinese Americans – Silicon Valley
Pasadena Chamber of Commerce
PulsePoint Foundation
Sacramento Asian Pacific Chamber of Commerce
Sacramento Black Chamber of Commerce
Sacramento Metro Chamber
San Diego Regional Chamber of Commerce
San Gabriel Valley Economic Partnership
San Marcos Chamber of Commerce
San Ysidro Chamber of Commerce
Solano Community College Educational Foundation
Sprint
T-Mobile
Tracefone
Tulare Kings Hispanic Chamber of Commerce
Valley Industry and Commerce Association
Verizon
Vietnamese American Chamber of Commerce

**Analysis Prepared by**: Edmond Cheung / C. & C. / (916) 319-2637