Br. for the Govt. Pets., *Mozilla v. FCC*,
Nos. 18-1051 et al. (D.C. Cir. Aug. 20, 2018)

NOT YET SCHEDULED FOR ORAL ARGUMENT

## 18-1051(L)

**Consolidated Cases: 18-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065,  18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105**

# United States Court of Appeals for the District of Columbia Circuit

MOZILLA CORPORATION, et al.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## PROOF BRIEF FOR GOVERNMENT PETITIONERS

JAMES R. WILLIAMS
  *County Counsel*
  *County of Santa Clara*
Office of the County Counsel
70 West Hedding Street
San José, CA 95110
(408) 299-5906

CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6279

Dated: August 20, 2018

*(Complete counsel listing appears on signature pages.)*

# CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioners the States of New York, California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia, the County of Santa Clara, Santa Clara County Central Fire Protection District, and the California Public Utilities Commission (Government Petitioners) certify as follows:

## A.    Parties and Amici

The Government Petitioners are the State of New York et al. (No. 18-1055), the County of Santa Clara and the Santa Clara County Central Fire Protection District (No. 18-1088), and the California Public Utilities Commission (No. 18-1089). In addition to the Government Petitioners, the following are petitioners in the consolidated petitions for review: Mozilla Corporation (No. 18-1051), Vimeo, Inc. (No. 18-1052), Public Knowledge (18-1053), Open Technology Institute at New America (No. 18-1054), National Hispanic Media Coalition (No. 18-1056), NTCH, Inc. (No. 18-1061), Benton Foundation (No. 18-1062), Free Press (18-1064),

Case 2:18-cv-02660-JAM-DB Document 2-5 Filed 09/30/18 Page 4 of 86

Coalition for Internet Openness (No. 18-1065), Etsy, Inc. (No. 18-1066), Ad Hoc Telecom Users Committee (No. 18-1067), Center for Democracy and Technology (No. 18-1068), and INCOMPAS (No. 18-1105).

Respondents in these consolidated cases are the Federal Communications Commission and the United States of America.

More than twenty million companies, organizations, and individuals participated in the underlying rulemaking proceeding (WC Docket 17-108, FCC No. 17-166). The Commission did not include in its *Order* a listing of the parties that participated in the underlying proceeding. Below is a representative, but not comprehensive, list of companies and organizations that filed comments or reply comments during the rulemaking according to the Commission's Electronic Comment Filing System:

> 18MillionRising.org (Voices Coalition)
> AARP
> Access Now
> Ad Hoc Telecommunications Users Committee
> ADT Corporation
> ADTRAN, Inc.
> Advanced Communications Law & Policy Institute at New York Law School
> Akamai Technologies, Inc.
> Alamo Broadband
> Alarm Industry Communications Committee
> Alaska Communications
> ALEC
> Amazon

American Association of Community Colleges
American Association of Law Libraries et al.
American Association of State Colleges and Universities et al.
American Cable Association
American Civil Liberties Union
American Consumer Institute
American Library Association
American Sustainable Business Council
Americans for Tax Reform and Digital Liberty
Apple Inc.
AppNexus
Asian Americans Advancing Justice | AAJC
Association of Research Libraries
AT&T Services, Inc.
Benton Foundation
Black Women's Roundtable
California Public Utilities Commission
CALinnovates
Cause of Action
CCIA
Center for Democracy & Technology
Center for Individual Freedom
Center for Media Justice et al. (Voices Coalition)
CenturyLink
Charter Communications, Inc.
Cisco Systems, Inc.
Citizens Against Government Waste
City of Boston, Massachusetts
City of Portland, Oregon
City of San Francisco, California
Coalition for Internet Openness
Cogent Communications Group, Inc.
Color of Change (Voices Coalition)
Comcast Corporation
Common Cause
Communications Workers of America
Commonwealth of Massachusetts
Competitive Enterprise Institute

CompTIA
Community Technology Advisory Board
Consumers Union
County of Santa Clara, California
Cox Communications, Inc.
CREDO Mobile
CTIA – The Wireless Association
Daily Kos
Data Foundry
Digital Policy Institute
Directors Guild of America
District of Columbia
Electronic Frontier Foundation
Electronic Gaming Foundation
Engine
Entertainment Software Association
Electronic Privacy Information Center
Ericsson
Etsy, Inc.
European Digital Rights
Farsight Security
Fiber Broadband Association
FreedomWorks
Free Press
Free State Foundation
Friends of Community Media
Frontier Communications
FTC Staff
Future of Music Coalition
Golden Frog
Greenlining Institute
Hispanic Technology and Telecommunications Partnership
Home Telephone Company
INCOMPAS
Independent Film & Television Alliance
Information Technology Industry Council
Inmarsat
Institute for Local Self-Reliance

Interisle Consulting Group LLC
Internet Association
Internet Freedom Coalition
Internet Innovation Alliance (IIA)
ITIF
ITTA – The Voice of Midsize Communications Companies
Level 3 Communications, LLC
Judicial Watch
Massillon Cable Comments
Media Alliance (Voices Coalition)
MediaFreedom.org
Meetup, Inc.
Microsoft Corporation
M-Lab
Mobile Future
Mobilitie, LLC
Motion Picture Association of America
Mozilla
NAACP
National Association of Realtors
National Association of Regulatory Utility Commissioners
National Association of State Utility Consumer Advocates
National Cable & Telecommunications Association
National Exchange Carrier Association
National Grange
National Hispanic Media Coalition
National Newspaper Publishers Association
National Venture Capital Association
Netflix, Inc.
New America Foundation (Open Technology Institute)
New Media Rights
Nokia
Nominum
NTCA – The Rural Broadband Association
Oracle Corp
Presente.Org (Voices Coalition)
Public Knowledge
QUALCOMM Incorporated

R Street
Sandvine Incorporated
Software and Information Industry Alliance
Sprint Corporation
State of California
State of Connecticut
State of Hawaiʻi
State of Illinois
State of Iowa
State of Maine
State of Maryland
State of Mississippi
State of New York
State of Oregon
State of Rhode Island
State of Vermont
State of Washington
Techdirt
Tech Knowledge
Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI),
    et al.
Telecommunications Industry Association
T-Mobile USA, Inc.
TracFone Wireless
Twilio
Twitter
United Church of Christ (Voices Coalition)
United States Telecom Association
Verizon
Vimeo, Inc.
Voices for Internet Freedom Coalition
Volo
Wikimedia Foundation
Wireless Internet Service Providers Association
Writers Guild of America, West, Inc.
WTA – Advocates for Rural Broadband
Y Combinator

The following entities have intervened in support of Petitioners: City and County of San Francisco, National Association of Regulatory Utility Commissioners, Internet Association, Computer and Communications Industry Association, National Association of State Utility Consumer Advocates, Writers Guild of America, West, Inc., and Entertainment Software Association. The following entities have moved to intervene in support of Respondents: NCTA - The Internet & Television Association, CTIA - The Wireless Association, USTelecom – The Broadband Association, American Cable Association, Leonid Goldstein, and Wireless Internet Service Providers Association. The following entity has intervened in support of neither side: Digital Justice Foundation.

As of the time of this filing, there are no *amici curiae*.

## B.  Ruling Under Review

The ruling under review is the Commission's *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 (2018) (the "*Order*").

## C.     Related Cases

The *Order* has not previously been the subject of a petition for review by this Court or any other court.  All petitions for review of the *Order* have been consolidated in this Court.

The following cases previously before this Court involved review of earlier, related Commission decisions that raised issues substantially similar to those raised in this case: *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *reh'g denied* 855 F.3d 381 (D.C. Cir. 2017), and *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014). The following petitions for certiorari seeking review of the *United States Telecom Association* decision are currently pending before the Supreme Court of the United States: *Daniel Berninger v. FCC*, S.Ct. No. 17-498; *AT&T Inc. v. FCC*, S.Ct. No. 17-499; *American Cable Association v. FCC*, S.Ct. No. 17-500; *CTIA-The Wireless Association v. FCC*, S.Ct. No. 17-501; *NCTA-The Internet & TV Association v. FCC*, S.Ct. No. 17-502; *TechFreedom v. FCC*, S.Ct. No. 17-503; *U.S. Telecom Association v. FCC*, S.Ct. No. 17-504.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

GLOSSARY OF TERMS AND ABBREVIATIONS ................................. x

PRELIMINARY STATEMENT................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 3

ISSUES PRESENTED ............................................................................ 3

STATUTES AND REGULATIONS ......................................................... 3

STATEMENT OF THE CASE ................................................................ 4

    A.   The Role of State and Local Governments in Regulating Communications and Protecting Public Safety......................... 4

    B.   Order on Review................................................................. 5

    C.   The Government Petitioners ..................................................... 8

        1.   The State Petitioners.......................................................... 8

        2.   The County of Santa Clara and the Santa Clara County Central Fire Protection District ........................... 9

        3.   California Public Utilities Commission ......................... 10

STANDARD OF REVIEW................................................................. 11

SUMMARY OF ARGUMENT ............................................................ 11

STANDING ....................................................................................... 14

ARGUMENT ..................................................................................... 15

i

**Page**

POINT I

THE *ORDER* IS ARBITRARY AND CAPRICIOUS .......................................... 15

    A.   The Commission Disregarded the Serious Risk That Providers Will Engage in Abusive Practices That Undermine the Open Internet.................................................. 16

    B.   The Commission Violated Its Statutory Mandate to Consider Public Safety.............................................................. 22

    C.   The *Order* Failed to Consider Significant and Long-Standing Reliance Interests. .................................................... 29

    D.   The Commission Failed to Properly Consider the Effect of Reclassification on Universal Service and Pole Attachment Rights.................................................... 32

POINT II

THE COMMISSION'S PREEMPTION ORDER IS INVALID ............................ 39

    A.   The Commission May Not Preempt Absent Statutory Authority. .................................................................... 39

    B.   The Commission's Reference to Conflict Preemption Is Premature and Erroneous in Any Event. .............................. 48

        1.   Conflict preemption must be raised on a case-by-case basis, not suggested in an order opining in advance that all state laws are preempted. .................... 48

        2.   The *Order* fails to identify a valid basis for conflict preemption. ....................................................... 50

CONCLUSION ................................................. 56

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alascom, Inc. v. FCC,*
    727 F.2d 1212 (D.C. Cir. 1984) .................................................... 48, 49

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989) ............................................................ 14

*American Library Ass'n v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005) ............................................................ 41

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ............................................................ 32

*AT&T Corp. v. FCC,*
    86 F.3d 242 (D.C. Cir. 1996) ............................................................. 15

*Building & Constr. Trades Council of Metro Dist. v.*
    *Associated Builders & Contractors of Mass./R.I., Inc.,*
    507 U.S. 218 (1993) ........................................................................... 53

*California v. FCC,*
    39 F.3d 919 (9th Cir. 1994) ............................................................... 42

*California v. FCC,*
    905 F.2d 1217 (9th Cir. 1990) ........................................................... 41

*City of New York v. FCC,*
    486 U.S. 57 (1988) ....................................................................... 44, 45

*Comcast Corp. v. FCC,*
    600 F.3d 642 (D.C. Cir. 2010) .............................. 13, 41, 42, 43, 44, 48

*Computer & Communications Industry Association v. FCC,*
    693 F.2d 198 (D.C. Cir. 1982) ........................................................... 44

*Direct Commc'ns Cedar Valley, LLC v. FCC,*
    753 F.3d 1015 (10th Cir. 2014) ......................................................... 34

| Cases | Page(s) |
|---|---|

*EchoStar Satellite L.L.C. v. FCC,*
    704 F.3d 992 (D.C. Cir. 2013) ............................................ 47

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ......................................... 16, 29, 30

*Global Tel\*Link v. FCC,*
    866 F.3d 397 (D.C. Cir. 2017) ............................................ 51

*Graham v. R.J. Reynolds Tobacco Co.,*
    857 F.3d 1169 (11th Cir. 2017) ......................................... 54

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.,*
    471 U.S. 707 (1985) .......................................................... 50

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ................................................... 4, 47

*Medtronic v. Lohr,*
    518 U.S. 470 (1996) .......................................................... 50

*Metropolitan Life Ins. Co. v. Massachusetts,*
    471 U.S. 724 (1985) ............................................................ 4

*Minnesota Pub. Util. Comm'n v. FCC,*
    483 F.3d 570 (8th Cir. 2007) ............................................ 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual
Auto Ins. Co.,*
    463 U.S. 29 (1983) ............................................................ 15

*National Ass'n of Regulatory Utility Comm'rs v. FCC,*
    533 F.2d 601 (D.C. Cir. 1976) ......................................... 40

*National Ass'n of Regulatory Utility Comm'rs v. FCC,*
    880 F.2d 422 (D.C. Cir. 1989) ......................................... 46

*New York State Dep't. of Soc. Servs. v. Dublino,*
    413 U.S. 405 (1973) .......................................................... 51

iv

**Cases**                                                   **Page(s)**

*Nuvio Corp. v. FCC*,
    473 F.3d 302 (D.C. Cir. 2006) ........................................................... 22

*People v. Charter Commc'ns, Inc.*,
    162 A.D.3d 553 (N.Y. App. Div. 2018) ............................................... 22

*Public Citizen v. Federal Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) .................................................... 15, 22

*Public Serv. Comm'n of Maryland v. FCC*,
    909 F.2d 1510 (D.C. Cir. 1990) .................................................... 40, 45

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988) ............................................................................ 55

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .............................................................................. 48

*Telocator Network of Am. v. FCC*,
    691 F.2d 525 (D.C. Cir. 1982) ........................................................... 16

*Texas Office of Pub. Util. Counsel v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ............................................................. 46

*United States Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ...................................................... 2, 30

*United States Telecom Ass'n v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) ........................................................... 20

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ........................................................... 53

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ...................................................................... 11, 49

**Constitutions**

Cal. Const. art. XII ................................................................................... 10

**Statutes**                                                   **Page(s)**

*Federal*

Pub. L. No. 104-104, 110 Stat. 56 (1996) ................................................. 52

5 U.S.C. § 706 ..................................................................................... 11

28 U.S.C. § 2342 .............................................................................. 3, 49

42 U.S.C. § 5195c ................................................................................. 24

47 U.S.C.
  § 151 ............................................................................................. 22
  § 152 note ....................................................................................... 52
  § 153 ............................................................................................. 43
  § 154 ............................................................................................. 40
  § 160 ............................................................................................. 46
  § 214 ............................................................................................. 33
  § 224 ....................................................................................... 36, 37
  § 230 ............................................................................................. 43
  § 253 ................................................................... 33, 35, 51, 52, 54
  § 254 ............................................................................... 33, 34, 35
  § 332 ....................................................................................... 51, 54
  § 402 ......................................................................................... 3, 49
  § 414 ............................................................................................. 51
  § 1302 ........................................................................................... 56
  § 1304 ........................................................................................... 56

*State*

Cal. Pub. Util. Code § 871 .................................................................... 33

Conn. Gen. Stat.
  § 16-247e ....................................................................................... 33
  § 21a-217 ....................................................................................... 52

6 Del. Code ch. 24A ............................................................................. 52

220 Ill. Comp. Stat. § 5/13-301 ............................................................ 33

| Statutes | Page(s) |
|---|---|

Mass Gen. L. c. 25 § 21 ........................................................................ 25

Md. Code Ann.
    Com. Law § 14-3301 et seq. ............................................................. 52
    Pub. Util. § 8-201 ............................................................................. 33

Minn. Stat.
    § 237.70 (2017) ................................................................................ 33
    § 325F.693 (2017) ........................................................................... 52

N.J. Stat. Ann. § 49:3-53 ..................................................................... 52

Ch. 88, 2018 Or. Laws (Apr. 9, 2018) .................................................. 9

Or. Rev. Stat. § 646A.800 .................................................................... 53

No. 169, 2018 Vt. Acts (May 22, 2018) ............................................... 9

Wash. Rev. Code ch. 19.385 ................................................................. 9

## Administrative Materials

### *Federal*

25 FCC Rcd. 5541 (May 19, 2010) ....................................................... 37

*In re City of Wilson*,
    30 FCC Rcd. 2408 (Mar. 12, 2015) ................................................. 52

*In re Lifeline & Link Up Reform and Modernization*,
    31 FCC Rcd. 3962 (2016) ................................................................ 33

*In re Protecting and Promoting the Open Internet*,
    30 FCC Rcd. 5601 (2015) ................................................................ 16

### *State*

### *Regulations*

940 Mass. Code Regs. § 19.01 et seq. ................................................... 52

**Administrative Materials**                                    **Page(s)**

37 Pa. Code § 301.1 et seq. .................................................................. 53

*Decisions*

Decision No. 98-10-058, 82 CPUC2d 510, 1998 Cal. PUC LEXIS 879 ...... 37

*In re Rockland Electric Co.*,
     Case No. ER16060524 (N.J. Bd. of Pub. Util., Aug. 23,
     2017) ................................................................................................ 25

*Executive Orders*

Exec. Order No. 2-18 (Feb. 17, 2018), 326 Vt. Govt. Reg. 2
     (Mar. 2018) ........................................................................................ 9

Exec. Order No. 9 (Feb. 5, 2018), 50 N.J. Reg. 931 (Mar. 5,
     2018) ................................................................................................... 9

Exec. Order No. 175 (Jan. 24, 2018), 9 N.Y.C.R.R. § 8.175 ..................... 9

Haw. Exec. Order No. 18-02 (Feb. 5, 2018),
     https://governor.hawaii.gov/wp-
     content/uploads/2018/02/Executive-Order-No.-18-02-Net-
     Neutrality-Signed.pdf ........................................................................ 9

Mont. Exec. Order No. 3-2018 (Jan. 22, 2018),
     http://governor.mt.gov/Portals/16/docs/2018EOs/EO-03-
     2018_Net%20Freedom.pdf?ver=2018-01-22-122048-023 .................... 9

R.I. Exec. Order No. 18-02 (Apr. 24, 2018),
     http://www.governor.ri.gov/documents/orders/ExecOrder1
     8-02.pdf ............................................................................................... 9

**Miscellaneous Authorities**

National Conference of State Legislatures, *Net Neutrality
     Legislation in States* (as of July 18, 2018),
     http://www.ncsl.org/research/telecommunications-and-
     information-technology/net-neutrality-legislation-in-
     states.aspx ......................................................................................... 9

**Miscellaneous Authorities**                                            **Page(s)**

Philip Weiser, *Federal Common Law, Cooperative
    Federalism, and the Enforcement of the Telecom Act*, 76
    N.Y.U. L. Rev. 1692 (2001) ................................................................. 51

S. Conf. Rep. No. 104-458 (1996) ............................................................ 47

Wash. S. Bill Rep. on SHB 2282 (Feb. 27, 2018), at
    http://lawfilesext.leg.wa.gov/Biennium/2017-
    18/Htm/Bill%20Reports/Senate/2282-
    S%20SBR%20APS%2018.htm ............................................................ 53

## GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2015 Order* | *In re Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015), *aff'd sub nom. United States Telecom Association v. FCC*, 825 F.3d 674 |
| BIAS | Broadband Internet Access Service |
| Cable Act of 1984 | Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2279 |
| *California I* | *California v. FCC*, 905 F.2d 1217 (9th Cir. 1990) |
| *California III* | *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) |
| CCIA | Computer and Communications Industry Association |
| Commission or FCC | Federal Communications Commission |
| CPUC | California Public Utilities Commission |
| Communications Act | Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq. |
| County | County of Santa Clara |
| County Fire | Santa Clara County Central Fire Protection District |
| Edge provider | Entity providing content, applications, and services over the Internet to end users |
| Government Petitioners | States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia, the County of Santa Clara, Santa Clara County Central Fire Protection District, and the California Public Utilities Commission |
| Kabai Decl. | Declaration of Imre Kabai [Addendum 13-15] |

x

| Lifeline | Federal and state programs that provide a monthly discount for low-income subscribers of certain communication services |
|---|---|
| *Maryland PSC* | *Public Serv. Comm'n of Maryland v. FCC*, 909 F.2d 1510 (D.C. Cir. 1990) |
| McSweeny | Commissioner Terrell McSweeny, Federal Trade Commission |
| *Minnesota PUC* | *Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) |
| *NARUC II* | *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) |
| Non-Government Petitioners | Mozilla Corporation, Vimeo, Inc., Public Knowledge, Open Technology Institute, National Hispanic Media Coalition, NTCH, Inc., Benton Foundation, Free Press, Coalition for Internet Openness, Etsy, Inc., Ad Hoc Telecom Users Committee, Center for Democracy and Technology, and INCOMPAS |
| NGP Br. | Brief for Non-Government Petitioners |
| NYAG | New York Attorney General's Office |
| Open Internet | The principle that broadband providers must treat all Internet traffic the same regardless of source |
| OTI | New America's Open Technology Institute |
| *Order* | Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) [JA __-__] |
| Sandoval | Professor Catherine Sandoval, Santa Clara University School of Law |
| State Petitioners | States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia |
| Transparency Rule | Disclosures mandated by the *Order* ¶¶ 215-231 |

## PRELIMINARY STATEMENT

The Government Petitioners are the States of New York, California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia (the State Petitioners); the County of Santa Clara (the County), the Santa Clara County Central Fire Protection District (County Fire), and the California Public Utilities Commission (CPUC).[1] The Government Petitioners share a strong interest in preserving the open Internet as a vital resource for the health and welfare of our residents.

For more than fifteen years, the Federal Communications Commission has agreed that an open Internet free from blocking, throttling, or other interference by service providers is critical to ensure that all Americans have access to the advanced telecommunications

---

[1] Intervenor City and County of San Francisco also joins this brief.

services that have become essential for daily life.[2] The recent *Order* represents a dramatic and unjustified departure from this long-standing commitment. The *Order* is invalid and must be vacated for the many reasons raised by the Non-Government Petitioners. In addition, as this brief explains, the *Order* is arbitrary and capricious because it failed to reconcile the Commission's abdication of regulatory authority with the inevitable harms that the *Order* will cause to consumers, public safety, and existing regulatory schemes. Indeed, the *Order* entirely ignored many of these issues, including public safety, in violation of the agency's statutory mandate.

The *Order* compounded its devastating impact on millions of Americans by purporting to preempt state and local laws that would protect consumers and small businesses from abuses by service providers. The Commission identified no valid authority for such preemption. The *Order*'s attempt to preempt state and local laws thus must be invalidated.

---

[2] The "open Internet" refers to "the principle that broadband providers must treat all internet traffic the same regardless of source." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 689 (D.C. Cir. 2016).

2

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The *Order* was released on January 4, 2018, and a summary of the *Order* was published on February 22, 2018. *See* 83 Fed. Reg. 7,852 (Feb. 22, 2018). The petitions were timely filed.

## ISSUES PRESENTED

1. Whether the *Order* is arbitrary and capricious.

2. Whether the Commission's purported preemption of state and local regulation of broadband service is invalid.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the Addendum.

3

## STATEMENT OF THE CASE[3]

### A.  The Role of State and Local Governments in Regulating Communications and Protecting Public Safety

State and local governments "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of their residents." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). The Federal Communications Act of 1934 (Communications Act), as amended by the Telecommunications Act of 1996 (1996 Act), recognizes that communications are central to this authority and thus establishes "a system of dual state and federal regulation." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 359 (1986).

---

[3] This Statement of the Case supplements the Statement contained in the Brief for the Non-Government Petitioners (NGP Br.), which the Government Petitioners hereby join. As stated *infra* at 11, the Government Petitioners also join the legal arguments made by the Non-Government Petitioners.

4

## B.    Order on Review

In the *Order*, the Commission reversed its prior regulatory treatment of broadband Internet access service (BIAS) in several pertinent respects.[4] *See Restoring Internet Freedom, Declaratory Ruling, Report and Order, and Order,* WC Docket No. 17-108, FCC 17-166, 33 FCC Rcd. 311 (2018) (*Order*) [JA __-__]. The *Order* (1) reclassified BIAS from a telecommunications service (regulated under Title II's common-carrier provisions) to an information service (governed by Title I); (2) eliminated "bright-line" rules prohibiting BIAS providers from blocking, throttling, and imposing paid prioritization; (3) eliminated the "general conduct" rule, which had prohibited "unreasonable interference or disadvantage" to end users' access to, or edge providers' offering of, online services;[5] (4) disavowed regulation of broadband privacy and data

---

[4] For a complete background of the Commission's regulatory approach to broadband, including its long history of promoting the open Internet through policy, enforcement, and regulations, *see* NGP Br. at Statement(A).

[5] An edge provider is an entity that provides online content to end users, such as Netflix, Google, Etsy, or Kickstarter.

5

security practices; and (5) eliminated numerous transparency require-
ments, while preserving a narrow and discrete set of mandatory federal
disclosures (the Transparency Rule). *See Order* ¶¶ 21-64, 86-161, 181-
184, 209-238, 239-296 [JA __-__, __-__, __-__, __-__, __-__].

The Commission justified the elimination of its existing bright-line
and general conduct rules by concluding that it had no statutory
authority to impose those rules. The Commission reasoned that its
reclassification decision eliminated Title II authority to regulate
broadband; that § 706 of the 1996 Act and § 230 of the Communications
Act were "hortatory" or "policy" statements that did not grant the
Commission any "regulatory authority"; and that various provisions in
Titles II, III, and VI of the Communications Act also did not confer
regulatory authority. *Id.* ¶¶ 268-292 [JA __-__].

In evaluating the impact of these changes, the Commission did not
perform any analysis of the public safety risks that several parties
(including Government Petitioners) had identified in the record, despite
its statutory mandate to consider such safety concerns. The Commission
also summarily dismissed record evidence of serious reliance interests

6

on the Commission's long-standing protection of an open Internet, mistakenly asserting that no such interests exist. *Id.* ¶ 159 [JA __].

Despite disavowing any statutory authority to affirmatively impose the bright-line and general conduct rules, the Commission declared that it was nonetheless preempting "any state or local measures that would effectively impose rules or requirements that [the Commission] ha[s] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service" addressed in the *Order*, including disclosure requirements.[6] *Id.* ¶¶ 194-196 [JA __-__]. The *Order* predominantly relied on "the impossibility exception to state jurisdiction" as authorizing preemption. *Id.* ¶ 198 [JA __]. The *Order* further relied on the Commission's "independent authority to displace state and local regulation in accordance with the longstanding federal policy of nonregulation for information services." *Id.* ¶ 202 [JA __]. The Commission purported to derive such authority from (1) § 230's policy

---

[6] The Commission provided a nonexclusive list of preempted laws and regulations, including "'economic regulation' and 'public utility-type regulation.'" *Id.* ¶ 195 n.730 [JA __].

7

statement regarding a "vibrant and competitive free market" for Internet services, notwithstanding the *Order*'s earlier disavowal of the statute as a source of regulatory power; (2) § 153(51)'s definition of a "telecommunications carrier"; and (3) the 1996 Act's forbearance provision, which allows the Commission to forbear from imposing certain Title II regulations on common carriers. *Id.* ¶¶ 202-204 [JA__-__] (citing 47 U.S.C. §§ 230(b)(2), 153(51), 160).

## C.   **The Government Petitioners**

### 1.   **The State Petitioners**

The State Petitioners collectively represent over 165 million people—approximately fifty percent of the United States population— who rely on broadband Internet for personal, business, and other services on a daily basis. The States promulgate and enforce numerous laws and regulations applicable to BIAS providers, including laws protecting consumers from deceptive and unfair business practices.

Following the *Order*, multiple State Petitioners took legislative or executive action to protect consumers and edge providers from harmful

8

practices by BIAS providers.[7] Many other States have introduced legislation to address such practices.[8]

## 2. The County of Santa Clara and the Santa Clara County Central Fire Protection District

The County provides its 1.9 million residents with essential services such as law enforcement, health care, and social services. The County also oversees most regional public health and safety functions, including emergency planning and services, disease control and prevention, and criminal justice administration. County Fire provides fire services both within and outside Santa Clara County.

---

[7] *See* Haw. Exec. Order No. 18-02 (Feb. 5, 2018); Exec. Order No. 9 (Feb. 5, 2018), 50 N.J. Reg. 931(a) (Mar. 5, 2018); Exec. Order No. 175 (Jan. 24, 2018), 9 N.Y.C.R.R. § 8.175; Ch. 88, 2018 Or. Laws (Apr. 9, 2018); R.I. Exec. Order No. 18-02 (Apr. 24, 2018); No.169, 2018 Vt. Acts (May 22, 2018); Exec. Order No. 2-18 (Feb. 17, 2018), 326 Vt. Govt. Reg. 2 (Mar. 2018); Wash. Rev. Code ch. 19.385. *See also* Mont. Exec. Order No. 3-2018 (Jan. 22, 2018). The State of Montana is not a party to this action.

[8] *See* National Conference of State Legislatures, *Net Neutrality Legislation in States* (as of July 18, 2018), http://www.ncsl.org/research/telecommunications-and-information-technology/net-neutrality-legislation-in-states.aspx.

9

Over the past several years, the County has made significant investments to modernize its systems. Many of the services developed through these investments are web-based and rely on high-bandwidth, latency-sensitive exchanges of information with the public. County Fire likewise relies on Internet-based systems to provide crucial public safety services.

### 3.    California Public Utilities Commission

The CPUC is a constitutionally created agency empowered to regulate industries deemed critical to the public welfare, including gas, electricity, telecommunications, and water. Cal. Const., art. XII. The agency is charged with ensuring that public utilities furnish safe and reliable service to promote the safety, health, and comfort of the public, at just and reasonable rates. The CPUC oversees and regulates numerous programs that are affected by the *Order*, including California's energy grid, public utility infrastructure, and universal service programs.

## STANDARD OF REVIEW

The *Order* should be set aside if this Court determines that the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

An "agency's conclusion that state law is preempted" is entitled to deference only if Congress has expressly "authorized" the agency "to pre-empt state law directly." *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). Absent such express authorization, the weight accorded an "agency's explanation of a state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577.

## SUMMARY OF ARGUMENT

The Government Petitioners join the legal arguments made by the Non-Government Petitioners. This brief provides several additional reasons that the *Order* is invalid and must be vacated.

I. The Commission acted arbitrarily and capriciously in crediting industry promises to refrain from harmful practices, notwithstanding substantial record evidence showing that BIAS providers have abused

11

and will abuse their gatekeeper roles in ways that harm consumers and threaten public safety. The Commission's failure to address the impact of the *Order* on public safety is particularly egregious given the agency's statutory mandate to consider this issue. The *Order* also failed to reconcile its abrupt abandonment of the Commission's long-standing protection of the open Internet with the substantial reliance interests of parties (including the Government Petitioners) that have invested in Internet-based services that depend on nondiscriminatory access by consumers to be effective. Finally, the Commission wrongly declined to address the effect of reclassification on universal service programs and other state regulatory structures.

II. Even if the *Order* were otherwise lawful, the Commission exceeded its authority by purporting to preempt state and local governments from taking action to protect consumers and edge providers from abuses by BIAS providers. Having disavowed Title II authority over broadband, the Commission's preemption order can be rooted only in Title I ancillary authority, which in turn must be based on some separate statutorily mandated responsibility. The *Order* identified no such mandate, and instead relied on a purported federal policy of deregulation

12

unmoored from any specific statutory command. But as this Court held in *Comcast Corp. v. FCC*, policy alone cannot provide the basis for the Commission's exercise of ancillary authority, and hence cannot support the *Order*'s attempt to preempt here. 600 F.3d 642, 658 (D.C. Cir. 2010).

Nor can the Commission rely on conflict preemption to support the *Order*. The Commission did not specifically identify conflict preemption as a basis for its *Order*, and any assertion of conflict preemption as a facial matter—divorced from consideration of a specific law or regulation—would be premature and invalid. In any event, there is no conflict between state regulation of broadband service and the Communications Act, which expressly contemplates and relies on active state supervision in this area.

13

# STANDING

The *Order* injures the Government Petitioners in several ways.[9] First, the *Order* authorizes BIAS providers to interfere with the Government Petitioners' ability to provide crucial Internet-based services to their residents on a nondiscriminatory basis.[10] Second, by abdicating federal regulatory authority, the *Order* imposes substantial costs on the Government Petitioners by shifting the burden of policing BIAS providers to state and local law enforcement. Third, the *Order* purports to preempt state laws, thus causing injury to the States' "sovereign power to enforce state law." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989). Fourth, the *Order* interferes with state public utility regulators' ability to comply with federal statutory mandates to promote universal service and protect public safety. The Government Petitioners participated in the proceedings below.[11]

---

[9] For the legal standard for standing, *see* NGP Br. at Standing.

[10] In an excess of caution, the County offers two supporting declarations in addition to the record evidence demonstrating this injury. See Addendum at 1-15.

[11] While Minnesota, New Jersey, and New Mexico did not submit comments or join the December 2017 letter submitted by nineteen

14

# ARGUMENT

## POINT I

### THE *ORDER* IS ARBITRARY AND CAPRICIOUS

An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency." *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

To survive review under the arbitrary-and-capricious standard, an agency's decision must be based on "substantial evidence," and "take into account whatever in the record fairly detracts from its weight." *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996). While an agency may depart from a prior policy, "'a reasoned explanation is needed for

---

Attorneys General (JA __-__), these States suffer the same injuries as the other State Petitioners.

disregarding facts and circumstances that underlay or were engendered by the prior policy,'" including reliance interests. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

The Government Petitioners join the Non-Government Petitioners' arguments with respect to the arbitrary and capricious nature of the *Order*. See *supra* at 11. The *Order* is also arbitrary and capricious for the following reasons.

## A. The Commission Disregarded the Serious Risk That Providers Will Engage in Abusive Practices That Undermine the Open Internet.

"One of the fundamental premises of a regulatory scheme such as that established by the Communications Act is that the free market cannot always be trusted to" advance the public good. *Telocator Network of Am. v. FCC*, 691 F.2d 525, 549 (D.C. Cir. 1982). Just a few years ago, the Commission reiterated its long-standing recognition of the need to protect consumers through affirmative rules ensuring access to an open Internet. *See, e.g.*, *In re Protecting and Promoting the Open Internet* (*2015 Order*), 30 FCC Rcd. 5601 (2015). Numerous commenters, including the Government Petitioners, urged the Commission to

16

preserve these prophylactic rules to prevent abusive practices by BIAS providers that will harm consumers and undermine public safety. *See, e.g.*, NYAG Comments at 13-14 [JA __-__]; Attorneys General Comments at 18-22 [JA __-__]; Public Knowledge Comments at 101-27 [JA __-__].

The *Order* unreasonably disregarded these concerns and disavowed the Commission's prior analysis of the likelihood that BIAS providers will engage in abusive practices. First, the Commission concluded that the record evidence of harm was "sparse" and "speculative." *Order* ¶¶ 109-116 [JA __-__]. Next, the Commission determined that its prior rules were unnecessary because BIAS providers "have strong incentives to preserve Internet openness" and have voluntarily "committed to refrain from blocking or throttling." *Id.* ¶¶ 117-129 [JA __-__]. Finally, the Commission decided that "the transparency rule . . . coupled with existing consumer protection and antitrust laws" would minimize the risk of future harm. *Id.* ¶ 116, 140-154 [JA __, __-__].

The Commission's analysis is deeply flawed. *See* Br. for Non-Government Petitioners (NGP Br.) at V(A)-(B). The Commission's assertion (*Order* ¶¶ 109-110, 117 [JA __, __-__]) that BIAS providers will

17

voluntarily refrain from blocking, throttling, and similar practices incorrectly assumes that providers historically displayed such self-restraint. But it was the Commission's long-standing enforcement of open Internet policies that *compelled* BIAS providers to refrain from harmful practices that injure consumers and undermine public safety. The relatively minimal evidence of such harms in the United States is the result of the protective rules that the Commission has abandoned, rather than evidence that those rules are unnecessary.

The Commission also unreasonably disregarded (*Order* ¶¶ 165, 168 [JA __, __-__]) evidence showing that BIAS providers intentionally engaged in harmful conduct when protective regulations were not in place. *See, e.g.*, NYAG Comments at 3-10 [JA __-__]; OTI Reply Comments at 47-50 [JA __-__]; INCOMPAS Comments at 60-61 [JA __-__] (describing interconnection disputes affecting millions of consumers). The Commission likewise improperly dismissed as irrelevant (*Order* ¶ 115 & n.426 [JA __]) record evidence of harms in foreign countries—where there were no open Internet protections—including specific examples of blocking and throttling by Canadian and European BIAS providers. *See* Engine Comments at 20-21 [JA __-__].

18

The Commission provided no reason that the same incentives that led providers to engage in such practices in the Canadian and European markets would not apply to the United States market if the Commission were to abandon its regulatory responsibilities.

Equally flawed is the Commission's misguided assumption (*Order* ¶¶ 116, 141-142 [JA __, __-__]) that providers' voluntary commitments coupled with existing consumer protection laws provide sufficient protection.[12] The Commission offered no meaningful defense of its decision to uncritically accept industry promises that are untethered to any enforcement mechanism. Nothing in the *Order* would stop a BIAS provider from abandoning its voluntary commitments, revising its Transparency Rule disclosures, and beginning to block, throttle, or engage in paid prioritization, subject only to the Transparency Rule's limited disclosure requirements—leading to the very harms to consumer interests and public safety that the Commission's long-standing commitment to protecting the open Internet was intended to prevent.

---

[12] The *Order* also relied on antitrust laws as a potential remedy for future consumer harm. *See Order* ¶¶ 143-154 [JA __-__]. Antitrust law is insufficient to address the harms at issue. *See* NGP Br. at V(A)(2).

19

The *Order* also failed to identify how consumers or state law enforcement could police BIAS provider's compliance with their voluntary commitments. The Commission merely stated that "the transparency rule allows us to reject the argument that antitrust and consumer protection enforcers cannot detect problematic conduct." *Order* ¶ 142 & n.515 [JA __]. But nothing in the Transparency Rule's generalized disclosures allows a consumer or a state law enforcement agency to evaluate the causes underlying real-time performance and service quality, let alone to attribute any observed service degradation to an undisclosed decision by the provider, without additional investigation. *See* CCIA Reply Comments at 19-21 [JA __-__]; McSweeny Comments at 6 [JA __]; OTI Reply Comments at 28 [JA __]. *See also United States Telecom Ass'n v. FCC*, 855 F.3d 381, 389 (D.C. Cir. 2017) (Srinivasan, J.) (concurring in denial of rehearing en banc). Without such information, it will be difficult for consumers or the States to meaningfully police whether BIAS providers have reneged on their promises.

Even if such information were available, consumer protection laws would provide only an imperfect, ex post remedy. As the Commission

explained in the *2015 Order*, prophylactic rules are especially necessary for BIAS because consumers have limited provider options, face high switching costs, and are at a substantial informational disadvantage. *2015 Order* ¶¶ 80-82, 97-99. Allowing only after-the-fact remedies removes a critical consumer protection and imposes substantial investigative and litigation costs on consumers and state law enforcement alike. Moreover, consumer protection laws may not be able to remedy the harms caused by interfering with individuals' access to public safety systems.

Finally, the Commission failed to address the conflict between its embrace of state laws (as a justification for withdrawing federal regulation) and its subsequent declaration that such laws are purportedly preempted. See *infra* Point II. While the Commission touted "state laws proscribing deceptive trade practices" as a way to minimize consumer harm (*Order* ¶ 142 & n.517 [JA __-__]), the agency simultaneously attempted to preempt state regulation of "any aspect of broadband service" addressed in the *Order* (*id.* ¶ 195 [JA __]). Unsurprisingly, BIAS providers have already cited to this preemption language to shield themselves from traditional state enforcement and

21

regulatory actions. *See, e.g.*, *People v. Charter Commc'ns, Inc.*, 162 A.D.3d 553 (N.Y. App. Div. 2018); Mot. for Summary Judgment, *MetroPCS Cal., LLC v. Picker*, No. 17-cv-5959, Dkt. No. 63 (N.D. Cal. Apr. 6, 2018).

## B. The Commission Violated Its Statutory Mandate to Consider Public Safety.

Congress created the Commission to "promot[e] safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. "The Commission is required to consider public safety by . . . its enabling act." *Nuvio Corp. v. FCC*, 473 F.3d 302, 307-08 (D.C. Cir. 2006). Notwithstanding this express mandate to consider public safety and record evidence showing substantial public safety concerns associated with abusive BIAS provider practices that violate open Internet principles but are permitted by the *Order*, the Commission did not consider public safety at all. "[T]he complete absen[c]e of any discussion of a statutorily mandated factor" renders the *Order* arbitrary and capricious. *Public Citizen*, 374 F.3d at 1216.

As with many private-sector services, large portions of critical infrastructure used by governments and utilities have moved to the

22

Internet. This modernization enables more robust, responsive, and efficient service delivery. Consumers' access to the open Internet is essential to the effective provision of these online services. There is no evidence that it is possible to isolate and preferentially prioritize communications important to public health and safety, given the diversity of platforms and endpoints. Santa Clara Comments at 3-4 [JA __-__]. *See also* Sandoval Reply Comments at 31-32 [JA __-__].

In addition, BIAS providers have shown every indication that they will prioritize their economic interests, even in situations that implicate public safety. See *supra* at 17-19. For example, a BIAS provider recently throttled the connection of a County Fire emergency response vehicle involved in the response to the largest wildfire in California history and did not cease throttling even when informed that this practice threatened public safety.[13] Declaration of Anthony Bowden ¶¶ 9-11

---

[13] Government Petitioners do not contend that this throttling would have violated the *2015 Order*. However, BIAS providers have not prioritized public safety over economic interests and should not be expected to; nor does the Order require them to.

[Addendum 3-4]. In light of these points, the *Order*'s total silence on the issue of public safety is arbitrary and capricious.

***The energy grid.*** As part of the effort to modernize the nation's electrical grid, electric utilities in California and other States have invested ratepayer funds in integrated systems of smart meters, communications networks, and data management systems that enable two-way communication between utilities and customers. Sandoval Reply Comments at 51 [JA __]. Instant communication between customers, suppliers, energy generators, contractors, regulators, and safety personnel is essential to maintaining a safe and reliable grid, and must thus remain free from blocking or delay due to throttling or deprioritization.[14]

California has relied on demand response services offered by utilities and third parties to directly balance load, manage congestion, and satisfy state and federal reliability standards. Sandoval Supp. Reply Comments, Ex. C at 34-35 [JA __-__]. The grid operator also dispatches demand response to achieve immediate load reduction when high temperatures, wildfire, or other emergencies make conservation urgent.

---

[14] 42 U.S.C. § 5195c; Sandoval Reply Comments at 47 [JA __].

Since demand response relies on instantaneous communication with the customer, the absence of open Internet rules jeopardizes the ability to reduce load in times of extreme energy grid stress. Consequently, the *Order* threatens the reliability of the electric grid, and the safety and welfare of California's residents.[15]

***Public health and safety systems.*** Similarly, state and local governments have modernized their public health and safety systems by moving such systems online. These systems depend on the public's access to BIAS on nondiscriminatory terms. *See e.g.*, Santa Clara Comments at 2-14 [JA __-__]; Sandoval Reply Comments at 25-27, 30-32 [JA __-__, __-__]; Ohio Counties Comments at 3-4, 8 [JA __-__, __]; West Virginia Counties Comments at 3-4 [JA __-__].

The County of Santa Clara's emergency and public health services are particularly likely to be affected by the repeal of the open Internet rules. *See* Santa Clara Comments at 2-14 [JA __-__]. The County has

---

[15] Other States have adopted similar programs and would be equally affected. *See, e.g.*, Mass. Gen. L. c. 25, § 21(b) (mandating energy efficiency plans that include demand response programs); *In re Rockland Electric Co.*, Case No. ER16060524 (N.J. Bd. of Pub. Util., Aug. 23, 2017).

25

established a web-based emergency operations center to facilitate coordination internally with other agencies and with first responders in case of emergency. *Id.* at 6-7 [JA __-__]. This tool relies on instant communication among emergency responders without regard to the users' BIAS provider. *Id.* Particularly in such emergencies, where networks are already stressed, delays, deprioritization, or blocking could render an emergency responder or victim using her own device unable to communicate, resulting in the loss of important situational information.

Instant communication is also essential to the proper functioning of the County's public health systems. For example, the County uses web-based public alert systems to distribute time-sensitive safety information to the public, including evacuation orders, shelter-in-place orders, and disease outbreak information. *Id.* at 8-9 [JA __-__]. This online information is widely used and of critical importance to the public—during the 2009 H1N1 emergency, for example, a County system was so heavily used that it became overloaded. Significant delays from blocking, throttling, or deprioritization could impede effective notification and jeopardize safety in public-health emergencies. *Id.* During an emergency, meaningful (that is, timely) access to public-

26

health information should not be limited to those who have paid for priority or access.

The County's hospital also relies upon, and has plans to expand, web-based systems that are latency-sensitive and bandwidth-intensive. The County is in the planning stages of an expansion of its telemedicine capabilities, which will include a high-definition video solution that will allow clinicians to treat patients using a broadband connection. Using the system, doctors will be able to perform triage and improve outcomes in time-sensitive situations (such as strokes or vehicular accidents) where immediate diagnosis can mean the difference between life and death. The system will also allow providers to avoid high-risk situations such as in-person treatment of jail inmates. The hospital also uses systems like Citrix, which allows doctors to access important clinical applications and its records system, which transfers more than two million patient records annually among thousands of clinics, hospitals, and emergency departments. *Id.* at 10-11 [JA __-__]. Access to an open Internet is essential for these tools to be reliable and beneficial.

Because of the unique functions of entities that provide public health and safety services, the providers that serve them are often small,

27

niche businesses. Declaration of Imre Kabai (Kabai Decl.) ¶¶ 8-9 [Addendum 14-15]; Santa Clara Comments at 3-4 [JA __-__]. Open Internet rules promoted the trend toward more effective public health and safety systems by allowing these niche providers to develop systems to serve the public sector. Santa Clara Comments at 3, 6 [JA __, __]. Because governments are obligated to be cost conscious, neither governments nor the businesses that serve them are likely to pay to prioritize their traffic.[16] *Id.* Accordingly, the *Order* could stifle the growth of niche providers and limit the effectiveness of government entities that rely on their services. The Commission's unexplained failure to address this concern is an additional reason the *Order* is arbitrary and capricious.

---

[16] The County has also heavily invested in Internet-based solutions to promote civic engagement, including, for example, live broadcast of public meetings and web publication of its law. The *Order* likewise threatens to make such innovative systems for connecting citizens to their governments available only to those who can pay, or to those whose governments pay for access. Santa Clara Comments at 4-6 [JA __-__].

## C.   The *Order* Failed to Consider Significant and Long-Standing Reliance Interests.

"In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino*, 136 S. Ct. at 2126 (quotation marks omitted). Commenters, including the Government Petitioners, submitted substantial evidence of reliance on open Internet principles, including millions of dollars of investment. Sandoval Reply Comments at 51-52 [JA __-__]; Santa Clara Comments at 3, 14 n.17 [JA __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. The *Order's* analysis of this evidence consists of a three-sentence paragraph that does not come close to satisfying the Commission's obligation. *See Order* ¶ 159 [JA __].

The Commission brushed aside evidence of reliance interests by erroneously asserting that it need not analyze "[a]ssertions in the record regarding absolute levels of edge investment" because commenters "do not meaningfully attempt to attribute particular portions of that investment to any reliance on the *Title II Order*." *Id*. Investments, however, are made in reliance on many factors, and courts have never required a precise allocation of portions of an investment to preexisting

29

conditions.[17] *See, e.g.*, *Encino*, 136 S. Ct. 2126 (finding serious reliance interest on "background understanding" of a policy without demanding allocation of the value of that reliance).

The Commission also incorrectly assumed that commenters must show reliance specifically on the *2015 Order*. But the open Internet did not begin in 2015. Rather, the Commission has enforced these principles since 2005, engendering reasonable reliance that whole time. *See U.S. Telecom*, 825 F.3d at 693; NGP Br. at Statement(A). The *Order* vitiated these principles, doing far more than revert to the status quo in 2014. Many commenters, including the Government Petitioners, explicitly and reasonably relied not only on the *2015 Order*, but also on the rules and enforcement actions taken by the Commission for over a decade.[18] Santa

---

[17] In contrast, the Commission found that BIAS providers had halted or limited infrastructure investment due solely to the *2015 Order* despite overwhelming evidence to the contrary. *See Order* ¶¶ 89-98 [JA __-__].

[18] The Commission is wrong to state that reliance would not have been reasonable because of "the lengthy prior history of information service classification of broadband Internet access service." *Order* ¶ 159 [JA __]. Reasonable reliance was based on the Commission's regulatory protection of the open Internet, which it had maintained for over a decade irrespective of how BIAS was classified.

Clara Comments at 3, 14 n.17 [JA __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. The Commission cannot avoid its obligation to analyze and weigh record evidence by artificially limiting the analysis to reliance on its most recent rules, when the *Order* overturned a much longer history of open Internet protections maintained by the Commission under both Title I and II.

The County, in particular, submitted evidence of its reliance on the Commission's protection of the open Internet in making decisions to invest in systems for protecting public safety, public health, and patient health and safety; publication of its law; compliance with its public notice and access requirements; and facilitating civic participation. Santa Clara Comments at 3, 10, 14 n.17 [JA __, __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. For example, in reliance on the open Internet, the County invested more than a million dollars in its medical records system and is investing hundreds of thousands of dollars in its telemedicine systems. Santa Clara Comments at 10-11 [JA __-__].

31

Similarly, the modern energy grid was developed in reliance on the open Internet. See *supra* at 24-25.

Having decided that it need not analyze record evidence of reliance, the Commission stated that it was "not persuaded that there were reasonable reliance interests" on the *2015 Order*. *Order* ¶ 159 [JA __]. Such a "conclusory . . . statement cannot substitute for a reasoned explanation." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008). The Commission's inaccurate summary of the record and its failure to address the ample evidence of industry, governmental, and public safety reliance on an open Internet renders the *Order* arbitrary and capricious.

## D. The Commission Failed to Properly Consider the Effect of Reclassification on Universal Service and Pole Attachment Rights.

The Commission's decision to reclassify BIAS cannot be reconciled with the States' statutory obligations to advance universal service and provide nondiscriminatory utility pole access. The Commission also disregarded the effect of reclassification on the States' ability to enforce important safety regulations for pole attachments. The *Order* must be reversed because the Commission

32

failed to properly consider the implications of its reclassification decision on important regulatory schemes.

**_Lifeline Programs._** The 1996 Act obligates the Commission and the States to ensure the affordability and widespread availability of safe, reliable, high-quality telecommunications services. 47 U.S.C. §§ 253(b), 254(c), (e)-(f). The federal Lifeline program promotes universal service by enabling discounts on telecommunications services for low-income Americans. In 2015, the Commission modernized the federal Lifeline program to include broadband.[19] Many States have also enacted state universal service programs to enable low-income citizens' access to high-quality telecommunications.[20]

Under 47 U.S.C. § 214(e)(1), federal universal service support is available only for common carriers designated by a State or the Commission as an "eligible telecommunications carrier." Title II common carriage thus forms the legal underpinning to provide Lifeline

---

[19] _See generally In re Lifeline & Link Up Reform and Modernization_, 31 FCC Rcd. 3962 (2016).

[20] _See, e.g._, Cal. Pub. Util. Code § 871; Conn. Gen. Stat. § 16-247e; 220 Ill. Comp. Stat. § 5/13-301; Md. Code Ann., Pub. Util. § 8-201; Minn. Stat. § 237.70 (2017).

subsidies for standalone broadband service—i.e., Internet connection unbundled from other services such as phone. *See Direct Commc'ns Cedar Valley, LLC v. FCC*, 753 F.3d 1015, 1049 (10th Cir. 2014). Similarly, only telecommunications providers are required to contribute to the Universal Service Fund. *See* 47 U.S.C. § 254(d).

Several commenters noted that reclassification of BIAS would eliminate the statutory basis for including standalone broadband in universal service programs. *See* CPUC Comments at 13 [JA __]; Public Knowledge Comments at 95-97 [JA __-__]; Free Press Comments at 71-72 [JA __-__]; Voices Coalition Comments at 53-62 [JA __-__]; National Consumer Law Center Comments at 5-8 [JA __-__]. As these commenters noted, universal service programs cannot fulfill their purpose unless they include broadband Internet access. While the Commission asserted in the *Order* that it need not address its legal authority to continue supporting BIAS in the Lifeline program until later proceedings (*Order* ¶¶ 192-193 [JA __-__]), this regulatory punt missed the point because classification determines eligibility for universal service support under § 214(e). The Commission thus could—

and should—have addressed the impact of reclassification on the federal Lifeline program.

The *Order* also failed to consider the effect of reclassification on the States' ability to include standalone broadband in state universal service programs. The 1996 Act preserves state authority to implement "requirements necessary to preserve and advance universal service [and] ensure the continued quality of *telecommunications services*." 47 U.S.C. § 253(b) (emphasis added); *see id.* § 254(f). If BIAS is not classified as a telecommunications service, the States could arguably be precluded from requiring standalone BIAS in their respective Lifeline programs.[21] Although the Commission recognized that reclassification would affect the Lifeline program, the Commission ultimately failed to address, much less resolve, how it or the States could mandate standalone broadband in Lifeline programs given these statutory limitations.

---

[21] The Commission's assertion that § 706 of the 1996 Act is "hortatory" impermissibly eliminates an alternate source of regulatory authority to include standalone BIAS in universal service programs. *Accord* NGP Br. at IV.

***Pole Attachments.*** In the *2015 Order*, the Commission recognized the critical importance of pole attachments to deploying communications networks, and acknowledged that Title II ensures BIAS providers' access to, among other things, utilities' poles at just, reasonable, and nondiscriminatory rates. *2015 Order* ¶¶ 56, 413, 478 [JA __, __, __]. In the current *Order*, the Commission reversed course but failed to recognize—much less reconcile—the *Order*'s effect on the States' ability to ensure nondiscriminatory pole access and to adopt and enforce pole attachment safety regulations.

The Commission concluded that Title II classification was not necessary to promote broadband deployment. *Order* ¶185 [JA __]. However, the Commission failed to acknowledge the federal requirement that utilities extend nondiscriminatory access to poles and rights-of-way *only* to "cable television systems or *telecommunications carriers*." 47 U.S.C. § 224(f)(1) (emphasis added). Once BIAS providers are classified as information services providers, they lose the statutory right to access utility infrastructure.

The Commission further failed to explain how the States could enforce safety regulations for pole attachments by standalone BIAS

providers in the absence of Title II classification. Pursuant to § 224, States can elect to regulate the rates, terms, and conditions for pole attachments under state law, and certify to the Commission that they will do so. More than twenty States, including California, have so certified, and thus have reverse-preempted the Commission from exercising jurisdiction over pole attachments in those States.[22] This reverse-preemption, however, applies to nondiscriminatory access by telecommunications carriers. *See* 47 U.S.C. § 224(c), (f). The Commission did not explain how States can enforce terms and conditions on BIAS providers under this statute—including regulations relating to "safety, reliability and generally applicable engineering purposes," *id.* § 224(f)(2), if those providers are not deemed to provide telecommunications services.

---

[22] *See* Decision No. 98-10-058, 82 CPUC2d 510, 1998 Cal. PUC LEXIS 879 (adopting pole attachment and rights-of-way rules); *see also* 25 FCC Rcd. 5541 (May 19, 2010) (complete list of States that have reverse-preempted).

This omission has real-world implications for public safety.[23] Unauthorized, and sometimes hazardous, attachments to the millions of poles in any given State are regular occurrences. The ability to enforce safety regulations for pole attachments is paramount in States like California, which has recently suffered unprecedented wildfires and windstorms that have wreaked havoc on utility infrastructure. *Cf.* CPUC Comments at 9 [JA __]. A standalone BIAS provider might pledge compliance with a State's safety regulations to obtain access to utility infrastructure, yet subsequently commit a major safety violation with impunity. The *Order* does not explicitly preclude such a provider from arguing that, as a provider of information services, it is exempt from a State's authority to investigate the incident or impose fines, sanctions, or other remedies. Although the Commission acknowledged (rightly) that its *preemption* determination does not interfere with States' authority to address safety issues in rights-of-way (*see Order* ¶ 196 n.735

---

[23] The Commission's failure to consider public safety concerns violated its express mandate to consider public safety. See *supra* at 22.

[JA __]), it failed to address the effect of *reclassification* on the States'

ability to regulate utility pole attachments by BIAS providers.

## POINT II

### THE COMMISSION'S PREEMPTION ORDER IS INVALID

## A.    The Commission May Not Preempt Absent Statutory Authority.

In the *Order's* preemption provisions, the Commission purported

to rely on a "federal policy of nonregulation" and asserted that "an

affirmative policy of deregulation is entitled to the same preemptive

effect as a federal policy of regulation."[24] *Order* ¶¶ 194, 202 [JA __, __].

This justification fundamentally misstates the law.

An agency that deems itself to lack statutory authority to regulate

a particular practice altogether cannot rely on the same absence of

authority to preempt state regulation. This Court has long held that "the

allowance of wide latitude in the exercise of *delegated* powers is not the

equivalent of untrammeled freedom to regulate activities over which the

---

[24] The Notice of Proposed Rulemaking (JA __-__) did not seek
comments on the Commission's intention to preempt state law or provide
notice of what statutory authority the Commission intended to rely on
in order to preempt state law.

Case 2:18-cv-02660-JAM-DB    Document 2-5    Filed 09/30/18    Page 61 of 86

statute fails to confer, or explicitly denies, Commission authority."
*National Ass'n of Regulatory Utility Comm'rs v. FCC* (*NARUC II*), 533
F.2d 601, 617 (D.C. Cir. 1976) (emphasis added). There is a "vital
difference between a refusal to use granted power, and an attempt to
prevent regulation by others in an area where no" agency authority
exists. *Id.* at 620 n.113. Here, the Commission interpreted the
Communications Act to prevent the agency from exercising affirmative
authority to regulate broadband. That position necessarily eliminated
the agency's authority to preempt as well.

Under controlling case law, the Commission has no power to
preempt state action unless its action is either directly authorized by
statute or ancillary to the effective performance of its statutorily
mandated responsibilities. As this Court has made clear, the
Commission "cannot regulate (let alone preempt state regulation of) any
service that does not fall within its Title II jurisdiction over common
carrier services [the pertinent statutory authority] or its Title I
jurisdiction over matters 'incidental' [or ancillary] to communication by
wire." *Public Serv. Comm'n of Maryland v. FCC* (*Maryland PSC*), 909
F.2d 1510, 1515 n.6 (D.C. Cir. 1990); *see also* 47 U.S.C. § 154(i). The

40

Commission emphatically disavowed Title II authority. See *supra* at 5-6. And none of the three grounds asserted in the *Order* provide the Commission with "independent authority to displace state and local regulations." *Order* ¶ 202 [JA __].

First, the Commission appeared to rely on its ancillary authority under Title I to preempt state and local laws pursuant to a purported "federal policy of nonregulation for information services." *Id.* But "Title I is not an independent source of regulatory authority; rather, it confers on the FCC only such power as is ancillary to the Commission's specific statutory responsibilities." *California v. FCC (California I)*, 905 F.2d 1217, 1240 (9th Cir. 1990). Regulations pursuant to ancillary authority are thus permissible only when they "are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." *American Library Ass'n v. FCC*, 406 F.3d 689, 703 (D.C. Cir. 2005).

"Policy statements alone cannot provide the basis for the Commission's exercise of ancillary authority" because policy is not a delegation of regulatory authority. *Comcast*, 600 F.3d at 654. Instead, only a statutorily mandated responsibility derived from "express delegated

41

authority" can justify the exercise of ancillary jurisdiction. *Id.* at 658.[25]

Thus, "it is Title II, III, or VI to which the [Commission's exercise of] authority must ultimately be ancillary." *Id.* Here, the Commission purported to identify a "federal policy of nonregulation for information services" in a policy statement and a definitional provision. But neither source is sufficient to assert ancillary authority under *Comcast* and *NARUC II.*

---

[25] There is no merit to the Commission's assertion that the Eighth and Ninth Circuits have authorized agency preemption based on a generic federal policy of deregulation alone. *See Order* ¶¶ 194, 198 & nn.726, 738 [JA __-__, __] (citing *Minnesota Pub. Util. Comm'n v. FCC* (*Minnesota PUC*), 483 F.3d 570 (8th Cir. 2007), and *California v. FCC* (*California III*), 39 F.3d 919 (9th Cir. 1994)). These courts did not have to resolve the question presented here—whether the Commission failed to properly assert ancillary authority. In *Minnesota PUC*, the parties did not contest the Commission's assertion of ancillary authority. And in *California III*, the Ninth Circuit had previously held that the FCC had ancillary authority to establish a regulatory regime for enhanced services. *See California III,* 39 F.3d at 932 (citing *California I*, 905 F.2d at 1240 n.35). In any event, to the extent that *Minnesota PUC* and *California III* may be read to stand for the proposition that the Commission may link its ancillary authority to preempt solely based on a "federal policy of nonregulation," such a holding would be flatly inconsistent with this Court's precedent. *See Comcast*, 600 F.3d at 651-58.

42

The Commission initially relied on § 230(b)(2) (*Order* ¶ 203 [JA __]), which provides, in relevant part, that "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). That provision, standing alone, cannot be construed to furnish the Commission with the necessary authority to preempt state laws because this Court has already held that the policy statements contained in § 230 do not support ancillary authority. *See Comcast*, 600 F.3d at 652-55. Indeed, the Commission itself acknowledged that § 230(b) is "hortatory." *Order* ¶ 284 [JA __-__].

The Commission also cited to § 153(51), the statutory definition of "telecommunications carrier," which provides that the Commission may impose common carrier regulations on such an entity "only to the extent that [a carrier] is engaged in providing telecommunications services." *See id.* ¶ 203 [JA __] (citing 47 U.S.C. § 153(51)). No court has held that the Commission can derive ancillary authority from a definitional statute that, by its plain terms, limits only the agency's authority to act and says nothing about state authority.

43

The Commission further mistakenly asserted (*see id.* ¶ 202 nn.748-749 [JA __-__]) that legal precedent permits the exercise of ancillary authority even without specific delegated powers. In *Computer & Communications Industry Association v. FCC*, this Court permitted preemption only after holding that the Commission had properly exercised its Title I ancillary authority over enhanced services offered by common carriers. 693 F.2d 198, 214 (D.C. Cir. 1982). As this Court later explained in *Comcast*, the order at issue in *CCIA* had properly "linked [the Commission's] exercise of ancillary authority to its Title II responsibility over common carrier rates—just the kind of connection to statutory authority missing here." 600 F.3d at 656.

The Commission was equally incorrect to rely on *City of New York v. FCC*, 486 U.S. 57 (1988). At issue in that case was the Commission's preemption of local technical standards for cable television signals following the Cable Act of 1984. The Supreme Court upheld the Commission's decision, holding that the text and legislative history of the Cable Act showed that Congress enacted the statute as a "straightforward endorsement" of the Commission's prior regulatory approach, which had included preemption of technical standards

44

regulation. *Id.* at 67-70. In doing so, the Court identified a specific statutory provision in the Cable Act to which the Commission's preemption order was ancillary. *Id.* at 66-67 (citing 47 U.S.C. § 544(a)-(e)). Here, the Commission failed to identify any comparable statutory provision to which its purported preemption is ancillary.

Second, and for similar reasons, the Commission cannot assert stand-alone authority to preempt state law under the "impossibility exception to state jurisdiction." *Order* ¶¶ 198-201 [JA __-__]. The so-called "impossibility exception" allows the Commission to exercise jurisdiction over intrastate practices that the agency otherwise would be prohibited from regulating under § 152(b). The Commission has authority to regulate such intrastate practices if and only if "(1) the matter to be regulated has both interstate and intrastate aspects; (2) FCC preemption is necessary to protect a valid federal regulatory objective; and (3) state regulation would negate the exercise by the FCC of its own *lawful authority*." *Maryland PSC*, 909 F.2d at 1515 (emphasis added) (citations and alteration marks omitted). Under the last prerequisite, the impossibility exception likewise requires the Commission to identify an independent source of statutory authority to support any given

45

preemption decision. *See Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 422-423 (5th Cir. 1999)*; National Ass'n of Regulatory Utility Comm'rs v. FCC*, 880 F.2d 422, 429 (D.C. Cir. 1989).

Third, and last, the Commission contended that its preemption authority "finds further support in the Act's forbearance provision." *See Order* ¶ 204 [JA __] (citing 47 U.S.C. § 160(e)). Section 160 allows the Commission to "forbear from applying any regulation or any provision of [Title II] to a telecommunications carrier or telecommunications service" if the Commission determines that such regulation is not necessary or that forbearance is consistent with public interest. 47 U.S.C. § 160(a). In turn, state public utility commissions "may not continue to apply or enforce any provision [of Title II] that the Commission has determined to forbear from applying." *Id.* § 160(e).

As the Commission appeared to acknowledge, the forbearance provision is not directly applicable here because it applies only to telecommunication services regulated by Title II, and not to information services as the Commission has reclassified BIAS to be. Instead, the Commission asserted that "[i]t would be incongruous if state and local regulation were preempted" pursuant to a Title II forbearance decision,

46

but not when the Commission has determined that Title II is inapplicable. *Order* ¶ 204 [JA __]. But the starting premise of the Commission's reasoning is mistaken. Section 160(e) does not by its own terms "limit or preempt State enforcement of State statutes or regulations"; instead, it forbids the States only from "continu[ing] to apply or enforce any provision of the *Communications Act* that the Commission has determined to forbear from applying." S. Conf. Rep. No. 104-458, at 185 (1996) (emphasis added). Because Title II's forbearance provision does not authorize preemption, it creates no incongruity that would justify the *Order*'s further attempt to preempt state and local laws.

The Commission thus failed to identify any statutory mandate to which its preemption of state laws is ancillary. Absent that authority, the Commission cannot "confer power upon itself" to "take action which it thinks will best effectuate a federal policy." *Louisiana Pub. Serv.*, 476 U.S. at 374; *see also EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 999 (D.C. Cir. 2013).

**B. The Commission's Reference to Conflict Preemption Is Premature and Erroneous in Any Event.**

**1. Conflict preemption must be raised on a case-by-case basis, not suggested in an order opining in advance that all state laws are preempted.**

Because the Commission did not cite conflict preemption as a legal basis for its preemption order, *see Order* ¶¶ 197-204 [JA __-__], the *Order* cannot be upheld on that basis.[26] To the extent that the *Order* nevertheless suggested (*see id.* ¶¶ 194-196) that state laws are preempted because they conflict with the Commission's deregulatory agenda, the Commission's effort to find conflict preemption as a facial matter, over a broad swath of unidentified state and local laws, is premature and without legal effect, and this Court should hold as much.

"[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract." *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1220 (D.C. Cir. 1984). Conflict preemption analysis is fact-driven and requires review of the specific state statute or regulation under review, its interplay with the federal regime, and

---

[26] *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Comcast*, 600 F.3d at 660 ("[T]he Commission must defend its action on the same grounds advanced in the *Order*.").

48

the nature of the regulated service or practice. *See id.* Moreover, agency assertions of conflict preemption are not entitled to deference as a blanket matter; rather, the weight given to such a declaration depends on the persuasiveness of the agency's analysis of the specific state and federal laws at issue. *See Wyeth*, 555 U.S. at 576-77. Accordingly, conflict preemption must be raised in individual cases challenging specific state laws—not in a broad pronouncement suggesting that state laws are preempted as a class regardless of their individual features.

The Commission's premature suggestion of conflict preemption could have substantial consequences for the Government Petitioners if this Court does not vacate the *Order*. Without such relief, BIAS providers could argue that the Hobbs Act's jurisdictional limitations, *see* 28 U.S.C. § 2342(1); *see also* 47 U.S.C. § 402(a), preclude state and local governments from contesting conflict preemption in challenges to individual laws and enforcement actions, and thus hamper state efforts to enforce duly enacted laws.[27]

---

[27] *See, e.g.*, Br. for Appellant at 25-26, *People v. Charter Commc'ns, Inc.*, No. 450318/17 (N.Y. App. Div. 2018) (BIAS provider arguing that

49

## 2. The *Order* fails to identify a valid basis for conflict preemption.

In any event, there is no merit to the Commission's suggestion (*Order* ¶¶ 194-196 [JA __-__]) that broad swaths of state laws and disclosure requirements impermissibly conflict with federal law. "[B]ecause the States are independent sovereigns in our federal system," preemption analysis must begin "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic v. Lohr*, 518 U.S. 470, 486 (1996). The presumption against preemption applies with equal force where the purported conflict derives from an agency regulation. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985). Moreover, where, as here, "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal

---

New York's state-law consumer protection action should be dismissed on the ground that it implicitly challenges the *Order*'s legal validity).

50

pre-emption becomes a less persuasive one."[28] *New York State Dep't. of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973).

Federal law endorses state regulation of communications services. *See generally* Philip Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692, 1694 (2001). The Communications Act preserves all state remedies available "at common law or by statute," 47 U.S.C. § 414, and embraces state authority in areas of traditional state concern—including state-law "requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." 47 U.S.C. § 253(b); *see also id.* § 332(c)(3), (7).

Congress underscored its intent to preserve a substantial role for state and local regulation of communications by carefully cabining federal preemption in this area. Thus, although the 1996 Act authorized

---

[28] The Commission's assertion that the presumption against preemption does not apply here is baseless. *Order* ¶ 202 n.749 [JA __]. The presumption against preemption is built into the Communications Act, which preserves and welcomes state regulation. *Global Tel\*Link v. FCC*, 866 F.3d 397, 403 (D.C. Cir. 2017).

preemption of some state laws, *see e.g., id.* § 253(a); Pub. L. No. 104-104, § 602(a), 110 Stat. 56, 144 (1996), Congress required all such provisions to be construed narrowly. To that end, § 601(c) of the 1996 Act provides that "[t]his Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 47 U.S.C. § 152 note. As then-Commissioner Ajit Pai noted in 2015, "section 601(c) counsels against any broad construction of the 1996 Act that would create an implicit conflict with state law." *In re City of Wilson*, 30 FCC Rcd. 2408, 2512 (Mar. 12, 2015) (dissenting statement) (alteration marks omitted), *pet. for review granted Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016).

Sovereign States are not required to take an *ex post* approach to consumer protection law and may prohibit specific industry practices *ex ante* in order to protect consumers and the general public.[29] Such laws

---

[29] *See, e.g.*, Conn. Gen. Stat. § 21a-217 (health club contracts); 6 Del. Code ch. 24A (debt management services); N.J. Stat. Ann. § 49:3-53 (investment advisers); Md. Code Ann., Com. Law § 14-3301 et. seq. (immigration consultants); 940 Mass. Code Regs. § 19.01 et seq. (retail marketing and sale of electricity); Minn. Stat. § 325F.693 (2017)

fall well within the ambit of traditional State police powers. Accordingly, States are entitled to take legislative and regulatory action to protect consumers and small businesses and address unfair business practices in the BIAS industry.[30]

The Commission nevertheless asserted that state laws addressing specific BIAS practices could be contrary to the agency's decision to reclassify BIAS as an information service and would therefore interfere with the "pro-competitive, deregulatory goals of the 1996 Act." *Order* ¶ 194 [JA __-__]. To be sure, this Court has interpreted the 1996 Act to bar the *Commission* from imposing regulations under Title I on information services that would prohibit blocking, throttling, and paid prioritization. *See Verizon v. FCC*, 740 F.3d 623, 656 (D.C. Cir. 2014). But Congress's choice to bar the Commission from promulgating certain

---

(prohibiting telephone companies from slamming); Or. Rev. Stat. § 646A.800 (regulating late fees for cable service); 37 Pa. Code § 301.1 et seq. (automotive industry trade practices).

[30] *See, e.g.*, Wash. S. Bill Rep. on SHB 2282 (Feb. 27, 2018) (making a violation of Washington's law enforceable under the Consumer Protection Act). State laws and executive orders involving the States' purchasing authority are likewise not subject to preemption. *See Building & Constr. Trades Council of Metro Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226-230 (1993).

types of regulations under Title I does not, standing alone, prohibit the States from acting. "Although federal agencies have only the authority granted to them by Congress, states are sovereign." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1190 (11th Cir. 2017). A "clear and manifest purpose" to preempt the States' sovereign powers cannot be inferred from a congressional decision to strip a federal agency of jurisdiction. *Id.* at 1190-91.

No other provision of the 1996 Act clearly expresses Congress's intent to preempt state regulation of information services. For example, while the 1996 Act expressly authorizes preemption with respect to certain types of state regulation of *telecommunications* services, *see, e.g.*, 47 U.S.C. §§ 253(a), 332(c)(3), the Act includes no similar provision regarding information services. To the contrary, Congress expressly preserved state regulation of *all* communications services through consumer protection, tort, or other state law remedies, and warned against implied preemption. See *supra* at 51-52. Indeed, the Commission admitted (*Order* ¶ 196 n.732 [JA _]), that the classification of BIAS as an information service cannot altogether preclude state regulation.

54

Nor is there merit to the Commission's argument that the 1996 Act implicitly "embraced" the Commission's policy of preemption by adopting the Commission's deregulatory approach to enhanced services (the predecessor to information services). *Order* ¶ 202 & n.749 [JA __-__]. A national policy of deregulation cannot be enacted silently. "Without a text that can . . . plausibly be interpreted as *prescribing* federal preemption, it is impossible to find that a free market was mandated by federal law." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988).

Finally, there is no basis for the Commission's effort to preempt state-law disclosure requirements exceeding the narrowed Transparency Rule. *Order* ¶ 195 n.729 [JA __-__]. In the absence of clear congressional intent to displace state law, the States have the authority (and in many cases, the obligation) to exercise their own judgment concerning the types of disclosures that are necessary to regulate the businesses operating in their States. Here, Congress has actively encouraged state efforts to collect data about BIAS service and providers, indicating that Congress intended to support, rather than displace, the States' ability to compel regulatory disclosures from

55

providers. *See, e.g.*, 47 U.S.C. § 1304 (setting aside federal funds for state studies regarding broadband deployment); *see also id.* § 1302(a). In addition, mandating public disclosures to protect consumers from being cheated based on their ignorance of material facts is a classic form of consumer protection well within the States' historic police powers.

## CONCLUSION

The *Order* should be vacated and reversed.

Dated:      New York, New York
            August 20, 2018

56

Respectfully submitted,

AROCLES AGUILAR
General Counsel
HELEN M. MICKIEWICZ
Assistant General Counsel
LISA-MARIE G. CLARK
Staff Counsel

By: _/s/ Kimberly J. Lippi_
KIMBERLY J. LIPPI
Staff Counsel
California Public Utilities
Commission
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822
Kimberly.Lippi@cpuc.ca.gov

*Attorneys for Petitioner California
Public Utilities Commission*

(*Counsel listing continues on next page.*)

BARBARA D. UNDERWOOD
Attorney General of the
 State of New York
STEVEN C. WU
Deputy Solicitor General

By: _/s/ Ester Murdukhayeva_
ESTER MURDUKHAYEVA
Assistant Solicitor General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6279
Ester.Murdukhayeva@ag.ny.gov

*Attorneys for Petitioner State of
New York*

JAMES R. WILLIAMS
County Counsel
GRETA S. HANSEN
LAURA TRICE

By: _/s/ Danielle L. Goldstein_
DANIELLE L. GOLDSTEIN
Office of the County Counsel
70 W. Hedding Street
San José, CA 95110
(408) 299-5906
Danielle.Goldstein@cco.sccgov.org

57

JEFFREY T. PEARLMAN
Intellectual Property &
Technology Law Clinic
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089-0071
(213) 740-7613
jef@law.usc.edu

PHILLIP R. MALONE
Juelsgaard Intellectual Property
and Innovation Clinic
Mills Legal Clinic at
Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305
(650) 725-6369
jipic@law.stanford.edu

*Attorneys for Petitioners County of
Santa Clara and Santa Clara
County Central Fire Protection
District*

XAVIER BECERRA
Attorney General of the
  State of California

By:  */s/ Nicklas A. Akers*
NICKLAS A. AKERS
Senior Assistant Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 703-5562
Nicklas.Akers@doj.ca.gov

*Attorneys for Petitioner State of
California*

GEORGE JEPSEN
Attorney General of the
  State of Connecticut

By:  */s/ Jonathan J. Blake*
JONATHAN J. BLAKE
Assistant Attorney General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105
(860) 808-5400
Jonathan.Blake@ct.gov

*Attorneys for Petitioner State of
Connecticut*

58

RUSSELL A. SUZUKI
Attorney General of the
   State of Hawai'i

By:   _/s/ Clyde J. Wadsworth_
CLYDE J. WADSWORTH
Solicitor General
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180
Clyde.J.Wadsworth@hawaii.gov

_Attorneys for Petitioner State of
Hawai'i_

LISA MADIGAN
Attorney General of the
   State of Illinois

By:   _/s/ David Franklin_
DAVID FRANKLIN
Solicitor General
Office of the Attorney General
100 West Randolph Street
12th Floor
Chicago, IL 60601
(312) 814-5028
DFranklin@atg.state.il.us

_Attorneys for Petitioner State of
Illinois_

MATTHEW P. DENN
Attorney General of the
   State of Delaware

By:   _/s/ Christian D. Wright_
CHRISTIAN D. WRIGHT
Director, Consumer Protection
Office of the Attorney General
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Christian.Wright@state.de.us

_Attorneys for Petitioner State of
Delaware_

THOMAS J. MILLER
Attorney General of the
   State of Iowa

By:   _/s/ Benjamin E. Bellus_
BENJAMIN E. BELLUS
Assistant Attorney General
Office of the Attorney General
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319
(515) 281-5926
Benjamin.Bellus@ag.iowa.gov

_Attorneys for Petitioner State of
Iowa_

59

JANET T. MILLS
Attorney General of the
State of Maine


By:  /s/ Brendan O'Neil
BRENDAN O'NEIL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8842
Brendan.ONeil@maine.gov

*Attorneys for Petitioner State of
Maine*

BRIAN E. FROSH
Attorney General of the
State of Maryland


By:  /s/ Richard L. Trumka, Jr.
RICHARD L. TRUMKA, JR.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6957
RTrumka@oag.state.md.us


*Attorneys for Petitioner State of
Maryland*

ANDREW G. BESHEAR
Attorney General of the
Commonwealth of
Kentucky


By:  /s/ Andrew G. Beshear
ANDREW G. BESHEAR
Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, KY 40601
(502) 696-5300
Andy.Beshear@ky.gov

*Attorney for Petitioner
Commonwealth of Kentucky*

MAURA HEALEY
Attorney General of the
Commonwealth of
Massachusetts


By:  /s/ Jared Rinehimer
JARED RINEHIMER
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Jared.Rinehimer@state.ma.us


*Attorneys for Petitioner
Commonwealth of Massachusetts*

JAMES M. HOOD
Attorney General of the
  State of Mississippi

By:  _/s/ Crystal Utley Secoy_
CRYSTAL UTLEY SECOY
Special Assistant Attorney
General, Consumer Protection
Office of the Attorney General
P.O. Box 22947
Jackson, MS 39225
(601) 359-4212
CUtle@ago.state.ms.us

*Attorneys for Petitioner State of
Mississippi*

GURBIR S. GREWAL
Attorney General of the
  State of New Jersey

By:  _/s/ Jeremy M. Feigenbaum_
JEREMY M. FEIGENBAUM
Assistant Attorney General
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 292-4925
Jeremy.Feigenbaum@njoag.gov

*Attorneys for Petitioner State of
New Jersey*

LORI SWANSON
Attorney General of the
  State of Minnesota

By:  _/s/ Joseph C. Meyer_
JOSEPH C. MEYER
Assistant Attorney General
Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1433
Joseph.Meyer@ag.state.mn.us

*Attorneys for Petitioner State of
Minnesota*

HECTOR BALDERAS
Attorney General of the
  State of New Mexico

By:  _/s/ Tania Maestas_
TANIA MAESTAS
Deputy Attorney General
Office of the Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
TMaestas@nmag.gov

*Attorneys for Petitioner State of
New Mexico*

61

ELLEN F. ROSENBLUM
Attorney General of the
    State of Oregon

By:   /s/ Andrew Shull
ANDREW SHULL
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
(503) 934-4400
Andrew.Shull@doj.state.or.us

*Attorneys for Petitioner State of
Oregon*

JOSH SHAPIRO
Attorney General of the
    Commonwealth of
    Pennsylvania

By:   /s/ Michael J. Fischer
MICHAEL J. FISCHER
Chief Deputy Attorney General
Office of the Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120
(215) 560-2171
MFischer@attorneygeneral.gov

*Attorneys for Petitioner
Commonwealth of Pennsylvania*

JOSHUA H. STEIN
Attorney General of the
    State of North Carolina

By:   /s/ Kevin Anderson
KEVIN ANDERSON
Senior Deputy Attorney General
Department of Justice
114 West Edenton Street
Raleigh, NC 27603
(919) 716-6000
KAnder@ncdoj.gov

*Attorneys for Petitioner State of
North Carolina*

PETER KILMARTIN
Attorney General of the
    State of Rhode Island

By:   /s/ Michael W. Field
MICHAEL W. FIELD
Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
MField@riag.ri.gov

*Attorneys for Petitioner State of
Rhode Island*

62

MARK R. HERRING
Attorney General of the
  Commonwealth of
  Virginia

By: _/s/ Samuel T. Towell_
SAMUEL T. TOWELL
Deputy Attorney General
Office of the Attorney General
202 N. North Street
Richmond, VA 23219
(804) 786-6731
STowell@oag.state.va.us

*Attorneys for Petitioner*
*Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of the
  State of Washington

By: _/s/ Tiffany Lee_
TIFFANY LEE
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6098
TiffanyC@atg.wa.gov

*Attorneys for Petitioner State of*
*Washington*

THOMAS J. DONOVAN, JR.
Attorney General of the
  State of Vermont

By: _/s/ Christopher J. Curtis_
CHRISTOPHER J. CURTIS
Chief, Public Protection Division
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5586
Christopher.Curtis@vermont.gov

*Attorneys for Petitioner State of*
*Vermont*

KARL A. RACINE
Attorney General of the
  District of Columbia

By: _/s/ Loren L. AliKhan_
LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General
441 4th Street NW
(202) 72706287
Loren.AliKhan@dc.gov

*Attorneys for Petitioner*
*District of Columbia*

63

DENNIS J. HERRERA
City Attorney


By: _ /s/ William K. Sanders _
WILLIAM K. SANDERS
Deputy City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
(415) 554-6771
William.Sanders@sfcityatty.org

*Attorneys for Intervenor City and
County of San Francisco*

64

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Megan Chu, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 9,966 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

 /s/ Megan Chu

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the accompanying Proof Brief for Government Petitioners by using the CM/ECF system on August 20, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:    August 20, 2018
          New York, NY


          /s/ Ester Murdukhayeva

# 18-1051(L)

**Consolidated Cases: 18-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105**

# United States Court of Appeals
# for the District of Columbia Circuit

MOZILLA CORPORATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## ADDENDUM TO BRIEF FOR GOVERNMENT PETITIONERS

JAMES R. WILLIAMS
  *County Counsel*
  *County of Santa Clara*
Office of the County Counsel
70 West Hedding Street
San José, CA 95110
(408) 299-5906

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6279

CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822

*(Complete counsel listing appears on Brief for Government Petitioners.)*

# TABLE OF CONTENTS

**PAGE**

Declaration of Anthony Bowden, dated Aug. 17, 2018 ............................ ADD1

    Exhibit A  -  Email Exchange ............................................... ADD5

Declaration of Imre Kabai, dated Aug. 16, 2018.................................... ADD13

28 U.S.C. § 2342 ....................................................................... ADD16

42 U.S.C. § 5195c ..................................................................... ADD17

47 U.S.C. § 151 ........................................................................ ADD19

47 U.S.C. § 152 ........................................................................ ADD20

47 U.S.C. § 153 ........................................................................ ADD21

47 U.S.C. § 154 ........................................................................ ADD22

47 U.S.C. § 160 ........................................................................ ADD23

47 U.S.C. § 214 ........................................................................ ADD24

47 U.S.C. § 224 ........................................................................ ADD27

47 U.S.C. § 230 ........................................................................ ADD30

47 U.S.C. § 253 ........................................................................ ADD32

47 U.S.C. § 254 ........................................................................ ADD33

47 U.S.C. § 332 ........................................................................ ADD43

47 U.S.C. § 402 ........................................................................ ADD47

47 U.S.C. § 414 ........................................................................ ADD49

47 U.S.C. § 1302 [Telecommunications Act of 1996 § 706]..................... ADD50

47 U.S.C. § 1304 ....................................................................... ADD51

Telecommunications Act of 1996, Pub. L. No. 104-104

    § 601(c)(1) [47 U.S.C. § 152 note] .................................... ADD54
    § 602 ................................................................. ADD55

i

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISCTICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| MOZILLA CORPORATION, et al., | Case No. 18-1051 (Lead) |
| Petitioners, |  |
| v. | Consolidated with Nos. 10-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, |  |
| Respondents. |  |

## DECLARATION OF FIRE CHIEF ANTHONY BOWDEN

I, Anthony Bowden, declare:

1.    I make this declaration in support of the Brief of the County of Santa Clara ("County") in the matter referenced above. I know the facts herein of my own personal knowledge and if called upon to do so, I could competently testify to them under oath.

2.    I was recently appointed the Fire Chief for the Santa Clara County Central Fire Protection District ("County Fire"). As Fire Chief, I also serve as Fire Marshal for Santa Clara County and as the California Office of Emergency Services (OES) Operational Area Fire and Rescue Coordinator. In these roles, I am responsible for the coordination of mutual aid resources in Santa Clara County. This includes the coordination of all fire resources to significant events, such as wildfires, throughout the State, when those resources are requested from Santa Clara County's operational area. I have worked in fire protection for more than two decades, and in that time, I have held every rank at County Fire.

**ADD1**

3.    Established in 1947, County Fire provides fire services for Santa Clara County and the County's communities of Campbell, Cupertino, Los Altos, Los Altos Hills, Los Gatos, Monte Sereno, and Saratoga. The department also provides protection for the unincorporated areas adjacent to those cities. Wrapping in an approximately 20-mile arc around the southern end of Silicon Valley, County Fire has grown to include 15 fire stations, an administrative headquarters, a maintenance facility, and several other support facilities, and covers 128.3 square miles. The department employs almost three hundred fire prevention, suppression, investigation, administration, and maintenance personnel; daily emergency response consists of more than sixty employees.  County Fire also contributes resources to all-hazard response outside Santa Clara County and around the state.  For example, County Fire has deployed equipment and personnel in response to the ongoing Mendocino Complex Fire, the largest fire in California's history.

4.    County Fire relies upon Internet-based systems to provide crucial and time-sensitive public safety services.  The Internet has become an essential tool in providing fire and emergency response, particularly for events like large fires which require the rapid deployment and organization of thousands of personnel and hundreds of fire engines, aircraft, and bulldozers. During these events, resources are marshaled from across the state and country—in some cases, even from other countries.  In these situations, a key responsibility of emergency responders, and of County Fire in particular, is tracking those resources and ensuring they get to the right place as quickly and safely as possible.  County Fire, like virtually all other emergency responders, relies heavily on the Internet to do both of these things.

5.    As I explain below, County Fire has experienced throttling by its ISP, Verizon. This throttling has had a significant impact on our ability to provide emergency services. Verizon imposed these limitations despite being informed that throttling was actively impeding County Fire's ability to provide crisis-response and essential emergency services.

6.    Only a few weeks ago, County Fire deployed OES Incident Support Unit 5262 ("OES 5262"), to the Mendocino Complex Fire, now the largest fire in state history.  OES 5262

**ADD2**

is deployed to large incidents as a command and control resource. Its primary function is to track, organize, and prioritize routing of resources from around the state and country to the sites where they are most needed. OES 5262 relies heavily on the use of specialized software and Google Sheets to do near-real-time resource tracking through the use of cloud computing over the Internet.

7.     Resources tracked across such a large event include personnel and equipment supplied from local governments across California; the State of California; federal agencies including the Department of Defense, the Bureau of Land Management, the U.S. Forest Service; and other countries. As of Monday, August 13, 2018, the response effort for the wildfires burning across California included 13,000 firefighters, multiple aircraft, dozens or hundreds of bulldozers, and hundreds of fire engines. The wildfires have resulted in over 726,000 acres burned and roughly 2,000 structures destroyed. With several months left in what is a "normal" fire season, we fully expect these numbers to rise.

8.     OES 5262 also coordinates all local government resources deployed to the Mendocino Complex Fire. That is, the unit facilitates resource check-in and routing for local government resources. In doing so, the unit typically exchanges 5-10 gigabytes of data per day via the Internet using a mobile router and wireless connection. Near-real-time information exchange is vital to proper function. In large and complex fires, resource allocation requires immediate information. Dated or stale information regarding the availability or need for resources can slow response times and render them far less effective. Resources could be deployed to the wrong fire, the wrong part of a fire, or fail to be deployed at all. Even small delays in response translate into devastating effects, including loss of property, and, in some cases, loss of life.

9.     In the midst of our response to the Mendocino Complex Fire, County Fire discovered the data connection for OES 5262 was being throttled by Verizon, and data rates had been reduced to 1/200, or less, than the previous speeds. These reduced speeds severely interfered with the OES 5262's ability to function effectively. My Information Technology staff

communicated directly with Verizon via email about the throttling, requesting it be immediately lifted for public safety purposes. That email exchange is attached here as Exhibit A. We explained the importance of OES 5262 and its role in providing for public and first-responder safety and requested immediate removal of the throttling. Verizon representatives confirmed the throttling, but, rather than restoring us to an essential data transfer speed, they indicated that County Fire would have to switch to a new data plan at more than twice the cost, and they would only remove throttling after we contacted the Department that handles billing and switched to the new data plan.

      10.    In the interim, County Fire personnel in were forced to use other agencies' Internet Service Providers and their own personal devices to provide the necessary connectivity and data transfer capability required by OES 5262. While Verizon ultimately did lift the throttling, it was only after County Fire subscribed to a new, more expensive plan.

      11.    In light of our experience, County Fire believes it is likely that Verizon will continue to use the exigent nature of public safety emergencies and catastrophic events to coerce public agencies into higher cost plans ultimately paying significantly more for mission critical service—even if that means risking harm to public safety during negotiations.


      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed on _August 17, 2018_ at San José, California.

Anthony Bowden

1825293

**ADD4**

# EXHIBIT A

## Re: [E] Verizon Account for OES 5262

**From :** Silas Buss <silas.buss@verizonwireless.com>          Mon, Jul 30, 2018 01:50 PM
**Subject :** Re: [E] Verizon Account for OES 5262                   📎1 attachment
    **To :** daniel farrelly <daniel.farrelly@sccfd.org>

Hi Dan,

Just left you a message. The below plans are what I would suggest - it's $99.99 for the first 20GB and $8/GB thereafter. To get the plan changed immediately, I would suggest calling in the plan change to our customer service team at 800-922-0204. Let me know if you have any questions - I'll be available by phone for at least the next hour or so.

| Public Sector Mobile Broadband Share Plans: Government Subscribers Only | | | |
|---|---|---|---|
| The calling plans below reflect the monthly access fee discount. No additional discounts apply. | | | |
| Public Sector Mobile Broadband | 5 Gigabytes | 10 Gigabytes | 20 Gigabytes |
| Monthly Access Fee | $39.99 (90239) | $59.99 (90240) | $99.99 (90241) |
| Shared Domestic Data Allowance | 5GB | 10GB | 20GB |
| Overage Per Gigabyte | $8.00 Per Gigabyte | | |

Note: This plan is available for domestic data only devices, on the Verizon Wireless network only. **Data Sharing:** At the end of each bill cycle, any unused data allowances for lines sharing on the same account will be applied to the overages of the other lines on the same account beginning with the line with the lowest overage need. Plan changes may not take effect until the billing cycle following the change request. Current NationalAccess and Mobile Broadband coverage details can be found at www.verizonwireless.com. New activations on these service plans require 4G LTE devices. Existing customers transitioning to one of these service plans are able to utilize existing 3G devices. The 5GB, 10GB, and 20GB Public Sector Mobile Broadband Plans are able to share with each other.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

## verizon√

On Mon, Jul 30, 2018 at 10:00 AM Daniel Farrelly <daniel.farrelly@sccfd.org> wrote:
Silas,

Please work with us. All we need is a plan that does not offer throttling or caps of any kind.

Dan

**From:** "Daniel Farrelly" <daniel.farrelly@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "Justin Stockman" <justin.stockman@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Sunday, July 29, 2018 9:38:28 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Silas,

Remove any data throttling on OES5262 effective immediately.

**ADD6**

Daniel Farrelly  -  Acting IT Officer

o: 408.341.4468 | c: 408.966.6156

e: daniel.farrelly@sccfd.org

---

**From:** "Justin Stockman" <justin.stockman@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "daniel farrelly" <daniel.farrelly@sccfd.org>, "tony bowden" <tony.bowden@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Sunday, July 29, 2018 8:32:50 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Chief Bowden,

I just wanted to provide an update to those who were involved in this originally.  OES 5262 is deployed again, now to the Mendocino Complex (CA-MEU-008674), and is still experiencing the same throttling.  As I understood it from our previous exchange regarding this device, the billing cycle was set to end 7/23, which should have alleviated the throttling.  In a side by side comparison, a crew members personal phone using verizon was seeing speeds of 20Mbps/7Mbps.  The department verizon device is experiencing speeds of 0.2Mbps/0.6Mbps, meaning it has no meaningful functionality.

I've sent an email to Dan trying to identify a rapid solution for OES 5262.


Thank you,



Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org

---

**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "daniel farrelly" <daniel.farrelly@sccfd.org>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "steve prziborowski" <steve.prziborowski@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>, "tamera haas" <tamera.haas@sccfd.org>, "Justin Stockman" <justin.stockman@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Dave Morrisey" <dave.morrisey@sccfd.org>, "Maggie Eddy" <maggie.eddy@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Monday, July 9, 2018 1:38:10 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Hi Dan,

**ADD7**

I'll give the short response below to some of your questions, but I would certainly suggest we follow-up with a call to discuss in greater detail. Here's my availability this week: **Tues: 1PM, Weds 3PM, Thurs 9AM-11:30AM**

In short, Verizon has always reserved the right to limit data throughput on unlimited plans. All unlimited data plans offered by Verizon have some sort of data throttling built-in, including the $39.99 plan. Verizon does offer plans with no data throughput limitations; these plans require that the customer pay by the GB for use beyond a certain set allotment. Attached is the list of public sector plans, see pgs. 10-18 for data plans. Also attached is the State of CA plans which offers the $37.99 unlimited data plan (pg. 1). We can talk about these plans to find the solution that best fits the needs of your department.

To my knowledge, there have not been any large scale changes to the price plans for the fleet as requested by SCC Fire. As I recall, there were some plan changes made on about 10 of the 400 or so mobile broadband lines from the $39.99 plan to the $37.99 - this was back in January or February. I'd just like to point out that Verizon will never change plans/service without advance customer consent and/or notice. If you'd like to know what those changes were, we can reach out to Asa Pierce, your account advisor, to see what was done at the time.

Service will not disconnect on the unlimited plans after 25GB of use. Depending on which plan is active, after 25GB of use, the data throughput is limited to 200Kbps or 600Kbps.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**√

On Fri, Jul 6, 2018 at 11:54 AM Daniel Farrelly <daniel.farrelly@sccfd.org> wrote:
Silas,

Can confirm that after using 25GB of data, our service drops to zero. This is unacceptable and needs to be fixed. Let me know when you are available.

Dan

**From:** "Daniel Farrelly" <daniel.farrelly@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "steve prziborowski"
<steve.prziborowski@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>,
"tamera haas" <tamera.haas@sccfd.org>, "justin stockman" <justin.stockman@sccfd.org>,
"todd garde" <todd.garde@sccfd.org>, "dave morrisey" <dave.morrisey@sccfd.org>, "Maggie
Eddy" <maggie.eddy@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Thursday, July 5, 2018 10:23:47 AM
**Subject:** Re: [E] Verizon Account for OES 5262

Silas,

I am back at County Fire full-time and would like to discuss the plans we have with Verizon.

As a base, I thought our data plan was not originally signed up for as a plan with data caps or throttling...

However, when I look up the same device on the Verizon portal, there seems to be a 25GB limitation...

I am assuming this is what Justin ran into on OES 5262. Yes, there may be unlimited data, but after 25GB speeds throttle down.

My major concern is that there may have been changes to the data plans we use for public safety, and that these changes might start adversely affecting our fleet. As I mentioned earlier, none of our devices should have any sort of data caps or throttling. Also, speed is essential for the services we utilize. Moving OES 5262 to a $34.99 plan offering 600Kbps is not an adequate solution for devices that require 4G access to data.
With that said, please provide a list of all applicable public safety plans that provide 4G data without any caps or data throttling limitations. Our goal is to have all our devices on one plan that offers both unlimited use and unlimited bandwidth and no data throughput limitations.

If you would like talk direct, feel free to contact me at any time,


**Santa Clara County Fire Department**
—
Daniel Farrelly  -  Systems Analyst
o: 408.341.4468 | c: 408.966.6156
e: daniel.farrelly@sccfd.org

---

**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "steve prziborowski" <steve.prziborowski@sccfd.org>
**Cc:** "Garrett Chan" <garrett.chan@verizonwireless.com>, "justin stockman" <justin.stockman@sccfd.org>, "todd garde" <todd.garde@sccfd.org>, "dave morrisey" <dave.morrisey@sccfd.org>, "tony bowden" <tony.bowden@sccfd.org>, "Maggie Eddy" <maggie.eddy@sccfd.org>, "daniel farrelly" <daniel.farrelly@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>, "tamera haas" <tamera.haas@sccfd.org>
**Sent:** Friday, June 29, 2018 2:17:56 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Hello Steve,

As Garrett mentioned, we have a call set at 2:30 to discuss, I hope you'll join.

The short of it is, public safety customers have access to plans that do not have data throughput limitations. However, the current plan set for all of SCCFD's lines does have data throttling limitations. We will need to talk about making some plan changes to all lines or a selection of lines to address the data throttling limitation of the current plan.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**√

On Fri, Jun 29, 2018 at 1:31 PM Steve Prziborowski <steve.prziborowski@sccfd.org> wrote:

Justin Stockman made me aware of the Internet bandwidth challenges we are having for our apparatus (OES 5262).

Before I give you my approval to do the $2.00 a month upgrade, the bigger question is why our public safety data usage is getting throttled down? Our understanding from Eric Prosser, our former Information Technology Officer, was that he had received approval from Verizon that public safety should never be gated down because of our critical infrastructure need for these devices. Justin articulates that quite well below in his forwarded email.

The unit we are discussing is basically a fire engine (minus the water, hoses and ladders) but with tools and equipment that is used to support incident operations at major emergencies and/or disasters. It is currently assisting the Incident Command Team at the Pawnee Fire in Lake County, to ensure that all of the apparatus and personnel can effectively mitigate that major wildfire.

If I need to talk to a supervisor or account manager to not have to pay the extra $2 per month and instead, have our account be unlimited and protected from being gated down, please let me know who that person would be.

Thanks for any assistance you can offer us, I look forward to hearing back from you.

Steve

= = =

**Steve Prziborowski**
Deputy Chief / Training
Santa Clara County Fire Department
14700 Winchester Blvd.
Los Gatos, CA 95032-1818

- 408-341-4476 (office)
- 408-896-6890 (cellular)
*Email:* steve.prziborowski@sccfd.org
*Website:* www.sccfd.org

---

**From:** "Justin Stockman" <justin.stockman@sccfd.org>
**To:** "Steve Prziborowski" <steve.prziborowski@sccfd.org>
**Sent:** Friday, June 29, 2018 12:15:59 PM
**Subject:** Fwd: [E] Throttled Device

Chief,

We're having an issue with 5262. 5262 has a device that connects to the internet using a verizon sim card. Data usage on the device is supposed to be unlimited. The reason for this need is that 5262 performs an important public safety function by supporting CalOES region chiefs at large disasters. This device spends months where it sits unused and uses zero data. When it does get used it uses a tremendous

Amount of data used reaches 26 gigabytes/day Verizon throttles normal consumer "unlimited devices" around 23 gigabytes.  Throttling means that the device that can normally act like a modern broadband internet connection is slowed to the point of acting more like an AOL dial up modem from 1995.  Verizon is currently throttling OES 5262 so severely that it's hampering operations for the assigned crew.  This is not the first time we have had this issue.  In December of 2017 while deployed to the Prado Mobilization Center supporting a series of large wildfires we had the same device with the same sim card also throttled.  I was able to work through Eric Prosser at the time to have service to the device restored and Eric communicated that Verizon had properly re-categorized the device as truly "unlimited".

In the email below Verizon is stating that they can restore the device for an extra $2/month.  I obviously lack the authority to make such an approval.  If we could get Verizon that approval I would appreciate it.

Respectfully,

Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org

---

**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "Justin Stockman" <justin.stockman@sccfd.org>
**Cc:** "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Friday, June 29, 2018 11:35:46 AM
**Subject:** Re: [E] Throttled Device

Hi Justin,

To get the data speeds restored on this device, will you please reply that you approve moving the plan on line 408-438-4844 from the $37.99 (84356) plan to the $39.99 (84357) plan?

We'll talk about what's going on here in the call this afternoon.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**✓

> ---------- Forwarded message ---------
> **From:** **Justin Stockman** <justin.stockman@sccfd.org>
> **Date:** Fri, Jun 29, 2018 at 9:05 AM
> **Subject:** [E] Throttled Device
> **To:** Garrett M Chan <garrett.chan@verizonwireless.com>
>
>
> Hi Garrett,

**ADD11**

The device we're having an issue with is a Cradlepoint AER 2100. It is deployed on the Pawnee fire as part of an OES support unit that is providing essential operational coverage for mutual aid resources deployed on that fire. The challenge of this device is that it is normally off, and consumes little to no data on a monthly basis. When the unit gets deployed it used a decent amount of data for a few days to a few weeks. On the order of 5-10gb a day. The crew was getting around 50/10mbps and is current getting 30/130kbps.

Info I have for the device is:
MEID A000005A866927
IMEI 353547064027397
NAI 6692210322@vzims.com
ICCID 89148000002567273591
Mobiel Subscriber ID 4084384844
IMSI 311480257790168
PRI ID 9903437
Cell ID 7844630 (0x77b316)

Hopefully that's more info than you need. Sorry if i'm over supplying, i'm not familiar with a lot of this info.

Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org

--

**Verizon**

Garrett Chan
Manager Solutions Engineer
Silicon Valley - Northern California/Nevada

2870 Zanker Road, Suite 100
San Jose, CA 95134

O 925.872.0620 | M 925.872.0620
Garrett.Chan@verizonwireless.com

24 hrs DATA TECHNICAL ASSISTANCE
contact the BGCO **1-800-922-0204**

**Product Information:**

IoT Private Network Overview

IoT Private Network White Paper

IoT Security Services | Verizon Enterprise Solutions

**ADD12**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISCTICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| MOZILLA CORPORATION, et al., | Case No. 18-1051 (Lead) |
| Petitioners, | |
| v. | Consolidated with Nos. 10-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | |
| Respondents. | |

## DECLARATION OF IMRE KABAI

I, Imre Kabai, declare:

1.      I make this declaration in support of the Brief of the County of Santa Clara ("County") in the matter referenced above.  I know the facts herein of my own personal knowledge and if called upon to do so, I could competently testify to them under oath.

2.      I have worked in information technology and architecture for more than twenty-five years.  I am currently the Chief Technology Officer ("CTO") for the County.  Before I held this position, I was the Chief Architect and Director of Platforms and Enterprise Architecture for Granite Construction, a $2.5 billion construction company employing approximately 5,400 employees across the United States.  Before I held that position, I was the Chief Architect for the Stanford Linear Accelerator Laboratory at Stanford University, and an Enterprise Architect for the Stanford University Medical Center.  Before I held those positions, I was a Senior Enterprise Architect and Senior Manager for Life Technologies.

**ADD13**

3. I have a B.S. in Computational Mathematics and an MSc in Geophysics from Eötvös Loránd University, one of the top universities in Hungary.

4. Santa Clara County, home to Silicon Valley, has roughly 1.9 million residents. With a $250B GDP it is the world's 43rd largest economy. The County Administration serves the residents and businesses of Santa Clara by providing environmental, safety-net, infrastructure, law enforcement, justice, and healthcare services.

5. The County is heavily dependent upon internet-based technology systems for service delivery and has invested millions of dollars in these systems over the last decade

6. For example, the County's safety-net hospital, Valley Medical Center, has invested in excess of a hundred million dollars in a medical records system, EPIC, that exchanges medical records between the County and thousands of clinics, hospitals, and emergency departments. While the system is capable of reduced functionality in a disaster scenario in which it is completely cut off from those endpoints, a large portion of the value of the system comes from high-volume, speedy records exchange that is free from blocking, throttling, or discriminatory practices.

7. The County has also invested in providing key civic engagement systems via the internet. These services include publication of County law through a niche provider called Municode, and live-streaming of its governing board meetings through Accela, a niche provider of government civic engagement systems. To function properly, these systems require residents to be able to access them without blocking, throttling, or deprioritization that degrades their function.

8. Generally, the County's investments in web-based systems were made in reliance on the idea that they would continue to function as intended because the public would continue to have access to an internet free from discriminatory practices like blocking, throttling, or deprioritization. The County's information technology design principles do not include such scenarios.

9. In addition, because the County's functions are unique to government entities and,

**ADD14**

like most government entities, its budget is constrained, the businesses that develop innovative technologies for the County are largely niche businesses that do not have significant resources. It is unlikely that governmental entities or the niche providers who host their services will have the resources to pay the ISPs of any possible user of the County's systems to avoid blocking, throttling, or deprioritization of their traffic. It is also unlikely that the County's users will pay more for the basic governmental access afforded by the County's systems. As a result, in a regime where traffic can be subjected to discriminatory practices by ISPs, it is quite likely that the kind of innovative systems developed by these providers will become much less effective and useful, and, ultimately, it is likely that development of these systems will slow dramatically, or the providers will be unable to continue developing them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___8-16-2018___ at San José, California.

<i>Imre Kabai</i><br>
Imre Kabai

1825293

**ADD15**

**28 U.S.C.**
United States Code, 2016 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 158 - ORDERS OF FEDERAL AGENCIES; REVIEW
Sec. 2342 - Jurisdiction of court of appeals
From the U.S. Government Publishing Office, www.gpo.gov

## §2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of—

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

USCA Case #18-1220    Document #1746555    Filed 09/30/18    Page 106 of 145
Case 2:18-cv-02660-JAM-DB    Document 2-5    Filed 09/30/18    Page 106 of 145

U.S.C. Title 42 - THE PUBLIC HEALTH AND WELFARE

**42 U.S.C.**
United States Code, 2016 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 68 - DISASTER RELIEF
SUBCHAPTER IV-B - EMERGENCY PREPAREDNESS
Sec. 5195c - Critical infrastructures protection
From the U.S. Government Publishing Office, www.gpo.gov

# §5195c. Critical infrastructures protection

**(a) Short title**

This section may be cited as the "Critical Infrastructures Protection Act of 2001".

**(b) Findings**

Congress makes the following findings:

(1) The information revolution has transformed the conduct of business and the operations of government as well as the infrastructure relied upon for the defense and national security of the United States.

(2) Private business, government, and the national security apparatus increasingly depend on an interdependent network of critical physical and information infrastructures, including telecommunications, energy, financial services, water, and transportation sectors.

(3) A continuous national effort is required to ensure the reliable provision of cyber and physical infrastructure services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States.

(4) This national effort requires extensive modeling and analytic capabilities for purposes of evaluating appropriate mechanisms to ensure the stability of these complex and interdependent systems, and to underpin policy recommendations, so as to achieve the continuous viability and adequate protection of the critical infrastructure of the Nation.

**(c) Policy of the United States**

It is the policy of the United States—

(1) that any physical or virtual disruption of the operation of the critical infrastructures of the United States be rare, brief, geographically limited in effect, manageable, and minimally detrimental to the economy, human and government services, and national security of the United States;

(2) that actions necessary to achieve the policy stated in paragraph (1) be carried out in a public-private partnership involving corporate and non-governmental organizations; and

(3) to have in place a comprehensive and effective program to ensure the continuity of essential Federal Government functions under all circumstances.

**(d) Establishment of national competence for critical infrastructure protection**

**(1) Support of critical infrastructure protection and continuity by National Infrastructure Simulation and Analysis Center**

There shall be established the National Infrastructure Simulation and Analysis Center (NISAC) to serve as a source of national competence to address critical infrastructure protection and continuity through support for activities related to counterterrorism, threat assessment, and risk mitigation.

**(2) Particular support**

The support provided under paragraph (1) shall include the following:

(A) Modeling, simulation, and analysis of the systems comprising critical infrastructures, including cyber infrastructure, telecommunications infrastructure, and physical infrastructure, in order to enhance understanding of the large-scale complexity of such systems and to facilitate

**ADD17**

modification of such systems to mitigate the threats to such systems and to critical infrastructures generally.

(B) Acquisition from State and local governments and the private sector of data necessary to create and maintain models of such systems and of critical infrastructures generally.

(C) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide education and training to policymakers on matters relating to—

(i) the analysis conducted under that subparagraph;

(ii) the implications of unintended or unintentional disturbances to critical infrastructures; and

(iii) responses to incidents or crises involving critical infrastructures, including the continuity of government and private sector activities through and after such incidents or crises.

(D) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide recommendations to policymakers, and to departments and agencies of the Federal Government and private sector persons and entities upon request, regarding means of enhancing the stability of, and preserving, critical infrastructures.

### (3) Recipient of certain support

Modeling, simulation, and analysis provided under this subsection shall be provided, in particular, to relevant Federal, State, and local entities responsible for critical infrastructure protection and policy.

### (e) Critical infrastructure defined

In this section, the term "critical infrastructure" means systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters.

### (f) Authorization of appropriations

There is hereby authorized for the Department of Defense for fiscal year 2002, $20,000,000 for the Defense Threat Reduction Agency for activities of the National Infrastructure Simulation and Analysis Center under this section in that fiscal year.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 151 - Purposes of chapter; Federal Communications Commission created
From the U.S. Government Publishing Office, www.gpo.gov

## §151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

47 U.S.C.
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 152 - Application of chapter
From the U.S. Government Publishing Office, www.gpo.gov

## §152. Application of chapter

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. The provisions of this chapter shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in subchapter V–A.

(b) Except as provided in sections 223 through 227 of this title, inclusive, and section 332 of this title, and subject to the provisions of section 301 of this title and subchapter V–A, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) of this subsection would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 to 205 of this title shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4) of this subsection.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 153 - Definitions
From the U.S. Government Publishing Office, www.gpo.gov

## §153. Definitions

For the purposes of this chapter, unless the context otherwise requires—

[*Sections 1-23 omitted*]

### (24) Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

[*Sections 25-49 omitted*]

### (50) Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

### (51) Telecommunications carrier

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

[*Section 52 omitted*]

### (53) Telecommunications service

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

[*Remaining sections omitted*]

**ADD21**

USCA Case #18-1051    Document #1746555    Filed: 08/20/2018    Page 24 of 58
Case 2:18-cv-02660-JAM-DB    Document 2-5    Filed 09/30/18    Page 111 of 145

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 154 - Federal Communications Commission
From the U.S. Government Publishing Office, www.gpo.gov

# §154. Federal Communications Commission

[*Sections a-h omitted*]

### (i) Duties and powers

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

[*Remaining sections omitted*]

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 160 - Competition in provision of telecommunications service
From the U.S. Government Publishing Office, www.gpo.gov

## §160. Competition in provision of telecommunications service

### (a) Regulatory flexibility

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

### (b) Competitive effect to be weighed

In making the determination under subsection (a)(3), the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

### (c) Petition for forbearance

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a). The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

### (d) Limitation

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

### (e) State enforcement after Commission forbearance

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a).

**ADD23**

**47 U.S.C.**

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 214 - Extension of lines or discontinuance of service; certificate of public convenience and necessity
From the U.S. Government Publishing Office, www.gpo.gov

# §214. Extension of lines or discontinuance of service; certificate of public convenience and necessity

**(a) Exceptions; temporary or emergency service or discontinuance of service; changes in plant, operation or equipment**

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: *Provided*, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 of this title: *Provided further*, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: *Provided, however*, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

**(b) Notification of Secretary of Defense, Secretary of State, and State Governor**

Upon receipt of an application for any such certificate, the Commission shall cause notice thereof to be given to, and shall cause a copy of such application to be filed with, the Secretary of Defense, the Secretary of State (with respect to such applications involving service to foreign points), and the Governor of each State in which such line is proposed to be constructed, extended, acquired, or operated, or in which such discontinuance, reduction, or impairment of service is proposed, with the right to those notified to be heard; and the Commission may require such published notice as it shall determine.

**(c) Approval or disapproval; injunction**

The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and

not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.

**(d) Order of Commission; hearing; penalty**

The Commission may, after full opportunity for hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier, party to such proceeding, to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier and to extend its line or to establish a public office; but no such authorization or order shall be made unless the Commission finds, as to such provision of facilities, as to such establishment of public offices, or as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier which refuses or neglects to comply with any order of the Commission made in pursuance of this subsection shall forfeit to the United States $1,200 for each day during which such refusal or neglect continues.

**(e) Provision of universal service**

**(1) Eligible telecommunications carriers**

A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

**(2) Designation of eligible telecommunications carriers**

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

**(3) Designation of eligible telecommunications carriers for unserved areas**

If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

**ADD25**

**(4) Relinquishment of universal service**

A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

**(5) "Service area" defined**

The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

**(6) Common carriers not subject to State commission jurisdiction**

In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

USCA11 Case: 18-11060  Date: (12 of 20)  Filed: 09/28/2018  Page: 116 of 145
Case 2:18-cv-02660-JAM-DB  Document 2-5  Filed 09/30/18  Page 116 of 145
U.S.C. Title 47 - TELECOMMUNICATIONS

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 224 - Pole attachments
From the U.S. Government Publishing Office, www.gpo.gov

# §224. Pole attachments

## (a) Definitions

As used in this section:

(1) The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

(3) The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

## (b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

## (c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f), for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and

**ADD27**

conditions for pole attachments—

(A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

(B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter—

(i) within 180 days after the complaint is filed with the State, or

(ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

**(d) Determination of just and reasonable rates; "usable space" defined**

(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

(3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e), this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

**(e) Regulations governing charges; apportionment of costs of providing space**

(1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

(4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

**(f) Nondiscriminatory access**

(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory [1] basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

**(g) Imputation to costs of pole attachment rate**

A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

**(h) Modification or alteration of pole, duct, conduit, or right-of-way**

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

**(i) Costs of rearranging or replacing attachment**

An entity that obtains an attachment to a pole, conduit, or right-of-way shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).

[1] *So in original. Probably should be "nondiscriminatory".*

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 230 - Protection for private blocking and screening of offensive material
From the U.S. Government Publishing Office, www.gpo.gov

# §230. Protection for private blocking and screening of offensive material

## (a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

## (b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

## (c) Protection for "Good Samaritan" blocking and screening of offensive material

### (1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

### (2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others

U.S.C. Title 47 - TELECOMMUNICATIONS

USCA Case #18-1051   Document #1746555   Filed: 08/20/2018   Page 120 of 145
Case 2:18-cv-02660-JAM-DB   Document 2-5   Filed 09/30/18   Page 120 of 145

the technical means to restrict access to material described in paragraph (1).[1]

### (d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

### (e) Effect on other laws

#### (1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

#### (2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

#### (3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

#### (4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

### (f) Definitions

As used in this section:

#### (1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

#### (2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

#### (3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

#### (4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

  (A) filter, screen, allow, or disallow content;
  (B) pick, choose, analyze, or digest content; or
  (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**47 U.S.C.**

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets
Sec. 253 - Removal of barriers to entry
From the U.S. Government Publishing Office, www.gpo.gov

# §253. Removal of barriers to entry

**(a) In general**

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

**(b) State regulatory authority**

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

**(c) State and local government authority**

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

**(d) Preemption**

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

**(e) Commercial mobile service providers**

Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

**(f) Rural markets**

It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) of this title for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply—

(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) of this title that effectively prevents a competitor from meeting the requirements of section 214(e)(1) of this title; and

(2) to a provider of commercial mobile services.

**ADD32**

**47 U.S.C.**

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets
Sec. 254 - Universal service
From the U.S. Government Publishing Office, www.gpo.gov

# §254. Universal service

## (a) Procedures to review universal service requirements

### (1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

### (2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

## (b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

### (1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

### (2) Access to advanced services

Access to advanced telecommunications and information services should be provided in all regions of the Nation.

### (3) Access in rural and high cost areas

Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

### (4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

### (5) Specific and predictable support mechanisms

**ADD33**

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

**(6) Access to advanced telecommunications services for schools, health care, and libraries**

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

**(7) Additional principles**

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

**(c) Definition**

**(1) In general**

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

**(2) Alterations and modifications**

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

**(3) Special services**

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

**(d) Telecommunications carrier contribution**

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

**(e) Universal service support**

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

**(f) State authority**

A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a

**ADD34**

manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

**(g) Interexchange and interstate services**

Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

**(h) Telecommunications services for certain providers**

**(1) In general**

**(A) Health care providers for rural areas**

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

**(B) Educational providers and libraries**

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall—

(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

**(2) Advanced services**

The Commission shall establish competitively neutral rules—

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

**(3) Terms and conditions**

Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

**(4) Eligibility of users**

**ADD35**

No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (7)(A) with an endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act [20 U.S.C. 9121 et seq.].

**(5) Requirements for certain schools with computers having Internet access**

**(A) Internet safety**

**(i) In general**

Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(I) submits to the Commission the certifications described in subparagraphs (B) and (C);

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

**(ii) Applicability**

The prohibition in clause (i) shall not apply with respect to a school that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

**(iii) Public notice; hearing**

An elementary or secondary school described in clause (i), or the school board, local educational agency, or other authority with responsibility for administration of the school, shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy. In the case of an elementary or secondary school other than an elementary school or a secondary school as defined in section 7801 of title 20, the notice and hearing required by this clause may be limited to those members of the public with a relationship to the school.

**(B) Certification with respect to minors**

A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors;

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and

(iii) as part of its Internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

**(C) Certification with respect to adults**

A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

**ADD36**

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

**(D) Disabling during adult use**

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

**(E) Timing of implementation**

**(i) In general**

Subject to clause (ii) in the case of any school covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

**(ii) Process**

**(I) Schools with Internet safety policy and technology protection measures in place**

A school covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

**(II) Schools without Internet safety policy and technology protection measures in place**

A school covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any school that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such school comes into compliance with this paragraph.

**(III) Waivers**

Any school subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year program may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding

requirements prevent the making of the certification otherwise required by such subclause. A school, school board, local educational agency, or other authority with responsibility for administration of the school shall notify the Commission of the applicability of such subclause to the school. Such notice shall certify that the school in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the school is applying for funds under this subsection.

### (F) Noncompliance

#### (i) Failure to submit certification

Any school that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

#### (ii) Failure to comply with certification

Any school that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse any funds and discounts received under this subsection for the period covered by such certification.

#### (iii) Remedy of noncompliance

##### (I) Failure to submit

A school that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the school shall be eligible for services at discount rates under this subsection.

##### (II) Failure to comply

A school that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the school shall be eligible for services at discount rates under this subsection.

## (6) Requirements for certain libraries with computers having Internet access

### (A) Internet safety

#### (i) In general

Except as provided in clause (ii), a library having one or more computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the library—

(I) submits to the Commission the certifications described in subparagraphs (B) and (C); and

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the library under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

#### (ii) Applicability

The prohibition in clause (i) shall not apply with respect to a library that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

#### (iii) Public notice; hearing

A library described in clause (i) shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

### (B) Certification with respect to minors

A certification under this subparagraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.

**(C) Certification with respect to adults**

A certification under this paragraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

**(D) Disabling during adult use**

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

**(E) Timing of implementation**

**(i) In general**

Subject to clause (ii) in the case of any library covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

**(ii) Process**

**(I) Libraries with Internet safety policy and technology protection measures in place**

A library covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

**(II) Libraries without Internet safety policy and technology protection measures in place**

A library covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it

is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any library that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such library comes into compliance with this paragraph.

**(III) Waivers**

Any library subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A library, library board, or other authority with responsibility for administration of the library shall notify the Commission of the applicability of such subclause to the library. Such notice shall certify that the library in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the library is applying for funds under this subsection.

**(F) Noncompliance**

**(i) Failure to submit certification**

Any library that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

**(ii) Failure to comply with certification**

Any library that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse all funds and discounts received under this subsection for the period covered by such certification.

**(iii) Remedy of noncompliance**

**(I) Failure to submit**

A library that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the library shall be eligible for services at discount rates under this subsection.

**(II) Failure to comply**

A library that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the library shall be eligible for services at discount rates under this subsection.

**(7) Definitions**

For purposes of this subsection:

**(A) Elementary and secondary schools**

The term "elementary and secondary schools" means elementary schools and secondary schools, as defined in section 7801 of title 20.

**(B) Health care provider**

The term "health care provider" means—

(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;

(ii) community health centers or health centers providing health care to migrants;

**ADD40**

(iii) local health departments or agencies;

(iv) community mental health centers;

(v) not-for-profit hospitals;

(vi) rural health clinics;

(vii) skilled nursing facilities (as defined in section 395i–3(a) of title 42); and

(viii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vii).

### (C) Public institutional telecommunications user

The term "public institutional telecommunications user" means an elementary or secondary school, a library, or a health care provider as those terms are defined in this paragraph.

### (D) Minor

The term "minor" means any individual who has not attained the age of 17 years.

### (E) Obscene

The term "obscene" has the meaning given such term in section 1460 of title 18.

### (F) Child pornography

The term "child pornography" has the meaning given such term in section 2256 of title 18.

### (G) Harmful to minors

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that—

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

(ii) depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

### (H) Sexual act; sexual contact

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of title 18.

### (I) Technology protection measure

The term "technology protection measure" means a specific technology that blocks or filters Internet access to the material covered by a certification under paragraph (5) or (6) to which such certification relates.

## (i) Consumer protection

The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

## (j) Lifeline assistance

Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

## (k) Subsidy of competitive services prohibited

A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

## (l) Internet safety policy requirement for schools and libraries

**(1) In general**

In carrying out its responsibilities under subsection (h), each school or library to which subsection (h) applies shall—

    (A) adopt and implement an Internet safety policy that addresses—

      (i) access by minors to inappropriate matter on the Internet and World Wide Web;

      (ii) the safety and security of minors when using electronic mail, chat rooms, and other forms of direct electronic communications;

      (iii) unauthorized access, including so-called "hacking", and other unlawful activities by minors online;

      (iv) unauthorized disclosure, use, and dissemination of personal identification information regarding minors; and

      (v) measures designed to restrict minors' access to materials harmful to minors; and

    (B) provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

**(2) Local determination of content**

A determination regarding what matter is inappropriate for minors shall be made by the school board, local educational agency, library, or other authority responsible for making the determination. No agency or instrumentality of the United States Government may—

    (A) establish criteria for making such determination;

    (B) review the determination made by the certifying school, school board, local educational agency, library, or other authority; or

    (C) consider the criteria employed by the certifying school, school board, local educational agency, library, or other authority in the administration of subsection (h)(1)(B).

**(3) Availability for review**

Each Internet safety policy adopted under this subsection shall be made available to the Commission, upon request of the Commission, by the school, school board, local educational agency, library, or other authority responsible for adopting such Internet safety policy for purposes of the review of such Internet safety policy by the Commission.

**(4) Effective date**

This subsection shall apply with respect to schools and libraries on or after the date that is 120 days after December 21, 2000.

47 U.S.C.
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER III - SPECIAL PROVISIONS RELATING TO RADIO
Part I - General Provisions
Sec. 332 - Mobile services
From the U.S. Government Publishing Office, www.gpo.gov

# §332. Mobile services

[*Sections a-b omitted*]

## (c) Regulatory treatment of mobile services

### (1) Common carrier treatment of commercial mobile services

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

   (i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;
   (ii) enforcement of such provision is not necessary for the protection of consumers; and
   (iii) specifying such provision is consistent with the public interest.

(B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

(C) As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

**(2) Non-common carrier treatment of private mobile services**

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

**(3) State preemption**

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

### (4) Regulatory treatment of communications satellite corporation

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications Satellite Act of 1962 [47 U.S.C. 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C. 731 et seq.].

### (5) Space segment capacity

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

### (6) Foreign ownership

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

(A) The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

(B) Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

### (7) Preservation of local zoning authority

#### (A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

#### (B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or

**ADD45**

USCA11 Case: 18-12660    Date Filed: 09/30/2018    Page: 135 of 145
Case 2:18-cv-02660-JAM-DB   Document 2-5   Filed 09/30/18   Page 135 of 145 of 58

instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

### (C) Definitions

For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

### (8) Mobile services access

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

[*Section d omitted*]

**47 U.S.C.**

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER IV - PROCEDURAL AND ADMINISTRATIVE PROVISIONS
Sec. 402 - Judicial review of Commission's orders and decisions
From the U.S. Government Publishing Office, www.gpo.gov

# §402. Judicial review of Commission's orders and decisions

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

**(b) Right to appeal**

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10) By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

**(c) Filing notice of appeal; contents; jurisdiction; temporary orders**

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless

otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

**(d) Notice to interested parties; filing of record**

Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same. The Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28.

**(e) Intervention**

Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

**(f) Records and briefs**

The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

**(g) Time of hearing; procedure**

The court shall hear and determine the appeal upon the record before it in the manner prescribed by section 706 of title 5.

**(h) Remand**

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

**(i) Judgment for costs**

The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

**(j) Finality of decision; review by Supreme Court**

The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 1254 of title 28, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER IV - PROCEDURAL AND ADMINISTRATIVE PROVISIONS
Sec. 414 - Exclusiveness of chapter
From the U.S. Government Publishing Office, www.gpo.gov

## §414. Exclusiveness of chapter

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C.

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 12 - BROADBAND
Sec. 1302 - Advanced telecommunications incentives
From the U.S. Government Publishing Office, www.gpo.gov

# §1302. Advanced telecommunications incentives

**(a) In general**

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

**(b) Inquiry**

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

**(c) Demographic information for unserved areas**

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) [1] and to the extent that data from the Census Bureau is available, determine, for each such unserved area—

(1) the population;
(2) the population density; and
(3) the average per capita income.

**(d) Definitions**

For purposes of this subsection: [2]

**(1) Advanced telecommunications capability**

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

**(2) Elementary and secondary schools**

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.

47 U.S.C.

United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 12 - BROADBAND
Sec. 1304 - Encouraging State initiatives to improve broadband
From the U.S. Government Publishing Office, www.gpo.gov

## §1304. Encouraging State initiatives to improve broadband

**(a) Purposes**

The purposes of any grant under subsection (b) are—

(1) to ensure that all citizens and businesses in a State have access to affordable and reliable broadband service;

(2) to achieve improved technology literacy, increased computer ownership, and broadband use among such citizens and businesses;

(3) to establish and empower local grassroots technology teams in each State to plan for improved technology use across multiple community sectors; and

(4) to establish and sustain an environment ripe for broadband services and information technology investment.

**(b) Establishment of State broadband data and development grant program**

**(1) In general**

The Secretary of Commerce shall award grants, taking into account the results of the peer review process under subsection (d), to eligible entities for the development and implementation of statewide initiatives to identify and track the availability and adoption of broadband services within each State.

**(2) Competitive basis**

Any grant under subsection (b) shall be awarded on a competitive basis.

**(c) Eligibility**

To be eligible to receive a grant under subsection (b), an eligible entity shall—

(1) submit an application to the Secretary of Commerce, at such time, in such manner, and containing such information as the Secretary may require;

(2) contribute matching non-Federal funds in an amount equal to not less than 20 percent of the total amount of the grant; and

(3) agree to comply with confidentiality requirements in subsection (h)(2) of this section.

**(d) Peer review; nondisclosure**

**(1) In general**

The Secretary shall by regulation require appropriate technical and scientific peer review of applications made for grants under this section.

**(2) Review procedures**

The regulations required under paragraph (1) shall require that any technical and scientific peer review group—

(A) be provided a written description of the grant to be reviewed;

(B) provide the results of any review by such group to the Secretary of Commerce; and

(C) certify that such group will enter into voluntary nondisclosure agreements as necessary to prevent the unauthorized disclosure of confidential and proprietary information provided by broadband service providers in connection with projects funded by any such grant.

**(e) Use of funds**

A grant awarded to an eligible entity under subsection (b) shall be used—

USCA Case #18-1051 Document #1746555 Filed 09/30/18 Page 141 of 145
Case 2:18-cv-02660-JAM-DB Document 2-5 Filed 09/30/18 Page 141 of 145

U.S.C. Title 47 - TELECOMMUNICATIONS

(1) to provide a baseline assessment of broadband service deployment in each State;

(2) to identify and track—

   (A) areas in each State that have low levels of broadband service deployment;

   (B) the rate at which residential and business users adopt broadband service and other related information technology services; and

   (C) possible suppliers of such services;

(3) to identify barriers to the adoption by individuals and businesses of broadband service and related information technology services, including whether or not—

   (A) the demand for such services is absent; and

   (B) the supply for such services is capable of meeting the demand for such services;

(4) to identify the speeds of broadband connections made available to individuals and businesses within the State, and, at a minimum, to rely on the data rate benchmarks for broadband service utilized by the Commission to reflect different speed tiers, to promote greater consistency of data among the States;

(5) to create and facilitate in each county or designated region in a State a local technology planning team—

   (A) with members representing a cross section of the community, including representatives of business, telecommunications labor organizations, K–12 education, health care, libraries, higher education, community-based organizations, local government, tourism, parks and recreation, and agriculture; and

   (B) which shall—

     (i) benchmark technology use across relevant community sectors;

     (ii) set goals for improved technology use within each sector; and

     (iii) develop a tactical business plan for achieving its goals, with specific recommendations for online application development and demand creation;

(6) to work collaboratively with broadband service providers and information technology companies to encourage deployment and use, especially in unserved areas and areas in which broadband penetration is significantly below the national average, through the use of local demand aggregation, mapping analysis, and the creation of market intelligence to improve the business case for providers to deploy;

(7) to establish programs to improve computer ownership and Internet access for unserved areas and areas in which broadband penetration is significantly below the national average;

(8) to collect and analyze detailed market data concerning the use and demand for broadband service and related information technology services;

(9) to facilitate information exchange regarding the use and demand for broadband services between public and private sectors; and

(10) to create within each State a geographic inventory map of broadband service, including the data rate benchmarks for broadband service utilized by the Commission to reflect different speed tiers, which shall—

   (A) identify gaps in such service through a method of geographic information system mapping of service availability based on the geographic boundaries of where service is available or unavailable among residential or business customers; and

   (B) provide a baseline assessment of statewide broadband deployment in terms of households with high-speed availability.

**(f) Participation limit**

For each State, an eligible entity may not receive a new grant under this section to fund the activities described in subsection (d) within such State if such organization obtained prior grant awards under this section to fund the same activities in that State in each of the previous 4 consecutive years.

**(g) Reporting; broadband inventory map**

The Secretary of Commerce shall—

(1) require each recipient of a grant under subsection (b) to submit a report on the use of the funds provided by the grant; and

(2) create a web page on the Department of Commerce website that aggregates relevant information made available to the public by grant recipients, including, where appropriate, hypertext links to any geographic inventory maps created by grant recipients under subsection (e) (10).

### (h) Access to aggregate data

#### (1) In general

Subject to paragraph (2), the Commission shall provide eligible entities access, in electronic form, to aggregate data collected by the Commission based on the Form 477 submissions of broadband service providers.

#### (2) Limitation

Notwithstanding any provision of Federal or State law to the contrary, an eligible entity shall treat any matter that is a trade secret, commercial or financial information, or privileged or confidential, as a record not subject to public disclosure except as otherwise mutually agreed to by the broadband service provider and the eligible entity. This paragraph applies only to information submitted by the Commission or a broadband provider to carry out the provisions of this chapter and shall not otherwise limit or affect the rules governing public disclosure of information collected by any Federal or State entity under any other Federal or State law or regulation.

### (i) Definitions

In this section:

#### (1) Commission

The term "Commission" means the Federal Communications Commission.

#### (2) Eligible entity

The term "eligible entity" means—

(A) an entity that is either—

(i) an agency or instrumentality of a State, or a municipality or other subdivision (or agency or instrumentality of a municipality or other subdivision) of a State;

(ii) a nonprofit organization that is described in section 501(c)(3) of title 26 and that is exempt from taxation under section 501(a) of such title; or

(iii) an independent agency or commission in which an office of a State is a member on behalf of the State; and

(B) is the single eligible entity in the State that has been designated by the State to receive a grant under this section.

### (j) No regulatory authority

Nothing in this section shall be construed as giving any public or private entity established or affected by this chapter any regulatory jurisdiction or oversight authority over providers of broadband services or information technology.

PUBLIC LAW 104–104—FEB. 8, 1996    110 STAT. 143

## TITLE VI—EFFECT ON OTHER LAWS    47 USC 152 note.

#### SEC. 601. APPLICABILITY OF CONSENT DECREES AND OTHER LAW.

(a) APPLICABILITY OF AMENDMENTS TO FUTURE CONDUCT.—

(1) AT&T CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the AT&T Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(2) GTE CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the GTE Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(3) MCCAW CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the McCaw Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and subsection (d) of this section and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(b) ANTITRUST LAWS.—

(1) SAVINGS CLAUSE.—Except as provided in paragraphs (2) and (3), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.

(2) REPEAL.—Subsection (a) of section 221 (47 U.S.C. 221(a)) is repealed.

(3) CLAYTON ACT.—Section 7 of the Clayton Act (15 U.S.C. 18) is amended in the last paragraph by striking "Federal Communications Commission,".

(c) FEDERAL, STATE, AND LOCAL LAW.—

(1) NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

(2) STATE TAX SAVINGS PROVISION.—Notwithstanding paragraph (1), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or supersession of, any State or local law pertaining to taxation, except as provided

PUBLIC LAW 104–104—FEB. 8, 1996

in sections 622 and 653(c) of the Communications Act of 1934 and section 602 of this Act.

(d) COMMERCIAL MOBILE SERVICE JOINT MARKETING.—Notwithstanding section 22.903 of the Commission's regulations (47 C.F.R. 22.903) or any other Commission regulation, a Bell operating company or any other company may, except as provided in sections 271(e)(1) and 272 of the Communications Act of 1934 as amended by this Act as they relate to wireline service, jointly market and sell commercial mobile services in conjunction with telephone exchange service, exchange access, intraLATA telecommunications service, interLATA telecommunications service, and information services.

(e) DEFINITIONS.—As used in this section:

(1) AT&T CONSENT DECREE.—The term "AT&T Consent Decree" means the order entered August 24, 1982, in the antitrust action styled United States v. Western Electric, Civil Action No. 82–0192, in the United States District Court for the District of Columbia, and includes any judgment or order with respect to such action entered on or after August 24, 1982.

(2) GTE CONSENT DECREE.—The term "GTE Consent Decree" means the order entered December 21, 1984, as restated January 11, 1985, in the action styled United States v. GTE Corp., Civil Action No. 83–1298, in the United States District Court for the District of Columbia, and any judgment or order with respect to such action entered on or after December 21, 1984.

(3) McCAW CONSENT DECREE.—The term "McCaw Consent Decree" means the proposed consent decree filed on July 15, 1994, in the antitrust action styled United States v. AT&T Corp. and McCaw Cellular Communications, Inc., Civil Action No. 94–01555, in the United States District Court for the District of Columbia. Such term includes any stipulation that the parties will abide by the terms of such proposed consent decree until it is entered and any order entering such proposed consent decree.

(4) ANTITRUST LAWS.—The term "antitrust laws" has the meaning given it in subsection (a) of the first section of the Clayton Act (15 U.S.C. 12(a)), except that such term includes the Act of June 19, 1936 (49 Stat. 1526; 15 U.S.C. 13 et seq.), commonly known as the Robinson-Patman Act, and section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent that such section 5 applies to unfair methods of competition.

### SEC. 602. PREEMPTION OF LOCAL TAXATION WITH RESPECT TO DIRECT-TO-HOME SERVICES.

(a) PREEMPTION.—A provider of direct-to-home satellite service shall be exempt from the collection or remittance, or both, of any tax or fee imposed by any local taxing jurisdiction on direct-to-home satellite service.

(b) DEFINITIONS.—For the purposes of this section—

(1) DIRECT-TO-HOME SATELLITE SERVICE.—The term "direct-to-home satellite service" means only programming transmitted or broadcast by satellite directly to the subscribers' premises without the use of ground receiving or distribution equipment,

PUBLIC LAW 104–104—FEB. 8, 1996          110 STAT. 145

except at the subscribers' premises or in the uplink process to the satellite.

(2) PROVIDER OF DIRECT-TO-HOME SATELLITE SERVICE.—For purposes of this section, a "provider of direct-to-home satellite service" means a person who transmits, broadcasts, sells, or distributes direct-to-home satellite service.

(3) LOCAL TAXING JURISDICTION.—The term "local taxing jurisdiction" means any municipality, city, county, township, parish, transportation district, or assessment jurisdiction, or any other local jurisdiction in the territorial jurisdiction of the United States with the authority to impose a tax or fee, but does not include a State.

(4) STATE.—The term "State" means any of the several States, the District of Columbia, or any territory or possession of the United States.

(5) TAX OR FEE.—The terms "tax" and "fee" mean any local sales tax, local use tax, local intangible tax, local income tax, business license tax, utility tax, privilege tax, gross receipts tax, excise tax, franchise fees, local telecommunications tax, or any other tax, license, or fee that is imposed for the privilege of doing business, regulating, or raising revenue for a local taxing jurisdiction.

(c) PRESERVATION OF STATE AUTHORITY.—This section shall not be construed to prevent taxation of a provider of direct-to-home satellite service by a State or to prevent a local taxing jurisdiction from receiving revenue derived from a tax or fee imposed and collected by a State.