ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
MATTHEW J. GLOVER
Counsel to the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch
JOSEPH BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Telephone: (202) 305-0924
Fax: (202) 616-8460
E-mail:  Kevin.Snell@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF CALIFORNIA;
GAVIN C. NEWSOM, Governor of
California, in his Official Capacity, and
XAVIER BECERRA, Attorney General
of California, in his Official Capacity,

Defendants.

Case No. 2:18-cv-2660-JAM-DB

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

Judge: The Hon. John A. Mendez
Action Filed: Sept. 30, 2018

Amended Complaint

Plaintiff, the United States of America, by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**NATURE OF THE ACTION**

1.   In this action, the United States seeks a declaration invalidating and preliminarily and permanently enjoining the California Internet Consumer Protection and Net Neutrality Act of 2018, enacted through Senate Bill 822 ("SB-822").  SB-822 is preempted by federal law and therefore violates the Supremacy Clause of the United States Constitution.

2.   The Communications Act, as amended by the Telecommunications Act of 1996, sets forth "the policy of the United States" to "preserve the vibrant and competitive free market . . . for the Internet and other interactive computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(2).  Consistent with that policy, in 2002, the Federal Communications Commission ("FCC") issued an order classifying broadband internet access provided over cable modems as an "information service" statutorily exempt from common carrier regulation under the Act.  *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002).  The FCC's decision was upheld by the Supreme Court in *National Cable & Telecommunications Ass'n v. Brand X*, 545 U.S. 967 (2005).  For the next decade, the Commission adhered to that classification, and the Internet marketplace flourished.

3.   In 2015, the FCC reversed its longstanding determination and classified broadband internet access service as a "telecommunications service" subject to the Communication Act's common carrier requirements.  *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("2015 Order").  Pursuant to that classification, the agency adopted a set of rules governing the conduct of broadband providers.  Those rules prohibited providers from (1) "blocking" or "throttling" (degrading) lawful Internet content, applications, services, or non-harmful devices, (2) engaging in "paid prioritization" (giving preferential treatment to certain Internet traffic either in exchange for consideration or to benefit an affiliated entity), or (3) "unreasonably interfer[ing] with or unreasonably disadvantag[ing]" the ability of producers

-1-

1   of Internet content, applications, services or devices—known as "edge providers"—to make their

2   offerings available to users, or the ability of users to access the content, applications, services,

3   and devices offered by edge providers.  30 FCC Rcd at 5659-69 ¶¶ 133-53.

4         4.   In January 2018, the FCC released *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018)

5   ("2018 Order"), a return to its prior classification of broadband Internet access as an information

6   service and repealing the 2015 Order's rules governing the conduct of broadband providers.  *Id.*

7   ¶ 4.

8         5.   The 2018 Order recognized that "regulation of broadband Internet access service should

9   be governed principally by a uniform set of federal regulations, rather than by a patchwork that

10  includes separate state and local requirements," which "could impose far greater burdens" than

11  the FCC's "calibrated federal regulatory regime," and threaten to "significantly disrupt the

12  balance" the agency struck.  *Id.* ¶ 194; *see id.* ¶¶ 197-204.

13        6.   California, however, seeks to second-guess the Federal Government's regulatory

14  approach by enacting SB-822.  As the State acknowledges, SB-822 "codif[ies] portions of the

15  recently-rescinded" 2015 Order and imposes "additional bright-line rules" that not even "the

16  FCC opted" to embrace in 2015.  Cal. S. Comm. on Judiciary, SB 822 Analysis 1, 19 (2018).

17  Such provisions conflict with the 2018 Order's significant objectives and are therefore

18  preempted under well-established principles of conflict preemption.

19        7.   SB-822 also violates the division of regulatory authority between states and the Federal

20  Government set forth in the Communications Act of 1934, as amended by the

21  Telecommunications Act of 1996.  That Act provides the FCC with exclusive responsibility for

22  "regulating interstate and foreign commerce in communication by wire and radio," 47 U.S.C.

23  § 151, *id.* § 152(a), while leaving states with responsibility for intrastate communications, *id.* §

24  152(b).  SB-822 tramples that division.  Internet communications are inherently interstate, and

25  yet SB-822 attempts to regulate them.  SB-822 is therefore preempted for this independent

26  reason.

27        8.   Plaintiff therefore seeks a declaratory judgment that SB-822 is invalid under the

Supremacy Clause and is preempted by federal law.  Plaintiff also seeks an order preliminarily and permanently enjoining enforcement of SB-822.

## JURISDICTION AND VENUE

9.   The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

10. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because Defendants reside within the Eastern District of California and because a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this judicial district.

11. The Court has authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, 2202, and its inherent equitable powers.

## THE PARTIES

12. Plaintiff is the United States of America.

13. Defendant, the State of California, is a state of the United States.

14. Defendant, Gavin C. Newsom, is the Governor of the State of California, and is being sued in his official capacity.

15. Defendant, Xavier Becerra, is the Attorney General for the State of California, and is being sued in his official capacity.

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

16. The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

17. The Communications Act of 1934 (the "Act"), as amended by the Telecommunications Act of 1996 and other laws, establishes "the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(2).  Congress therein established the goal of "promot[ing] competition and reduc[ing] regulation" to "secure lower prices and higher quality services for American telecommunications consumers" and to "encourage the rapid deployment of new

1   telecommunications technologies." Pub. L. No. 104-104 pmbl., 110 Stat. at 56.

2      18. Section 2 of the Act, 47 U.S.C. § 152, divides authority over communications services

3   between states and the Federal Government. Section 2(b) of the Act expressly preserves state

4   jurisdiction over *intrastate* communications, subject to any federal rules authorized elsewhere in

5   the Act. *Id.* § 152(b). By contrast, Congress did not reserve any state authority over *interstate*

6   communications, which instead are governed by federal law. *See id.* § 152(a) (granting the FCC

7   jurisdiction over "all interstate and foreign communication" and "all persons engaged . . . in such

8   communication").

9              **THE FCC'S APPROACH TO INTERNET REGULATION**

10     19. In 2002, the FCC classified broadband internet access as an "information service" subject

11  to only limited regulation under Title I of the Act, and not a telecommunications service subject

12  to common-carriage regulation under Title II of the Act. *Inquiry Concerning High-Speed Access*

13  *to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002).

14     20. In 2015, the FCC reversed course and classified broadband Internet access service as a

15  "telecommunications" service and adopted a set of bright-line rules governing the conduct of

16  broadband internet providers. *See* 2015 Order. Those rules prohibited Internet service providers

17  ("ISPs") from blocking access to lawful websites ("blocking"); impairing or degrading access to

18  Internet conduct ( "throttling"); and prioritizing the transmission of content for compensation

19  ("paid prioritization"). 2015 Order ¶¶ 15-19. The 2015 Order further adopted a general Internet

20  conduct standard and certain transparency provisions. *Id.* ¶¶ 20-24.

21     21. In 2018, the FCC exercised its lawful authority to reinstate the classification of

22  broadband as an information service subject to only limited regulation. The 2018 Order seeks to

23  "eliminate burdensome regulation that stifles innovation and deters investment, and empower

24  Americans to choose the broadband Internet access service that best fits their needs." 2018

25  Order ¶ 1; *see also, e.g.*, *id.* ¶ 207. It "establishes a calibrated federal regulatory regime based on

26  the pro-competitive, deregulatory goals of the [Telecommunications Act of 1996]." *Id.* ¶ 194.

27     22. The 2018 Order repealed several measures imposed in the 2015 Order. After careful

28

study, the FCC determined that "the costs of [these now repealed rules] to innovation and investment outweigh any benefits they may have," 2018 Order ¶ 4, and thus their elimination "is more likely to encourage broadband investment and innovation, furthering [the] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem," *id.* ¶ 86; *see also id.* ¶ 245. Accordingly, the FCC, among other things, repealed the blocking, throttling, and paid prioritization rules. It also concluded that the 2015 Internet conduct standard was "vague and had created regulatory uncertainty," *id.* ¶ 247, and thus repealed that requirement. *Id.* ¶¶ 246-66.

23. The 2018 Order instead relies on modified transparency and disclosure requirements, market forces, and enforcement of preexisting antitrust and consumer protection laws. *See, e.g.*, *id.* ¶¶ 140-54, 240-45.

24. The FCC recognized that "[o]ther legal regimes—particularly antitrust law and the [Federal Trade Commission's ("FTC")] authority under Section 5 of the FTC Act to prohibit unfair and deceptive practices—provide protection for consumers," *id.* ¶ 140; *see id.* ¶¶ 141-54, and that these protections are especially potent here because the transparency rule "amplifies the power of antitrust law and the FTC Act to deter and where needed remedy behavior that harms consumers," *id.* ¶ 244. To that end, the FCC entered into a memorandum of understanding with the FTC to share information and to assist that agency's policing specific unfair or deceptive acts. *See* Restoring Internet Freedom FCC-FTC Memorandum of Understanding, https://www.ftc.gov/system/files/documents/cooperation_agreements/fcc_ fcc_mou_internet_freedom_order_1214_final_0.pdf.

25. The 2018 Order retained, with some modifications, a "transparency rule" mandating that ISPs accurately disclose network management practices, performance, and commercial terms of services. *See id.* ¶¶ 215-31.

26. The FCC further "conclude[d] that regulation of broadband Internet access should be governed principally by a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements." 2018 Order ¶ 194. "Allowing state and local

governments to adopt their own separate requirements," the FCC explained, "could impose far greater burdens than the federal regulatory regime," and "could significantly disrupt the balance we strike here." *Id.*

27. The 2018 Order was released in January 2018, and took effect on June 11, 2018.

28. The 2018 Order was challenged by a number of parties, including California, in the U.S. Court of Appeals for the District of Columbia Circuit.  The D.C. Circuit largely upheld the 2018 Order.  *See Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).  That Court denied several petitions for rehearing and for rehearing *en banc*, the time to seek *certiorari* has expired, and the *Mozilla* decision is now final and unreviewable.

**COMPARISON BETWEEN CALIFORNIA SB-822 AND THE 2018 ORDER**

29. On August 31, 2018, California's state legislature passed SB-822, which codifies the federal requirements that the 2018 Order eliminated and imposes additional restrictions on ISPs. California's Governor signed the bill into law on September 30, 2018.

30. **Blocking**.  SB-822 makes it "unlawful" to "[b]lock[] lawful content."  SB-822 §§ 3101(a)(1); *see also id.* § 3101(a)(3)(B) (prohibiting charges to avoid blocking) [collectively referred to hereinafter as "Blocking Provisions"].  Yet the 2018 Order repealed "the no-blocking . . . rule[]" because it "[was] unnecessary to prevent the harms that they were intending to thwart," 2018 Order ¶ 263, and because the costs of *ex ante* conduct rules exceed their benefits, *see id.* ¶¶ 322-23.

31. **Throttling**.  SB-822 forbids the "[i]mpairing or degrading [of] lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device."  SB-822 § 3101(a)(2); *id.* § 3100(j); *see also id.* § 3101(a)(3)(C) (prohibiting charges to avoid throttling) [collectively referred to hereinafter as "Throttling Provisions"].  Yet the 2018 Order repealed the "unnecessary" "no-throttling rules."  2018 Order ¶ 263.

32. **Paid Prioritization**.  SB-822 makes it unlawful to "[e]ngage in paid prioritization."  SB-822 § 3101(a)(4); *id.* § 3100(r) [collectively referred to hereinafter as "Paid Prioritization Provisions"].  Yet the 2018 Order "decline[d] to adopt a ban on paid prioritization."  2018 Order

¶ 253.

33. **<u>Internet Conduct Standard</u>**.  SB-822 prohibits "unreasonably interfering with[] or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users."  SB-822 § 3101(a)(7) [hereinafter "Internet Conduct Standard"]. Yet the 2018 Order repealed the 2015 Order's nearly identical Internet conduct standard that it found "not in the public interest," 2018 Order ¶¶ 246-52; *see also* 2015 Order ¶ 136 (text of former Internet conduct standard).

34. **<u>Internet Traffic Exchange</u>.**  On information and belief, SB-822 regulates Internet traffic exchange by prohibiting ISPs from charging edge providers for delivering traffic to end users and by prohibiting any traffic-exchange agreements that could be construed as having the purpose or effect of evading other prohibitions.  SB-822 §§ 3101(a)(3)(A), (a)(9) [hereinafter "Traffic-Exchange Provisions"].  Yet the 2018 Order eliminated the 2015 Order's oversight of Internet traffic exchange agreements and "return[ed] Internet traffic exchange to the longstanding free market framework."  2018 Order ¶¶ 163-73.

35. **<u>Zero-Rating</u>**.  SB-822 bans "[z]ero-rating," defined as "exempting some Internet traffic from a customer's data usage allowance," SB-822 § 3100(t), either (a) in exchange for consideration, *id.* § 3101(a)(5); *see also id.* § 3101(a)(7)(B), or (b) for only "some Internet content, applications, services, or devices in a category for Internet content, applications, services, or devices, but not the entire category," *id.* § 3101(a)(6) [hereinafter "Zero-Rating Provisions"].  The 2018 Order not only declined to bar zero-rating programs, but expressly noted that a "thirteen-month investigation . . . did not identify specific evidence of harms from particular zero-rating programs."  2018 Order ¶ 250.

36. **<u>Specialized Services Provisions.</u>**  SB-822 extends its prohibitions to separate non-Internet services that are delivered over an ISP's last-mile transmission facilities.  SB-822 § 3102(a) [hereinafter "Specialized Services Provisions"].  SB-822 does not define what services

are prohibited by section 3102(a).  On information and belief, SB-822 reaches what are sometimes known as "specialized services" (such as "facilities-based VoIP offerings, heart monitors, or energy consumption sensors," 2015 Order ¶ 35) as well as co-packaged pay-TV services.  On information and belief, SB-822 subjects specialized services as well as co-packaged pay-TV services to all of "the prohibitions in Section 3101," SB-822 § 3102(a)(1).  The 2018 Order did not impose SB-822's prohibitions in the first place, let alone apply such prohibitions to specialized services or co-packaged pay-TV services.  Further, on information and belief, SB-822 prohibits any specialized services or co-packaged pay-TV services perceived to "negatively affect the performance of broadband Internet access service," *id.* § 3102(a)(2), which is plainly inconsistent with the 2018 Order's repeal of the Internet Conduct Standard.

37. **Disclosure Provision.**  SB-822 further forbids "[f]ailing to disclose publicly accurate information regarding the network management practices, performance, and commercial terms . . . sufficient for consumers to make informed choices . . . ."  SB-822 § 3101(a)(8) [hereinafter "Disclosure Provision"].  Although this language resembles a portion of the FCC's transparency rule, 47 C.F.R. § 8.1(a), it omits the 2018 Order's specific guidance addressing precisely what disclosures are and are not required, *see* 2018 Order ¶¶ 215-31.

38. **Mobile Broadband Internet Access Service Provisions.**  The 2018 Order makes clear that "broadband Internet access service, regardless of whether offered using fixed or mobile technologies, is an information service under the Act," and that mobile broadband Internet access service "should not be classified as a commercial mobile service [i.e., requiring common carrier treatment] or its functional equivalent." 2018 Order ¶ 65; *see also id.* ¶¶ 65-85.  This designation "furthers the Act's overall intent to allow information services to develop free from common carrier regulations."  *Id.* ¶ 82.  SB-822, by contrast, imposes the same common carrier rules described above on providers of mobile broadband Internet access services as it does on providers of fixed broadband Internet access services.  SB-822 §§ 3101(b), 3102(b) [hereinafter "Mobile Broadband Internet Access Service Provisions"].

## COUNT ONE – CONFLICT PREEMPTION

39. Plaintiff hereby incorporates paragraphs 1 through 38 of this Amended Complaint as if fully stated herein.

40.  SB-822 conflicts with the 2018 Order's affirmative federal "deregulatory policy" and "deregulatory approach" to Internet regulation, *see* 2018 Order ¶¶ 39, 61, 194-96, which the FCC adopted in furtherance of United States' policy "to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2).

41. SB-822's Blocking Provisions conflict with the 2018 Order's repeal of "the no-blocking rule." *Compare* SB-822 §§ 3101(a)(1), (a)(3)(B), *with* 2018 Order ¶ 263; *see also* ¶¶ 322-23.

42. SB-822's Throttling Provisions conflict with the 2018 Order's repeal of the "unnecessary" "no-throttling rules." *Compare* SB-822 §§ 3101(a)(2), (a)(3)(C), 3100(j), *with* 2018 Order ¶ 263.

43. SB-822's Paid Prioritization Provisions conflict with the 2018 Order's refrain from "adopt[ing] a ban on paid prioritization." *Compare* SB-822 §§ 3101(a)(4), 3100(r), *with* 2018 Order ¶ 253.

44. SB-822's Internet Conduct Standard conflicts with the 2018 Order's repeal of a nearly identical standard from the 2015 Order that the FCC found "not in the public interest." *Compare* SB-822 § 3101(a)(7), *with* 2018 Order ¶¶ 246-52.

45. SB-822's Traffic-Exchange Provisions conflict with the 2018 Order's elimination of oversight of Internet traffic exchange agreements and "return [of] Internet traffic exchange to the longstanding free market framework." *Compare* SB-822 §§ 3101 (a)(3)(A), (a)(9), *with* 2018 Order ¶¶ 163-73.

46. SB-822's Zero-Rating Provisions conflict with the FCC's deregulatory approach by imposing more stringent regulation. *Compare* SB-822 §§ 3101(a)(5), (a)(6), (a)(7)(B), *with* 2018 Order.

47. SB-822's Specialized Services Provisions conflict with the 2018 Order's deregulatory approach by imposing more stringent regulation. *Compare* SB-822 §§ 3102(a)(1), (a)(2), *with*

2018 Order.

48. SB-822's Mobile Broadband Internet Access Service Provisions conflict with the 2018 Order by imposing more stringent regulation.  The FCC determined that mobile broadband Internet access service "should not be classified as a commercial mobile service [i.e., requiring common carrier treatment] or its functional equivalent."  *Compare* SB-822 §§ 3101(b), 3102(b), *with* 2018 Order ¶ 65; *see also* 2018 Order  ¶¶ 65-85.

49. SB-822's Disclosure Provision conflicts with the 2018 Order by allowing more stringent disclosure obligations than those imposed by the FCC.  *Compare* SB-822 § 3101(a)(8), *with* 2018 Order ¶¶ 215-31.

50. SB-822 contributes to a patchwork of separate and conflicting requirements from different jurisdictions, and thereby impairs the effective provision of broadband services, *see* 2018 Order ¶ 194, as ISPs generally cannot comply with state or local rules for intrastate communications without applying the same rules to interstate communications, *see id.* ¶ 200.

51. SB-822 conflicts with and otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law.

52. SB-822 is preempted by the 2018 Order.

## COUNT TWO – PREEMPTION BY THE COMMUNICATIONS ACT

53. Plaintiff hereby incorporates paragraphs 1 through 52 of this Amended Complaint as if fully stated herein.

54. The Act provides the FCC with exclusive responsibility for "regulating interstate and foreign commerce in communication by wire and radio," 47 U.S.C. § 151, *id.* § 152(a), while leaving states with responsibility for intrastate communications, *id.* § 152(b).

55. "Internet access is a jurisdictionally interstate service because a substantial portion of Internet traffic involves accessing interstate or foreign websites."  *See* 2018 Order ¶ 199; *see also id.* ¶ 200.

56. SB-822 attempts to regulate interstate communications.  By its terms, SB-822 defines "broadband internet access service" to which it applies as "a mass market retail service by wire

or radio provided to customers in California that provides the capability to transmit data to, and receive data, from *all or substantially all Internet endpoints*." SB-822 § 3100(b) (emphasis added).

57. SB-822 eviscerates the Act's division of regulatory authority and is preempted by the Act.

### **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

a.      A declaratory judgment stating that SB-822 is invalid, null, and void;

b.      A preliminary and a permanent injunction against the State of California, and its officers, agents, and employees, prohibiting the enforcement of the preempted provisions of SB-822;

c.      That this Court award the United States its costs in this action; and;

d.      That this Court award any other relief that it deem just and proper.


Dated:  August 5, 2020                    Respectfully submitted,

                                        ETHAN P. DAVIS
                                        Acting Assistant Attorney General
                                        Civil Division

                                        MATTHEW J. GLOVER
                                        Counsel to the Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        JACQUELINE COLEMAN SNEAD
                                        Assistant Branch Director, Federal Programs Branch


                                        /s/ Kevin Snell_____
                                        JOSEPH BORSON (Va. Bar No. 85519)
                                        KEVIN SNELL (NY Bar)
                                        Trial Attorneys
                                        U.S. Department of Justice

1   Civil Division, Federal Programs Branch
2   1100 L St. NW
    Washington, DC 20530
3   Telephone: (202) 305-0924
    Fax: (202) 616-8460
4   E-mail:  Kevin.Snell@usdoj.gov

5   *Attorneys for the United States*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28