ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division
MATTHEW J. GLOVER
Counsel to the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch
JOSEPH E. BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Telephone: (202) 514-1944
Fax: (202) 616-8460
E-mail:  Joseph.Borson@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, Governor of California, in his Official Capacity, and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>Defendants. | Case No. 2:18-cv-2660-JAM-DB<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: The Hon. John A. Mendez<br>Action Filed: Sept. 30, 2018 |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

I.     HISTORY OF FEDERAL INTERNET REGULATION ............................. 3

     A.     Broadband Internet Access Service ................................... 3

     B.     The Commission's Historic Approach to Internet Regulation .............................. 3

     C.     The 2015 Order ................................................................... 4

     D.     The 2018 Order ................................................................... 6

II.     CALIFORNIA'S INTERNET REGULATION LAW ................................ 10

III.     PROCEDURAL HISTORY ................................................................... 13

LEGAL STANDARD ....................................................................................... 13

ARGUMENT ................................................................................................... 15

I.     THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS. .................... 15

     A.     SB-822 Conflicts With, and Thus Is Preempted By, the 2018 Order. .................. 15

          1.     The Significant Objective of the 2018 Order is to Return to a Light-Touch Approach to Regulating Broadband Internet Access. ............................... 16

          2.     SB-822's Specific Provisions Frustrate the 2018 Order's Significant Objectives. ............................... 18

     B.     SB-822 Is Preempted by the Communications Act's Assignment of Exclusive Authority to Regulate Interstate Communications to the Federal Government. .. 22

II.     THE EQUITABLE FACTORS STRONGLY MILITATE IN FAVOR OF INJUNCTIVE RELIEF. ................................................................... 24

CONCLUSION ............................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,*
    461 U.S. 375 (1983)...................................................................................... 15

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.,*
    330 U.S. 767 (1947).............................................................................. 14, 16

*Burlington Northern Santa Fe Corp. v. Anderson,*
    959 F. Supp. 1288 (D. Mt. 1997)................................................................. 18

*City of Abilene, Tex. v. FCC,*
    164 F.3d 49 (D.C. Cir. 1999)........................................................................ 22

*City of New York v. FCC,*
    486 U.S. 57 (1988)....................................................................................... 14

*Comcast Corp. v. FCC,*
    600 F.3d 642 (D.C. Cir. 2010)....................................................................... 4

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000).............................................................................. 18, 23

*Fed. Home Loan Bank Bd. v. Empie,*
    778 F.2d 1447 (10th Cir. 1985).................................................................... 25

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982)..................................................................................... 14

*Fober v. Mgm't & Tech. Consultants, LLC,*
    886 F.3d 789 (9th Cir. 2018)........................................................................ 16

*Geier v. American Honda Motor Co.,*
    529 U.S. 861 (2000).............................................................................. 15, 18

*Global Tel*Link v. FCC,*
    866 F.3d 397 (D.C. Cir. 2017)...................................................................... 22

*Ivy Broadcasting Co. v. Am. Tel. & Tel. Co.,*
    391 F.2d 486 (2d Cir. 1968)......................................................................... 23

*Louisiana Public Service Commission v. FCC,*
    476 U.S. 355 (1986)..................................................................................... 24

*Mahoney v. RFE/RL, Inc.,*
    47 F.3d 447 (D.C. Cir. 1995)........................................................................ 14

*Mayo v. United States*,
   319 U.S. 441 (1943) .................................................................................................. 14

*Minnesota Pub. Utilities Comm'n v. FCC*,
   483 F.3d 570 (8th Cir. 2007) ........................................................................... 6, 16

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ................................................................................ *passim*

*National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ..................................................................................... 3, 4, 16

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*,
   746 F.2d 1492 (D.C. Cir. 1984) ...................................................................... 22

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989) ........................................................................................ 25

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................ 13

*Ray v. Atl. Richfield Co.*,
   435 U.S. 151 (1978) ........................................................................................ 14

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ................................................................................. 14, 15

*Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ................................................................... 13, 14

*Sprint Nextel Corp. v. FCC*,
   508 F.3d 1129 (D.C. Cir. 2007) ...................................................................... 16

*Union Telecom, LLC v. United States*,
   144 Fed. Cl. 477 (2019) .................................................................................. 22

*United States Telecom Ass'n v. FCC*,
   825 F.3d 674 (D.C. Cir. 2016) .......................................................................... 6

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ................................................................. 25, 26

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded on other grounds*, 567
   U.S. 387 (2012) ................................................................................... 2, 14, 25

*United States v. California*,
  314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in part, reversed in part and remanded*, 921 F.3d
  865 (9th Cir. 2019) ........................................................................................... 25, 26

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ........................................................................................... 25

*United States v. Costanzo*,
  956 F.3d 1088 (9th Cir. 2020) ........................................................................................... 23

*US West Commc'ns, Inc. v. Jennings*,
  304 F.3d 950 (9th Cir. 2002) ........................................................................................... 16

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) ........................................................................................... 3, 4

*Williamson v. Mazda Motor of Am., Inc.*,
  562 U.S. 323 (2001) ........................................................................................... 15, 17

*Wilson v. A.H. Belo Corp.*,
  87 F.3d 393 (9th Cir. 1996) ........................................................................................... 16

*Winter v. NRDC*,
  555 U.S. 7 (2008) ........................................................................................... 13

**Statutes**

28 U.S.C. § 2342(1) ........................................................................................... 13, 16

47 U.S.C. § 151 ........................................................................................... 22

47 U.S.C. § 153(24) ........................................................................................... 3

47 U.S.C. § 230(b)(2) ........................................................................................... 3

47 U.S.C. § 402(a) ........................................................................................... 13

Cal. Bus. & Prof. Code § 17204 ........................................................................................... 12

Cal. Bus. & Prof. Code §§ 17200 ........................................................................................... 12

Cal. Civ. Code § 3100 ........................................................................................... 10, 20, 23

Cal. Civ. Code § 3101 ........................................................................................... *passim*

Cal. Civ. Code §§ 3100-3104 ........................................................................................... 1

Cal. Gov't Code § 9600(a) ........................................................................................... 10

Telecommunications Act of 1996,
  Pub. L. No. 104-104, 110 Stat 56 ........................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 65 ................................................................. 1

**Regulations**

47 C.F.R. § 8.1(a)............................................................................... 12, 21

**Other Authorities**

Cal. S. Comm. on Energy, Utils., & Commc'ns,
  SB 460 Analysis 1 (2018) ................................................................. 10

Cal. S. Comm. on Judiciary,
  SB 822 Analysis 1 (2018)....................................................... 1, 12, 13, 19

*In re Federal-State Joint Bd. on Universal Serv.*,
  13 FCC Rcd 11,501 (1998)................................................................ 4

*Protecting & Promoting the Open Internet*, GN Docket No. 14-28, Report and Order on
  Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015)………………….…….*passim*

*Restoring Internet Freedom*,
  Notice of Proposed Rulemaking, 32 FCC Rcd 4434 (2017) ............................................ 6, 7, 8

*Restoring Internet Freedom*, 33 FCC Rcd. 311 ¶ 1 (2018)…………………………..…….*passim*

*Restoring Internet Freedom Memorandum of Understanding* (Dec. 14, 2017), https://www.ftc.
  gov/system/files/documents/cooperation_agreements/fcc_fcc_mou_internet_freedom_order_
  1214_final_0.pdf.................................................................................... 7

http://sd11.senate.ca.gov/news/20180808-california-net-neutrality-proposal-moves-forward .... 18

In order to avoid ongoing, irreparable harm to the United States and its interests, the United States moves this Court under Federal Rule of Civil Procedure 65 to preliminarily enjoin enforcement of the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Civ. Code §§ 3100-3104, enacted through Senate Bill 822 ("SB-822").

## INTRODUCTION

This case involves California's attempt to nullify the Federal Government's statutory and regulatory scheme for interstate broadband communications by enacting previously repealed or rejected rules governing the provision of broadband Internet access service. In adopting SB-822, California has imposed stringent regulation on interstate broadband communications in a way that directly contradicts both the Federal Communications Commission's ("FCC" or "Commission") validly adopted regulatory scheme and the Congressionally enacted principle, codified in the Communications Act of 1934, that the Federal Government—not individual States—has exclusive regulatory authority over interstate communications. Pursuant to the Constitution's Supremacy Clause, SB-822 is preempted.

In 2018, the FCC adopted an order that honored a historically "bipartisan commitment to a free and open Internet" and "reverse[d] the Commission's abrupt shift" in a 2015 order "to heavy handed utility-style regulation." *Restoring Internet Freedom*, 33 FCC Rcd. 311 ¶ 1 (2018) ("2018 Order"). The FCC determined that to promote the continued vitality of the Internet, it was necessary to return to a light-touch, market-based framework for regulating the provision of broadband service and repeal previously established bans on certain internet management practices, including blocking, throttling, and paid prioritization. *E.g.*, 2018 Order ¶¶ 207, 239. That Order was affirmed by the D.C. Circuit against a challenge brought by a number of states, including California. *Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019). Despite the 2018 Order's plain objective, California enacted legislation that both "codif[ies] portions of the recently-rescinded [FCC] rules," and imposes additional bright-line rules that not even "the FCC opted" to embrace in 2015. Cal. S. Comm. on Judiciary, SB 822 Analysis 1, 19 (2018) ("Senate Judiciary Analysis").

California's attempt to nullify federal law should fail for two separate and independent reasons. First, under well-established principles of conflict preemption, a state law that conflicts with the purpose or objectives of a federal regulatory scheme is preempted. SB-822 does just that. The FCC sought to *reduce* the regulatory burdens on the provision of broadband service by removing certain restrictions; yet California deliberately attempts to revert to and go beyond the regulatory scheme the FCC specifically rejected. Second, California improperly attempts to assert regulatory authority over an inherently interstate communications service in violation of the Communications Act of 1934. That Act divides regulatory authority as follows: the states have authority over intrastate communication, while the Federal Government has responsibility over interstate communications. California's law fails to accord with this clear division of power. Not only does it purport to regulate an inherently interstate communications service, but it affirmatively adopts a definition of broadband internet access service as interstate and thus, on its face, purports to regulate the entirety of the Internet.

California thereby has deliberately countermanded the FCC's decision—by itself reason to preliminarily enjoin SB-822. "[A]n alleged constitutional infringement will often alone" as here "constitute irreparable harm." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded on other grounds*, 567 U.S. 387 (2012). "In such circumstances, the interests of preserving the Supremacy Clause is paramount." *Id*. Here, due to its size and substantial impact on the Internet marketplace, California effectively has dictated a broadband Internet access policy for the entire Nation—a task Congress placed solely within the purview of the FCC. Given the nature of Internet communications, which frequently straddle multiple jurisdictions, Internet Service Providers ("ISPs") cannot apply two separate and conflicting legal frameworks to Internet communications—one for California and one for everywhere else. This impossibility means that California's rules effectively are the only ones that matter. California's nullification of federal law—with the concomitant regulatory uncertainty and resulting instability of the Internet marketplace it creates—is not in the public's interest, not otherwise justified, and thus should be enjoined.

# BACKGROUND

## I.    History of Federal Internet Regulation

### A.    Broadband Internet Access Service

Internet users generally connect to "backbone networks"—"interconnected, long-haul fiber-optic links and high-speed routers capable of transmitting vast amounts of data"—via local access providers "who operate the 'last-mile' transmission lines." *Verizon v. FCC*, 740 F.3d 623, 628-29 (D.C. Cir. 2014). In the early days of the Internet, most users relied on dial-up connections via local telephone lines to connect. *Id.* at 629. Today, however, users generally access the Internet "through 'broadband,' i.e., high-speed communications technologies, such as cable modem service." *Id.* Both "edge providers" ("those who, like Amazon or Google, provide content, services, and applications") as well "end users" ("those who consume edge providers' content, services, and applications") usually rely on broadband Internet access service. *Id.* Over the past two decades, the FCC has issued a series of orders addressing the appropriate regulatory treatment of broadband Internet access service.

### B.    The Commission's Historic Approach to Internet Regulation

In the Telecommunications Act of 1996 ("1996 Act"), Congress comprehensively reformed and amended the Communications Act of 1934 ("Communications Act") to "promote competition and reduce regulation" so as to "secure lower prices and higher quality services for American telecommunications consumers" and to "encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104 (preamble), 110 Stat. at 56. As amended, the Communications Act distinguishes between lightly regulated "information services" and heavily regulated "telecommunications services." 47 U.S.C. § 153(24), (53); *see National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 973, 975-76 (2005) ("*Brand X*"); 2018 Order ¶ 9. It further established that "[i]t is the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services"—including any "information service"—"unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2), (f)(2). To this end, for much of the next two decades, the FCC

"repeatedly adopted a light-touch approach to the Internet that favored discrete and targeted actions over pre-emptive, sweeping regulation of Internet service providers." 2018 Order ¶ 9; *see id.* ¶¶ 9-16. In 1998, for instance, the FCC informed Congress that Internet access service should be classified as an information service, not a telecommunications service. *In re Federal-State Joint Bd. on Universal Serv.*, 13 FCC Rcd 11,501, 11,536 (1998). In 2002, consistent with that conclusion, the Commission classified broadband Internet access service over cable systems as an "interstate information service" rather than a "telecommunications service." 2018 Order ¶ 10. In 2005, the Supreme Court upheld that classification, concluding that it was based on a permissible reading of ambiguous language in the Telecommunications Act's definitional provisions. *Brand X*, 545 U.S. at 986-1000. The FCC later classified broadband Internet access service via other modes, such as wireline facilities and power lines, as information services as well. 2018 Order ¶¶ 12-13. The thriving, rapidly expanding, and ubiquitous Internet that we know today emerged in this regulatory environment.

Starting in 2008, the FCC asserted certain regulatory authority over broadband Internet access providers. *Id.* ¶¶ 14-17. With the exception of a 2010 transparency rule, which required providers of broadband Internet access services to disclose their network management practices, the D.C. Circuit rejected these efforts as exceeding the Commission's authority over information services. *See Verizon*, 740 F.3d at 627; *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010). At no point during this time did the FCC seek to justify these actions by invoking its Title II authority over telecommunications services. *See* 2018 Order ¶¶ 14-17.

## C.     The 2015 Order

In 2015, in a sharp departure from its historic practice, the FCC issued an order classifying, for the first time, broadband Internet access service, whether fixed or mobile, as a telecommunications service subject to the Commission's Title II authority. *Protecting & Promoting the Open Internet*, GN Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) ("2015 Order").

Relying on this authority, the FCC adopted several rules. Specifically, it banned broadband Internet access service providers from engaging in the following conduct:

1) *Blocking*: A provider "shall not block lawful content, applications, services, or nonharmful devices, subject to reasonable network management." *Id.* ¶ 15.

2) *Throttling*: A provider "shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management." *Id.* ¶ 16.

3) *Paid Prioritization*: A provider "shall not engage in paid prioritization," which "refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶ 18.

The 2015 Order also adopted an Internet conduct standard, directing that providers "shall not unreasonably interfere with or unreasonably disadvantage" either:

(i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule.

*Id.* ¶¶ 21, 136. In addition to these new substantive rules, the 2015 Order added reporting requirements to the transparency rule adopted by the FCC in 2010. *Id.* ¶¶ 24, 162-71.

The FCC declined, however, to impose "bright-line" prohibitions on "other practices" to which some commentators objected. *Id.* ¶¶ 151-52. For example, the Commission refused to ban "zero-rating"—the practice of exempting certain Internet traffic from users' data "usage allowances," *id.* ¶ 151—because some uses of this practice "could benefit consumers and competition," *id.* ¶ 152. Similarly, the Commission did not apply bright-line rules to so-called interconnection or Internet traffic exchange agreements—generally, commercial arrangements between ISPs and edge providers concerning Internet traffic at connections between the backbone networks and the last-mile transmission lines (although it asserted authority to review

interconnection disputes under Title II on a case-by-case basis). *Id.* ¶¶ 30-31, 202-06. And the Commission declined to apply the rules to separate non-Internet services—sometimes referred to as "specialized services"—offered by a broadband provider, such as "facilities-based VoIP offerings, heart monitors, or energy consumption sensors," except for narrow circumstances where they could be subject to limited oversight under the Internet conduct standard. *Id.* ¶¶ 35, 207-13.

The FCC also stated that it would "exercise [its] preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with [its] carefully tailored regulatory scheme." *Id.* ¶ 433. As it observed, "[c]ompetition and deregulation are valid federal interests the FCC may protect through preemption of state regulation." *Id.* ¶ 433 n.1286 (quoting *Minnesota Pub. Utilities Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007)).

In 2016, a divided panel of the D.C. Circuit upheld the 2015 Order against legal challenges. *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).

### D.     The 2018 Order

In May 2017, the FCC issued a proposal to overturn the 2015 Order and return to a light-touch, market-based approach to regulating the provision of broadband service. *Restoring Internet Freedom*, Notice of Proposed Rulemaking, 32 FCC Rcd 4434 (2017). Following public comment, the FCC released in January 2018 its 2018 Order, which repealed the rules adopted in 2015, reestablished the agency's longstanding classification of broadband Internet access service as an "information service," 2018 Order ¶ 20, and embraced the agency's historic practice of less intrusive Internet regulation, *see id.* ¶ 207. In doing so, the FCC repealed the 2015 Order's bans on blocking, throttling, and paid prioritization, *id.* ¶ 239; the Internet conduct standard, *id.*; oversight of Internet traffic exchange agreements, *id.* ¶¶ 246-52; and enhancements to the transparency rule, *id.* ¶ 225. In their place, the 2018 Order opted for a more tailored regulatory approach that relied on a combination of disclosure requirements, market forces, and enforcement of pre-existing antitrust and consumer protection laws. *See, e.g.*, *id.* ¶¶ 140-54, 240-45.

First, the FCC reinstated its 2010 transparency rule, with limited modifications, but eliminated the additional reporting requirements of the 2015 Order. *Id.* ¶¶ 215-31. The FCC

recognized that "transparency substantially reduces the possibility that ISPs will engage in harmful practices, and it incentivizes quick corrective measures by providers if problematic conduct is identified." *Id*. ¶ 209; *see also id*. ¶¶ 217, 237, 240-44. In addition, "[a]ppropriate disclosures" can "help consumers make informed choices about their purchase and use of broadband Internet access services." *Id*. ¶ 209; *see also id*. ¶¶ 216-18, 237. As to the 2015 Order's additional disclosure requirements, the FCC concluded that they had "significantly increased the burdens imposed on ISPs without providing countervailing benefits to consumers or the Commission." *Id.* ¶ 215. The FCC's current transparency rule requires broadband Internet access service providers to "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings." *Id.* The rule also provides that "[s]uch disclosure shall be made via a publicly available, easily accessible website or through transmittal to the Commission," *id.*, and was accompanied by nine pages of guidance specifying what disclosures are and are not required, *see id.* ¶¶ 215–31.

Second, the FCC recognized that "[o]ther legal regimes—particularly antitrust law and the [Federal Trade Commission's (FTC)] authority under Section 5 of the FTC Act to prohibit unfair and deceptive practices—provide protection for broadband consumers," *id.* ¶ 140; *see generally id.* ¶¶ 141-54, and that these protections are especially potent because the transparency rule "amplifies the power of antitrust law and the FTC Act to deter and where needed remedy behavior that harms consumers," *id.* ¶ 244. To that end, the FCC entered into a memorandum of understanding with the FTC enabling the two agencies to share information, strengthening the FTC's ability to police specific unfair or deceptive practices. *Restoring Internet Freedom Memorandum of Understanding* (Dec. 14, 2017), https://www.ftc.gov/system/files/documents/ cooperation_agreements/fcc_fcc_mou_internet_freedom_order_1214_final_0.pdf. In the FCC's view, these well-established authorities are better suited to address violations of net-neutrality principles, in part because "antitrust and consumer protection laws . . . apply to the whole of the

Internet ecosystem, including edge providers," and draw "guidance from [an] ample body of precedent" from across industries, thereby avoiding "economic distortions by regulating only one side of business transactions on the Internet." *Id.* ¶ 140.

As the FCC explained, this shift from the 2015 Order was necessary for several independent reasons. First, based on its comprehensive review of the administrative record and its policy expertise, the FCC concluded that "the costs of [the repealed] rules to innovation and investment outweigh any benefits they may have," *id.* ¶ 4, and thus their elimination "is more likely to encourage broadband investment and innovation, furthering [the] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem," *id.* ¶ 86; *see also id.* ¶ 245 ("[T]he substantial costs [of the 2015 rules]—including the costs to consumers in terms of lost innovation as well as monetary costs to ISPs—are not worth the possible benefits" (footnote omitted)). Second, the FCC found that the repealed rules were "unnecessary," *id.* ¶ 4, because "the transparency rule . . . in combination with [market forces] and the antitrust and consumer protection laws, obviates the need for conduct rules by achieving comparable benefits at lower cost," *id.* ¶ 239; *see id.* ¶¶ 240-66. Third, apart from these policy considerations, the Commission concluded that its prior approach was "legally flawed" because it had "not identified any sources of legal authority that could justify the comprehensive conduct rules governing ISPs adopted in the [2015 Order]." *Id.* ¶¶ 2, 4; *see id.* ¶¶ 267-96.

The 2018 Order, like the 2015 Order, also expressly preempted "any state or local measures that would effectively impose rules or requirements that [the FCC] ha[d] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that [it] address[ed] in this order." *Id.* ¶ 195 ("Express Preemption Clause"). This includes "any so-called 'economic' or 'public utility type' regulations, including common-carriage requirements akin to those found in Title II of the [Communications] Act and its implementing rules, as well as other rules or requirements that [the FCC] repeal[ed] or refrain[ed] from imposing" in the 2018 Order. *Id.* (footnote omitted). However, the 2018 Order took care to "not disturb or displace the states' traditional role in generally policing such matters

as fraud, taxation, and general commercial dealings," and noted that "the continued applicability of these general state laws is one of the considerations" for why "ISP conduct regulation is unnecessary." *Id.* ¶ 196.

Multiple parties challenged the 2018 Order, which took effect on June 11, 2018, by petitioning for review in the D.C. Circuit. Among them was a coalition of various state and local entities, the District of Columbia, and 20 States, including California. *See Mozilla Corp. v. FCC*, Cases Nos. 18-1052 *et al* (D.C. Cir.). On October 1, 2019, the D.C. Circuit unanimously upheld the FCC's determination to classify broadband internet access as an information service subject to Title I of the Communications Act. *Mozilla Corp. v. FCC*, 940 F.3d 1, 18-45 (D.C. Cir. 2019). The Court also found that the FCC had not acted arbitrarily and capriciously in repealing the former federal conduct rules, except for three discrete issues not relevant here on which the panel remanded without vacatur. *Id.* at 45-74.[1] But a divided panel also vacated the portion of the 2018 Order that sought to expressly preempt state or local laws—on grounds that it went "far beyond conflict preemption." *Id.* at 74-86. "At bottom," the panel majority held, "the Commission lacked the legal authority to categorically abolish all fifty States' statutorily conferred authority to regulate intrastate communications." *Id.* at 86. But the Court did "not consider whether the remaining portions of the 2018 Order have preemptive effect under principles of conflict preemption or any other implied-preemption doctrine." *Id.* at 85. It explained that doing so "would be wholly premature" "because no particular state law is at issue in this case and the Commission makes no provision-specific arguments." *Id.* at 86. Judge Stephen F. Williams dissented from this part of the Court's holding, recognizing that "the Commission here made an uncontested finding that it would be 'impossible' to maintain the regime it had adopted under Title I in the face of inconsistent state regulation," and that "Supreme Court decisions make clear that a federal agency's authority to

---

[1] Specifically, the D.C. Circuit remanded without vacatur to allow for the FCC to consider and explain the impact of the 2018 Order on public safety, pole-attachment regulation, and the Lifeline Program. *Mozilla*, 940 F.3d at 49, 59-63, 65-70.

preempt state law *need not be expressly granted*." *Id.* at 95-96 (Williams, J., concurring in part and dissenting in part) (emphasis in original).

The time to seek certiorari of the D.C. Circuit's decision has passed, and the decision is now final.

## II.   California's Internet Regulation Law

While California's challenge to the 2018 Order was pending before the D.C. Circuit, its State Legislature passed SB-822 on August 31, 2018. California's Governor signed SB-822 into law the next month, and it took effect on January 1, 2019. Cal. Gov't Code § 9600(a). As the legislative history expressly acknowledges, SB-822 "codif[ies] portions of the recently-rescinded [FCC] rules." Senate Judiciary Analysis 1; *see also* Cal. S. Comm. on Energy, Utils., & Commc'ns, SB 460 Analysis 1 (2018) ("Senate Energy Analysis") (noting that it "adopts the main components of the net neutrality rules repealed by [the FCC]"). Like the 2018 Order, *see* 2018 Order ¶ 21, SB-822 defines broadband Internet access service as "a mass market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data, from all or substantially all Internet endpoints." SB-822 § 3100(b). And like the repealed 2015 Order, SB-822 renders it "unlawful" for a provider of broadband Internet access service "to engage in":

1) *Blocking*: "Blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management." Cal. Civ. Code § 3101(a)(1); *see also id.* § 3101(a)(3)(B) (prohibiting charges to avoid blocking).

2) *Throttling*: "Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, subject to reasonable network management." *Id.* § 3101(a)(2); § 3100(j); *see also id.* § 3101(a)(3)(C) (prohibiting charges to avoid throttling).

3) *Paid Prioritization*: "Engaging in paid prioritization," *id.* § 3101(a)(4), which "means the management of an Internet service provider's network to directly or indirectly favor some traffic over other traffic, including, but not limited to, through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in

exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity," *id.* § 3100(r).

SB-822 also reinstates the 2015 Order's general Internet conduct standard by prohibiting:

> Unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be a violation of this paragraph.

*Id.* § 3101(a)(7).

And although the 2018 Order eliminated the 2015 Order's oversight of Internet traffic exchange agreements, "return[ing] Internet traffic exchange to the longstanding free market framework," 2018 Order ¶¶ 163-73, SB-822 appears to regulate such exchanges by prohibiting ISPs from charging edge providers for delivering traffic to end users and by prohibiting any traffic-exchange agreements that could be construed as having the purpose or effect of evading other prohibitions, Cal. Civ. Code §§ 3101(a)(3)(A), (a)(9).

In addition, SB-822 categorically prohibits conduct that not even the 2015 Order reached. To start, it outlaws "zero-rating"—which "means exempting some Internet traffic from a customer's data usage allowance," *id.* § 3100(t)—either (1) "in exchange for consideration, monetary or otherwise, from a third party," *id.* § 3101(a)(5), or (2) for "some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category," *id.* § 3101(a)(6). Similarly, SB-822 bars offering or providing other services "that are delivered over the same last-mile connection as the broadband Internet access service" if they "have the purpose or effect of evading" its prohibitions or "negatively affect the performance of broadband Internet access service." *Id.* § 3102(a). Through such measures, California legislators "establish[ed] additional bright-line rules that prohibit preferential treatment for some services but not others, including prohibiting ISPs from charging website fees for access to users and incorporating net-neutrality protections at the point of interconnection," even though in the 2015 Order, "the FCC [had] opted to adopt a case-by-case approach" in these areas. Cal.

Assembly Comm. on Commc'ns & Conveyance, SB 822 Analysis 9 (2018) ("Assembly Analysis").

SB-822 also contains a transparency rule that prohibits ISPs from "[f]ailing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings." *Id.* § 3101(a)(8). Although this language resembles a portion of the FCC's transparency rule, 47 C.F.R. § 8.1(a), it conspicuously omits the 2018 Order's specific guidance addressing what disclosures are and are not required, *see* 2018 Order ¶¶ 215-31.

SB-822 is expected to be enforced through litigation under California's Unfair Competition Law, which authorizes courts to issue an injunction against and impose civil penalties of up to $2,500 per violation on anyone who "engages, has engaged, or proposes to engage in unfair competition," which is defined to "include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §§ 17200, 17203; *see id.* § 17206(a). "[B]y making the various practices unlawful," SB-822 "automatically provide[s] a right of action under the Unfair Competition Law." Senate Judiciary Analysis 21. The California Attorney General, among others, is authorized to bring such enforcement actions, Cal. Bus. & Prof. Code § 17204, and he has promised that "preserving net neutrality protections for California's consumers" will be "a priority for his office," Senate Judiciary Analysis 22.

In adopting this regime, California legislators were aware that SB-822 "would create a patchwork of regulation that could stymie the marketplace since California would have rules that are different from other states and the [F]ederal [G]overnment." Senate Energy Analysis 14. They likewise were advised that, "[d]ue to the nature of the internet traffic travelling across state lines, it would be ideal to have one rule to address the issue of net neutrality." *Id.* Nevertheless, California enacted SB-822.

**III.    Procedural History**

The United States filed this lawsuit on September 30, 2018. Compl., ECF No. 1. It sought to enjoin both preliminarily and permanently a number of SB-822's provisions, to the extent that they were explicitly preempted by the 2018 Order's Express Preemption Clause. *Id.* ¶ 40; Mot. Prelim. Inj., ECF No. 2. The United States also averred that "SB-822 conflicts with the 2018 Order's affirmative federal 'deregulatory policy' and 'deregulatory approach' to Internet regulation." Compl. ¶ 41.

Because the validity of the 2018 Order was then being challenged in the D.C. Circuit, and because under the Hobbs Act, 47 U.S.C. § 402(a), 28 U.S.C. § 2342(1), the district court was required to presume the validity of the 2018 Order, including the Express Preemption Clause, the parties met and negotiated a stipulation and non-enforcement agreement. California agreed "not to take any action to enforce, or direct the enforcement, of Senate Bill 822 in any respect, including through participation in any private action seeking to enforce Senate Bill 822" until this Court ruled on any renewed motion for preliminary injunction that was filed within 30 days after the period of seeking review of the *Mozilla* decision had expired. Stipulation of Stay and Agreement Not to Enforce, at 6, ECF No. 15. The time for filing a petition for a writ of certiorari with the U.S. Supreme Court expired on July 6, 2020, and no party sought such review. The United States has filed this motion for a preliminary injunction as well as an amended complaint within thirty days of that deadline, thus extending California's agreement to not enforce SB-822.

**LEGAL STANDARD**

A preliminary injunction is warranted if the movant establishes that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). When the Federal Government is a party, the last two factors "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). And generally, when the United States has shown a likelihood

of success on the merits in a preemption challenge, the equities similarly favor an injunction. *See,*
*e.g.*, *Valle del Sol*, 732 F.3d at 1029; *Arizona*, 641 F.3d at 366.

The Supremacy Clause ensures that "the activities of the Federal Government are free from
regulation by any state," *Mayo v. United States*, 319 U.S. 441, 445 (1943), and "gives force" to
"both federal statutes themselves and federal regulations that are properly adopted in accordance
with statutory authorization," *City of New York v. FCC*, 486 U.S. 57, 63 (1988); *see also Mahoney*
*v. RFE/RL, Inc.*, 47 F.3d 447, 450 (D.C. Cir. 1995). "A pre-emptive regulation's force does not
depend on express congressional authorization to displace state law." *Fid. Fed. Sav. & Loan Ass'n*
*v. de la Cuesta*, 458 U.S. 141, 154 (1982). And a federal deregulatory decision can preempt
contrary state law. *See, e.g.*, *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978) ("'where failure
of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling
that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are
not permitted to use their police power to enact such a regulation") (quoting *Bethlehem Steel Co.*
*v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 774 (1947))

Preemption may occur in three ways. *See Arizona*, 567 U.S. at 399–400. Express
preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a
statute containing an express preemption provision." *Id.* at 399. Aside from such "express
preemption," "[s]tate law must also give way to federal law in at least two other circumstances."
*Id.* "First, the States are precluded from regulating conduct in a field that Congress, acting within
its proper authority, has determined must be regulated by its exclusive governance." *Id.* This form
of preemption, so-called "field preemption," may be found where "[t]he intent to displace state
law altogether can be inferred from a framework of regulation 'so pervasive … that Congress left
no room for the States to supplement it' or where there is a 'federal interest … so dominant that
the federal system will be assumed to preclude enforcement of state laws on the same subject.'"
*Id.* (ellipses in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).
"Second, state laws are preempted when they conflict with federal law." *Id.* "Conflict preemption"
includes cases in which "'compliance with both federal and state regulations is a physical

impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citations omitted).

## ARGUMENT

## I.     The United States is Likely to Prevail on the Merits.

SB-822 is preempted for two independent reasons. First, it conflicts with the FCC's longstanding, well-reasoned, and lawful choice to enact a light-touch, market-based approach to regulating the provision of broadband Internet. Second, it tramples over the Communication Act's explicit division of regulatory authority between states and the Federal Government by regulating interstate communications.

### A.     SB-822 Conflicts With, and Thus Is Preempted By, the 2018 Order.

The Constitution preempts state laws that "prevent or frustrate the accomplishment of a federal objective," *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873, 883-84, 886 (2000) (holding agency's determination as to how to carry out statutory objective has preemptive effect under conflict preemption principles). SB-822 does exactly that. This analysis proceeds in two parts. First, the Court must determine the "*significant objective* of the federal regulation," *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2001), based on "the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretative view," *id.* at 336. Second, the court must determine if there is a conflict between the regulation's significant objective and the countervailing state law. *Id.* A federal policy that suggests an intent to deregulate or to afford regulated parties space to shape their conduct has no less preemptive effect than a decision to regulate. *See, e.g.*, *Geier*, 529 U.S. at 883 (concluding that giving "auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation," and that state tort law that might interfere with or constrain that choice was preempted); *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 383 (1983) ("[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-

emptive force as a decision *to* regulate."); *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 774 (1947) (state regulation preempted "where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate); *Minn. Pub. Utils. Comm'n*, 483 F.3d at 580–81 ("[D]eregulation" is "a valid federal interest[] the FCC may protect through preemption of state regulation.").

Importantly, when construing the 2018 Order, the validity of the Commission's findings cannot be challenged in this Court. Under the Hobbs Act, this Court must presume that such findings are valid. *See* 28 U.S.C. § 2342(1) (The Hobbs Act vests "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to *determine the validity of* . . . all final orders of the Federal Communications Commission" in "[t]he court of appeals."); *see Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007). Because the Hobbs Act provides that "'parties seeking to challenge the validity of FCC orders must do so through actions in the circuit courts,'" *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir. 1996) (brackets omitted), "[p]roperly promulgated FCC regulations currently in effect must be presumed valid" in district court actions such as this one, as district courts "lack[] jurisdiction to pass on the validity" of such rules, *US West Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002); *accord Fober v. Mgm't & Tech. Consultants, LLC*, 886 F.3d 789, 792 n.2 (9th Cir. 2018).

### 1. The Significant Objective of the 2018 Order is to Return to a Light-Touch Approach to Regulating Broadband Internet Access.

Here, reducing the regulatory burden on broadband services was the FCC's overarching objective. *E.g.*, 2018 Order ¶ 207 ("We reaffirm and honor this longstanding, bipartisan commitment by adopting a light-touch framework that will preserve Internet freedom for all Americans."). The FCC exercised its lawful authority to classify broadband as an information service, a category subject to far less regulation than if broadband were classified as a telecommunications service, *see Brand X*, 545 U.S. at 980-82, 986-89; *Mozilla*, 940 F.3d at 18-21, and "calibrated [a] federal regulatory regime based on . . . pro-competitive, deregulatory goals," 2018 Order. ¶ 194. The 2018 Order expressly seeks to "eliminate burdensome regulation that

stifles innovation and deters investment, and empower Americans to choose the broadband Internet access service that best fits their needs." *Id.* ¶ 1. And the FCC concluded that its light-touch approach—rather than the more stringent regulation propounded by the 2015 Order—was best suited to encourage innovation. *Id.* ¶ 208 ("[W]e conclude that preexisting federal protections—alongside the transparency rule we adopt today—are not only sufficient to protect Internet freedom, but will do so more effectively and at lower social cost than the [2015 Order's] conduct rule. In short, we believe the light-touch framework we adopt today will pave the way for additional innovation and investment that will facilitate greater consumer access to more content, services, and devices, and greater competition.").

Furthermore, in repealing the 2015 rules, the FCC found that their "costs. . . to innovation and investment outweigh any benefits they may have." *Id.* ¶ 4; *see also id.* ¶ 253 ("eliminating the ban on paid prioritization will help spur innovation, experimentation, encourage network investment, and better allocate the costs of infrastructure, likely benefitting consumers and competition"). In other words, the objective of the 2018 Order is to restore a light-touch federal approach to regulating broadband Internet access service.

Finally, although the D.C. Circuit vacated the 2018 Order's Express Preemption Clause, the FCC made clear in a "[then-]contemporaneous explanation of its objectives," *Williamson*, 562 U.S. at 330, that preemption was necessary because "[o]ur order today establishes a calibrated federal regulatory regime based on the pro-competitive, deregulatory goals of the 1996 Act. Allowing state and local governments to adopt their own separate requirements, which could impose far greater burdens than the federal regulatory regime, could significantly disrupt the balance we strike here." 2018 Order ¶ 194.[2]

---

[2] The D.C. Circuit's *Mozilla* ruling vacating the 2018 Order's Express Preemption Clause does not alter the fact that SB-822 is preempted here. The *Mozilla* panel ruled narrowly, concluding that the Commission had "fail[ed] to ground its sweeping [Express Preemption Clause]—which goes far beyond conflict preemption—in a lawful source of statutory authority." *Mozilla*, 940 F.3d at 74. As the panel explained, the FCC lacked "express or ancillary authority" to expressly preempt countervailing state laws in this area, *id.* at 75-76, and that it "lacked the legal authority to categorically abolish all fifty States' statutorily conferred authority to regulate intrastate

Notwithstanding the FCC's clear federal objective, California's legislature made no secret of its intent to override the 2018 Order and reinstate the repealed 2015 rules in a manner explicitly prohibited by federal law. According to SB-822's principal sponsor, "California can and should lead the way in restoring the net neutrality protections that were repealed by Donald Trump's FCC." http://sd11.senate.ca.gov/news/20180808-california-net-neutrality-proposal-moves-forward. Accordingly, while the purpose of the 2018 Order was to *reduce* regulation of the provision of broadband service, the explicit purpose of SB-822 is to do the opposite. The Supremacy Clause requires that this conflict be resolved in favor of the Federal Government.

### 2. SB-822's Specific Provisions Frustrate the 2018 Order's Significant Objectives.

Because establishing a specific, light-touch regulatory framework was a significant objective of the 2018 Order, the United States is likely to succeed in establishing that SB-822 "stand[s] as an 'obstacle' to the accomplishment" of that framework. *See Geier*, 529 U.S. at 886; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."); *see Burlington Northern Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1296 (D. Mt. 1997) ("[A]lthough hypothetically it may be possible . . . for a party to comply with both state and federal requirements, state regulation of Plaintiffs' actions . . . would stand as an obstacle to Congress' stated purpose of deregulation of rail transportation.").

---

communications," *id.* at 86. But, importantly, the D.C. Circuit did not decide "whether the remaining portions of the 2018 Order have preemptive effect under principles of conflict preemption or any other implied-preemption doctrine," *id.* at 85, noting that a conflict analysis depended on having "the facts of any alleged conflict before us," *id.* at 82. The Court left that issue open for another case where – like here – "the Commission makes . . . provision-specific arguments." *Id.* at 86 (concluding that because no such case was before the court "it would be wholly premature to pass on the preemptive effect, under conflict or other recognized preemption principles of the remaining portions of the 2018 Order.").

SB-822 resurrects the bans on blocking, throttling, and paid prioritization, as well as an Internet conduct standard, that the 2015 Order created and the 2018 Order abolished. *See* Cal. S. Comm. on Judiciary, SB 822 Analysis 1 (2018) (noting that SB-822 "codif[ies] portions of the recently-rescinded [FCC] rules). Indeed, the conflict is explicit, as the below table makes clear:

| | **SB-822** | **2018 Order** |
|---|---|---|
| **Blocking** | SB-822 makes it "unlawful" to "[b]lock[] lawful content," SB-822 § 3101(a)(1); *see also id.* § 3101(a)(3)(B) (ISP cannot require consideration from provider to avoid blocking). | 2018 Order repealed "the no-blocking . . . rule[]" because it "[was] unnecessary to prevent the harms that they were intending to thwart." 2018 Order ¶ 263. |
| **Throttling** | SB-822 forbids the "[i]mpairing or degrading [of] lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device," SB-822 § 3101(a)(2); *see also id.* § 3101(a)(3)(C) (ISP cannot require consideration from provider to avoid throttling). | 2018 Order repealed the "unnecessary" "no-throttling rule[]." 2018 Order ¶ 263; *id.* ¶ 323 (concluding that "replacing the prohibitions on blocking and throttling with a transparency rule implements a lower-cost method of ensuring that threats to Internet openness are exposed and deterred by market forces, public opprobrium, and enforcement of the consumer protection laws"). |
| **Paid Prioritization** | SB-822 makes it unlawful to "[e]ngag[e] in paid prioritization," SB-822 § 3101(a)(3), meaning an ISP is prohibited from favoring some traffic in exchange for consideration or to benefit an affiliated entity, *id.* § 3100(r). | The 2018 Order "decline[d] to adopt a ban on paid prioritization," 2018 Order ¶ 253; *see also id.* ¶ 319 (concluding that banning paid prioritization "has created uncertainty and reduced ISP investment," "is likely to prevent certain types of innovating applications from being developed or adopted," and "imposes substantial social costs"). |

|  | **SB-822** | **2018 Order** |
|---|---|---|
| **Internet Conduct Standard** | California seeks to impose a standard prohibiting "unreasonably interfering with[] or unreasonably disadvantaging" an "end user's ability to select, access, and use broadband Internet access service" or "the lawful Internet content . . . of the end user's choice," as well as an edge provider's ability to make such content available to end users, SB-822 § 3101(a)(7. | The 2018 Order eliminated a nearly identical "Internet Conduct Standard" that the FCC concluded was "vague," "created regulatory uncertainty in the marketplace hindering investment and innovation," and "not in the public interest," 2018 Order ¶¶ 246-52; *see also* 2015 Order ¶ 136 ("General Conduct Rule," prohibiting broadband providers from "unreasonably interfer[ing] with or unreasonably disadvantag[ing] (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users."). |

SB-822 also imposes additional restrictions on ISPs' relationships with edge providers. In particular, ISPs cannot require consideration from edge providers in exchange for (A) delivering Internet traffic to ISPs' end users; (B) avoiding blockage of the edge provider's content; or (C) avoiding impairment or degradation of the edge provider's content. SB-822 § 3101(a)(3)(A)-(C). But the 2018 Order ended regulation of Internet traffic exchange, 2018 Order, ¶¶ 163-73, concluding that "freeing" such agreements "from burdensome government regulation, and allowing market forces to discipline this emerging and competitive market is the better course," *id.* ¶ 168.

SB-822 also imposes at least two more stringent requirements than even the 2015 Order. First, the law bans "[z]ero-rating"—defined as "exempting some Internet traffic from a customer's data usage allowance," SB-822 § 3100(t)—for certain content only, *id.* § 3101(6), or in exchange for payment, *id.* § 3101(5). Even the 2015 Order declined SB-822's categorical approach, opting instead for case-by-case evaluation. *See* 2015 Order ¶ 152 ("[W]e will look at and assess such practices under the no-unreasonable interference/disadvantage standard, based on the facts of each individual case, and take action as necessary."). And in 2018, the FCC expressly noted that a

"thirteen-month investigation . . . did not identify specific evidence of harms from particular zero-rating programs," 2018 Order ¶ 250, and "decided to refrain from imposing" this rule, which it determined "would impose more stringent requirements for" broadband service, *id.* ¶ 195. SB-822's contrary treatment is "inconsistent with the federal deregulatory approach" adopted by the FCC. *Id.* ¶ 194.

Second, SB-822 has a catch-all provision that apparently targets "specialized services," (such as "facilities-based VoIP offerings, heart monitors, or energy consumption sensors," 2015 Order ¶ 35), in addition to co-packaged pay-TV services, by preventing ISPs from offering or providing other services "that are delivered over the same last-mile connection as the broadband Internet access service" if they "negatively affect the performance of broadband Internet access service," SB-822 § 3102(a)(2), or "have the purposes or effect" of evading the bright line "prohibitions in Section 3101," *id.* § 3102(a)(1). Even the 2015 Order expressly declined to apply the categorical rules to specialized services. *See* 2015 Order ¶¶ 35, 207-13. Further, prohibiting any specialized services or co-packaged pay-TV services perceived to "negatively affect the performance of broadband Internet access service," SB-822 § 3102(a)(2), would be plainly inconsistent with the 2018 Order's repeal of the Internet Conduct Standard. Again, SB-822's more stringent provisions are inconsistent with the 2018 Order's deregulatory approach. *See* 2018 Order ¶ 194.[3]

SB-822 also conflicts with the 2018 Order's treatment of mobile broadband internet access service. The 2018 Order makes clear that "broadband Internet access service, regardless of whether

---

[3] Although SB-822's transparency provision resembles a portion of the FCC's transparency rule, 47 C.F.R. § 8.1(a), it does not address—and does not purport to track—the 2018 Order's detailed guidance specifying what disclosures are and are not required, *see* 2018 Order ¶¶ 215–31. Accordingly, SB-822's disclosure provision may impermissibly impose more stringent requirements than the *2018 Order's* transparency rule. If this disclosure provision were meant only to duplicate the federal requirements, it would be wholly unnecessary, and its imprecise and open-ended language creates a substantial risk that it could instead be interpreted more broadly. To the extent that provision could be applied in a manner inconsistent with the detailed guidance set forth in the 2018 Order, or could be used to reinstate the "enhanced" transparency requirements that that the 2018 Order specifically repealed, it likewise conflicts with the federal regulatory scheme.

offered using fixed or mobile technologies, is an information service under the Act," and that mobile broadband Internet access service "should not be classified as a commercial mobile service [*e.g.*, requiring common carrier treatment] or its functional equivalent." 2018 Order ¶ 65; *see also id.* ¶¶ 65-85. This conclusion, the Commission explained, "furthers the Act's overall intent to allow information services to develop free from common carrier regulations." *Id.* ¶ 82. SB-822, by contrast, subjects mobile broadband Internet access services to the same common carrier rules as it imposes on providers of fixed broadband Internet access services. SB-822 §§ 3101(b), 3102(b).

Given the direct conflict between the FCC's 2018 Order and California's SB-822, the Constitution dictates that SB-822 be enjoined as preempted.

**B.    SB-822 Is Preempted by the Communications Act's Assignment of Exclusive Authority to Regulate Interstate Communications to the Federal Government.**

SB-822 is alternatively preempted because it violates the Communications Act's division of federal and state regulatory authority over communications services. Congress provided the FCC with exclusive responsibility for "regulating interstate and foreign commerce in communication by wire and radio," 47 U.S.C. § 151, *id.* § 152(a), while leaving states with responsibility for intrastate communications, *id.* § 152(b). *See, e.g.*, *City of Abilene, Tex. v. FCC*, 164 F.3d 49, 53 (D.C. Cir. 1999) (noting "Congress's clearly expressed intent in 47 U.S.C. § 151 to 'centraliz[e] authority . . . with respect to interstate and foreign commerce in wire and radio communication' in one federal agency (the Commission)"); *Global Tel*Link v. FCC*, 866 F.3d 397, 402 (D.C. Cir. 2017) ("Under [the Communications Act], the Commission regulates interstate telephone communication."); *Union Telecom, LLC v. United States*, 144 Fed. Cl. 477, 485 (2019) ("States regulate intrastate telecommunication services, but the FCC has exclusive regulatory powers of interstate and international services."). Courts have recognized that the Communication Act's commitment of interstate responsibility to the FCC preempts countervailing state acts that attempt to regulate interstate communications. *See, e.g.*, *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 746 F.2d 1492, 1498-501 & n.6 (D.C. Cir. 1984) (finding no "doubt concerning

preemption in this case," as the FCC "regulated *exclusively* interstate communications which are placed explicitly within the sphere of federal jurisdiction by the plain language of the Communications Act"); *Ivy Broadcasting Co. v. Am. Tel. & Tel. Co.*, 391 F.2d 486, 491 (2d Cir. 1968) ("questions concerning the duties, charges, and liabilities of telegraph or telephone companies with respect to interstate communications services are to be governed solely by federal law and [] the states are precluded from acting in this area"). That conclusion follows regardless of whether the preemption is understood as a form of express preemption, with the Communications Act explicitly precluding state regulation over interstate communications, or field preemption, with the Communications Act embodying Congressional judgment that the field of interstate communications is committed exclusively to federal jurisdiction. *Cf. Crosby*, 530 U.S. at 373 (internal citations omitted) (noting that the bases for preemption are not "rigidly distinct" and "field pre-emption may be understood as a species of conflict pre-emption").

The dispositive question, then, is whether SB-822 regulates interstate communications. There can be no doubt that it does. On its face, SB-822 does not purport to limit its reach only to intrastate matters; rather it defines "broadband internet access service" as "a mass market retail service by wire or radio provided to consumers in California that provides the capability to transmit data to, and receive data, from *all or substantially all Internet endpoints*." SB-822 § 3100(b) (emphasis added). California clearly is not home to "all or substantially all Internet endpoints." As the 2018 Order recognized "it is well-settled that Internet access is a jurisdictionally interstate service because a substantial portion of Internet traffic involves accessing interstate or foreign websites." 2018 Order ¶ 199 (internal quotation marks and citation omitted). "Because both interstate and intrastate communications can travel over the same Internet connection (and indeed may do so in response to a single query from a consumer), it is impossible or impracticable for ISPs to distinguish between intrastate and interstate communications over the Internet or to apply different rules in each circumstance." *Id.* ¶ 200. Such FCC findings are consistent with Ninth Circuit precedent, which "ha[s] long recognized that the Internet and the nation's vast network of telephone lines are instrumentalities of and intimately related to interstate commerce." *United*

*States v. Costanzo*, 956 F.3d 1088, 1092 (9th Cir. 2020) (internal quotation marks and citation omitted).

Even if the line between interstate and intrastate communication services were unclear (and it is not), the Supreme Court has recognized that the FCC can still preempt state law "where compliance with both federal and state law is in effect physically impossible," *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 368 (1986), and that preemption should be affirmed "where it [is] not possible to separate the interstate and intrastate components of the asserted FCC regulation," *id.* at 375 n.4. Here, as discussed above, the FCC has made a factual determination that internet traffic cannot be disaggregated into interstate and intrastate components. Accordingly, even if this Court determines that California may regulate intrastate communications in part, the fact that such communications are inextricably intertwined with interstate communications requires that the law be preempted.

## II.     The Equitable Factors Strongly Militate in Favor of Injunctive Relief.

The remaining preliminary-injunction factors—irreparable injury, the balance of the equities, and the public interest—weigh strongly in favor of injunctive relief here. The enforcement of SB-822 would irreparably injure both the United States and the public interest. Conversely, California will suffer no cognizable harm if it is unable to thwart judicially-approved federal law, as evidenced by its agreement to not enforce SB-822 to this point.

SB-822 negates—and thus can be said to irreparably injure—the Federal Government's chosen regulatory choice. Indeed, that is its purpose. In the 2018 Order, the FCC expressly adopted an affirmative "deregulatory policy" and "deregulatory approach" to Internet regulation. *E.g.*, 2018 Order ¶¶ 39, 61, 194-96. The 2018 Order does not constitute an absence of regulation for States to fill; it is a uniform, national regulatory framework, the metes and bounds of which were carefully considered by the Commission in exercising its lawfully delegated authority. Effectuating its preference for a single, national framework, the Commission sought to "eliminate burdensome regulation that stifles innovation and deters investment, and empower Americans to choose the broadband Internet access service that best fits their needs." 2018 Order ¶ 1; *see also, e.g.*, ¶¶ 4,

207-08. In the face of this clear exercise of federal authority, California has tried not only to reinstate the same rules the FCC repealed, but to impose new requirements that have never existed at the federal level. And given that ISPs cannot realistically comply with one set of standards in this area for California and another for the rest of the Nation—especially when Internet communications frequently cross multiple jurisdictions, and indeed, are inherently interstate—the effect of this state legislation would be to nullify federal law across the country. Only an injunction from this Court can address that unlawful result. *See, e.g.*, *Fed. Home Loan Bank Bd. v. Empie*, 778 F.2d 1447, 1454 (10th Cir. 1985) (affirming injunction sought by federal agency against a state "statute . . . expressly forbidding something that the federal regulations expressly permit").

Indeed, as the Ninth Circuit recently observed, presuming that "the United States will suffer irreparable harm based on the constitutional violations," is "consistent with our . . . recognition that preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019); *cf. New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that irreparable injury inherently results from enforcement of preempted state law). After all, "an alleged constitutional infringement will often alone constitute irreparable harm," and that is no less true when a State attempts "to violate the requirements of federal law" in the face of "the Supremacy Clause." *Arizona*, 641 F.3d at 366 (citations omitted). Accordingly, courts have recognized that enjoining the enforcement of preempted laws is necessary to protect the United States from actions by States that undermine its sovereignty. *See id.*; *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *United States v. California*, 314 F. Supp. 3d 1077, 1112 (E.D. Cal. 2018), *aff'd in part, reversed in part and remanded*, 921 F.3d 865 (9th Cir. 2019).

Similarly, the balance of the equities and public interest strongly favor an injunction here. "It is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law"; instead, "the interest of preserving the Supremacy Clause is paramount." *California*, 314 F. Supp. 3d at 1111 (quoting *Arizona*, 641 F.3d at 366). And that is particularly true here given the significant public interest in maintaining the FCC's federal

"deregulatory approach" to Internet regulation, which it could not do if California (and others) enacted measures that contradict the Commission's judgment in this area. *See* 2018 Order ¶¶ 39, 61, 194-96; *see also id.* ¶¶ 194, 200 (explaining that states and local governments could impose far greater burden, disrupt the balance struck by 2018 Order, and interfere with the FCC's regulation of interstate traffic); *cf. California*, 314 F. Supp. 3d at 1112 ("Frustration of federal statutes and prerogatives are not in the public interest.") (quoting *Alabama*, 691 F.3d at 1301)).

In addition to undermining the federal deregulatory scheme, allowing California and other separate state and local jurisdictions "to impose separate regulatory requirements on [broadband providers]" would not be in the public interest because it "could inhibit broadband investment and deployment and would increase costs to consumers." 2018 Order ¶ 194 n.727. Requiring broadband providers to track and adhere to a patchwork of separate state and local requirements in every individual jurisdiction in which they operate would "place an undue burden on the provision of broadband Internet access service." *Id.* ¶ 195; *cf. id.* ¶ 127 ("Accordingly (and unsurprisingly), most ISPs actively try to minimize the discrepancies in their terms of service, network management practices, billing systems, and other policies.").

## CONCLUSION

The Court should grant the United States' motion for a preliminary injunction.

Dated:  August 5, 2020                    Respectfully submitted,

                                          ETHAN P. DAVIS
                                          Acting Assistant Attorney General
                                          Civil Division

                                          MATTHEW J. GLOVER
                                          Counsel to the Assistant Attorney General

                                          ALEXANDER K. HAAS
                                          Director, Federal Programs Branch

                                          JACQUELINE COLEMAN SNEAD
                                          Assistant Branch Director, Federal Programs Branch

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Telephone: (202) 514-1944
Fax: (202) 616-8460
E-mail:  Joseph.Borson@usdoj.gov

*Attorneys for the United States*