L. Charles Keller (CA SBN 169573)
WILKINSON BARKER KNAUER LLP
1800 M Street, N.W., Suite 800N
Washington, D.C. 20036
(202) 783-4141
ckeller@wbklaw.com

*Attorneys for Amici Communications Law Scholars*

Lawrence J. Spiwak (pro hac pending)
Phoenix Center for Advanced Legal &
Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
(202) 274-0235
lspiwak@phoenix-center.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA, et al.,<br><br>         Defendants. | Case No. 2:18-cv-02660-JAM-DB<br>Case No. 2:18-cv-02684-JAM-DB<br><br>**BRIEF AMICUS CURIAE OF COMMUNICATIONS LAW SCHOLARS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. John A. Mendez<br>Hearing Date: To be determined by the Court per Order of July 30, 2020<br>Hearing Time: To be determined by the Court per Order of July 30, 2020 |
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>         Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>         Defendant. | |

i

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

## CORPORATE DISCLOSURE STATEMENT

The Communications Law Scholars (the "Scholars") submit the following corporate disclosure statements:

The Communications Law Scholars are all individuals with significant experience in communications law.  All of the Scholars joining this brief are signing in their individual capacity rather than as authorized representatives of their respective places of employment.

Dated:

/s/ _L. Charles Keller_
L. Charles Keller (CA SBN 169573)
WILKINSON BARKER KNAUER LLP
1800 M Street, N.W., Suite 800N
Washington, D.C.  20036
(202) 783-4141
ckeller@wbklaw.com

Lawrence J. Spiwak (pro hac pending)
President and General Counsel
Phoenix Center for Advanced Legal &
Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C.  20015
(202) 274-0235
lspiwak@phoenix-center.org

_Attorneys for Amici Communications Law Scholars_

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................................ii

TABLE OF CONTENTS ...................................................................................iii

TABLE OF AUTHORITIES ..............................................................................iv

INTEREST OF AMICUS CURIAE .......................................................................1

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................5

I.    Congress Gave the FCC Exclusive Jurisdiction Over Interstate Communications ..........5

    A.    The FCC's Jurisdiction Over Interstate Communications Is Absolute .................5

    B.    The Fact that Congress Gave States Discrete and Limited Cooperative Roles Does Not Diminish the FCC's Exclusive Jurisdiction over Interstate Communications ...........................................................9

    C.    The FCC Has Steadfastly Retained its Exclusive Jurisdiction Over Title I Information Services .......................................................10

    D.    The *2018 Order*'s Transparency Rule Demonstrates the FCC's Continued Exercise of Exclusive Authority over Interstate Communications .....................11

    E.    Even SB-822's Legislative Sponsor Concedes Federal Supremacy over Interstate Communications .......................................................12

II.    SB-822 Unconstitutionally Intrudes into the FCC's Exclusive Jurisdiction Over Interstate Communications Services .......................................................13

    A.    By its Own Terms, SB-822 Seeks to Assert Jurisdiction Over an Interstate Service .......................................................13

    B.    SB-822 Frustrates Other Congressional Mandates ...........................................13

CONCLUSION ...............................................................................................15

iii

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

# TABLE OF AUTHORITIES

**Federal Cases**

*Arizona v. United States, 567 U.S. 387 (2012)* ............................................................ 6, 13

*AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 378 (1999) ..................................... 10

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) .................................................. 7

*Ivy Broadcasting Co. v. AT&T Co.*, 391 F.2d 486 (2d Cir. 1968) ..................................... 7

*Mozilla v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), *reh'g en banc denied*, (D.C. Cir. 18-1051)
  (Feb. 6, 2020) ........................................................................................................... 3, 9, 12

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919) .................... 6

*Verizon v. FCC*, 740 F.3d 623, 675 (D.C. Cir. 2014) .................................................... 2, 8

*Western Union Tel. Co. v. Boegli*, 251 U.S. 315 (1920) .................................................. 7

*Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003) ....................................... 7

**Federal Administrative Decisions**

*2010 Order:*
  *Preserving the Open Internet; Broadband Industry Practices*, FCC 10-201,
  REPORT AND ORDER, 25 FCC Rcd. 17905 (2010), *rev'd Verizon v. FCC,* 740
  F.3d 623, 675 (D.C. Cir. 2014) ................................................................................... 2

*2015 Order:*
  *Protecting and Promoting the Open Internet,* FCC 15-24, REPORT AND ORDER
  ON REMAND, DECLARATORY RULING, AND ORDER, 30 FCC Rcd. 5601 (2015),
  *petitions for review denied*, *United States Telecom Ass'n v. FCC,* 825 F.3d 674
  (D.C. Cir. 2016), *pet. for rehearing en banc denied*, 855 F.3d 381 (2017), *cert.
  denied,*139 S.Ct. 454 (2018) ............................................................................ 2, 3, 5, 12,15

*2018 Order:*
  *Restoring Internet Freedom Order,* FCC 17-166, DECLARATORY RULING,
  REPORT, AND ORDER, 33 FCC Rcd. 311 (2018), *aff'd Mozilla v. FCC,* 940 F.3d 1
  (D.C. Cir. 2019), *reh'g en banc denied*, (D.C. Cir. 18-1051)
   (Feb. 6, 2020) .............................................................................. 3, 4,11,12, 13, 15

iv

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

*BPL Classification Order:*
> *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, FCC 06-165, 21 FCC Rcd. 13281 (2006) ......................................................................................... 3, 11

*Cable Modem Classification Order:*
> *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities,* 17 FCC Rcd. 4798 (2002), *aff'd Nat'l Cable & Telecomms. Association v. Brand X Internet Services,* 545 U.S. 967 (2005) ..................... 2, 11

*In the Matter of Applications of Cellco Partnership D/B/A Verizon Wireless and SpectrumCo LLC And Cox TMI, LLC For Consent to Assign AWS-1 Licenses,* FCC 12-95, MEMORANDUM OPINION AND ORDER AND DECLARATORY RULING, 27 FCC Rcd. 10698 (rel. August 23, 2012), *aff'd NTCH, INC. v. Federal Communications Commission,* 841 F.3d 497 (D.C. Cir. 2016), *cert. denied* 137 S.Ct. 2277 (June 19, 2017) .......................................................................................................................... 8

*Operator Services Order:*
> *In the Matter of Operator Services Providers of America, Petition for Expedited Declaratory Ruling,* FCC 91–185, MEMORANDUM OPINION AND ORDER, 6 FCC Rcd. 4475 (1991) ................................................................................................. 8

*Pulver Order:*
> *In the Matter of Petition for Declaratory Ruling that Pulver.Com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service,* FCC 04-27, MEMORANDUM OPINION AND ORDER, 19 FCC Rcd. 3307 (2004) ...... 10, 14

*Universal Service Report:*
> *Federal-State Joint Board on Universal Service*, FCC 98-67, REPORT TO CONGRESS, 13 FCC Rcd. 11501 (1998) ................................................................ 2

*Video Dialtone Order:*
> *In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54–63.58,* FCC 92-327, SECOND REPORT AND ORDER, RECOMMENDATION TO CONGRESS, AND SECOND FURTHER NOTICE OF PROPOSED RULEMAKING, 7 FCC Rcd. 5781(rel. August 14, 1992), *dismissed as moot, Mankato Citizens Telephone Company, et al., v. Federal Communications Commission,* No. 92-1404 (D.C. Circuit 1996) (1996 WL 393512) .................. 12

*Vonage Order:*
> *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, 19 FCC Rcd. 22404 (2004) ........................................................................................................................ 8, 13

*Wireless Classification Order:*
> *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks,* DECLARATORY RULING, FCC 07-30, 22 FCC Rcd. 5901 (2007) ............................................................................................................... 2, 11

v

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

*Wireline Classification Order:*
    *Appropriate Framework for Broadband Access to the Internet over Wireline*
    *Facilities,* REPORT AND ORDER, FCC 05-150, 20 FCC Rcd. 14853 (2005), *aff'd*
    *Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205 (3d Cir. 2007) .................2, 11

## Federal and State Statutes

15 U.S.C. § 45(a)(2) ...........................................................................................12

47 U.S.C. § 1301 .................................................................................................9

47 U.S.C. § 1302 ............................................................................................9, 14

47 U.S.C. § 1302(a) ...........................................................................................14

47 U.S.C. § 151 ...................................................................................................7

47 U.S.C. § 152 ...................................................................................................7

47 U.S.C. § 153(11) ............................................................................................7

47 U.S.C. § 153(24) ........................................................................................7, 10

47 U.S.C. § 153(53) ..........................................................................................10

47 U.S.C. § 230(b)(1) ........................................................................................14

47 U.S.C. § 230(b)(2) ........................................................................................14

47 U.S.C. § 254 ..............................................................................................9, 10

47 U.S.C. § 254(f) .............................................................................................10

Cal. Civ. Code § 3100 .......................................................................................13

Preamble, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ..........15

## Law Reviews and Economic Analyses

Beard, T.R. Ford, G.S. *et al., Developing A National Wireless Regulatory Framework: A*
*Law and Economics Approach,* 16 COMMLAW CONSPECTUS 391 (2008) (available at:
https://tinyurl.com/yy7th5f6) .............................................................................14

Brennan, T., *Perspectives from FSF Scholars: Is the Open Internet Order an*
*"Economics-Free Zone"?* Free State Foundation (June 28, 2016) (available at:
https://tinyurl.com/y5598zzh) ..............................................................................3

Brogan, P., *U.S. Broadband Investment Continued Upswing In 2018,* USTELECOM
RESEARCH BRIEF (July 31, 2019) (available at: https://tinyurl.com/y3ufsrgp) .................4

Ellig, J., *Implications of Mozilla for Agency Economic Analysis,* YALE JOURNAL ON
REGULATION, NOTICE AND COMMENT (October 10, 2019) (available at:

vi

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

https://tinyurl.com/yyke23zm) ..................................................................... 3

F.H. Dixon, *The Mann-Elkins Act, Amending the Act to Regulate Commerce*, 24 THE QUARTERLY JOURNAL OF ECONOMICS 563 (1910) ........................................ 6

Ford, G.S., *Comcast's Capital Spending After Reclassification: A Check on Claims,* PHOENIX CENTER POLICY PERSPECTIVE NO. 18-03 (April 25, 2018) (available at: https://tinyurl.com/Perspective18-03) ........................................................ 4

Ford, G.S., *COVID-19 and Broadband Speeds: A Multi-Country Analysis,* PHOENIX CENTER POLICY BULLETIN NO. 49 (May 2020) (available at: https://tinyurl.com/PCPB49Final) ................................................................. 4

Ford, G.S., *Infrastructure Investment After Title II,* PHOENIX CENTER POLICY PERSPECTIVE NO. 18-09 (November 1, 2018) (available at: https://tinyurl.com/Perspective18-09) ........................................................ 4

Ford, G.S., *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175–205 (2019) (available at: https://tinyurl.com/y2w6h58a) ...................................... 5

Ford, G.S., *Regulation and Investment in the U.S. Telecommunications Industry,* 56 APPLIED ECONOMICS 6073 (2018) (available at: https://tinyurl.com/y2brc94f) .......... 3, 15

Katz, M.L., *Regulation: The Next 1000 Years, in* SIX DEGREES OF COMPETITION: CORRELATING REGULATION WITH THE TELECOMMUNICATIONS MARKETPLACE 27, 44 (2000) ......................................................................................... 15

Spiwak, L.J., *The Preemption Predicament Over Broadband Internet Access Services,* 21 FEDERALIST SOCIETY REVIEW 32 (2020) (available at:https://tinyurl.com/y57ypq5b) .................................................. 9

Oxman, J., *The FCC and the Unregulation of the Internet,* OPP WORKING PAPER NO. 31, Office of Plans and Policy, Federal Communications Commission (July 1999) (available at: https://tinyurl.com/y3lwh6ej) ........................................................ 2

**Other Material**

M.H. McGill, *How the Loss of Net Neutrality Could Change the Internet,* POLITICO (December 14, 2017) (available at: https://tinyurl.com/ybl82fom) ...................... 4

*The Unregulation of the Internet: Laying a Competitive Course for the Future,* Remarks by FCC Chairman William E. Kennard Before the Federal Communications Bar Northern California Chapter, San Francisco, CA (July 20, 1999) (available at: https://tinyurl.com/y3lwh6ej) ..................................................................... 1

YouTube: *Senator Wiener: Net Neutrality Press Conference Streamed live on May 29, 2018* (available at: https://youtu.be/W_F3ByhHLS4) ................................. 12

## INTEREST OF AMICUS CURIAE

The Communications Law Scholars are academics affiliated with law schools and think tanks with extensive experience in communications law and policy.[1]  Listed in alphabetical order, these scholars include:

James E. Dunstan, General Counsel – TechFreedom
Justin (Gus) Hurwitz, Associate Professor of Law and Director, Nebraska Governance and Technology Center – University of Nebraska
Sam Kazman, General Counsel – Competitive Enterprise Institute
Geoffrey A. Manne, President – International Center for Law & Economics
Randolph J. May, President – The Free State Foundation
Michael J. Santorelli, Director, Advanced Communications Law & Policy Institute – New York Law School
Lawrence J. Spiwak, President – Phoenix Center for Advanced Legal & Economic Public Policy Studies
Jeffrey Westling, Research Fellow – R Street Institute

The Communications Law Scholars, therefore, have an established interest in the outcome of this proceeding and believe that their perspective on the issues at bar will assist the Court in resolving this case.[2]

## INTRODUCTION

As first dial-up and then broadband Internet access took off in the late 1990s, the Federal Communications Commission ("FCC") made the deliberate choice to reject the application of the legacy common carrier regulations designed for the old Ma Bell telephone monopoly to those services.  Instead, the Commission opted for a "light" regulatory touch by classifying those services as "information services" under Title I of the Communications Act.  The hope was that this "light touch" regulatory policy would, in the words of former FCC Chairman Bill Kennard, ensure the "unregulation" of the Internet.  *The Unregulation of the Internet: Laying a Competitive Course for the Future,* Remarks by FCC Chairman William E. Kennard Before the

---

[1]     Affiliations listed for identification alone.  Each Scholar is signing in their individual capacity.

[2]     The Communications Law Scholars state that no counsel for a party authored this brief in whole or in part, and no person other than their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

Federal Communications Bar Northern California Chapter, San Francisco, CA (July 20, 1999); *see also* J. Oxman, *The FCC and the Unregulation of the Internet,* OPP WORKING PAPER NO. 31, Office of Plans and Policy, Federal Communications Commission (July 1999).

For the better part of the next two decades, regardless of whether the FCC was controlled by Democrats or Republicans, the Commission held fast to this policy. *See, e.g., Federal-State Joint Board on Universal Service,* FCC 98-67, REPORT TO CONGRESS, 13 FCC Rcd. 11501 (1998) (hereinafter "*Universal Service Report*"); *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities,* 17 FCC Rcd. 4798 (2002) (hereinafter "*Cable Modem Classification Order*"), *aff'd Nat'l Cable & Telecomms. Association v. Brand X Internet Services,* 545 U.S. 967 (2005); *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* REPORT AND ORDER, FCC 05-150, 20 FCC Rcd. 14853 (2005) (hereinafter "*Wireline Classification Order*"), *aff'd Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205 (3d Cir. 2007); *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks,* DECLARATORY RULING, FCC 07-30, 22 FCC Rcd. 5901 (2007) (hereinafter "*Wireless Classification Order*"); *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, FCC 06-165, 21 FCC Rcd. 13281 (2006) (hereinafter "*BPL Classification Order*"); *Preserving the Open Internet; Broadband Industry Practices*, FCC 10-201, REPORT AND ORDER, 25 FCC Rcd. 17905 (2010) (hereinafter "*2010 Order*"), *rev'd Verizon v. FCC,* 740 F.3d 623, 675 (D.C. Cir. 2014).

This bi-partisan tradition ended with the *2015 Order*, when the Commission rejected its traditional light touch approach by choosing to apply the legacy common carrier regulatory regime designed for the Old Ma Bell telephone monopoly to broadband Internet access services. *Protecting and Promoting the Open Internet,* FCC 15-24, REPORT AND ORDER ON REMAND, DECLARATORY RULING, AND ORDER, 30 FCC Rcd. 5601 (2015) at ¶ 431 (hereinafter *2015 Order*), *petitions for review denied*, *United States Telecom Ass'n v. FCC,* 825 F.3d 674 (D.C. Cir. 2016), *pet. for rehearing en banc denied*, 855 F.3d 381 (2017), *cert. denied,*139 S.Ct. 454

2

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

(2018). But while the *2015 Order* may have survived legal scrutiny, it was bad policy. It is well-established that regulation has both costs and benefits, but the *2015 Order* failed to conduct even a basic cost/benefit analysis. (Indeed, the Commission's own economist at the time described the *2015 Order* as an "economics free zone." T. Brennan, *Perspectives from FSF Scholars: Is the Open Internet Order an "Economics-Free Zone"?* Free State Foundation (June 28, 2016).) Given such poorly designed and overzealous regulation, it came as no surprise that broadband infrastructure investment suffered significantly after the *2015 Order*. G.S. Ford, *Regulation and Investment in the U.S. Telecommunications Industry,* 56 APPLIED ECONOMICS 6073 (2018).

As the detrimental economic effects of the *2015 Order* continued to mount, in 2017 the FCC recognized that it needed to switch gears and develop a different regulatory approach that would still protect consumers but not stymie broadband investment. Accordingly, it opened a new proceeding to investigate these issues. The end product of the Commission's extensive efforts was the *Restoring Internet Freedom Order,* FCC 17-166, DECLARATORY RULING, REPORT, AND ORDER, 33 FCC Rcd. 311 (2018) (hereinafter "*2018 Order*"). The Commission's revised approach was straightforward and effective: The Commission returned broadband Internet access back to a Title I service and continued its exclusive oversight through the establishment of a transparency rule to be enforced by the Federal Trade Commission. The Commission's revised approach not only reflected sound economic reasoning that has since been empirically confirmed, *see* G.S. Ford, *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175–205 (2019); J. Ellig, *Implications of Mozilla for Agency Economic Analysis,* YALE JOURNAL ON REGULATION, NOTICE AND COMMENT (October 10, 2019), but also carefully followed the law. As a result, the *2018 Order* was generally upheld by the D.C. Circuit in *Mozilla v. FCC,* 940 F.3d 1 (D.C. Cir. 2019), *reh'g en banc denied*, (D.C. Cir. 18-1051) (Feb. 6, 2020).

The Commission's policy of light touch regulation proved correct: broadband

infrastructure investment began to rebound, *see, e.g.,* G.S. Ford, *Infrastructure Investment After Title II,* PHOENIX CENTER POLICY PERSPECTIVE NO. 18-09 (November 1, 2018); G.S. Ford, *Comcast's Capital Spending After Reclassification: A Check on Claims,* PHOENIX CENTER POLICY PERSPECTIVE NO. 18-03 (April 25, 2018); G.S. Ford, *Net Neutrality and Investment in the US* (2019), *supra,* and the most current raw data appear to confirm this trend.  P. Brogan, *U.S. Broadband Investment Continued Upswing In 2018*, USTELECOM RESEARCH BRIEF (July 31, 2019).[3]  Best of all, in these trying times of the current COVID pandemic, when reliable broadband access is needed more than ever, the FCC's *2018 Order* did not break the Internet as some predicted.  *See, e.g.,* M.H. McGill, *How the Loss of Net Neutrality Could Change the Internet,* POLITICO (December 14, 2017).  Quite to the contrary, U.S. networks performed admirably and were resilient to the traffic surges.  G.S. Ford, *COVID-19 and Broadband Speeds: A Multi-Country Analysis,* PHOENIX CENTER POLICY BULLETIN NO. 49 (May 2020) (finding no statistically-significant changes in fixed-line download speeds, while mobile networks had a statistically-significant increase in download speeds).

The State of California disagreed with the *2018 Order*'s change in federal policy.  Its response was to enact SB-822, in which California seeks to supplant the exclusive federal jurisdiction over interstate communications enshrined in statute by Congress with its own.  As explained below, under the long-standing legal doctrine of field preemption, this it may not do.  Whether it likes federal policy or not, California is not entitled to trample on the federal government's exclusive authority over interstate communications, including the broadband Internet access services at issue here.

---

[3]    As the FCC noted in its *2018 Order*, simple comparisons of changes in short-term capital spending "can only be regarded as suggestive, since they fail to control for other factors that may affect investment (such as technological change, the overall state of the economy, and the fact that large capital investments often occur in discrete chunks rather than being spaced evenly over time), and companies may take several years to adjust their investment plans." *Id.* at ¶ 92.  Instead, "methodologies designed to estimate impacts *relative to a counterfactual* tend to provide more convincing evidence of causal impacts of Title II classification.  *Id.* at ¶ 93 (emphasis supplied).

4

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

First, we discuss Congress's long-standing determination that the federal government has exclusive jurisdiction over interstate communications, leaving no authority to the states to regulate such services. As we show below, throughout this history, and even in the *2015 Order*, the FCC has consistently recognized and reaffirmed that broadband Internet access service is a jurisdictionally *interstate* service. *See 2015 Order* ¶ 431 (reaffirming "the Commission's longstanding conclusion that broadband Internet access service is jurisdictionally interstate for regulatory purposes"). The fact that Congress may have afforded states a limited cooperative role in select, statutorily itemized areas does not mean that Congress has empowered the states with the *concurrent* authority to regulate the rates, terms, and conditions of any interstate communications service. Where, as here, a communications service is interstate, states are forbidden from regulating that service directly, whether the FCC regulates the field extensively or not at all. That principle applies all the more clearly given that the FCC has detailed at length in its *2018 Order* how its continued oversight, enforced by its transparency rule, will preserve Internet openness.

Second, we provide several examples how SB-822 unconstitutionally intrudes into the FCC's exclusive jurisdiction over interstate communications and is therefore subject to field preemption. To begin, the plain terms of SB-822 unambiguously define broadband Internet access as an interstate service, meaning that the law facially seeks to regulate interstate communications. Similarly, SB-822's improper intrusion into the FCC's exclusive jurisdiction over interstate communications services impedes the agency's ability to carry out Congressional instructions set forth under both Section 230 and Section 706 of the Communications Act.

## ARGUMENT

### I. Congress Gave the FCC Exclusive Jurisdiction Over Interstate Communications

#### A. The FCC's Jurisdiction Over Interstate Communications Is Absolute

It is well established that when "Congress intends federal law to 'occupy the field,' state law in that area is preempted." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted). Importantly, field preemption need not be explicit. As the Supreme

5

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

Court noted in *Arizona v. United States*, the "intent to displace state law altogether can be inferred … where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" 567 U.S. 387, 389 (2012) (citations omitted). Here, field preemption is explicitly grounded in the Communications Act, which confers jurisdiction on the FCC over interstate services and reserves authority for the states over intrastate services. Field preemption is further supported by decades of regulatory history and judicial precedent.

Exclusive federal oversight of interstate communications can be traced back more than a century. In 1910, Congress endowed the Interstate Commerce Commission ("ICC") with the authority to regulate the field of interstate communications with the passage of the Mann-Elkins Act. *See generally,* F.H. Dixon, *The Mann-Elkins Act, Amending the Act to Regulate Commerce*, 24 THE QUARTERLY JOURNAL OF ECONOMICS 563, 596 (1910). That legislation amended the Interstate Commerce Act ("ICA") to provide that the ICA's provisions "shall apply to … telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one State, Territory, or District of the United States, to any other State, Territory, or District of the United States, or to any foreign country." Mann-Elkins Act § 7. In 1919, the Supreme Court found it "clear that the [Mann-Elkins Act] was designed to and did subject [communications] companies as to their interstate business to the rule of equality and uniformity of rates which it was manifestly the dominant purpose of the [ICA] to establish," and that the consistency that Congress sought to impose "would be wholly destroyed if … [carriers'] interstate commerce business continued to be subjected to the control of divergent and [possibly] conflicting local laws." *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 30 (1919). In short, the Mann-Elkins Act "was an exertion by Congress of its authority to bring under federal control the interstate business of telegraph companies and therefore was an occupation of the field by Congress which excluded state action." *Id.* at 31. Thus, when Indiana attempted to penalize a telegraph company for failure to timely deliver a message sent there from Illinois, the Court found that any such penalty was "foreclosed," because the Mann-

6

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

Elkins Act "so clearly establish[ed] the purpose of Congress to subject [telegraph] companies to a uniform national rule as to cause it to be certain that there was no room thereafter for the exercise by the several States of power to regulate." *Western Union Tel. Co. v. Boegli*, 251 U.S. 315, 316-17 (1920).

Exclusive federal jurisdiction over interstate communications was reinforced with the enactment of the Communications Act of 1934, which transferred the ICC's authority in this sphere to the newly created FCC. The 1934 Act preserved the prior law's assertion of federal control over interstate communications traffic. In particular, Section 1 of the Communications Act of 1934 clearly states that the federal government—acting through the FCC as a "centralizing authority"—has jurisdiction over "interstate and foreign commerce in communication by wire or radio." (47 U.S.C. § 151), and Section 2 further states that the Communications Act "shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States…." (47 U.S.C. § 152). *See generally Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984) (Communications Act grants FCC authority "to regulate *all aspects* of interstate communication by wire or radio") (emphasis added); *Ivy Broadcasting Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968) (Communications Act created "broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law"). Indeed, it does not matter whether the Commission classifies the interstate communications as a common carrier "telecommunications service" under Title II (*see* 47 U.S.C. § 153(11)) or as an "information service" under Title I (*see* 47 U.S.C. § 153(24)); the Commission's jurisdiction over interstate communications is absolute. *See, e.g., Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003) ("[T]he establishment of [a] broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law.") (*citing Ivy Broadcasting Co., Inc. v. AT&T, supra*).

While states have occasionally tried to encroach on the Commission's exclusive jurisdiction over interstate communications, the FCC has consistently rejected these attempted incursions. For example, when Tennessee enacted a statute regulating interstate operator services, the FCC found the law preempted: "[T]he Communications Act precludes the Tennessee statute's efforts to regulate interstate and foreign communications. The Tennessee statute seeks broadly to establish the terms and conditions under which interstate operator services may be offered in the states—establishing specific requirements for [providers of operator services] before they complete interstate calls. The Tennessee statute thus seeks to exercise one of the fundamental functions *exclusively assigned to this Commission* under the Communications Act, namely to assure the reasonableness of the rates, terms, and conditions of interstate communications services." *In the Matter of Operator Services Providers of America, Petition for Expedited Declaratory Ruling,* FCC 91–185, MEMORANDUM OPINION AND ORDER, 6 FCC Rcd. 4475, 4477 (1991) (emphasis supplied). And the Commission has never deviated from this view, regardless of which political party was in control. *See e.g.*, *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, 19 FCC Rcd. 22404 (2004) ("*Vonage Order*") (preempting Minnesota's regulation of interstate voice over IP traffic); *In the Matter of Applications of Cellco Partnership D/B/A Verizon Wireless and SpectrumCo LLC And Cox TMI, LLC For Consent to Assign AWS-1 Licenses,* FCC 12-95, MEMORANDUM OPINION AND ORDER AND DECLARATORY RULING, 27 FCC Rcd. 10698 (rel. August 23, 2012) at n. 349, *aff'd NTCH, INC. v. Federal Communications Commission,* 841 F.3d 497 (D.C. Cir. 2016), *cert. denied* 137 S.Ct. 2277 (June 19, 2017) (Section 2 of the Communications Act provides "the Commission with jurisdiction over all interstate communications by wire or radio"); *In the Matter of Telephone Company–Cable Television Cross–Ownership Rules, Sections 63.54–63.58,* FCC 92-327, SECOND REPORT AND ORDER, RECOMMENDATION TO CONGRESS, AND SECOND FURTHER NOTICE OF PROPOSED RULEMAKING, 7 FCC Rcd. 5781(rel. August 14, 1992) at ¶ 72, *dismissed as moot, Mankato Citizens Telephone Company, et al., v. Federal Communications Commission,* No. 92-1404

8

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

(D.C. Circuit 1996) (1996 WL 393512) (hereinafter "*Video Dialtone Order*") ("The Commission has exclusive jurisdiction [over video dialtone services] because the local telephone company facility is an 'integral component in an indivisible dissemination system which forms an interstate channel of communication.' Consistent with this approach, the basic video dialtone platform is presumptively an interstate service over which the FCC has exclusive jurisdiction.").

### B. The Fact that Congress Gave States Discrete and Limited Cooperative Roles Does Not Diminish the FCC's Exclusive Jurisdiction over Interstate Communications

While it is true that Congress in more recently enacted statutes envisioned "dual federal-state authority and cooperation," *Mozilla*, 940 F.3d at 80-81, Congress did not alter the federal government's exclusive jurisdiction over interstate communications.[4] Rather, Congress has been careful to give the states narrowly tailored roles to play—and in one very prominent instance has even supplanted states' authority over a critical class of *intra*state traffic. In each of the instances of cooperative federalism the *Mozilla* panel cited, Congress afforded states only discrete, purpose-specific authority. In none of those instances did Congress open the field of interstate communications to concurrent regulation.

For example, 47 U.S.C. § 1301 et seq., provides a role for the states to help the FCC oversee the broadband mapping and affiliated grant program under the 2008 Broadband Data Improvement Act. Similarly, Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 1302, encourages both the federal government (with exclusive jurisdiction over interstate communications services) and states (with jurisdiction over *intra*-state communications services) to promote advanced telecommunications services to all Americans (but affords *neither* independent authority to take action). 47 U.S.C. § 1302; *Mozilla*, 940 F.3d at 45-46 (upholding FCC determination that Section 706 is not a grant of authority). Section 254 of the

---

[4] As the association plaintiffs and United States note, *Mozilla* did not suggest that states have authority to regulate interstate broadband and did not address any claims of field preemption under the Communications Act. *See* Association Br. at 2, 10, 13, 19-20; U.S. Br. at 9, 17 n.2. *See also* Lawrence J. Spiwak, *The Preemption Predicament Over Broadband Internet Access Services,* 21 FEDERALIST SOCIETY REVIEW 32 (2020).

9

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

Communications Act provides a cooperative role between the federal government and the states in dealing with the multi-billion-dollar universal service program (which also involves both inter-and intra-state communications), 47 U.S.C. § 254, but that state role is narrowly tailored and limited to areas of subsidy collection and distribution, *see id.* § 254(f) (providing that state regulations may not be "inconsistent with the Commission's rules" or "burden the Federal universal service support mechanisms").

Congress has *never* permitted the individual states to regulate as they please the rates, terms, and conditions of interstate communications services, much less interstate *information* services. To the contrary, Congress has made it abundantly clear that states have no concurrent jurisdiction over those interstate communications services; that authority continues to reside *exclusively* with the FCC. Indeed, if anything, Congress has demonstrated a clear preference for federal control even regarding certain purely intrastate communications—namely, local telephone service. *See AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 378 (1999). ("[T]he question … is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has.").

### C. The FCC Has Steadfastly Retained its Exclusive Jurisdiction Over Title I Information Services

While the Communications Act gives the FCC exclusive jurisdiction over *all* interstate communications, including *both* "telecommunications services" under Title II (47 U.S.C. § 153(53) and "information services" (*id*. § 153(24)), the case for field preemption is especially clear with regard to information services. The Commission has repeatedly and unambiguously confirmed that it retains exclusive jurisdiction over interstate information services.

In 2004, for example, the FCC found that a voice over IP product offering only computer-to-computer service was an information service. *Petition for Declaratory Ruling that Pulver.Com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service,* FCC 04-27, MEMORANDUM OPINION AND ORDER, 19 FCC Rcd. 3307 (2004) (hereinafter "*Pulver Order*"). As such, it was subject to federal, not state, control: "[F]ederal

authority has already been recognized as preeminent in the area of information services, and particularly in the area of the Internet and other interactive computer services, which Congress has explicitly stated should remain free of regulation." *Id*. at 3317.

The FCC made similar statements each time it classified any form of broadband Internet access as an information service. *See Cable Modem Classification Order* at ¶ 59 ("cable modem service is an interstate information service"); *Wireline Classification Order* at ¶ 110 ("we find that we have subject matter jurisdiction over providers of broadband Internet access services); *Wireless Classification Order* at ¶ 28 ("Having concluded that wireless broadband Internet access service is an information service, we also find that the service is jurisdictionally interstate."); *BPL Classification Order* at ¶ 11) ("Having concluded that BPL-enabled Internet access service is an information service, we also find that the service is an interstate service to the same extent as cable modem service and wireline broadband Internet access service"); *2018 Order* at ¶ 199 (explaining that "it is well-settled that Internet access is a jurisdictionally interstate service"). To this day, the FCC has never viewed the matter otherwise. In the realm of interstate information services, there simply is no tradition of cooperative federalism. Claims that the FCC has somehow ceded authority to the states are baseless—even assuming that that agency were free to hand over its powers allocated by Congress, which it is not.

### D. The *2018 Order*'s Transparency Rule Demonstrates the FCC's Continued Exercise of Exclusive Authority over Interstate Communications

As noted above, Congress's assertion of exclusive federal jurisdiction over interstate communications governs whether the federal government (via the FCC or otherwise) regulates such communications aggressively, modestly, or not at all. Here, though, the fact that the FCC imposed (and continues to maintain) a transparency rule in the *2018 Order* further demonstrates that the federal government continues to exercise its exclusive authority over these interstate communications services. *See 2018 Order* at ¶¶ 209 *et seq.* Indeed, a transparency rule is clearly an act of affirmative regulatory oversight, not abdication. The FCC's transparency rule requires every broadband provider to publicly disclose, either on an easily accessible website or by transmittal to the FCC, "accurate information regarding the network management practices,

11

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings." *2018 Order* at ¶ 215.

The legal logic behind the FCC's transparency rule was straightforward: By requiring Internet Service Providers ("ISPs") to describe their business practices and service offerings forthrightly and honestly, the agency ensured that any ISP that engaged in anticompetitive, unfair, or deceptive conduct in violation of these stated terms would be subject to enforcement by (*inter alia*) the FTC and the Department of Justice. *See generally 2018 Order* at ¶ 244. And the Commission's transparency rule was upheld by the D.C. Circuit in *Mozilla*, 940 F.3d at 47. Thus, far from abdicating its authority, the federal government—acting via two independent agencies and the DOJ—remains closely involved in overseeing the broadband marketplace. (In fact, by returning broadband Internet access services back to a Title I information service, the FCC was able to put the FTC "back on the beat," as it was prohibited by law from overseeing the sector due to the common carrier exemption contained in the Federal Trade Commission Act. *See* 15 U.S.C. § 45(a)(2); *see also 2018 Order*, Statement of Chairman Ajit Pai ("Two years ago, the *Title II Order* stripped the FTC of its jurisdiction over broadband providers. But today, we are putting our nation's premier consumer protection cop back on the beat.")).

### E. Even SB-822's Legislative Sponsor Concedes Federal Supremacy over Interstate Communications

What is particularly interesting about this case is that even the legislative sponsor of SB-822—California State Senator Scott Wiener—never denies that California is intruding into a field Congress specifically assigned to the FCC. Indeed, at a press conference he held on the legislature's steps in support of the passage of SB-822, Senator Wiener specifically stated that it is the Commission's "job" to set Internet policy. *See* YouTube: *Senator Wiener: Net Neutrality Press Conference Streamed live on May 29, 2018* (video starting at 5:19). But Senator Wiener was dissatisfied with how the Commission did that job. In Senator Wiener's view, "because Donald Trump [came] into office and his FCC" reversed the Obama-era *2015 Order* by

12

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

replacing it with the *2018 Order,* we now are left with "essentially no federal net neutrality protections." (YouTube, *id*) Unfortunately for Senator Wiener, Congress's clear assertion of exclusive federal authority over interstate communications services (and especially over interstate *information* services) is not dependent on his approval of the regime the federal government selects. SB-822 improperly intrudes into the exclusive jurisdiction Congress granted to the FCC over interstate communications and is therefore ripe for field preemption.

## II. SB-822 Unconstitutionally Intrudes into the FCC's Exclusive Jurisdiction Over Interstate Communications Services

### A. By its Own Terms, SB-822 Seeks to Assert Jurisdiction Over an Interstate Service

Despite Congress's decision to give the federal government exclusive jurisdiction over all interstate communications services, California seeks to extend its jurisdictional grasp into interstate commerce by defining "broadband Internet access services" as "a mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data *from, all or substantially all Internet endpoints*." Cal. Civ. Code §3100(b) (emphasis supplied). SB-822 thus explicitly regulates California customers' interactions with websites and other content located outside of California—*i.e.*, their *interstate* traffic. *See, e.g.*, *Vonage Order* at ¶ 6 ("When a service's end points are in different states or between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive jurisdiction."). Given the FCC's occupation of the entire field of interstate communications, California's improper attempt to assert its police power over interstate communications (*see* SB-822 Section 1(a)(1) ("This act is adopted pursuant to the police power inherent in the State of California….") is unconstitutional, *see Arizona v. United States, supra*. As such, SB-822 is preempted in its entirety, regardless of its savings clause (*see* Cal. Civ. Code Section 3).

### B. SB-822 Frustrates Other Congressional Mandates

That SB-822 impermissibly regulates in a federal field is also demonstrated by the FCC's other statutory responsibilities under the Communications Act. These responsibilities

13

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

include, *inter alia*, the Congressional mandate contained in Section 230 to "promote the continued development of the Internet" (47 U.S.C. § 230(b)(1)) in a manner "unfettered by Federal or State regulation" (47 U.S.C. § 230(b)(2)) and the Congressional command in Section 706 for the agency to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 47 U.S.C. § 1302(a).

Indeed, one does not have to be a communications-law specialist to understand that allowing each state to regulate the rates, terms, and conditions of ISPs' service offerings as they deem fit will clearly have adverse extrajudicial effects on interstate commerce. As noted above, the FCC recognized this problem almost twenty years ago in the *Pulver Order*, and the fundamental economics of broadband deployment have not changed since then. *See, e.g., Pulver Order* at ¶ 25 ("[A]llowing the imposition of state regulation would eliminate any benefit of using the Internet to provide the service: the Internet enables individuals and small providers, such as Pulver, to reach a global market simply by attaching a server to the Internet; requiring Pulver to submit to more than 50 different regulatory regimes as soon as it did so would eliminate this fundamental advantage of IP-based communication.").

An economic analysis focused on the communications sector illustrates the problem of having providers of a national service comply with different state rules, some of which may even go farther than the national rules. As the paper's economic model details, when state law applies to a product or service that is actually national in scope such as telecommunications or the Internet, even if each state acts with the purest of intentions to protect their respective constituents' interests, there is the risk of harmful conflicts in the rules as the states will inevitably vary in their legal regimes. As a result, there will be *extra-jurisdictional effects* of state-by-state regulation on a national service, making society worse off. T.R. Beard, G.S. Ford, *et al., Developing A National Wireless Regulatory Framework: A Law and Economics Approach,* 16 COMMLAW CONSPECTUS 391 (2008). As former FCC Chief Economist Michael Katz stated regarding state-level business rules, "policies that make entry difficult in one geographic area may raise the overall cost of entering the industry and thus reduce the speed at

14

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

which entry occurs in other areas."  M.L. Katz, *Regulation: The Next 1000 Years,* in SIX DEGREES OF COMPETITION: CORRELATING REGULATION WITH THE TELECOMMUNICATIONS MARKETPLACE 27, 44 (2000).  Accordingly, when state and local regulation can spill across borders, as is the case with communications regulation, economics dictate that society is typically better off with a single national regulatory framework.  This is precisely why Congress gave the FCC—and not the individual states—exclusive jurisdiction over interstate communications.

Firms are also not passive recipients of regulation.  If we have learned anything from the FCC's ill-conceived *2015 Order*, it is that firms will not invest aggressively in the massive sunk costs necessary when economic profits are under attack.  The *2018 Order* eliminated the federal threat, reigniting investment.  But a regulatory "Sword of Damocles" threatening "Death by Fifty State Regulatory Cuts" would exert a similar (and perhaps greater) chilling effect on the investment decision of ISPs.  G.S. Ford, *Regulation and Investment in the U.S. Telecommunications Industry,* 56 APPLIED ECONOMICS 6073 (2018).  The potential for aggressive and, more importantly, *inconsistent* regulation of the Internet from fifty different states will in turn inhibit the FCC's ability to fulfil the congressional directives contained in Section 230 and Section 706.  *See also* Preamble, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (in passing the Telecommunications of Act of 1996, the goal of Congress was to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.").

## CONCLUSION

For the reasons set forth above, we join with the Plaintiffs and respectfully ask this Court to grant their motion for preliminary injunction.

15

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

Dated: August 19, 2020

/s/ *L. Charles Keller*
L. Charles Keller (CA SBN 169573)
WILKINSON BARKER KNAUER LLP
1800 M Street, N.W., Suite 800 N
Washington, D.C.  20036
(202) 783-4141
ckeller@wbklaw.com


Lawrence J. Spiwak (pro hac pending)
President and General Counsel
Phoenix Center for Advanced Legal &
Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C.  20015
(202) 274-0235
lspiwak@phoenix-center.org


*Attorneys for Amici Communications Law
Scholars*

16

Brief Amicus Curiae in Supp. of Pls.' Motions for Prelim. Inj. (18-cv-02660, 18-cv-02684)

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 19, 2020, I electronically submitted the foregoing to be electronically filed with the Court's CM/ECF filing system, which will send a notice of electronic filing to all parties of record who are registered with CM/ECF.

/s/     *L. Charles Keller*
L. Charles Keller (CA SBN 169573)
WILKINSON BARKER KNAUER LLP
1800 M Street, N.W., Suite 800 N
Washington, D.C. 20036
(202) 783-4141
ckeller@wbklaw.com