Bryan K. Weir, CA Bar # 310964
William S. Consovoy
Jeffrey M. Harris
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
*Counsel for Amici Curiae*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM –THE BROADBAND ASSOCIATION,<br><br>                         Plaintiffs,<br>v.<br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>                         Defendant. | Case No.:  2:18-cv-02684<br>Case No.:  2:18-cv-02660<br><br>**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, SMALL BUSINESS & ENTREPRENEURSHIP COUNCIL, TELECOMMMUNICATIONS INDUSTRY ASSOCIATION, AND CALINNOVATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' RENEWED MOTIONS FOR PRELIMINARY INJUNCTIONS**<br><br><br>Judge: Hon. John A. Mendez |
| THE UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br>v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOME, Governor of California, in his Official Capacity, and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>                         Defendants. | |

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE.................................................................................................1

INTRODUCTION .........................................................................................................................3

ARGUMENT ...............................................................................................................................4

    I.   Broadband Service Continues To Be Fast, Efficient, and Competitive in the Absence of Heavy-handed Federal Mandates. ....................................................................................4

    II.  SB-822 Should Be Preliminarily Enjoined............................................................................9

        A.     SB-822's scope is highly vague and uncertain...........................................................10

        B.     These inherent uncertainties in SB-822 tip the equities overwhelmingly in plaintiffs' favor. ...........................................................................................................................13

CONCLUSION ..........................................................................................................................15

CERTIFICATE OF COMPLIANCE............................................................................................16

CERTIFICATE OF SERVICE....................................................................................................17

# TABLE OF AUTHORITIES

**CASES**

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008)......................................................................1

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)........................................................11

*Am. Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997)............................................11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ..................................................14

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)....................................................................1

*Cel-Tech Comm'ns, Inc. v. L.A. Cellular Telephone Co.*,
973 P.2d 527 (Cal. 1999)..........................................................13

*Coventry Health Care of Mo., Inc. v. Nevils*,
137 S. Ct. 1190 (2017)................................................................1

*Gobeille v. Liberty Mut. Ins. Co.*,
136 S. Ct. 936 (2016)..................................................................1

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012)....................................................................1

*Nw., Inc. v. Ginsberg*,
134 S. Ct. 1422 (2014)................................................................1

*Puerto Rico v. Franklin Calif. Tax-Free Trust*,
136 S. Ct. 1938 (2016)................................................................1

*Riegel v. Medtronic, Inc.*,
552 U.S. 312 (2008)....................................................................1

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018)...........................................................4, 10

*Smith v. Goguen*,
415 U.S. 566 (1974)..................................................................10

*Spears v. United States*,
555 U.S. 261 (2009)..................................................................14

*United States Telecom Ass'n v. FCC*,
No. 15-1063 (D.C. Cir. 2015) .....................................................1

*USAir, Inc. v. Dep't of Transp.*,
969 F.2d 1256 (D.C. Cir. 1992)................................................11

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011)....................................................................1

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ............................................................................1

**STATUTES**

Cal. Bus. & Prof. Code §§ 17200-17209 .......................................................11

Cal. Civ. Code § 3100(b), (i), (p) .................................................................11

Cal. Civ. Code § 3101(a)(7)(A) .....................................................................9

**OTHER AUTHORITIES**

30 FCC Rcd 5601 (2015) ...............................................................................11

33 FCC Rcd 311 (2018) ........................................................................2, 9, 10

Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic
   During the Pandemic* (June 2020) ...........................................................7

Br. for Gov't Petitioners, *Mozilla Corp. v. FCC*, Nos. 18-1051 *et al.*
   (D.C. Cir. Nov. 27, 2018) ........................................................................7

Cal. S. Comm. on Energy, Utilities and Commn's, Analysis SB 822 (2018) ..................2

Christopher Yoo, *Coronavirus Crisis Vindicates the FCC's 'Net Neutrality' Rollback*,
   Wall St. J. (Apr. 14, 2020) ......................................................................7

Competitive Enterprise Institute, Comments on Restoring Internet Freedom
   (Apr. 20, 2020) .......................................................................................4

Consumer Action for a Stronger Economy, Comments on Restoring Internet Freedom
   (Mar. 30, 2020) ......................................................................................5

Doug Brake, *Lessons From the Pandemic: Broadband Policy After COVID-19*,
   Info. Tech. & Innovation Found. (July 12, 2020) ...........................5, 7, 8

Free Press, Comments on Restoring Internet Freedom, at 65-70 (July 17, 2017) ..............6

George Ford, *Covid-19 and Broadband Speeds: A Multi-Country Analysis*,
   Phoenix Ctr. Pol'y Bull. (May 2020) ......................................................7

Information Technology & Innovation Found., Comments on Restoring Internet
   Freedom (Apr. 20, 2020) .....................................................................6, 7

Jeff Jacoby, *A Year After Net-Neutrality's Repeal, the Internet Is Alive and
   Well — And Faster Than Ever*, Bos. Globe (Dec. 28, 2018) ....................5

Jeffrey Westling, *FCC, Broadband Industry Rising to the Challenge of Covid-19*,
   R Street (Mar. 26, 2020) ..........................................................................7

Maureen K. Ohlhausen, *Antitrust over Net Neutrality: Why We Should Take
   Competition in Broadband Seriously*, 15 Colo. Tech. L.J. 119 (2016) ................6

National Conference of State Legislatures, *Net Neutrality Legislation in States* (Oct. 1, 2018) ............13

Ookla, *Speedtest Global Index: United States June 2020* ..............................5

Ookla, *United States: Fixed Broadband Report* (Dec. 12, 2018) ....................5

Patrick Brogan, USTelecom, *U.S. Broadband Investment Continued Upswing in 2018* (July 31, 2019) ....................................................................................................4

Seth Cooper, *FCC Report Shows Broadband Success Under Pro-Market Policies*, Persps. from FSF Scholars (May 11, 2020) ...................................................7

Seth L. Cooper, *Resurgence in Broadband Deployment Vindicates FCC's Pro-Investment Policies*, Free State Foundation (Sept. 19, 2019)..............................................4, 5

Statement of Chairman Pai on Increased Broadband Investment for Second Year in a Row (June 10, 2019) ...........................................................................4

Telecommunications Industry Association, Comments on Restoring Internet Freedom (Apr. 20, 2020) .............................................................................................4, 5

U.S. Chamber of Commerce Technology Engagement Center, Comments on Restoring Internet Freedom ("Chamber Comments") (March 20, 2020) ................4

USTelecom, Comments on Restoring Internet Freedom (Apr. 20, 2020)...................4

**REGULATIONS**

47 C.F.R. § 8.1..............................................................................................................6

## INTEREST OF AMICUS CURIAE

**Chamber of Commerce of the United States of America.** The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country.

An important function of the Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files amicus briefs in cases that raise issues of concern to the Nation's business community. The Chamber has previously participated as amicus curiae in net-neutrality litigation, including filing a brief during the previous stage of this case. *See, e.g.*, Amicus Brief, Dkt. No. 31 (filed Oct. 19, 2018); *United States Telecom Ass'n v. FCC*, No. 15-1063 (D.C. Cir. 2015). And it regularly participates in cases involving federal preemption. *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190 (2017); *Puerto Rico v. Franklin Calif. Tax-Free Trust*, 136 S. Ct. 1938 (2016); *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936 (2016); *Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011); *Wyeth v. Levine*, 555 U.S. 555 (2009); *Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008); *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008).

The Chamber has a significant interest in, and can offer a unique perspective on, the issues here. American businesses are the beneficiaries of a nationally and globally deployed broadband infrastructure, which has transformed (and will continue to transform) the way that they operate, providing numerous opportunities to create and market innovative products and services. The Chamber is a proponent of a free and open Internet, and it supports congressional legislation to promote net-neutrality principles in a way that protects consumers and provides regulatory certainty. At the same time, the Chamber opposes efforts to treat the Internet like a public utility or legislation that would create a disparate patchwork of state laws. The California Internet Consumer Protection and Net Neutrality Act of 2018 (SB-822) would do both of those things.

**California Chamber of Commerce.** The California Chamber of Commerce ("CalChamber") is a non-profit business association with over 13,000 members, both individual and corporate, representing virtually every economic interest in the state of California. For over 100 years, CalChamber has been the voice of California business. While CalChamber represents several of the largest corporations in California, seventy-five percent of its members have 100 or fewer employees. CalChamber acts on behalf of the business community to improve the state's economic and jobs climate by representing business on a broad range of legislative, regulatory and legal issues. CalChamber often advocates before federal and state courts by filing *amicus curiae* briefs and letters in cases, like this one, involving issues of paramount concern to the business community. CalChamber has members who actually support net neutrality, but are not supportive of SB 822 or state-by-state regulation of the Internet.

**Small Business & Entrepreneurship Council.** As an organization that has worked for more than 25 years to promote a policy environment that is conducive to entrepreneurship, innovation, and small business growth, the Small Business & Entrepreneurship Council is concerned about how the California Internet Consumer Protection and Net Neutrality Act of 2018 (SB-822) will negatively disrupt the activity of startups and entrepreneurs that have fueled and are fueling innovative technologies and uses of the Internet to the benefit of all consumers, including small businesses and the self-employed; the potential costs and burdens that a complex web of state rules governing the Internet may impose on small businesses and their ability to conduct business across state lines; and the overall impact of how the uncertain regulatory regime and its unintended consequences will impact investment and entrepreneurship generally, with significant potential to damage U.S. competitiveness and economic recovery.

**Telecommunications Industry Association.** TIA is an advocacy organization and a standard-setting body that represents hundreds of global manufacturers and vendors of information and communications technology ("ICT") equipment and services that are supplied to infrastructure owners and operators, enabling network operations across all segments of the economy. TIA's membership responsible for providing the equipment that comprises the U.S.'s networks have nevertheless been affected by the California's decisions regulating the Internet. On their behalf, we seek to maximize the deployment of broadband infrastructure nationwide and have been active participants on dockets

regarding Net Neutrality, as decisions on Internet openness have a direct and significant effect on such deployment. In order to ensure continued investment in ICT networks and broadband deployment, TIA has been vocal about the necessity for a federal framework setting the rules for the Internet, as opposed to a patchwork state-by-state of laws that force the ICT industry to conform to varying regulations.

**CALinnovates.** CALinnovates is a coalition comprised of technology leaders, startups, traditional telecommunications companies, entrepreneurs, and venture capitalists, all united around a shared desire to ensure that the Internet remains a vibrant and open space in which innovation continues to thrive.

### INTRODUCTION

California has designated itself the nationwide regulator of the Internet. Never mind that the Federal Communications Commission (FCC)—the expert agency tasked by Congress with adopting a uniform, national regulatory regime for interstate communications services, like broadband—has rejected approaches like California's in an exhaustive, 196-page order. *See* 33 FCC Rcd 311 (2018) (2018 Order). Never mind that internet traffic is indifferent to state borders, that there is no meaningful way to limit internet regulations to a single State, and that SB-822 makes no effort to do so. And never mind that the vague prohibitions—including in particular the open-ended "Internet Conduct Standard" in SB-822—are anathema to the development of a dynamic, constantly changing industry. California forged ahead anyway, announcing its intention to "position [itself] as a leader in the fight for net neutrality." Cal. S. Comm. on Energy, Utilities and Commn's, Analysis SB 822 1, 13 (2018) (Energy Analysis).

The Internet has thrived since the FCC repealed the same kind of utility-style regulation that SB-822 would now reimpose. In fact, the current regime has spurred broadband investment, expanded access, nurtured innovation, facilitated higher internet speeds, and reduced consumer prices. On top of that, the FCC's return to its long-standing "light-touch" regime has enabled broadband to weather a global pandemic without any serious issues. At bottom, broadband service continues to be fast, efficient, and competitive in the absence of utility-style regulations.

Moreover, because there is no principled way to limit regulation of the Internet to a single State (something SB-822 makes no effort to do), California's new regulatory regime raises more questions than it answers. The pervasive ambiguity and uncertainty about what practices SB-822 prohibits or allows only

underscore the need for preliminary injunctive relief. SB-822 amplifies many of the uncertainties created by the FCC's repealed 2015 rules—which the FCC explicitly found to be chilling new investments in broadband services—and then overlays another layer of uncertainty about the geographic scope of its new restrictions. The statute is also riddled with ambiguities about what practices California will view as "reasonable," "legitimate," "harmful," "lawful," "primarily technical," or "application-agnostic"—going well beyond the FCC's now-repealed 2015 Order. Thus, an Internet service provider that invests to develop new services, features, traffic-management practices, or interconnection arrangements may face *ex post* penalties if a California court determines, years later, that it ran afoul of one of these vague words. And, while the statute purports to limit itself to services provided "in California," SB-822 does not limit the scope of the prohibitions to only in-state communications.

In sum, "this isn't your everyday ambiguous statute." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1232 (2018) (Gorsuch, J., concurring). It "leaves the people to guess about what the law demands—and leaves judges to make it up." *Id.* Our national broadband network is too important to the economy and interstate commerce to be left to an amorphous regulatory regime where the key details will be worked out on an ad hoc and patchwork basis after years of litigation. It would be profoundly damaging and inequitable to force an entire industry to come into compliance with this new and poorly defined regulatory regime, only to revert back to the old practices when plaintiffs inevitably prevail on the merits. The far better—and legally required—course is to preserve the regulatory status quo by enjoining the operation of SB-822 pending a final resolution of this case. The renewed motion for preliminary injunction should be granted.

## ARGUMENT

### I. Broadband Service Continues To Be Fast, Efficient, and Competitive in the Absence of Heavy-handed Federal Mandates.

As the private plaintiffs aptly note, this case "is not about whether the Internet will remain open." Dkt. No. 53-1 at 1. It will. Following the repeal of the 2015 federal regulations, the Internet has flourished. An open, transparent, and competition-based Internet policy has delivered fast, efficient, and competitive broadband service.

**A. The light-touch, post-2015 Order regime has spurred broadband investment, expanded access, supported innovation, facilitated higher internet speeds, and reduced consumer prices.**

In 2018, the FCC replaced the uncertain and investment-deterring Title II regulatory regime it had adopted in 2015 with a new set of rules that sought to neutralize the 2015 Order's deleterious effects on investment and restore broadband investment to pre-2015 levels. Two years in, the 2018 Order has succeeded in rejuvenating both investment and innovation.

Comparing the economic effects of the Title II-era and post-Title II-era regimes is telling. Between 2000 and 2014, broadband was classified, as it is now, as an "information service," and capital expenditures ranged between $64 billion and $118 billion annually. USTelecom, Comments on Restoring Internet Freedom, at 6 (Apr. 20, 2020), bit.ly/30xgJkV.[1] Investment began to decline, however, in 2015, when the FCC issued its heavy-handed federal net neutrality mandates. *Id.* But capital expenditures began to increase again with both the expectation and issuance of the 2018 Order. In 2017—the year the FCC announced its proposal to repeal the 2015 Order—investment in broadband infrastructure "reversed what had been a multi-year decline, rising from $74.8 billion in 2016 to $76.9 billion in 2017." Telecommunications Industry Association, Comments on Restoring Internet Freedom ("TIA Comments"), at 4 (Apr. 20, 2020), bit.ly/31AsCWD. Then, in 2018, broadband investment reached $80 billion—the highest amount since 2001. *Id.*; *see also* Competitive Enterprise Institute, Comments on Restoring Internet Freedom, at 6 (Apr. 20, 2020), bit.ly/2PtADH7 ("The promulgation of [the 2015 Order] corresponded with a decline in broadband infrastructure investment . . . . These declines are significant given the fact they occurred outside of a recession—the last time such a year-over-year decline occurred. With the promulgation and finalization of [the 2018 Order] however, investment rebounded . . . ."); Patrick Brogan, USTelecom, *U.S. Broadband Investment Continued Upswing in 2018*, at 1-2 (July 31, 2019), bit.ly/31n3xOt. There is no question that the FCC's utility-style regulation of the Internet chilled broadband investment—an effect reversed by the 2018 Order.

---

[1] In February 2020, the FCC requested public comments to "refresh the record" on three limited issues the D.C. Circuit had remanded. *See Wireline Competition Bureau Seeks to Refresh Record in Restoring Internet Freedom and Lifeline Proceedings in Light of the D.C. Circuit's Mozilla Decision*, Public Notice, DA 20-168 (WCB Feb. 19, 2020). Many of the comments cited in this brief were filed in that proceeding.

Those investment increases are not merely numbers on a page; they directly contribute to real-world improvements in broadband deployment and quality. In 2017, household access to benchmark fixed broadband service increased from 91.9% to 93.5% compared with only 0.5% growth in 2015. Seth L. Cooper, *Resurgence in Broadband Deployment Vindicates FCC's Pro-Investment Policies*, Free State Foundation, at 2 (Sept. 19, 2019), bit.ly/30vXb0g. And households with *fiber* broadband access increased by 17% in 2018, *see* U.S. Chamber of Commerce Technology Engagement Center, Comments on Restoring Internet Freedom ("Chamber Comments"), at 4 (March 20, 2020), bit.ly/2PtwFOw, the largest expansion in U.S. history, *see* Statement of Chairman Pai on Increased Broadband Investment for Second Year in a Row (June 10, 2019), bit.ly/3ketyIp. Those investments are especially critical to national economic growth as more Americans work and learn from home—a trend that has only accelerated during the COVID-19 pandemic.

Access to mobile broadband also increased over this time period, as providers relied on the FCC's "light-touch" framework. Beginning in 2017, there was a surge in mobile broadband investment that reversed "historic declines." TIA Comments, *supra*, at 4. Then, in 2018, the wireless industry's investments increased by $1.8 billion (to a total of $27.4 billion), and the number of cell sites nationwide increased by 8%. *See* Cooper, *supra*, at 2 (collecting data).

The 2018 Order has also fostered competition and innovation that better serves low-income consumers by reducing prices. The United States "consistently ranks … as one of the most affordable nations for entry-level broadband," and "has for two years running ranked … first in the world for broadband affordability." Doug Brake, *Lessons From the Pandemic: Broadband Policy After COVID-19*, Info. Tech. & Innovation Found. (July 13, 2020), at 11, bit.ly/2PobvRY; *see also* Consumer Action for a Stronger Economy, Comments on Restoring Internet Freedom, at 2 (Mar. 30, 2020), bit.ly/3kf3xbY ("Broadband access for low-income consumers is another area where the Restoring Internet Freedom Order advances the public interest."). Moreover, the 2018 Order's investment-friendly policies have facilitated innovation that leads to quality improvements. *See* TIA Comments, *supra*, at 3 ("The RIF Order permits the sort of flexible network management that will allow U.S. broadband providers to develop and support innovative applications that serve the public interest.").

Internet speeds have also vastly improved since the FCC issued the 2018 Order. In 2018 alone, U.S. internet speeds increased by 40%. Jeff Jacoby, *A Year After Net-Neutrality's Repeal, the Internet Is Alive and Well — And Faster Than Ever*, Bos. Globe (Dec. 28, 2018), bit.ly/2C20eUv. Ookla, a web analytics company, predicted that "as ISPs continue to build out their fiber networks and gigabit-level speeds expand[,] we only expect to see internet speeds increase across the U.S." Ookla, *United States: Fixed Broadband Report* (Dec. 12, 2018), bit.ly/3ifVauT. Indeed, between 2018 and June 2020, average fixed broadband speeds increased from 96.25 Mbps to 143.28 Mbps. *Id.*; Ookla, *Speedtest Global Index: United States June 2020* (last accessed Aug 4, 2020), bit.ly/39XiESK. By all accounts, the FCC's repeal of the 2015 Order has benefitted consumers by expanding access to fixed and mobile broadband, encouraging investment and innovation, promoting faster service, and reducing prices.

**B. Critics' predictions about the repeal of the 2015 Order have failed to materialize.**

Some critics of the 2018 Order predicted that ISPs would subsequently engage in a variety of undesirable practices, including throttling, anticompetitive paid-prioritization, and blocking. *See, e.g.*, Free Press, Comments on Restoring Internet Freedom, at 65-70 (July 17, 2017), bit.ly/3g64Pmn (predicting that repeal of 2015 Order would, *inter alia*, "drastically change the nature of the service that customers have come to expect from broadband providers," would allow "broadband providers [to] block applications merely to exact a toll from an app maker," would grant ISPs "editorial control over access to certain kinds of content," and would "gravely inhibit [consumers'] access to the content of their own choosing").

To date, there is no record of ISPs engaging in blocking, throttling, or paid prioritization (much less anticompetitive arrangements). That is attributable in large part to the competitive environment. *See, e.g.*, Information Technology & Innovation Found., Comments on Restoring Internet Freedom ("ITIF Comments"), at 3-4 (Apr. 20, 2020), bit.ly/3g5NyKj (finding a "lack of problematic behavior" since the 2018 Order); 2018 Order ¶ 261 ("there is scant evidence that end users, under different legal frameworks, have been prevented by blocking or throttling from accessing the content of their choosing"); Maureen K. Ohlhausen, *Antitrust over Net Neutrality: Why We Should Take Competition in Broadband Seriously*, 15

Colo. Tech. L.J. 119, 129–30 (2016) (noting that the 2015 Order "proffered virtually no evidence of real-world, net neutrality violations, let alone sustained ones.").

In addition to competitive constraints on practices such as blocking and throttling, the 2018 Order's transparency requirements also ensure that an ISP's practices will be disclosed to consumers. That order requires ISPs to "publicly disclose accurate information regarding the network management practices, performance characteristics, and commercial terms of its broadband internet access services." 47 C.F.R. § 8.1. Those disclosures must be "sufficient to enable consumers to make informed choices." *Id.* And the 2018 Order's transparency requirements are enforceable by both the FTC and state attorneys general (to the extent consistent with federal law). 2018 Order ¶¶ 142, 244. Beyond this enforcement mechanism, moreover, "[m]any of the largest ISPs" have committed not to block or throttle content—a promise enforceable by the FTC. *Id.* ¶¶ 117 n.438, 142 n.511.

Finally, contrary to some critics' assertions that the 2018 Order would negatively impact public safety, "[i]f anything, the [2018 Order] likely has had a positive impact on public safety communications." ITIF Comments, *supra*, at 5. Some have referenced an incident during the 2018 California wildfires in which a provider did not immediately waive a provision of a government data plan that data speeds could be reduced after users exhausted a preset quantity of data. But as the government entities that challenged the 2018 Order previously admitted, this was entirely "unrelated to net neutrality" and "would not have been prevented" even if the 2015 Order remained in place. *Id.* at 4; *see also* Br. for Gov't Petitioners at 24 n.13, *Mozilla Corp. v. FCC*, Nos. 18-1051 *et al.* (D.C. Cir. Nov. 27, 2018). More fundamentally, a light-touch, pro-investment regulatory regime "encourages greater investment in the same facilities that can be shared for public safety communications—both among first responders and from the public to emergency answering services." *Id.* at 5.

### C. Broadband networks' performance during the global pandemic is a byproduct of the FCC's "light-touch" regulatory framework.

The COVID-19 global pandemic highlights the resilience of the U.S. broadband infrastructure—a product of "light-touch" regulation and years of investment. *See* Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic* (June 2020), bit.ly/31fTRVW. Despite an extraordinary 20 to 30 percent pandemic-induced surge in internet traffic, "the U.S. broadband

networks were able to accommodate these changes with virtually no drop in performance." Brake, *supra*, at 1; *see also* Seth Cooper, *FCC Report Shows Broadband Success Under Pro-Market Policies*, Persps. from FSF Scholars (May 11, 2020), bit.ly/31q069J ("Strong investment in 2017 and especially 2018 has enabled broadband networks to handle, without any material degradation, traffic increases occasioned by the COVID-19 pandemic."); George Ford, *Covid-19 and Broadband Speeds: A Multi-Country Analysis*, Phoenix Ctr. Pol'y Bull. (May 2020), bit.ly/3gxnkkQ; Christopher Yoo, *Coronavirus Crisis Vindicates the FCC's 'Net Neutrality' Rollback*, Wall St. J. (Apr. 14, 2020), on.wsj.com/3gwHgnH; Jeffrey Westling, *FCC, Broadband Industry Rising to the Challenge of Covid-19*, R Street (Mar. 26, 2020), bit.ly/3a0gFx4.

By contrast, "some countries in the European Union faced more difficulty accommodating the fluctuation in traffic," leading officials in those countries to ask content providers to reduce the resolution of video streams. Brake, *supra*, at 4. In Australia, too, one leading ISP "urged users to download movies overnight, during off-peak usage times, or for families with multiple children to try not to 'all use the Internet all at the same time.'" *Id.* But "because speeds and network capacity were significantly higher in the United States, such rationing steps were not necessary for U.S. broadband users." *Id.* The 2018 Order restored an environment conducive to investment, which, in turn, contributed to exceptional U.S. broadband performance notwithstanding the extraordinary challenges posed by the pandemic.

## II. SB-822 Should Be Preliminarily Enjoined.

SB-822's provisions appear to prohibit a number of existing business practices and arrangements, including "zero rating" plans and certain paid interconnection agreements. *See* Dkt. No. 53-1 at 26-27 (explaining how SB-822 would impact pro-consumer zero-rating offerings). At a minimum, the California law is vague, ambiguous, and uncertain—leaving Internet users and providers in the dark about what the law actually requires. Rather than force an entire, economically critical industry to disrupt existing business plans in an effort to comply with these mandates—and face severe penalties and enforcement actions for noncompliance—the Court should preliminarily enjoin SB-822 until it can reach a final decision on the merits.

## A. SB-822's scope is highly vague and uncertain.

Vague or unclear laws "invite arbitrary power." *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring). When a statute "leav[es] the people in the dark about what the law demands," it simply allows "prosecutors and courts to make it up," *id.* at 1223-24, or to use the law to "pursue their personal predilections," *Smith v. Goguen*, 415 U.S. 566, 575 (1974). California's net-neutrality statute flouts bedrock principles of fair notice and due process. SB-822 has all of the pervasive uncertainty and ambiguity of the FCC's repealed net-neutrality order from 2015 (and then some), and then overlays that uncertainty with an *additional* lack of clarity over its own territorial scope.

The California law suffers from all of the ambiguities and uncertainties of the FCC's now-repealed 2015 Order, which SB-822 expressly incorporates. The FCC made specific findings in the 2018 Order that the repealed Title II framework "depressed broadband investment," and that "the uncertainty regarding what is allowed and what is not allowed under the new … broadband regime has caused [providers] to shelve projects that were in development, pursue fewer innovative business models and arrangements, or delay rolling out new features or services." ¶ 99. The FCC record demonstrates that uncertainty associated with the Title II classification, including the "Internet conduct standard," caused a decline in investment. Other commenters insisted that the FCC needed to retain a such a general standard to police an expansive array of so-called "unreasonable" practices involving encryption, cookies, inserting code into third-party website, sending search data to third parties, and numerous other acts. *See* ¶ 115. But the 2018 Order concluded that it was "not in the public interest" to retain an Internet conduct standard because that rule "has created regulatory uncertainty in the marketplace," thereby "hindering investment and innovation" by internet providers, app developers, and equipment manufacturers alike. *See* ¶¶ 246-49.

California has nonetheless forged ahead with its own general conduct standard. In addition to its specific prohibitions on practices such as blocking and throttling, SB-822 broadly prohibits any provider from unspecified actions that interfere with or disadvantage "an end user's ability to select, access, and use broadband Internet access service or lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices

available to end users." Cal. Civ. Code § 3101(a)(7)(A). But, as the FCC concluded, such an open-ended, totality-of-the-circumstances standard that provides no guidance as to which particular practices will be deemed unlawful is anathema to the development and deployment of innovative new services. 2018 Order ¶¶ 246-49; *see also USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1263 (D.C. Cir. 1992) (explaining that "totality-of-the-circumstances" tests are inherently indeterminate, "give little guidance to future litigants," and "impose limited restraint on agencies"). An Internet provider that invests to develop new services as a competitive differentiator may face *ex post* penalties if a California court determines, years later, that the innovative service "unreasonably" disadvantaged end-users, other providers, or edge providers. Worse still, there will be no precedent to rely on for guidance since new services are, necessarily, unprecedented.

SB-822 then adds another, California-specific complexity: how, if at all, to limit the statute's reach to California. If SB-822 were allowed to go into force, its practical effect would be to control broad swaths of out-of-state conduct.[2] There is simply no way that the bill's effects can be contained within California's boundaries: that is not how California has defined the broadband service that it seeks to regulate and it is not how the Internet works. "Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy*, 491 U.S. at 334); *see also Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 170-72 (S.D.N.Y. 1997) (explaining the many reasons why "no aspect of the Internet can feasibly be closed off to users from another state"). As the FCC recognized, a provider cannot "comply with state or local rules for intrastate communications without applying the same rules to interstate communications." 2018 Order ¶ 200 & n. 744. "Because both interstate and intrastate communications can travel over the same Internet connection (and indeed may do so in response to a single query from a consumer), it is impossible or impracticable for ISPs … to apply different rules in each circumstance." *Id.* Content providers typically rely on a nationwide (or worldwide)

---

[2] The extraterritorial sweep of SB-822 also violates the Dormant Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). A state law violates the Dormant Commerce Clause when the "practical effect" of the law is "to control conduct beyond the boundaries of the State." *NCAA*, 10 F.3d at 639 (quoting *Healy*, 491 U.S. at 336). That is precisely the case here. *See* First Amended Complaint, Dkt. No. 52 at ¶¶ 15-16.

network of servers to exchange traffic with internet service providers, and routing of information changes dynamically from moment to moment depending on network congestion and other factors. It would thus be impossible to apply California-specific rules regarding matters such as interconnection or zero-rating without completely changing the architecture of the network in highly inefficient ways.

Consider, moreover, SB-822's application to mobile broadband services, which are—by definition—*mobile*. If a Californian travels to Texas and brings her wireless phone, do California's net-neutrality regulations travel with her? Conversely, if a wireless customer in Florida travels to California for a one-week vacation, must the provider now comply with the full panoply of regulations that apply to service in California? What if a California resident near the state border connects to a cell tower in Nevada or Oregon? Or what if a college student has a wireless account registered at his parents' address in San Diego but spends most of the year at school in North Carolina? Number porting introduces yet another complexity: because customers can now keep their phone numbers no matter where they live—and more than 100,000 people move out of California every year—there may be more than a million California phone numbers that are no longer used primarily in the State. When consumers use devices associated with those numbers to access mobile broadband offerings, are those consumers still deemed to be "in California" for purposes of the net-neutrality regulations?

Given these obvious problems with States regulating the internet, SB-822 purports to limit its reach to fixed and mobile broadband services provided "in California." *See* § 3100(b), (i), (p). But placing an "only in California" label on regulations that inherently apply to interstate and nationwide commerce does not fix the problem. And the statute provides no further guidance about that restriction—raising countless questions while providing few answers.

Finally, the inherent ambiguities in SB-822 are exacerbated by its proposed enforcement mechanism. Although the FCC's repealed Title II regulations were vague, overbroad, and unnecessary, they would have at least been administered on a nationwide basis by an expert agency. *See* 30 FCC Rcd 5601 ¶ 36 (2015) ("The Commission may enforce the open Internet rules through investigation and the processing of complaints (both formal and informal)."). The FCC thus could have exercised enforcement

discretion in choosing whether to punish a specific practice, and could have considered the broader, systemic implications of any individual enforcement action.

Not so in California. SB-822 would likely be enforced through California's general Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17209, which authorizes suits for injunctive relief and civil penalties against any "person" who has engaged in "any unlawful, unfair, or fraudulent business act or practice." "By proscribing 'any unlawful' business practice, [the UCL] 'borrows' violations of other laws and treats them as unlawful practices' that the [UCL] makes independently actionable." *Cel-Tech Comm'ns, Inc. v. L.A. Cellular Telephone Co.*, 973 P.2d 527, 539-40 (Cal. 1999). Thus, unlike the FCC's repealed regulations, there will be no check of enforcement discretion. That is a recipe for regulatory disaster.

### B. These inherent uncertainties in SB-822 tip the equities overwhelmingly in plaintiffs' favor.

The hopeless ambiguities of California's law, regarding both its substantive scope and its territorial effect, only underscore that plaintiffs satisfy each factor for obtaining a preliminary injunction. In the face of amorphous and open-ended prohibitions in the Nation's largest State, many providers will likely err on the side of caution before launching new services, directly undermining the FCC's goals of promoting innovative new services and maintaining a "light touch" nationwide. And, as explained, there is no principled or workable way to limit the statute's reach to internet traffic "in California" and the statute includes a definition of broadband Internet access service that makes no attempt to do so.

Even more fundamentally, the complexity and uncertainty of the legal regime that California has created underscore why the equitable factors strongly favor plaintiffs. The Internet is an indispensable component of the stream of commerce, and the constant innovation occurring in this sector has been a boon to consumers and businesses alike. It would be profoundly inequitable to force internet providers to come into near-immediate compliance with an onerous and ambiguous series of rules that the FCC has determined (in a 200-page order) to be excessively burdensome and unnecessary. And that is doubly true when the challenged rules cannot in any meaningful way be limited to California. The most prudent way forward is to freeze the status quo and preliminarily enjoin SB-822 to ensure that, while this litigation proceeds, companies will not need to come into compliance with its standardless mandates.

The Ninth Circuit's decision in *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), is instructive. In that case, industry associations sought to challenge state and local policies that imposed requirements on truck operators at certain ports. The Ninth Circuit found that those requirements were likely preempted by federal law. *Id.* at 1053-57. The court further found that the requirements for a preliminary injunction were satisfied. As long as the challenged policies were in effect, the Ninth Circuit reasoned, the associations' members were forced to either discontinue doing business at the ports or else "disrupt and change the whole nature of their business in ways that most likely cannot be compensated with damages alone." *Id.* at 1058. If the challenged laws "were then held to be unconstitutional, [businesses] would be faced with either continuing in that form, or, to the extent [they] could, unwinding that and returning to the old form." *Id.*

So too here. The communications industry has already faced major changes at the federal level with the 2015 enactment, and 2018 repeal, of the FCC's nationwide net-neutrality rules. It would be flatly contrary to the public interest to force that industry to come into compliance with a sweeping yet vague state-level regulatory scheme while this litigation proceeds to a final decision. The far better course is to enter a preliminary injunction and freeze the regulatory status quo until this case can be litigated to completion on the merits.

Finally, preliminary injunctive relief is imperative because other States have also sought to impose *their own* net-neutrality regimes. *See Healy*, 491 U.S. at 336 (explaining that the practical effects of a challenged law "must be evaluated … by considering … what effect would arise if … every[] State adopted similar legislation"). In 2019 alone, legislators in 29 States introduced legislation that would impose a host of different net-neutrality mandates. *See* Nat'l Conf. of State Legislatures, *Net Neutrality Legislation in States* (Dec. 21, 2019), bit.ly/34c8nBh; *see also* ISPs First Amendment Compl. ¶ 75 (identifying nine States that have already enacted state-level net-neutrality regulations). It is difficult to imagine a development more harmful to the effective functioning of a *national* broadband system that pays no heed to state boundaries. The FCC's 2018 Order has given the industry "a good deal to digest over a relatively short period," and this Court should "promptly remove from the menu the [California law], a smuggled-in dish that is indigestible." *Spears v. United States*, 555 U.S. 261, 267 (2009).

**CONCLUSION**

For all these reasons, the Court should grant plaintiffs' renewed motion for preliminary injunction.

Respectfully submitted,

/s/ *Bryan K. Weir*
Bryan K. Weir, CA Bar # 310964
William S. Consovoy
Jeffrey M. Harris
Tiffany H. Bates
CONSOVOY MCCARTHY PARK PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the 15-page limit set forth in the Court's July 30, 2020 scheduling order.

Dated: August 19, 2020

/s/ *Bryan K. Weir*
Bryan K. Weir, CA Bar # 310964

**CERTIFICATE OF SERVICE**

I certify that on August 19, 2020, I electronically filed the foregoing via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ *Bryan K. Weir*
Bryan K. Weir, CA Bar # 310964