XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DECLARATION OF MAYOR LONDON N. BREED IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:    The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

I, London N. Breed, being duly sworn, declare:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in the above-captioned consolidated matters.

2. I am the Mayor of the City and County of San Francisco. As Mayor, one of my goals is to ensure that all residents of San Francisco have access to fast, affordable, and reliable broadband service. This is particularly important now during this pandemic as many San Franciscans are working at home while their children are distance learning. In addition, many residents, particularly our senior citizens, are increasing relying on the internet to obtain necessary medical care. To bridge the digital divide in San Francisco, I have initiated the Fiber to Housing program. The Mayor's Office of Housing and Community Development is working with the Department of Technology and Monkeybrains, a local internet provider, to bring free high-speed internet service to residents in affordable housing.

3. The net neutrality law adopted by the State of California in Senate Bill 822 will help local governments deliver essential services to residents. Local governments increasingly rely on high-speed internet to deliver services ranging from public information, to telehealth, to public safety, to libraries. For now, our public schools are relying on distance learning to educate San Francisco's school-aged children. These services are only as reliable as the retail internet services used by local residents to access them. Blocking, throttling, paid prioritization, and other conduct that SB 822 prohibits could cripple these essential services.

4. The COVID-19 pandemic has illustrated how critical the internet has become for governments, education, employment, healthcare, culture, entertainment, and basic human interaction. Two specific examples of how retail internet access is foundational to the operation and delivery of municipal services concern public meetings and telehealth.

5. In response to the pandemic, on March 16, 2020 the San Francisco Health Officer, along with counterparts in five other Bay Area counties, issued the "Shelter in Place Order" which among other things prohibited public gatherings and closed City Hall for the purpose of

1

public meetings. This order prohibited the Board of Supervisors and other city boards and commissions from conducting public meetings in person.

6. In order to continue functioning in an open and public manner, the City has been conducting these meetings virtually. As a result, the eleven member Board of Supervisors, the Clerk of the Board, city staff participating in the meetings, and citizens interested in listening to the meeting or exercising their rights to petition the government by making comments during the meeting must rely on their residential internet access service. The same is true for the many city commissions that hold public meetings including the Planning Commission and the Police Commission. Between March 23 and June 30, the City has conducted 168 virtual meetings over 428 hours. Given the increased transparency and access afforded by the virtual meetings, we expect the reliance on virtual connections to continue.

7. The San Francisco Department of Public Health ("SFDPH") has also come to depend on reliable retail broadband service to provide telemedicine to ambulatory care patients and to establish field clinics. SFDPH provides primary and specialty care to nearly 90,000 patients through a network of community clinics. Due the COVID-19 emergency, SFDPH drastically reduced the hours and availability of services provided through these clinics.

8. Consequently, SFDPH had to increase its reliance on telemedicine for continuity of medical care for its existing caseload as well as for new patients infected with COVID-19. To stay in touch with their health care providers, patients depend on reliable, robust retail broadband services. In addition, SFDPH rapidly deployed medical clinics and isolation shelters, which require high-speed connectivity to access information and requests for new service. While these facilities are often in remote locations with limited communications, San Francisco successfully deployed mobile Wi-Fi hotpot devices to provide the needed connectivity with minimal setup.

9. SB 822's protections will ensure that San Francisco can continue to rely on an open internet to deliver critical services to residents. Internet traffic for civic purposes would be at a disadvantage without SB 822's protections. Allowing internet service providers to create enhanced treatment based on economic considerations, such as paid prioritization and zero

2

Declaration of Mayor London N. Breed in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

rating, degrades public uses. These schemes, if not prohibited, would inhibit participation in public processes, access to health care and the ability of low-income residents to participate fully in today's economy.

10. San Francisco's concerns are not unique. In 2014, the United States Conference of Mayors adopted a resolution introduced by former San Francisco Mayor Edwin Lee in which the Nation's mayors for the first time recognized the importance of net neutrality for the economic well-being of cities. The resolution advocated for strong net-neutrality protections at the federal level. A copy of the resolution is attached as Exhibit A to this declaration.

11. Distance learning is another area where the COVID-19 pandemic demonstrates the need for an open internet to deliver vital services to the community. When San Francisco's Shelter in Place order was issued in March, the San Francisco Unified School District ("SFUSD") closed all of its schools. Since then, the SFUSD has relied entirely on distance learning to reach its 57,000 students. Currently, all students and teachers from kindergarten to twelfth grade depend on an internet connection to conduct and attend school.

12. The City has been assisting SFUSD in reaching vulnerable, low-income students by, among other things, accelerating the expansion of the Fiber to Housing program in affordable housing complexes with high numbers of public school students. The majority of SFUSD students and teachers rely on standard residential internet service to participate in school. This requires a bandwidth intensive, two-way video communication that taxes the upstream capacity from the communications networks that are used to reach a majority of home users. (Most home internet access in San Francisco uses a hybrid fiber coax cable modem service or digital subscriber line service, both of which have bandwidth constraints for upstream traffic.) With distance learning, a quality educational experience demands a quality broadband internet connection. Practices that would de-prioritize standard home internet access could limit the educational experience of many of San Francisco's schoolchildren.

13. Finally, when San Francisco explored the possibility of a municipal telecommunications network (called FiberSF) one of the central motivations of that initiative was

3

to ensure that all users enjoy the content and services of their choice over the San Francisco's network. San Francisco intended to require network operators to adhere to net neutrality principles at all levels of service, including both wholesale and retail, and for all types of services, including voice, video, and data.

14. The COVID-19 pandemic has taught us the importance of planning for unfamiliar, but foreseeable threats. It has shown us that market forces and voluntary pledges are insufficient guarantees of the robust and reliable communication platforms cities need to provide services to the public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 16, 2020, at San Francisco, California.

*[signature: London Breed]*

_____
London N. Breed
Mayor, City and County of San Francisco

4

Declaration of Mayor London N. Breed in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

# EXHIBIT A

## PRESERVING A FREE AND OPEN INTERNET

**WHEREAS**, Since its inception, the Internet has existed based on principles of freedom and openness, core values that have made it the most powerful communication medium ever known; and

**WHEREAS**, The FCC is currently debating how to enshrine these Open Internet Principles into 21st century regulation; and

**WHEREAS**, the U.S. Court of Appeals in Washington, D.C. in 2010 determined that the long-observed Open Internet Principles of nondiscrimination, nonblocking, and transparency, described below, should not be declared in an FCC Policy Statement, but instead should be enshrined in a formal rulemaking seeking to reinstate those principles; and

**WHEREAS**, the FCC issued its Open Internet Order, reinstating these rules for preserving a free and open internet, on December 23, 2010, formalizing the three basic protections: transparency, no blocking of lawful content and no unreasonable discrimination of network traffic; and these rules were made effective November 20, 2011; and

**WHEREAS**, these rules enshrine the values of what is commonly referred to as net neutrality; and

**WHEREAS**, the first principle of the Open Internet Order states that fixed and mobile broadband providers must publicly disclose accurate information regarding network management practices, performance characteristics, and commercial terms of their broadband services; and

**WHEREAS**, the second principle states that fixed broadband providers may not block lawful content, applications, services, or non-harmful devices; mobile broadband providers may not block lawful websites, or block applications that compete with their voice or video telephony services; and

**WHEREAS**, the third principle states that unreasonable discrimination shall not be permitted, that fixed broadband providers may not unreasonably discriminate in transmitting lawful network traffic; and

**WHEREAS**, these principles, applied with the complementary principle of reasonable network management, guarantee that the freedom and openness that previously enabled the internet to flourish as an engine for creativity and commerce under the protection of the original policy statement will continue, providing greater certainty and predictability to citizens, consumers, innovators, investors, and broadband providers, while retaining the flexibility providers need to effectively manage their networks; and

**WHEREAS**, since the beginning of the internet, broadband internet access services have continued to invest in a single infrastructure which has increased average speeds for all users across our nation, without resorting to the practice of prioritization for users who can afford to pay the most; and

**WHEREAS**, online companies, or edge providers, have also invested in new innovative products and services that have driven economic growth and consumer demand for improved internet services and faster speeds from broadband internet access providers; and

**WHEREAS**, the dual investment of broadband Internet access service providers and edge providers has fostered a virtuous cycle of investment and innovation online; and

**WHEREAS**, two key rules of the three rules comprising the Open Internet Order, one pertaining to no blocking and another pertaining to no unreasonable discrimination, were again vacated on January 14, 2014 by the U.S. Court of Appeals in Washington, D.C. in the Verizon Communications Inc. v. Federal Communications Commission (2014), ruling that the FCC has no authority to enforce these rules; and

**WHEREAS**, the FCC on May 15, 2014, voted 3-2 to open the process of public comment on their proposed net neutrality rules that could in some circumstances allow paid prioritization of internet traffic based on a commercially reasonable standard; and

**WHEREAS**, paid prioritization under a commercially reasonable standard allows paid prioritization that has heretofore been understood to be unjust and unreasonable; and

**WHEREAS**, unreasonable paid prioritization is antithetical to a neutral Internet, and nondiscrimination is an inherent and indivisible characteristic of net neutrality; and

**WHEREAS**, all data on the Internet should be treated equally, not discriminating or charging differentially by user, content, site, platform, application, type of attached equipment, and modes of communication; and

**WHEREAS**, innovation relies on a free and open Internet that does not allow individual arrangements for priority treatment over broadband Internet access service; and

**WHEREAS**, preventing access to any lawful websites, slowing speeds for services, or redirecting users from one website to a competing website creates asymmetrical access which is antithetical to an Open Internet; and

**WHEREAS**, startups are the engine of an innovation economy, yet may not have the cash flow to pay for paid prioritization, and will therefore be unable to compete with large companies to deliver content to customers, impeding startup growth, thus limiting economic development and the creation of jobs; now

**THEREFORE, BE IT RESOLVED**, that the US Conference of Mayors supports a free and open internet as outlined in the FCC's original Open Internet Order; and

**BE IT FURTHER RESOLVED**, that the US Conference of Mayors supports comprehensive nondiscrimination as a key principle for any FCC rulemaking; and

**BE IT FURTHER RESOLVED**, that the US Conference of Mayors supports securing a commitment to transparency and the free flow of information over the internet, including no blocking of lawful websites and no unreasonable discrimination of lawful network traffic; and

**BE IT FURTHER RESOLVED**, that the US Conference of Mayors calls on the White House to offer their support of these principles; and

**BE IT FURTHER RESOLVED**, that the US Conference of Mayors calls on Congress to offer their support of these principles and if necessary use their lawmaking power to enshrine access to a free and open Internet and give the FCC a clear mandate.

**BE IT FURTHER RESOLVED**, that the US Conference of Mayors recommends that the FCC preempt state barriers to municipal broadband service as a significant limitation to competition in the provision of Internet access.