XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>                  Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>                  Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DECLARATION OF SCOTT JORDAN IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:     The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>                  Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>                  Defendant. | |

1

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

I, SCOTT JORDAN, hereby declare and state as follows:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in these consolidated matters.

2. I am a Professor of Computer Science at the University of California, Irvine.[1] I served as the Federal Communication Commission's Chief Technologist from September 2014 through December 2016. In that position, I worked extensively on the FCC's 2015 *Open Internet Order*. I also worked on the analysis of interconnection and traffic exchange, and the related merger conditions, that featured prominently in the FCC's reviews of three proposed mergers: AT&T and DIRECTV, Comcast and Time Warner Cable, and Charter and Time Warner Cable. I also worked on the FCC Wireless Telecommunication Bureau's *Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero-Rated Content and Services*. I was the senior technologist advising on all of these issues. My research has focused on technological aspects of networking since the 1980s, and on net neutrality issues since 2006. I have published over 100 peer-reviewed articles on related topics.

3. Contrary to the assertions of the large broadband Internet access service providers (henceforth "broadband providers"), it is technologically feasible for a broadband provider to comply with net neutrality requirements, such as those codified in SB 822, in one state and not in another. This is true for blocking, application-specific discrimination, prioritization, zero-rating and traffic exchange.[2]

4. **Internet architecture.** When a user[3] transmits and/or receives a communication or some content over the Internet, the whole communication or content is first broken down into units, with each unit called a data packet. The user's broadband provider transmits each data packet between the user's residence or mobile device and either the party with which the user is communicating (e.g., another person or a content provider) or another network operator.

---

[1] This declaration does not represent the views of the University of California.
[2] I do not opine here on the effect on the public interest from such network practices.
[3] A broadband customer is the person who subscribes to the broadband service. A broadband user is any person who uses that broadband service.

2

5.  If the user and the party communicating are both customers of the same broadband provider, then all the data packets constituting the communication or content almost always travel entirely over that broadband provider's network.  If, however, the party with whom the user is communicating is not a customer of the user's broadband provider, the data packets travel through the network of the user's broadband provider to an interconnection point, where they are delivered to another network operator.  That network operator will either hand off the data packets to yet another network operator or deliver them to their final destination, where they are reassembled to become the whole communication or content.

6.  A broadband provider's network is made up of two different types of networks: multiple access networks and a backbone network.  Each of a particular broadband provider's access networks connects that provider's customers within a particular geographical area to that broadband provider.  A particular broadband provider's backbone network, on the other hand, connects the multiple access networks of that broadband provider's to each other.  A particular broadband provider's backbone network also connects that broadband provider's network to those of other network operators via interconnection points.  Note that a backbone network does not connect directly to a user.

7.  To arrive at an interconnection point, each data packet a user sends passes through the access network operated by the user's broadband provider in the user's geographical area, and then passes through a portion of that broadband provider's backbone network.  It is important to note that the only way for data to travel between a user's computer or mobile device and an interconnection point is via the access network and backbone network of that user's broadband provider.  Although there are alternative routes for Internet traffic to travel between the various backbone networks of various network operators, there is no path to or from a user other than through the user's broadband provider.

8.  For example, suppose that a broadband customer in California wants to talk via Skype with a broadband customer in New York.  The broadband customer in California would open the Skype application and select the person that he or she wants to talk to.  When the call starts, the California person's speech (having been packaged into data packets) would travel through the

3

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

access network operated by the California customer's broadband provider in the California customer's geographical area to the broadband provider's backbone network. Those data packets would then continue via the backbone network to an interconnection point, where they would move into another provider's network. The data packets would then travel via that network, operated by either an Internet transit provider or another broadband provider, toward New York. The data packets could change networks again, but ultimately will be delivered to the Skype application of the person in New York by that person's broadband provider. This process will be reversed in order for the New York person's voice to be transmitted to the California person.

9. The vast majority of Internet traffic to and from California users is either (1) transmitted to and from other parties in California or (2) passes through an interconnection point within California. For example, Comcast states in its declaration that it interconnects at four backbone interconnection points in California (Declaration of Ken Klaer of Comcast, henceforth "Comcast Declaration", ¶5). San Francisco and Los Angeles are among the ten largest backbone interconnection points in the United States.

10. For users in California, it is exceedingly likely that a user's access network lies entirely within California. It is also very likely that the portion of a broadband provider's backbone network in between a user's access network and the closest backbone interconnection point lies entirely within California.

11. **Internet Protocol Addresses and Geographical Location.** Each computer, smartphone, or other device connected to the Internet is assigned an Internet Protocol (IP) address. Broadband providers use IP addresses to route Internet traffic to the correct location. Each broadband provider assigns an IP address to each of its customers' modems (e.g., cable modem, DSL modem, or smartphone), such that each customer can be identified by a unique IP address.[4]

---

[4] For simplicity of presentation, this declaration assumes that the IP address assigned to a customer's modem is a "public" IP address, meaning that the IP address uniquely identifies the customer's modem. However, in some cases, a broadband provider may assign both a public IP address that identifies the geographical region in which the user's modem is located and another number called a "port" that identifies that user's modem within that geographical region. In that case, it is the combination of the public IP address and the port that uniquely identifies the user's

(continued…)

4

12. Within each access network, the IP addresses assigned to broadband customers are selected from a range of IP addresses associated specifically with that broadband provider and that access network. This means that consecutive IP addresses are clustered together geographically, and that the range of IP addresses assigned within one access network does not overlap with the range of IP addresses assigned within another access network. Thus, a broadband provider can easily identify the geographical location of an IP address (and, by extension, the customer).[5] Indeed, some third-party providers use IP addresses to identify the geographical location of users down to areas as small as a city, even without the benefit of the information that a broadband provider has about the location of its customers.

13. **Ability to block, throttle, and prioritize.** The ability of a broadband provider to determine the content, application, or service being carried by Internet traffic increased dramatically in the mid-1990s with the introduction of network equipment that allows a broadband provider to look into data packets and determine the content, application, or service, e.g. web browsing or email. The routers and other network equipment used by broadband providers examine the destination IP address of each packet in order to determine where to route that packet. Today, this network equipment is also capable of determining whether to block, throttle, or prioritize each packet based on the content, application, or service. This technology, which broadband providers have now implemented, allows them to differentiate Internet traffic not only for network management purposes, but also to engage in blocking, throttling, or paid prioritization of certain Internet traffic for other purposes. As I discuss further below, this network equipment is similarly capable of determining whether to block, throttle, or prioritize each packet based on the source and destination IP addresses in that packet.

14. **Blocking.** Internet blocking is a technical network practice by which broadband providers can restrict access to certain content, applications, services, or devices. Network

---

modem. This alternate system of assigning IP addresses does not substantially affect the ensuing discussion of IP addresses in this declaration.

[5] In fixed broadband service, the geographical location is the location of the residence. In mobile broadband service, the geographical location is the location of the smartphone. Mobile broadband providers dynamically track the geographical location of users when traveling outside their home region.

5

devices such as routers can block data based on its content, its application, the device used, or the IP address of the sender or recipient.

15. It is both possible and practical for a broadband provider to engage in blocking of lawful content, applications, services, or nonharmful devices for customers outside California but not for customers inside California. There are two different ways this can be achieved.

16. First, if a broadband provider chooses to implement a network practice that blocks lawful content, applications, services, or devices for customers outside California, then it could simply implement that network practice in the state in which the customer resides, but refrain from implementing it in California. For example, in 2007 Comcast blocked a specific application—BitTorrent. Comcast implemented this blocking practice by interrupting the Internet traffic within each customer's access network to and from this application. When a broadband provider implements blocking only for customers inside an access network (which in turn corresponds to a specific geographic area), this type of blocking would not affect customers outside the neighborhood in which the broadband provider implemented it.

17. Alternatively, a broadband provider could implement a blocking network practice anywhere in its network (not just in the customer's local access network), but could simply refrain from applying that practice to packets to or from customers in California. Currently, such blocking practices would likely be implemented only at the request of the user or based on the user's service plan (though this may change in the absence of net neutrality protections). As a technological matter, a broadband provider could implement such a blocking practice by blocking content, applications, or services flowing to or from the IP addresses associated with such users. The network equipment used by broadband providers to implement such network practices is capable of blocking traffic only to or from selected IP addresses (and thus customers) and not others. For example, a broadband provider could block data packets carrying a webpage from the New York Times traveling to a customer in Texas, but could refrain from blocking New York Times packets to customers in California. Thus, a broadband provider could easily block only selected traffic directed to or sent from non-California IP addresses.

6

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

18. **Application-specific discrimination.** Application-specific discrimination occurs when a broadband provider impairs or degrades lawful Internet traffic on the basis of Internet content, application, service, or non-harmful device. Application-specific discrimination includes both negative differentiation (often called application-specific throttling, e.g. slowing down the transmission of packets from a specific website, but not others) and positive differentiation (e.g. speeding up the transmission of packets from a particular website, but not others). It includes both differentiation based on the application (e.g. Skype) and differentiation based on the class of application (e.g. video chat programs).

19. The most common example today of application-specific discrimination is implemented by mobile broadband providers who offer so-called "unlimited data" plans but then "throttle" or limit video to specified downstream speeds. For example, Verizon's Start Unlimited data plan offers what Verizon advertises as "unlimited 4G LTE … data", but under this plan Verizon throttles video to much lower than 4G LTE download speeds, while other traffic is transmitted at 4G LTE download speeds. Absent net neutrality protections[6], broadband providers will be permitted to throttle the data transmissions of specific content, applications or services, regardless of whether the purpose is related to reasonable network management.

20. As with blocking, it is both possible and practical for a broadband provider to engage in application-specific discrimination for customers outside California but not for customers inside California. There are two different ways this can be achieved.

21. First, if a broadband provider chooses to engage in application-specific discrimination for customers outside California, then it could simply implement that network practice in the state in which the customer resides, but not in California. Technology that implements application-specific discrimination locally is available today. As a technological matter, when a broadband provider uses application-specific discrimination, the practice is often implemented inside the customer's access network in order to reduce the amount of traffic passing through the access

---

[6] I do not opine here on how net neutrality protections would be applied to various examples mentioned in this declaration, including what constitutes reasonable network management, other than to illustrate the technical feasibility of implementing network practices for some customers but not for others.

7

network. As mentioned above, some mobile broadband providers offer so-called "unlimited data" plans, but then throttle video to downstream speeds that are much lower than speeds allowed to traffic from other types of applications. This throttling is implemented locally, in the access network that connects a set of cellular base stations to the wired network. The effect of this throttling is to reduce the traffic passing over the cellular network's airwaves. Since the throttling is implemented in the access network, it would not be a problem to implement the throttling only in access networks outside of California, but not in access networks in California, if a broadband provider wanted to do so.

22. In other cases, throttling is implemented in a specific geographic area for traffic to or from certain IP addresses. For example, under some mobile plans, Internet traffic to or from a customer who has exceeded a monthly data quota is given a lower priority when the cell site in which the customer is located is congested. For example, on most T-Mobile-branded plans, T-Mobile deprioritizes the Internet traffic of customers who use more than 50GB of data in a billing cycle, which results in slower data speeds at times and locations where there are competing customer demands for network resources. Thus, these customers will be subject to discrimination when they are in a congested cell site, but not when they are in an uncongested cell site. In the same way, a broadband provider could choose to implement application-based discrimination in cell sites located outside of California, but not in cell sites in California.

23. Because this type of application-specific discrimination is implemented only for customers inside specific access networks, it would not affect customers outside the geographic areas covered by the access networks in which the broadband provider implemented it.

24. Alternatively, a broadband provider could implement an application-specific discrimination network practice anywhere in its network (as opposed to only in the customer's local access network), but could simply refrain from applying that practice to customers in California. Similar to blocking practices, such application-specific discrimination practices are currently likely be implemented only at the request of the user or based on the user's service plan (though this may change in the absence of net neutrality protections). As a technological matter, a broadband provider is able to discriminate among traffic flowing to or from the IP addresses

8

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

associated with specific users. For example, T-Mobile's Binge On network practice allows a customer to choose whether he or she wishes to have streamed video throttled to a much lower speed (1.5 Mbps) than it would normally be transmitted at. A T-Mobile customer who subscribes to a qualifying plan may toggle this feature on or off at any time. T-Mobile applies this application-based discrimination only to those customers who have not toggled this feature off. The same approach could be used to apply an application-specific discriminatory practice to the traffic to and from customers outside of California, but not to traffic to and from customers in California. For example, a broadband provider could throttle video packets traveling to or from a customer in Texas, but could refrain from throttling video packets traveling to or from customers in California. Thus, a broadband provider could easily throttle only selected traffic directed to or sent from non-California IP addresses.

25. **Reasonable network management.** As Cox acknowledges in its declaration (Declaration of Guy McCormick, henceforth "Cox Declaration", ¶¶ 17, 20), there is an exception for reasonable network management in SB 822's prohibition on blocking of lawful content, applications, services, or nonharmful devices, as well as in SB 822's prohibition on impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device. The same exception for reasonable network management applies to SB 822's prohibition on unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users.

26. Congestion management practices are ubiquitous in the Internet. A subscriber's download and upload speeds are commonly limited by a broadband provider based on each subscriber's service plan. In addition, most applications utilize one of the Internet's most fundamental protocols, the Transmission Control Protocol (TCP), which dynamically adjusts the download and upload rates of the application to manage congestion. Neither of these two approaches involve a broadband provider managing congestion on the basis of Internet content,

9

1 application, service, or use of a nonharmful device. Thus, these two approaches are application-
2 agnostic.

3     27. Nevertheless, if a broadband provider believes that these application-agnostic
4 congestion management practices are insufficient, and wishes to implement a congestion
5 management practice on the basis of Internet content, application, service, or use of a nonharmful
6 device, then under SB 822 that congestion management practice qualifies as a reasonable network
7 management practice if it has a primarily technical network management justification (e.g.,
8 congestion management), if it is primarily used for and tailored to achieving that network
9 management purpose, and if it is as application-agnostic as possible.

10     28. **Paid prioritization.** Paid prioritization is the practice of a broadband provider
11 preferring its own content or that of a paid partner over other traffic, including delivering the
12 favored content with faster speeds (i.e., more bandwidth) or lower latency (i.e., fewer delays in
13 data transmission).

14     29. It is also both possible and practical for a broadband provider to engage in paid
15 prioritization for customers outside California but not for customers inside California. There are
16 two different ways this can be achieved.

17     30. First, if a broadband provider chooses to implement paid prioritization for customers
18 outside California, then it could simply implement that network practice in the state in which the
19 customer resides, without implementing it in California. Technology that implements
20 prioritization locally is available and used by broadband providers today. Currently, when a
21 broadband provider prioritizes some traffic over other traffic, such prioritization is often
22 implemented inside the customer's access network, i.e., in the geographical neighborhood in
23 which the customer is located. This ensures that the prioritized traffic obtains the desired
24 performance in the access network, which is the most frequent location of network congestion.
25 The most common example of prioritization today is cable broadband providers' prioritization of
26 the voice traffic of their landline telephone service subscribers.[7] This form of prioritization is

---

[7] Such landline telephone traffic may not, however, be classified as Internet traffic.

10

implemented locally and so does not affect customers outside the neighborhood in which the broadband provider implemented it.

31. As an alternative to implementing paid prioritization locally, a broadband provider could implement prioritization anywhere in its network and simply refrain from applying that prioritization to traffic going to or from customers in California. The network equipment used by broadband providers to implement other prioritization practices is capable of prioritizing traffic to or from only selected IP addresses (and thus customers) and not others. For example, a broadband provider could prioritize its own video packets traveling to customers in Texas, but could refrain from prioritizing its own video packets to customers in California. Thus, a broadband provider could easily prioritize only selected traffic directed to or sent from non-California IP addresses.

32. **Zero rating.** Zero rating is the practice of a broadband provider exempting some data from counting against a user's monthly data cap, while counting all other data against that data cap.

33. Several large broadband providers now exempt certain streaming video content (often content offered by the broadband provider or an affiliated company) from a user's monthly data cap. For example, AT&T by default zero rates its affiliated DIRECTV programming for its mobile broadband customers on qualifying plans.

34. Other broadband providers now exempt streaming video content based on the customer's service plan. For example, T-Mobile's Binge On network practice by default zero rates certain video on specified qualifying service plans.

35. It is both possible and practical for a broadband provider to engage in zero rating for customers outside California in a manner that would not apply to customers inside California. Unlike blocking, throttling or prioritization, zero rating does not affect the flow of network traffic. Instead, zero rating only requires measurement of the data usage of a customer, and the exemption of particular traffic from that measurement. Thus, a broadband provider may engage in zero rating for customers outside California in a manner that would not apply to customers inside California by exempting particular traffic from the measurement of the data usage of

11

customers outside California but not from the measurement of the data usage of customers in California.

36. Broadband providers already have the ability to zero rate specific content for some customers but not for others. For example, T-Mobile's Binge On network practice zero rates video from participating streaming services only for subscribers on qualifying plans who have not toggled this feature off. As a result, for these subscribers, watching videos from participating streaming services does not count against their data caps, whereas for other T-Mobile subscribers, it does. It is both possible and practical for T-Mobile to disable zero rating for customers in California, just as it does for customers on non-qualifying service plans and as it does for customers on qualifying plans who have toggled off Binge On.

37. As another example, AT&T zero rates data from services participating in AT&T's Sponsored Data (which includes its affiliated DIRECTV programming) only for subscribers on qualifying plans who have not toggled this feature off. It is both possible and practical for AT&T to disable zero rating for customers in California, just as it does for customers on non-qualifying plans and as it does for customers on qualifying plans who have toggled off Sponsored Data.

38. **Compliance with multiple state net neutrality laws.** Comcast states that "it will be impossible for Comcast to apply California's requirements to Internet packets as they move through California, and then to apply New York's requirements when those packets travel through New York" (Comcast Declaration ¶37). That is not correct. For example, Comcast seems to imply (although it doesn't explicitly state) that it is impossible for Comcast to simultaneously comply with SB 822's prohibition on unreasonably interfering with an end user's ability to select, access, and use the lawful Internet content and applications of the end user's choice and with New York's prohibition on requiring that end users pay different or higher rates to access specific types of content or applications. However, the New York executive order only governs how it can charge its broadband customers in New York, and SB 822's requirements only govern how it could charge its customers in California. Comcast can charge its customers in New York in one manner and its customers in California in a different manner, just as it already does today.

12

39. **Traffic exchange.** As explained above, when a user transmits and/or receives communications or content over the Internet, and when the party with which the user is communicating is not a customer of the same broadband provider, then that user's broadband provider transmits that Internet traffic between the user's residence or mobile device and another network operator. The other network operator may be another broadband provider, a transit provider, a content provider, or a content delivery network (CDN).

40. Traffic exchange service may consist of either peering service or transit service. In peering service, the interconnecting parties agree to accept and deliver Internet traffic from each other that is destined to their own customers. In transit service, the transit provider agrees to accept and deliver Internet traffic to all Internet destinations, regardless of whether those destinations are transit provider customers.

41. When a broadband provider interconnects with another network operator, it necessarily agrees, at a minimum, to transport traffic between its own customers and a backbone interconnection point of its choice. The interconnection point used in such agreements is often that nearest to the customer. In this declaration, I call this service local delivery.[8] For example, for a Comcast customer in Los Angeles, the Comcast interconnection point that is closest to that customer is in Los Angeles. In this example, local delivery would be Comcast transporting data packets over its own network between the customer in Los Angeles and the interconnection point in Los Angeles.

42. Local delivery must be a component of traffic exchange with a broadband provider, because there is no path to or from a user other than through the user's broadband provider. Only the user's broadband provider can deliver data between the user and an interconnection point. Thus, a broadband provider has a monopoly (often called a "terminating access monopoly") over access to its users.

43. When a broadband provider interconnects with another network operator, it may or may not also agree to transport traffic between the backbone interconnection point of its choice

---

[8] The concept of local delivery is well recognized in industry. However, there is no well-accepted term of art for it.

13

and other backbone interconnection points within its network. This allows for alternate routes between the edge provider[9] and the broadband providers' backbone network. In this declaration, I call this service long-distance delivery.[10] For example, consider a Comcast customer in Los Angeles who is retrieving content from a website located in New York. In this example, if Comcast not only carries that traffic between the customer and the Los Angeles interconnection point (i.e., local delivery), but also carries that traffic between the Los Angeles interconnection point and an interconnection point in New York, then the portion of the route between Los Angeles and New York is long distance delivery.

44. Long-distance delivery is an optional component of traffic exchange with a broadband provider, because there are alternate paths from competing providers between various backbone interconnection points. For example, a transit provider may offer to transmit traffic between the backbone interconnection point closest to a consumer and the backbone interconnection point closest to the edge provider. AT&T states that such "third-party arrangements provide multiple alternative paths into any ISP's network" (Declaration of Michael D. Paradise of AT&T, henceforth "AT&T Declaration", ¶22). The existence of multiple alternate paths provides an opportunity for a competitive market for long-distance delivery, but not for local delivery (see ¶42 above). In the example described in the previous paragraph, other network operators are able to transport traffic over their own networks between Comcast's interconnection point in New York and Comcast's interconnection point in Los Angeles (the long distance delivery part of the route); however, only Comcast can transport the packet over its own network between the Los Angeles interconnection point and the Comcast customer (the local delivery part of the route).

45. **Traffic exchange agreements.** Traffic exchange agreements specify the terms under which two network operators interconnect. The two parties may provide each other traffic exchange without charge, or one party may charge the other party based on service provided

---

[9] An edge provider is an entity that provides content, an application, or a service, e.g., Netflix or YouTube.

[10] The concept of long-distance delivery is well recognized in industry. However, there is no well-accepted term of art for it.

14

(including whether it includes long-distance delivery) and on the volume and characteristics of the traffic exchanged between their networks. There are at least three common types of traffic exchange agreements for peering service.

46. The first type only offers local delivery. An edge provider, CDN, or other network operator agrees to exchange all traffic to and from the broadband provider's customers at interconnection points chosen by the broadband provider. Commonly, the broadband provider requires that traffic be delivered to the backbone interconnection point closest to each customer, and the parties agree to exchange traffic at a specified minimum number of backbone interconnection points. For instance, Comcast states that its settlement-free interconnection agreements require interconnection at a minimum of four geographically diverse interconnection points (Comcast Declaration ¶15). The combination of requirements to interconnect at a specified minimum number of backbone interconnection points and to deliver traffic to the backbone interconnection point closest to each customer ensures that the broadband provider need not transport the traffic across a long distance. This type of peering agreement therefore only offers local delivery.

47. As discussed above, San Francisco and Los Angeles are among the ten largest backbone interconnection points in the United States. The vast majority of Internet traffic to and from California users is either (1) transmitted to and from other parties in California or (2) passes through an interconnection point within California. Therefore, when a broadband provider and an edge provider have a peering agreement in which the edge provider agrees to exchange all traffic to and from the broadband provider's customers at interconnection points chosen by the broadband provider, the practical effect is that Internet traffic delivered under such an agreement to a customer located in California is very likely exchanged at an interconnection point located in California.

48. The second common type of peering agreement offers both local and long-distance delivery. The edge provider, CDN, or other network operator (rather than the broadband provider) selects the interconnection points for the exchange of traffic. Under this type of agreement, commonly, an edge provider may choose interconnection points closest to the edge

15

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

provider's servers, which may not be the interconnection points closest to each customer. It typically allows an edge provider to exchange traffic at only a few interconnection points—in some cases at only a single interconnection point. Such an arrangement requires that the broadband provider transport the traffic across a long distance. For instance, Comcast states that it interconnects at fourteen backbone interconnection points outside California (Comcast Declaration ¶5). This type of peering agreement therefore offers both local and long-distance delivery.

49. The third common type of peering agreement offers local delivery plus a specified maximum amount of long-distance delivery. It is a hybrid of the first two types. An edge provider, CDN, or other network operator agrees to exchange a specified minimum percentage of traffic to and from the broadband provider's customers at interconnection points chosen by the broadband provider. Broadband providers measure the percentage of traffic exchanged at interconnection points closest to each consumer in order to enforce these agreements. As with the first type of peering agreement, it also typically includes an agreement to exchange traffic at a specified minimum number of backbone interconnection points. This type of peering agreement therefore offers local delivery plus a specified maximum amount of long-distance delivery.

50. **Paid traffic exchange agreements.** Comcast and AT&T have asserted that SB 822 may be interpreted to prohibit broadband providers from charging edge providers, CDNs, and other network operators for traffic exchange. I do not opine on that in this declaration.

51. However, it should be noted that, although AT&T asserts that "third-party CDNs have long compensated ISPs for direct interconnection" and that "compensation typically flows from a CDN-equipped content provider to any ISP that it directly interconnects with" (AT&T Declaration ¶19), there are many peering agreements between broadband providers and CDNs in which neither party pays the other. In fact, this is the most common type of peering agreement between broadband providers and CDNs or edge providers for all but the largest broadband providers. In addition, in the vast majority of interconnection agreements between broadband providers and transit providers, either no party pays the other or the broadband provider pays the transit provider.

16

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

52. If SB 822 were to be interpreted to prohibit certain forms of paid traffic exchange, it would be both possible and practical for a broadband provider to require consideration from an edge provider, CDN, or other network operator for traffic delivered to customers outside California but not for traffic delivered to customers inside California.

53. If a broadband provider chooses to charge an edge provider, CDN, or other network operator for traffic delivered to customers outside California, then it could simply measure the amount of traffic destined for customers outside California that is exchanged with an edge provider, CDN, or other network operator and determine any fees accordingly. This method is possible and practical. Broadband providers today that offer peering agreements in which an edge provider, CDN, or other network operator agrees to exchange a specified minimum percentage of traffic at interconnection points closest to each consumer already measure the percentage of exchanged traffic destined for each geographical region at their various interconnection points, in order to enforce these agreements. This same method of measurement can similarly be used to measure the amount of traffic exchanged with an edge provider, CDN, or other network operator that is destined for customers outside California.

54. This method does not require any modification of traffic routes or flows, including the interconnection points used. It is merely a billing issue. No reconfiguration of physical networks is required. And no new network infrastructure is required to stop charging edge providers, CDNs, or other network operators for delivery of traffic to customers in California. No separation or segregation of traffic is required. Only mere measurement of the volume of traffic destined for customers outside California is required.

55. Not charging edge providers, CDNs, or other network operators for delivery of traffic to customers in California would not affect traffic destined for customers outside California. This does not create any new rationale for edge providers, CDNs, or other network operators to route their traffic through California interconnection points, regardless of whether the traffic is destined for customers inside California. No such arbitrage is incentivized, since edge providers, CDNs, or other network operators could still be billed for traffic passing through California interconnection points to customers outside California.

17

56. **Physical interconnection costs.** Of course, before entering into any type of traffic exchange agreement, a broadband provider and an edge provider, CDN, or other network operator must first agree to establish a physical interconnection at the desired interconnection points. The cost of the equipment located at interconnection points constitutes a very small percentage of each party's costs for transporting traffic between the two parties. Overall costs are dominated by the costs of having and running content servers and transporting traffic across networks, rather than the cost of the physical equipment at interconnection points.

57. A broadband provider and an edge provider, CDN, or other network operator may agree to share the relatively small costs of the physical infrastructure at interconnection points. As Comcast states, "interconnecting parties often agree to share the costs of upgrading capacity at interconnection points …" (Comcast Declaration ¶13). This cost-sharing, when it occurs, is a mutual investment in network infrastructure that is prerequisite to any traffic exchange.

58. **Traffic ratios.** Peering agreements between a broadband provider and an edge provider, CDN, or another network operator may or may not include a charge for the traffic exchanged. When the two parties perceive an approximately equal value to the peering service they offer to one another, it is common for the peering agreement to be settlement-free (i.e., not to require payment from either party to the other).

59. When both network operators are in the primary business of selling broadband service to consumers, i.e. broadband Internet access service providers, they may perceive value by the amount of traffic exchanged and the distance each carries the traffic across their network. This is because a broadband Internet access service provider promises to its customers to deliver all Internet traffic requested by the customer, regardless of the location of the source of that traffic. Since no broadband Internet access service provider's network directly connects to the entire Internet, each broadband Internet access service provider must interconnect with other network operators to accomplish this promise. Thus, a broadband Internet access service provider may perceive the value of traffic exchange with another broadband Internet access service provider by the amount of traffic exchanged and the work the other does to carry exchanged traffic. Two broadband Internet access service providers may perceive equal value if each agrees to accept

18

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

roughly the same amount of traffic from the other and to deliver that traffic a similar average distance to their respective customers. If two broadband Internet access service providers exchange traffic and deliver it a similar average distance to their respective customers, the perception of approximately equal value between them is sometimes written into a traffic exchange agreement as a requirement that the traffic exchanged also be roughly balanced, see, e.g. AT&T Declaration ¶ 13.

60. However, traffic balance indicates value to each party only when the parties are in the same line of business. In contrast, traffic balance does not indicate anything about perceived value when one party is a broadband Internet access service provider and the other party is an edge provider or transit provider, since the two parties are in different lines of business and measure value in different ways. For example, whereas a broadband Internet access service provider promises to its customers to deliver all Internet traffic requested by the customer, regardless of the location of the source of that traffic, an edge provider often offers to its customers access to particular content. Whereas a broadband Internet access service provider measures the value of traffic exchange by the amount of traffic exchanged and the distance the other party carries that traffic, an edge provider often measures the value of traffic exchange by the number of its customers that the traffic exchange enables it to reach. The broadband Internet access service provider and the edge provider measure value in different ways, and consequently traffic balance is not relevant. Thus, although AT&T asserts that an imbalanced traffic ratio in traffic exchange between a broadband Internet access service provider and an edge provider or transit provider necessarily implies that the edge provider or transit provider should pay the broadband Internet access service provider (AT&T Declaration ¶13), an imbalanced traffic ratio when the parties are in different lines of business indicates no such thing.

19

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 14, 2020, at Irvine, California.

_____
Scott Jordan

20

Declaration of Scott Jordan in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)