XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>                        Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>                        Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DECLARATION OF ANGIE KRONENBERG IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:     The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>                        Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>                        Defendant. | |

I, Angie Kronenberg, hereby declare and state as follows:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in these consolidated matters.

2. I am the Chief Advocate and General Counsel of INCOMPAS. I have extensive experience working on open internet policy. I began working on this issue as an advisor to then-FCC Commissioner Mignon Clyburn during the FCC's open internet proceeding that resulted in the FCC's 2010 Open Internet Order, and I have represented INCOMPAS and its members on this issue since I joined the organization in June 2013.

3. INCOMPAS is the preeminent national industry association for providers of internet and competitive communications networks. We represent companies that provide competitive residential broadband Internet access service ("BIAS"), as well as other mass-market services, such as video programming distribution and voice services in urban, suburban, and rural areas, including small BIAS providers that offer service that is competitive to incumbents such as AT&T and Comcast. We also represent companies that are providing business broadband services to schools, libraries, hospitals and clinics, and businesses of all sizes. Finally, we represent transit and backbone providers that carry broadband and Internet traffic, and online content and video distributors ("OVDs") which offer video programming over BIAS to consumers, as well as online social media companies.[1]

4. INCOMPAS supports an open internet; has been an active participant in the FCC's open internet dockets and the resulting litigation in 2015 and following the FCC's repeal of net neutrality in 2018.[2] INCOMPAS also has participated in several large merger proceedings at the FCC, including the Comcast/Time Warner Cable, Charter/Time Warner Cable, and AT&T/DirecTV mergers wherein we expressed our concerns that the BIAS market is highly

---

[1] A list of INCOMPAS Members can be found at https://www.incompas.org/memberlist.asp?contentid=2109.

[2] INCOMPAS was formerly known as COMPTEL. COMPTEL rebranded to INCOMPAS in the fall of 2015.

1

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

concentrated and that large BIAS providers have economic incentives that do not align with the availability of an open internet, including through their practices at interconnection points with other networks and through internet traffic exchange. INCOMPAS' former[3] and current members have experienced congestion that large BIAS providers have permitted for purposes of extracting access fees or tolls from them.

5. While INCOMPAS does not have a formal position on SB 822, we appreciate the intent of SB 822: to protect consumers' access to an open internet, including the protections afforded to ensure that BIAS providers do not circumvent net neutrality protections by engaging in blocking and throttling of internet content at the interconnection points between their networks and the rest of the internet to exchange traffic—a practice that was adopted by several large BIAS providers before the FCC's *2015 Open Internet Order* in order to extract access fees (which were not related to the BIAS providers' costs) from transit providers, content delivery networks ("CDNs"), and internet content companies (also known as edge providers). I submit this declaration to refute AT&T's claims that the FCC has not intervened to protect consumers from the harms that large BIAS providers have engaged in with respect to their interconnection practices; to address the claims of AT&T and Comcast that transit providers, such as Cogent, caused congestion on their networks; and to address the claims that BIAS providers will be harmed if they are not permitted to charge transit providers, CDNs, and edge providers for interconnection and internet traffic exchange.

6. First, it is important to understand that interconnection and traffic exchange are central to the internet's functioning. Indeed, it is the interconnection and exchange of data between networks that enables internet users to reach all points on the internet, rather than just the resources and users on their own BIAS provider's network. When BIAS providers offer internet access service to consumers, they typically promise them the opportunity to reach all content on the internet with certain capacity. For example, the large BIAS providers serving residential

---

[3] Level 3 and Cogent were members of INCOMPAS during the Commission's 2015 proceeding, as well as during the large BIAS merger reviews. Level 3 was not eligible under the association's bylaws to renew its voting membership when it merged with CenturyLink. Cogent recently left the association's membership.

2

customers with wired service today commonly offer internet access speeds of 50 Mbps or more. As video content has become more widely available online, consumer demand for it has grown, and BIAS providers have marketed their BIAS service as capable of delivering that content to consumers at faster speeds—typically charging consumers higher prices for the higher speeds. Given that each of the large residential BIAS providers is also a large video content provider— what the FCC describes as a multichannel video programming distributors ("MVPD")—these providers' MVPD businesses are threatened by the online video streaming content that consumers are adopting.

7. Second, it is important to understand the functions of the different networks that make up the internet ecosystem. Some networks offer capability to transmit internet content, such as websites and video from one point on the globe to many other points (the transit and backbone marketplace); others offer to transmit and store content in geographic locations so that popular content need not traverse across the nation or globe when consumers request it (the CDN marketplace); and still others, sometimes referred to as last mile BIAS providers, offer residential and small business customers access to the internet and the content that flows over it. Transit and backbone networks, as well as CDNs, provide various ways for content providers to get their content to the doorstep of BIAS providers. The transit and backbone marketplace and CDN marketplace are more competitive than the last-mile BIAS marketplace—internet content (edge) providers generally have numerous choices to deliver their Internet traffic to large BIAS providers like AT&T and Comcast.

8. In contrast, there is only one type of provider that transmits Internet traffic across the BIAS provider's network to its subscribers, and that is the BIAS provider itself. This gives each BIAS provider exclusive control over access to its subscribers, often referred in the industry as a "terminating access monopoly."

9. The last mile residential BIAS marketplace is highly concentrated. About half of Americans today subscribe to broadband service with download speeds of 100 Mbps or above, yet 83% of the population either live in an area with no service or are served by a monopoly or

3

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

duopoly for that speed.[4]  Indeed, this estimate is based on the FCC's current Form 477 deployment data which is overly optimistic of consumer options, and that Congress passed a law earlier this year to rectify by requiring the FCC to gather more accurate broadband deployment information from industry.[5]

10.   Moreover, 77% of the residential last mile BIAS marketplace is only served by four companies, Comcast, AT&T, Charter (Spectrum), and Verizon (and, as just noted, very little head-to-head competition is occurring in the last mile BIAS marketplace).[6]  Thus, transit providers, CDNs, and edge providers face a highly concentrated marketplace in delivering internet traffic to last mile BIAS providers, and large BIAS providers have the ability, and have exercised that ability, to extract non-cost based fees from transit providers, CDNs, and edge providers.

11.   Comcast and AT&T's declarations create the impression that transit providers, CDNs and edge providers paying last-mile BIAS providers for interconnection is the norm, but that is not the case.  In fact, the overwhelming majority of BIAS providers either pay for transit service in order to connect with BIAS providers and the other networks that make up the internet, or they exchange traffic with BIAS providers without compensation (also known as peering or settlement free interconnection).  Only a small number of the very largest BIAS providers, including Comcast and AT&T, demand and extract payment for interconnection.[7]  As I explain below, these

---

[4] *See* Jonathan Sallet, *Broadband for America's Future: A Vision For The 2020s*, Benton Institute for Broadband & Society (Oct. 2019), at 46, *available at* https://www.benton.org/sites/default/files/BBA_full_F5_10.30.pdf (*citing* FCC's 2018 Communications Marketplace Report, Fig. D-3).  Mr. Sallet also discusses how competitive choices have generally been declining over the years as broadband technologies— and consumers' bandwidth requirements—have increased, and he cites OECD data that shows Americans pay some of the highest broadband prices in the world.

[5] Broadband Deployment Accuracy and Technology Availability Act, Pub. L. No. 116-130, 134 Stat. 228 (2020) (codified at 47 U.S.C. §§ 641-646).

[6] Leichtman Research Group, *About 1,165,000 Added Broadband in 1Q 2020: The Most Quarterly Broadband Additions Since 1Q 2015* (May 13, 2020), *available at* https://www.leichtmanresearch.com/about-1165000-added-broadband-in-1q-2020/.

[7] In the *Charter/Time Warner Cable Merger Order*, the FCC stated that five BIAS providers were charging for interconnection, including Comcast, AT&T, Time Warner Cable, Verizon, and CenturyLink.  *In the Matter of Applications of Charter Communications, Inc., Time Warner*

4

payments resulted in part from some large BIAS providers refusing to upgrade their interconnection capacity into their last mile BIAS networks as their customers were demanding more online content. Thus, paid interconnection arrangements with large BIAS providers are an exception and not the rule. And, contrary to the assertions of Comcast and AT&T, these arrangements are not the result of a well-functioning market. Indeed, the FCC aptly described this ability to control interconnection in the last mile networks in its Charter/Time Warner Cable Merger Order. There, the FCC stated:

> BIAS providers function as gatekeepers between their subscribers and the rest of the Internet; all traffic going to or from a subscriber must pass through the BIAS provider. Because of this gatekeeping role, BIAS providers with large numbers of subscribers have greater leverage to negotiate preferential terms and prices with edge providers seeking to reach those subscribers.[8]

**Large BIAS providers control access to their last-mile BIAS networks, and they have allowed for congestion into those networks to extract tolls.**

12.     Prior to the FCC's *2015 Open Internet Order*, several large BIAS providers, including Comcast, leveraged their control over access to their subscribers to extract terminating access fees or tolls from transit providers, CDNs, and edge providers. They did so by intentionally allowing interconnection points into their networks to congest, preventing their own subscribers from efficiently accessing internet content via the BIAS service that those subscribers had paid for. Traditionally, BIAS providers, transit providers, and CDNs would cooperate to upgrade the connections between their networks as the amount of Internet traffic flowing over the connection between their networks increased. Around 2013, some of the largest BIAS providers began to refuse to upgrade the connections between their networks on the one side, and transit providers and CDNs on the other side, unless the transit providers and/or edge providers they served agreed to pay a recurring toll.

---

*Cable Inc., and Advance/Newhouse Partnership For Consent to Assign or Transfer Control of Licenses and Authorizations* , MB Docket No. 15-149, FCC 16-59 (rel. May 10, 2016), at ¶ 99 ("*Charter/Time Warner Cable Merger Order*"), *available at* https://www.fcc.gov/document/commission-approves-charter-twc-and-bright-house-merger.

[8] *Id.* at ¶ 95.

5

13. The tolls the large BIAS providers sought to impose were not related to actual interconnection costs. Upgrading the connections between the networks includes adding new data ports (the doorways between the networks) and adding wires between those data ports. These kinds of upgrades are not a large cost—they range in the tens of thousands of dollars for a significant capacity increase at a major point of interconnection. Indeed, although traditionally both parties have shared these upgrade costs, our members offered to pay the entire cost of the upgrades in order to ensure that sufficient capacity was available. But the large BIAS providers refused. As a result, these interconnection ports remained congested.

14. Neither were these costs related to the actual cost of transporting data from the doorstep of the BIAS provider across the BIAS provider's last mile network to its subscribers that requested the data. The costs of carrying data increase with the distance over which a provider has to carry the data. Our members offered to help reduce these costs by offering to drop off the traffic closer to the relevant subscribers, which would reduce the distance over which the BIAS provider had to carry the data, but the large BIAS providers refused.

15. Instead, the charges seem to directly reflect each BIAS provider's terminating access monopoly that stems from the number of subscribers to which a particular provider controls. Data shows that the per-subscriber access fees charged by the largest BIAS providers increase with the number of subscribers the BIAS provider serves, even though scale economies should allow larger BIAS providers to have lower per-subscriber costs than their smaller peers.[9] We understand from our member companies, and from Level 3's comments to the FCC, that large BIAS providers did not attempt to justify their request for access charges as cost-related. Level 3 explained:

---

[9] *Id.* at ¶ 115 ("The ability of a BIAS provider to charge for access to subscribers increases with the number of subscribers; the greater the number of subscribers, the more the BIAS provider can charge on a per-subscriber basis."). *See also* Nicholas Hill, Nancy L. Rose, & Tor Winston, *Economics at the Antitrust Division 2014- 2015*: *Comcast/Time Warner Cable and Applied Materials/ Tokyo Electron*, 47 R. Indus. Org. 425, 427-29 (2015) (discussing the DOJ staff's empirical study of interconnection contracts between BIAS providers and online content providers). In regressions to determine the relationship between interconnection fees and size of BIAS providers, the DOJ found that "the relationship between size and fees was found to be positive, statistically significant, and economically meaningful." *Id.* at 428. In other words, larger BIAS providers obtained higher interconnection fees, a sign of greater bargaining power.

6

> While the tolls demanded varied among these big consumer ISPs, they frequently equaled or exceeded the price that Level 3 charges its customers to provide connectivity to the entire global Internet—notwithstanding that the consumer ISP was charging only for 'opening the door' to its network rather than for global connectivity and was already being paid by its own customer to provide that customer with access to the global Internet. These tolls would likely have been just the beginning, because the rational price for an ISP exploiting its gatekeeper power to charge is the profit-maximizing price: a price reflecting the ISP's control over access to its users and the value those users represent to the edge providers that make services available to them. As a consequence of these consumer ISPs' attempts to exploit their control over access to their customers and to extract access tolls, interconnection ports between the Level 3 network and these ISP networks became extremely congested, and consumers' experiences were harmed as a result.[10]

16. Others have observed and confirmed that large BIAS providers have engaged in congestion at interconnection points to extract non-cost based access fees from online video providers. According to the Open Technology Institute, which based its conclusions on data from Measurement Lab, a public, open data resource for internet measurement:

> Customers who had purchased cable modem service that [were] promised 20-50 Mbps were instead experiencing speeds of less than 2 Mbps for weeks and months. The data also reveal that in the days following the resolution of the business dispute [over interconnection fees], the average throughput spiked back to normal levels. This fluctuation does not appear to be explained through any normal patterns of network traffic flow. The data do not reflect a congestion problem due to insufficient physical capacity in the network, but instead appear to reflect intentionally created artificial congestion designed to significantly degrade the quality of service of a popular application for millions of consumers in order to generate pressure on one company to pay more money. … The scale of the disruption to consumer services is noteworthy. The data reveal that the four largest ISPs in the United States, representing 68% of all American Internet users, were the principal actors in this episode.[11]

17. The congestion did not just impact online video traffic. It also affected a broad array of internet services, including, for example, telework virtual private networks that employees of small and medium-sized enterprises use to connect to their company's internal network.[12]

---

[10] Comments of Level 3 Communications, FCC GN Docket No. 17-108, at 10-11 (July 17, 2017), *available at* https://ecfsapi.fcc.gov/file/107171850225629/Level%203%20Comments.pdf.

[11] Reply Comments of the Open Technology Institute at New America, FCC GN Docket No. 14-28, at 15-16 (Sept. 15, 2014), *available at* https://ecfsapi.fcc.gov/file/7522726666.pdf.

[12] *Id.* at 12.

7

Following a 16-month investigation, the New York Attorney General filed suit against the combined Charter-Time Warner Cable, explaining in one of its findings:

> Spectrum-TWC represented to their subscribers that they would get fast, reliable access to content online …. However, Spectrum-TWC knew that it could not deliver on this promise because of the state of interconnection points in the transmission of online content. Specifically, the company was aware of, and sometimes deliberately created, bottlenecks at interconnection points, which resulted in slowdowns and disruptions to subscribers' service.[13]

18. While large last-mile BIAS providers claim that they did not cause the congestion at the interconnection points they control, the FCC's records and these other third-party statements demonstrate the truth. Indeed, the FCC itself also found that the four largest BIAS providers in the U.S. and CenturyLink have all been able to impose access charges on transit providers, CDNs and edge providers.[14]

19. Large BIAS providers have exclusive control over access to their last-mile networks, and they caused congestion deliberately to force transit providers, CDNs, and edge providers to pay access charges in order to avoid that congestion. The problems resulting from that congestion—slow internet speeds and dropped data—affected millions of Americans and lasted for years. Prior to the *2015 Open Internet Order*, these problems only ended when affected providers chose to pay the fee.

20. The declarations by AT&T and Comcast claim that these problems were the result of edge providers or transit providers deliberately routing traffic through congested connections. However, these entities have consistently refuted these allegations,[15] and the results of ongoing

---

[13] *See* New York State Office of the Attorney General, *A.G. Schneiderman Announces Lawsuit Against Spectrum-Time Warner Cable And Charter Communications For Allegedly Defrauding New Yorkers Over Internet Speeds And Performance*, Press Release (Feb. 1, 2017), *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-lawsuit-against-spectrum-time-warner-cable-and-charter. Charter settled with the New York Attorney General in late 2018. *See* New York State Office of the Attorney General, *A.G. Underwood Announces Record $174.2 Million Consumer Fraud Settlement With Charter For Defrauding Internet Subscribers*, Press Release (Dec. 18, 2018), *available at* https://ag.ny.gov/press-release/2018/ag-underwood-announces-record-1742-million-consumer-fraud-settlement-charter.

[14] *Charter/Time Warner Cable Merger Order*, at ¶ 120.

[15] *See, e.g.*, Letter from Joseph C. Cavender, Vice President & Assistant General Counsel, Federal

8

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

1 | investigations of major BIAS providers by the Attorney General of New York demonstrate otherwise. As stated in comments in the FCC's latest net neutrality proceeding, the investigation uncovered documentary evidence that:

> [F]rom at least 2013 to 2015, major BIAS providers made the deliberate business decision to let their networks' interconnection points become congested with Internet traffic and used that congestion as leverage to extract payments from backbone providers and edge providers, despite knowing that this practice lowered the quality of their customers' Internet service. This practice was not limited to a single instance or locality: NYOAG has found that this practice was used for years by at least two of the country's biggest BIAS providers who operate in New York and in many other states.[16]

21. Further demonstrating that competitive forces do not adequately constrain residential BIAS providers, the FCC has found that consumers do not switch BIAS providers when they receive degraded service as a result of congestion.[17] Often consumers do not even know that the interconnection congestion caused by the BIAS provider is the reason for the degraded quality of their BIAS service.[18] And even if a customer determines that the degraded quality of their service is attributable to the BIAS provider, decides to change providers, and is willing and able to pay for the high switching costs and tolerate the inconvenience, they often lack an effective

---

Affairs, Level 3 to Marlene H. Dortch, Secretary, FCC, WC Docket No. 17-108, at 2 (Sept. 15, 2017), *available at* https://ecfsapi.fcc.gov/file/10915153128264/2017-09-15%20Level%203%20ex%20parte.pdf; Reply Comments of Cogent Communications Inc., FCC WC Docket No. 17-108, at 3-6 (Aug. 30, 2017), *available at* https://ecfsapi.fcc.gov/file/10830160800351/2017.08.30%20Cogent%20Reply%20Comment%20on%20NPRM%20-%20To%20File.pdf.

[16] Comments of The People of the State of New York by Attorney General Eric T. Schneiderman (NY Attorney General), FCC WC Docket No. 17-108, at 2 (July 17, 2017) *available at* https://ecfsapi.fcc.gov/file/10717583023587/FINAL%20RIF%20Comment%202017-07-17%20%5BREDACTED%5D%5D.pdf.

[17] *Charter/Time Warner Cable Merger Order*, at ¶ 111. When Comcast intentionally allowed congestion to build in order to harm online video consumers and forced an edge provider to pay Comcast a fee for access to Comcast's subscribers, Comcast faced no serious consequences because its customers lack a competitive alternative and faced high switching costs.

[18] *See* Oral Statement of FTC Commissioner Terrell McSweeny, Testimony before the House Judiciary Committee (Nov. 1, 2017), at 2, *available at* https://www.ftc.gov/system/files/documents/public_statements/1268963/mcsweeny_oral_testimony_to_us_house_of_representatives_committee_on_the_judiciary_11-1-17_.pdf (describing how will consumers know why their service is slow).

9

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

1  substitute.[19]  As I mentioned above, in many places, consumers have access to only one or two

2  broadband providers that offers high-speed internet access at their home.

3  **Interconnection Improved because of the FCC's *2015 Open Internet Order*, *AT&T/DirecTV Merger Order* and *Charter/Time Warner Cable Merger Order*.**

5      22.   For providers that refused to pay access charges, including Cogent and Level 3, the

6  problems persisted until the FCC decided to assert oversight over interconnection and traffic

7  exchange in the *2015 Open Internet Order*.  When the FCC reclassified BIAS as a

8  telecommunications service under Title II of the Communications Act, BIAS providers became

9  subject to Sections 201 and 202 of the Communications Act, which prohibit providers of

10 telecommunications service from engaging in "unjust and unreasonable practices" and "unjust

11 and unreasonable discrimination."  The Commission explained that these provisions also covered

12 BIAS providers' interconnection practices and agreements, prohibiting BIAS providers from

13 engaging in "unjust and unreasonable practices" and "unjust and unreasonable discrimination"

14 with respect to interconnection, and that these provisions would allow the Commission to review

15 interconnection practices and agreements case-by-case, including its review of anticompetitive

16 incentives through its merger review process.[20]  Finally, the Commission pointed out that it would

17 use these provisions to prevent BIAS providers from evading the FCC's Open Internet rules.[21]

---

[19] To switch their broadband provider, a consumer generally must pay equipment rental fees and an early termination fee, which could add up to several hundred dollars.  And then there is the inconvenience of returning equipment and waiting for a technician to connect the new service.

[20] *In the Matter of Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, FCC GN Docket No. 14-28, FCC 15-24 (rel. Mar. 12, 2015), at ¶¶ 193, 195 & 203 ("*2015 Open Internet Order*"), *available at* https://www.fcc.gov/document/fcc-releases-open-internet-order. .

[21] *Id.* ¶ 206: "[T]he *2014 Open Internet NPRM* asked: "how can we ensure that a broadband provider would not be able to evade our open Internet rules by engaging in traffic exchange practices that would be outside the scope of the rules as proposed?"⁵³¹ [Fn. 531: *2014 Open Internet NPRM*, 29 FCC Rcd at 5582, para. 59.] [O]ur assertion of authority over Internet traffic exchange practices addresses that question by providing us with the necessary case-by-case enforcement tools [Editor: i.e. Sections 201 and 202 of the Communications Act] to identify practices that may constitute such evasion and address them."

10

23. With the oversight afforded by the *2015 Open Internet Order*, both Cogent and Level 3 were able to negotiate contracts with the large BIAS providers with which they had had disputes, including Comcast and AT&T.[22] As a result of these agreements, interconnection capacity between Cogent and Level 3 on the one hand, and the large BIAS providers on the other hand, increased significantly, relieving the congestion that resulted from the large BIAS providers refusing to augment their interconnection ports.[23]

24. Moreover, as it indicated it would do so in its *2015 Open Internet Order*, the FCC specifically reviewed interconnection and traffic exchange in its merger reviews. In the *AT&T/DirecTV Merger Order*, the FCC explained:

> As stated in the 2015 Open Internet Order, "consumers bear the harm when they experience degraded access to the applications and services of their choosing due to a dispute between a large broadband provider and an interconnecting party." Also, because OVD subscribers expect high-quality video, OVDs are vulnerable to degradation at the interconnection point with

---

[22] *See* Comments of Level 3 Communications, FCC GN Docket No. 17-108, at 11-12 (July 17, 2017) ("*Level 3 Comments*"), *available at* https://ecfsapi.fcc.gov/file/107171850225629/Level%203%20Comments.pdf ("Discussions between Level 3 and these big consumer ISPs remained at an impasse until the 2015 Open Internet Remand Order.  Once the Commission made clear that it had jurisdiction to entertain a complaint filed against a consumer ISP relating to its interconnection practices, the consumer ISPs' position became untenable for the reasons discussed above: agreeing to augment interconnection on the terms Level 3 had already publicly offered would improve the consumer ISPs' own service and was virtually cost-free to the ISPs (and in fact would reduce their backhaul costs), and accordingly there was no defensible reason for the consumer ISPs to refuse.  Level 3 was then able to negotiate new interconnection agreements with all the US-based ISPs with which it had previously had disputes. While those agreements are not perfect, they are agreements Level 3 was willing to sign under the circumstances.  As a result of these new agreements, interconnection capacity between Level 3 and the consumer ISP networks has been increased substantially, benefitting the Internet ecosystem as a whole and end users in particular."). *See also* Comments of Cogent Communications, FCC WC Docket No. 17-108, at 16-17 (July 17, 2017) ("*Cogent Comments*"), *available at* https://ecfsapi.fcc.gov/file/107170396623051/2017.07.17%20Cogent%20Comment%20on%20NPRM%20-%20To%20File.pdf ("Soon thereafter [i.e. the adoption of the 2015 Open Internet Order], BIAS providers that had refused to increase interconnection capacity reversed course and agreed with transit providers to augment capacity.  Accordingly, sustained congestion was eliminated at the interconnection points between Cogent and the BIAS providers. It defies logic to believe anything other than that the BIAS providers' change of course was influenced by the *Title II Order*.").

[23] *See Level 3 Comments*, at 12 ("As a result of these new agreements, interconnection capacity between Level 3 and the consumer ISP networks has been increased substantially, benefitting the Internet ecosystem as a whole and end users in particular."); *see also Cogent Comments*, at 18 ("In each case, once an agreement was reached and implemented, congestion and the ensuing consumer harm essentially disappeared.").

11

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

a broadband Internet access service provider's last mile network. Thus, as stated in the 2015 Open Internet Order, we find that "broadband Internet access providers have the ability to use terms of interconnection to disadvantage edge providers and that consumers' ability to respond to unjust or unreasonable broadband provider practices are limited by switching costs."[24]

25.  The Commission had "heightened concerns" about AT&T's incentives to discriminate against unaffiliated online content, and its ability to do so at the interconnection points it controls onto its last-mile BIAS network. Accordingly, in addition to conditions related to AT&T's treatment of unaffiliated online content, the FCC also required that AT&T file its interconnection agreements with the Commission and report on its interconnection performance metrics.[25]

26.  In the Charter/Time Warner Cable merger proceeding, the FCC described the congestion caused by the large BIAS providers, and specifically stated that its economic analysis has shown that "the ability of a BIAS provider to charge for access to subscribers increases with the number of subscribers; the greater the number of subscribers, the more the BIAS provider can charge on a per-subscriber basis."[26] It found that the proposed merger would enable the combined company to impose higher costs on edge providers, transit services, and CDNs due to its increased market power, stating:

> In the 2015 Open Internet Order, we concluded that 'broadband Internet access providers have the ability to use terms of interconnection to disadvantage edge providers and that consumers' ability to respond to unjust or unreasonable BIAS provider practices are limited by switching costs.' This transaction aggravates those concerns—it creates a large BIAS provider and thereby strengthens its ability to unilaterally impose increased interconnection costs on edge providers, transit providers, and CDNs, ultimately raising costs to consumers for a diverse array of Internet-based services and impeding the virtuous cycle of development. We conclude that

---

[24] *In the Matter of Applications of AT&T Inc. and DIRECTV For Consent to Assign or Transfer Control of Licenses and Authorizations*, , MB Docket No. 14-90, FCC 15-94 (rel. July 28, 2015) ("*AT&T/DirecTV Merger Order*"), at ¶ 217, available at https://www.fcc.gov/document/fcc-releases-order-approving-att-directv-transaction.

[25] *Id.* ¶ 219. Those requirements lasted four years and have now expired by the terms of the *AT&T/DirecTV Merger Order*. *Id.* ¶ 396. A member of INCOMPAS has indicated to me that AT&T's interconnection terms were more reasonable when the requirements were in force, demonstrating that AT&T will use its market power when regulators are not a cop on the beat.

[26] *Charter/Time Warner Cable Merger Order*, at ¶ 115.

12

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

>increased interconnection costs can disrupt the virtuous cycle of innovation by diverting funds towards interconnection fees that could have otherwise been used for further innovation or price reductions for consumers.
>
>New Charter will be well positioned to leverage its larger BIAS subscriber base and increased control of interconnection traffic to act as a gatekeeper between edge providers and their customers. The combination of Charter and Time Warner Cable will increase the potential damage to their business if they forgo—even temporarily—interconnection with New Charter compared with either Charter or Time Warner Cable individually. Moreover, because there is limited competition in its BIAS footprint and BIAS subscribers switch providers infrequently, New Charter will be able to pressure edge providers without fear of harming its retail BIAS business.[27]

27. As such, the FCC imposed conditions that prevent Charter from exercising its market power with respect to interconnection to its last-mile BIAS network, including the requirement that such interconnection be settlement free (i.e., without charging tolls or access fees) for seven years stating:

>We determine that a mandatory interconnection condition is necessary to mitigate [the] transaction's interconnection-related harms. By requiring that large backbone providers, CDNs, and edge providers have reliable, unfettered access to New Charter subscribers for seven years, we believe that New Charter will be constrained from harming the public interest in the interconnection market. For the reasons discussed above, we believe this is an appropriate duration to allow the interconnection market to evolve and for edge providers to mature to a position where they will be more resilient to potentially anticompetitive practices. Such a condition ensures that there will be a competitive market for access to New Charter subscribers, preventing the company from acting as a gatekeeper to its subscribers.[28]

28. The FCC also required Charter to file its interconnection agreements with the agency for seven years so that it could monitor the merged companies' practices to ensure that it would not "deny or impede access to its networks in ways that limit competition from rival edge providers."[29]

---

[27] *Id.* at ¶¶ 108-9.

[28] *Id.* at ¶ 132.

[29] *Id.* at ¶ 136. By the terms of the *Charter/Time Warner Cable Merger Order,* Charter is now seeking FCC approval to sunset the interconnection requirements (as well as the data caps/usage-based pricing prohibition) on the fifth anniversary of its merger consummation—which is May 18, 2021. *See* Petition of Charter Communications, Inc., *Conditions Imposed in the Charter Communications-Time Warner Cable-Bright House Networks Order*, FCC WC Docket No. 16-197 (filed June 17, 2020). INCOMPAS filed a Petition to Deny in the proceeding on July 22,

13

**In the absence of oversight over BIAS providers' interconnection, problems are likely to reappear.**

29. In January 2018, the FCC released its decision to eliminate all of the substantive net neutrality rules, including its oversight of interconnection, retaining only a weakened transparency rule, and it reclassified BIAS as an information service under Title I of the Communications Act. These changes took effect on June 11, 2018. As a result, most of the largest BIAS providers are now again free under FCC regulations to use their leverage over access to their BIAS subscribers to force edge providers, CDNs and transit providers to pay them non-cost based, recurring access fees by refusing to cooperate in upgrading the connections into their network, harming their own subscribers in the process. (As stated above, pursuant to its merger condition, the FCC required Charter to offer interconnection with no access tolls pursuant to the *Charter/Time Warner Cable Merger Order*.)

30. The incentives to charge access tolls have not changed, but the regulatory regime that curbed them from acting on these incentives and charging excessive fees is no longer in effect at the federal level for Comcast, AT&T, and Verizon. In fact, many of the largest BIAS providers

---

2020. *See* INCOMPAS Petition to Deny, FCC WC Docket No. 16-197 (filed July 22, 2020). The FCC's Wireline Competition Bureau sought additional comment in the proceeding to ensure a full record and also in response to a recent decision from the U.S. Court of Appeals for the D.C. Circuit. That decision found that consumers who had not participated in the underlying merger proceeding but alleged increased prices from Charter resulting from the FCC's *Charter/Time Warner Cable Merger Order's* conditions had standing to challenge two of the FCC's merger conditions, including the interconnection condition. *See* WCB Public Notice, WC Docket No. 16-197 (rel. Aug. 18, 2020) *citing* Competitive Enterprise Institute, et al., v. FCC, No. 18-1281, 2020 WL 4745272 (D.C. Cir. Aug. 14, 2020). The FCC only responded to the standing issues in the case and did not defend the challenged conditions in its *Charter/Time Warner Cable Merger Order*. While the court did not reach the merits of the Commission's merger decision, it vacated the challenged conditions. The FCC's Public Notice states that "the court's mandate will not issue until the deadline for filing petitions for rehearing has passed; if such a petition is filed, issuance of the mandate would be delayed until such petition is resolved." *Id.,* n. 4. INCOMPAS filed additional comments in the record in response to the FCC's Public Notice and Charter's Reply in the docket emphasizing Charter's failure to demonstrate that its incentives to use its market power to extract interconnection fees have changed and that its market power has increased since the merger. *See generally* INCOMPAS Comments, FCC WC Docket No. 16-197 (filed Sept. 2, 2020).

14

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

are now even larger, both because of the mergers discussed above and due to their subscriber growth, which increases their ability to use this strategy successfully.  Indeed, in our Petition to Deny Charter's request to prematurely sunset its interconnection condition, INCOMPAS noted that Charter has added 9 million more subscribers since its merger and now has over 27 million subscribers. We have argued in that proceeding that if the Commission releases Charter from its settlement free interconnection obligation, there will be no check on its ability to charge excessive fees for interconnection.  The largest four wireline BIAS providers, including Comcast and AT&T, together now serve more than 78 million of the approximately 102 million wired BIAS subscribers; that is more than 77% of the total number of subscribers served by the top 16 providers.[30]

31.  AT&T and Comcast's assertions that edge providers actually benefit from paying BIAS providers for direct interconnection because doing so allows them to save money by cutting out the middlemen—transit providers and CDNs—is incorrect.[31] Edge providers must still bear the costs of delivering their content to the BIAS provider's network via transit providers and/or CDNs.  In addition to those expenses, the edge provider now must also pay a fee to the BIAS provider so that the BIAS provider will deliver the data to the BIAS subscriber that requested it. For these reasons, switching to a paid, direct interconnection agreement does not save the edge provider money; it actually increases the edge provider's costs by adding a terminating access charge on top of delivery costs. (Another issue is that large BIAS providers can now use their last-mile leverage to distort competition for transit and CDNs where they also provide those services.)  Of course, the Comcast and AT&T declarations assert that the competitive market for transit services limits the amount they can charge edge providers for interconnection, but that is not the case.  An edge provider may have multiple options to transport its data to the BIAS provider's doorstep, but a BIAS provider controls the conditions under which any packet can

---

[30] Leichtman Research Group, *About 1,165,000 Added Broadband in 1Q 2020: The Most Quarterly Broadband Additions Since 1Q 2015* (May 13, 2020).

[31] Comcast Declaration, at ¶ 20; AT&T Declaration, at ¶ 18.

15

1   enter its network through interconnection.  Furthermore, each transit provider and CDN provider
2   faces the BIAS provider's terminating access monopoly.  If a transit provider or CDN provider
3   wants to deliver traffic to the BIAS provider's subscriber, the only way is through the BIAS
4   provider's network.  Thus, an edge provider will always have to pay the BIAS provider's access
5   fee—either directly as part of an agreement for direct interconnection or indirectly by paying its
6   transit provider or CDN provider— which in turn pays the BIAS provider.  That means that an
7   edge provider will not be able to avoid a BIAS provider's access charge by using a transit or
8   CDN provider rather than connecting with the BIAS provider directly.  As discussed above in
9   fact, Level 3 and Cogent, both transit providers, were prominently involved in disputes over
10  BIAS providers' demands for access fees.  The additional interconnection costs they incurred as
11  result would be passed on to their transit customers.

**BIAS providers will be not be harmed if they are prohibited from charging transit providers, CDNs, and edge providers fees for access to their subscribers as part of interconnection agreements.**

15        32.    The declarations by AT&T and Comcast claim that BIAS providers will be harmed if
16  they are banned from charging transit providers, CDNs, and edge providers fees for access to
17  their subscribers as part of interconnection agreements.  First, the declarations claim that a ban on
18  these fees would force BIAS providers to forego revenue they are entitled to and lead to an unfair
19  allocation of costs.  But they are not entitled to such revenue.  Edge providers already pay for the
20  costs of transporting data to the BIAS provider's network.  Handing off the traffic close to where
21  the subscriber requesting the traffic is located reduces the BIAS provider's costs and reduces the
22  load on the BIAS provider's network because the BIAS provider does not need to carry the data
23  over longer distances over its own network infrastructure.  INCOMPAS members have
24  consistently offered the same arrangement—handing off traffic to BIAS providers at points of
25  interconnection that are reasonably close to the BIAS subscriber requesting the data—in
26  exchange for settlement-free interconnection.  Under this arrangement, the BIAS provider only
27  bears the cost of carrying the data over a small part of its network from the point where it was
28  handed off by the transit or edge provider to the point where the subscriber is located.  That is not

16

a large burden. BIAS providers are already being paid to transmit data over this portion of their network infrastructure by their own subscribers.

33. Subscription fees are sufficient to cover the cost of transmitting the data over the BIAS provider's network. Only the largest BIAS providers in the U.S. are being paid by at least some of their interconnection partners for the privilege of being able to deliver the data that the BIAS provider's subscriber has requested. All other BIAS providers in the U.S.—the vast majority of providers, including INCOMPAS' small BIAS providers—have been able to function effectively without these fees. Globally, almost all interconnection agreements do not involve the exchange of money: 99.5 % of internet interconnection is concluded without a written contract.[32]

34. Like other internet companies, very large providers of residential BIAS like AT&T and Comcast do not need fees from edge providers, CDNs, and transit providers to make it economically beneficial for them to deploy the necessary network infrastructure to deliver data between reasonably localized points of interconnection and their subscribers. First, the large BIAS providers' networks are deployed already. Second, the costs of upgrading their networks have fallen considerably, allowing them to deploy more capacity for the same or lower costs.[33] For example, AT&T CFO John Stephens told investors in 2016 that due to the company's move

---

[32] Weller, D. and B. Woodcock (2013-01-29), "Internet Traffic Exchange: Market Developments and Policy Challenges", OECD Digital Economy Papers, No. 207, OECD Publishing, Paris, *available at* http://dx.doi.org/10.1787/5k918gpt130q-en ("A survey of 142 000 peering agreements conducted for this report shows that the terms and conditions of the Internet interconnection model are so generally agreed upon that 99.5% of interconnection agreements are concluded without a written contract. That these "rules of the game" are so ubiquitous and serviceable indicates a degree of public unanimity that an external regulator would be hard-pressed to create. The parties to these agreements include not only Internet backbone, access, and content distribution networks, but also universities, NGOs, branches of government, individuals, businesses and enterprises of all sorts—a universality of the constituents of the Internet that extends far beyond the reach of any regulatory body's influence.").

[33] Andrew Entwistle and Frank Knowles, *Cable Capex Set to Fall: A Deep Dive on Network Capex and Opex*, New Street Research (Sept. 25, 2017) *available at* https://www.newstreetresearch.com/?s=Cable+Capex+Set+to+Fall%3A+A+Deep+Dive+on+Network+Capex+and+Opex.

17

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

to network virtualization, "we will be adding 2.5 times more capacity at 75 percent of the capital cost compared to just a few years ago."[34]

35. Moreover, a ban on BIAS providers charging for the termination of traffic to their subscribers will not motivate transit providers and edge providers to suddenly "dump" a lot of traffic on BIAS providers' networks or to increase the amount of traffic they are delivering to these networks. Edge providers only send traffic specifically requested by a BIAS provider's subscriber. In other words, an online video provider only sends a video to a specific BIAS subscriber if that subscriber has asked for that video. Sending traffic that is not desired would only slow the end user's internet connection and antagonize that user.

**Meaningful net neutrality protections must include interconnection.**

36. When a BIAS provider's customer requests content from an online source, the requested content will reach the customer only if the BIAS provider allocates sufficient capacity at its interconnection points. When it does not do so, the customer's experience will be degraded, leading to frustrating interruptions in accessing content. Without interconnection oversight, BIAS providers can use (and have used) their gatekeeper power to demand access tolls from online content providers that are not cost-based. If online content providers do not capitulate and pay these tolls, customers' access to online content will be blocked or throttled. A ban on access fees provides an important backstop against anticompetitive traffic manipulation by BIAS providers. Such a ban does not harm BIAS providers.

37. As I have discussed, to make the internet work, BIAS providers must interconnect with the other networks, applications and services that make up the rest of the internet. Globally, the vast majority of interconnection agreements are done without any access tolls. But some large BIAS providers have sought to impose anti-competitive access tolls on edge providers directly or by charging third-party services that smaller online services use to reach consumers.

---

[34] *T-Mobile, AT&T and Verizon maintain capex spending despite incentive auction*, FierceWireless (Apr. 27, 2016), *available at* https://www.fiercewireless.com/wireless/t-mobile-at-t-and-verizon-maintain-capex-spending-despite-incentive-auction.

18

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

Interconnection oversight and bans on access fees prevent broadband providers from exerting gatekeeper power, but they do not prevent businesses from entering into private agreements to directly interconnect with BIAS providers. As I have noted, they have entered into such direct arrangements prior to and after the FCC's *2015 Open Internet Order*.

38. In sum, interconnection protections are a critical element to meaningful net neutrality policy. Such protections ensure that the BIAS providers cannot use their gatekeeper power to block, throttle, or charge unfair and anticompetitive access tolls.

I declare the foregoing under penalty of perjury under the laws of the United States of America. Executed this 12th day of September, 2020, at Silver Spring, MD.

Angie Kronenberg

19

Declaration of Angie Kronenberg in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)