XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3817
Fax: (415) 703-1234
E-mail: Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**THE UNITED STATES OF AMERICA,**

Plaintiff,

**v.**

**THE STATE OF CALIFORNIA, et al.,**

Defendants.

**AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**

Plaintiffs,

v.

**XAVIER BECERRA, in his official capacity as Attorney General of California,**

Defendant.

2:18-cv-02660-JAM-DB
2:18-cv-02684-JAM-DB

**DECLARATION OF P. PATTY LI IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**

Judge: The Hon. John A. Mendez
Actions Filed: Oct. 1, 2018; Oct. 3, 2018

I, P. Patty Li, hereby state and declare as follows:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in these consolidated matters.

2. I am a Deputy Attorney General in the California Attorney General's Office. I am a counsel of record for Defendants in the above-captioned matter.

3. Attached is a true and correct copy of "Comments on the May 23, 2017 Notice of Proposed Rulemaking, Redacted – For Public Inspection," submitted by the People of the State of New York to the Federal Communications Commission in WC Docket No. 17-108, on July 17, 2017. The submission responds to *In the Matter of Restoring Internet Freedom*, Notice of Proposed Rulemaking, 32 FCC Rcd. 4434 (2017).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 15, 2020, at San Francisco, California.

P. Patty Li

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| In the Matter of<br><br>Restoring Internet Freedom | WC Docket No. 17-108 |
|---|---|

# PEOPLE OF THE STATE OF NEW YORK

# COMMENTS ON THE MAY 23, 2017

# NOTICE OF PROPOSED RULEMAKING

## I. INTRODUCTION

The People of the State of New York by Attorney General Eric T. Schneiderman submit these Comments concerning the Federal Communications Commission (the "Commission")'s Notice of Proposed Rulemaking, FCC WC Docket No. 17-108, entitled "Restoring Internet Freedom" ("NPRM").

The New York State Office of the Attorney General ("NYOAG") has unique insight into the need for the Commission's current net neutrality rules under Title II of the Telecommunications Act, based on our recent and ongoing investigations of major providers of broadband Internet access service ("BIAS"). These investigations have uncovered documentary evidence revealing – for the first time – that from at least 2013 to 2015, major BIAS providers made the *deliberate business decision* to let their networks' interconnection points become congested with Internet traffic and used that congestion as leverage to extract payments from backbone providers[1] and edge providers[2], despite knowing that this practice lowered the quality of their customers' Internet service. This practice was not limited to a single instance or locality: NYOAG has found that this practice was used for years by at least two of the country's biggest BIAS providers who operate in New York and in many other states.

BIAS providers' deliberate decisions to put their profit ahead of consumer service quality has relevance beyond interconnection disputes. For many years, the Commission's regulations promulgated under Title I effectively prohibited BIAS providers from engaging in practices like blocking and throttling but did not address interconnection. BIAS providers took advantage of this unregulated space by manipulating interconnection arrangements to extract fees from

[1] A backbone provider is an entity that connects BIAS providers to each other and to edge providers.
[2] An edge provider is an entity such as Netflix, Google, Etsy, or Kickstarter that provides online content to users.

backbone and edge providers, to the direct detriment of their customers. After the DC Circuit's ruling in 2014 in *Verizon v. FCC* effectively ended regulation of blocking and throttling under Title I of the Federal Communications Act[3], the Commission passed new net neutrality rules under Title II, regulating blocking, throttling, and, for the first time, interconnection. *See In re Protecting and Promoting the Open Internet*, 30 F.C.C.R. 5601 ("2015 OIO"). Only then did BIAS providers begin to address the congestion at interconnection points for backbone and edge providers that had refused payment demands, resulting in improved performance for consumers.

In light of *Verizon*, if the Commission now rolls back the 2015 OIO's Title II protections, BIAS providers will have as free a hand to profit from blocking, throttling, and paid prioritization as they once had to profit from interconnection. Our evidence shows that BIAS providers will choose to engage in these practices, despite the obvious harm to customers, because they made that very choice for interconnection before it was regulated under Title II. While state and federal consumer protection and antitrust laws may help deter some abuses, such laws have a more limited scope and in many jurisdictions they can be unevenly enforced. They cannot fully substitute for net neutrality protections under Title II.

New York State's technology sector is the second largest in the country and has flourished under the virtuous cycle of innovation and investment that an open Internet creates. As our evidence of BIAS provider practices shows, the NPRM's proposed changes risk destroying the conditions that created and continue to fuel that virtuous cycle. We therefore urge the Commission to leave the 2015 OIO in place and not to adopt the NPRM.

---

[3] 740 F.3d 623 (D.C. Cir. 2014).

## II. New Evidence Confirms that BIAS Providers Pursue Revenue at the Expense of Consumers and Edge Providers Absent Title II Protections

The NPRM incorrectly portrays the 2015 OIO as a sea change in the Commission's oversight of the handling of traffic on the Internet. On the contrary, the 2015 OIO is the culmination of the Commission's efforts over more than a decade to use its regulatory authority to preserve the open Internet following the advent of broadband. Indeed, the Commission's prior efforts – including rules promulgated under Title I – barred practices such as blocking and unreasonable discrimination until 2014, when the DC Circuit's decision in *Verizon* effectively foreclosed reliance on Title I as authority for meaningful net neutrality rules.

Our investigations of BIAS providers operating in the State of New York have uncovered evidence showing that, in the absence of regulation, BIAS providers pursue tactics that disadvantage edge providers and degrade their customers' experiences in pursuit of their bottom line. Evidence of how BIAS providers handled interconnection disputes when interconnection was outside the scope of the Commission's regulatory purview is the best evidence of how those providers will approach other practices, including blocking, throttling, and paid prioritization, if the Commission were to roll back Title II regulation.

### A. Before the 2015 OIO Took Effect, Large BIAS Providers Were Involved in Long-Running Interconnection Disputes that Harmed Consumers and Edge Providers

Typically, for a subscriber to access content from an edge provider, such as Netflix, the requested content must travel across several networks. Upon receiving a request for data from a subscriber, the edge provider transmits that data to a larger backbone network, either directly or via a third-party intermediary (which in turn connects to a backbone network). The backbone provider then delivers the data to the subscriber's BIAS provider (again, possibly via an intermediary), which transmits it to the subscriber.

The place where a backbone provider and a BIAS provider exchange Internet traffic is known as an interconnection point. Traffic at an interconnection point is exchanged between networks through ports, which are the physical hardware sockets through which one network can plug into another using fiber-optic wire.

Ports have a fixed capacity. If traffic exceeds the ports' capacity, the ports become congested, which may result in increased latency or increased packet loss, both of which degrade the quality of service experienced by the end user. Specifically, increased latency and packet loss can result in a variety of problems such as slower upload and download speeds, lengthy buffering when streaming media, lag time in gaming, diminished picture quality in videos, or dropped portions of audio for VoIP calls. Congestion can also cause complete interruptions in service. These issues often begin to arise at a port capacity utilization of 70%, increasing in frequency and severity as port utilization approaches 90%.

Interconnecting parties can avoid or alleviate congestion by adding ports at the point of congestion. Disputes may arise, however, if one party – typically the BIAS provider – refuses to add capacity to relieve congestion until the other party – typically the backbone provider or edge provider delivering content to consumers – agrees to pay for access to subscribers.

These disputes became increasingly common with the growth of consumer demand for streaming video, which uses large amounts of data. Increased streaming video traffic from edge providers like Netflix and others led to increased port capacity utilization at interconnection points. As ports became heavily congested, BIAS providers refused to continue adding ports until the backbone providers and edge providers responsible for the additional traffic agreed to enter into paid arrangements. Some of these disputes lasted for years.

Although interconnection disputes generally involved commercial entities, *consumers* suffered the consequences of service degradation. Indeed, the Commission has recognized that "consumers bear the harm when they experience degraded access to the applications and services of their choosing due to a dispute between a large broadband provider and an interconnecting party." 2015 OIO ¶ 199.

Many of these long-running interconnection disputes were resolved only after the 2015 OIO subjected BIAS providers' interconnection practices to the "regulatory backstop prohibiting common carriers from engaging in unjust and unreasonable practices." 2015 OIO ¶ 203. For example, one backbone provider that had refused to pay for interconnection quickly saw the resolution of its interconnection problems from major BIAS providers Verizon, Time Warner Cable, and CenturyLink following the 2015 OIO.

### B. In the Absence of Regulatory Protections, BIAS Providers Engaged in Interconnection Disputes to Pursue Revenue at the Expense of Consumers and Edge Providers

In mid-2015, NYOAG opened several state consumer fraud investigations into the practices of BIAS providers operating in New York State.[4] Among the practices NYOAG has examined are providers' representations in advertisements about their ability to deliver consistent and reliable access to services offered by popular edge providers. As part of those investigations, NYOAG received and reviewed internal documents from BIAS providers, such as executive presentations on corporate strategy and internal emails. These documents establish for the first time that the long-running interconnection disputes that harmed consumers and edge

[4] NYOAG's investigations are solely concerned with the legality of BIAS providers' conduct under New York State's consumer protection laws, including false advertising laws. NYOAG is not investigating whether BIAS providers have violated the 2015 OIO or the Telecommunications Act.

providers were the result of BIAS providers' deliberate business decisions to use degraded service to consumers as leverage to extract payments from backbone and edge providers.

NYOAG's investigations have uncovered evidence that this deliberate tactic was used for years by at least two of the country's biggest BIAS providers who operate in New York and in many other states. The following is a description of that evidence.[5]

1. BIAS Provider No. 1

On February 1, 2017, NYOAG brought an action in New York State court against Charter Communications, Inc. ("Charter") and its subsidiary, Spectrum Management Holding Company formerly known as Time Warner Cable, Inc. (together "Spectrum-TWC").[6] Spectrum-TWC is the largest provider of residential Internet services in New York State.[7] NYOAG's complaint asserted, among other things, that Spectrum-TWC had misled its subscribers through advertising that promised reliable access to Netflix streaming video and other content that Spectrum-TWC knew it would be unable to deliver because of its ongoing interconnection disputes with the companies that delivered that content.[8]

NYOAG found through its investigation that Spectrum-TWC had been involved in disputes with several backbone providers and edge providers. During these disputes, the ports between Spectrum-TWC and certain of its interconnection peers became severely congested, with the monthly port utilization during peak hours even exceeding 90% at times.

---

[5] NYOAG's discussion of documents obtained in the course of its investigations is not intended as a waiver of any exemptions or privileges with respect to those documents, or any other documents obtained during or created as part of the NYOAG's ongoing investigations.
[6] *People of the State of N.Y. v. Charter Commc'ns & Spectrum Mgmt. Holding Co. f/k/a Time Warner Cable, Inc.*, Index No. 450318/2017 (Sup. Ct., N.Y. Cty. 2017) [hereinafter, "*NY v. Spectrum-TWC*"].
[7] Before becoming part of Charter, Time Warner Cable operated in New York State and 29 other states.
[8] *Id.* at NYSCEF Doc. No. 1 (Complaint).

Spectrum-TWC's internal documents show that these interconnection disputes were not related to technical limitations or the cost of upgrading its systems to add capacity but rather were the result of Spectrum-TWC's deliberate business decision to use congestion to strong-arm backbone providers and edge providers into "paying [] for access" to Spectrum-TWC's subscribers.[9] Spectrum-TWC did so by refusing to add ports at interconnection points, effectively limiting the ability of backbone and edge providers to deliver content to subscribers, unless the backbone or edge provider agreed to pay for access to subscribers.

A 2011 strategy presentation titled "Internet Economics," described Spectrum-TWC's approach. The document made clear that the company intended to shift its interconnection strategy from a "cost recovery model to a full business model" by converting "some legacy settlement-free peers to Paid Interconnect."[10] Spectrum-TWC had already deliberately "frozen port upgrades" with one interconnection peer at settlement-free interconnection points, causing overflow traffic to be redirected through other routes into Spectrum-TWC's network.[11] These alternate routes were more expensive for both the interconnection peer and Spectrum-TWC.[12] Spectrum-TWC recognized that, as both sides were incurring additional costs, it had effectively started a "game of chicken."[13] It expected, however, that the interconnection peer would ultimately yield and agree to a paid arrangement in order to avoid the more expensive routing options. "[T]he short-term costs" that Spectrum-TWC incurred from the more expensive routing would therefore "eventually lead to longer-term revenue growth and cost containment"[14]

---

[9] Exhibit A at 1.
[10] Exhibit B at Slide 21 and notes accompanying Slide 21.
[11] *Id.* at Slide 23.
[12] *Id.*
[13] *Id.* at notes accompanying Slide 23.
[14] *Id.* at Slide 24.

By 2013, Spectrum-TWC had implemented this plan with several peers, leading to sustained congestion at many interconnection points. A Spectrum-TWC executive acknowledged in an internal email that the company's new contentious relationships with backbone providers "may be artificially throttling [subscriber] demand" for broadband services.[15] {{[REDACTED]}}[16]

Eventually, some edge providers agreed to interconnect directly with Spectrum-TWC on a paid basis, which alleviated congestion almost immediately. Not every backbone and edge provider agreed to pay Spectrum-TWC, however. One backbone provider who refused to pay explained the consequences of Spectrum-TWC's actions to delay or avoid capacity upgrades:

> The problem that exists today – packets dropping on the ground to the detriment of your customers and ours – is the direct and foreseeable result of TWC's decision to cease upgrading peering capacity . . . Our proposal is that the parties use all the tools to alleviate congestion . . . with each side bearing its own very small expense ($10,000 for a 10 Gbps port) of adding capacity. TWC has rejected that.[17]

Spectrum-TWC was well aware that its customers suffered significant service degradation as a result of its interconnection disputes. For example, more than a quarter of the customers that responded to a survey Spectrum-TWC conducted in 2015 reported experiencing "interruption[s] in Internet service," "buffering problem[s]" or "[i]ssue[s] with streaming video content" in the prior 30 days.[18]

---

15 Exhibit C at 1.
16 {{[REDACTED]}}
17 Exhibit E.
18 Exhibit F at Slide 17. Further illustrating the effect of Spectrum-TWC's strategy, an internal company presentation from February 2015 showed that, when edge provider Netflix agreed to pay for interconnection, the average streaming video speed for subscribers quickly jumped by 28%. Exhibit G at Slide 3. The higher speeds improved picture quality and reduced buffering and other interruptions that subscribers experienced.

2. BIAS Provider No. 2

NYOAG's investigations have uncovered documentary evidence showing that another major BIAS provider that operated in New York State, {{[redacted]}}, engaged in similar tactics.[19] These documents show that {{[redacted]}}, like Spectrum-TWC, made a deliberate business decision to let its interconnection points become congested and used the resulting degraded service to its customers as leverage in negotiations with edge and backbone providers.

An internal analysis by {{[redacted]}} showed that, {{[redacted]}} Other internal documents from 2013 reveal that [redacted]

[19] As in the case involving Spectrum-TWC, NYOAG's investigation of {{[redacted]}} is solely concerned with the legality of the company's conduct under New York State's consumer protection laws, including false advertising laws. NYOAG is not investigating whether the company has violated the 2015 OIO or the Telecommunications Act.

[20] {{[redacted]}}

[21] {{[redacted]}}

[22] {{[redacted]}}

[23] {{[redacted]}}



[redacted]}}

{{[redacted]

[redacted]}}

{{[redacted]}} allowed the congestion to persist for years.[26] {{[redacted]}}

**C. Without Title II's Protections, BIAS Providers Will Continue to Harm Consumers and Edge Providers to Enhance the BIAS Providers' Bottom Line**

The interconnection disputes examined by NYOAG demonstrate that large BIAS providers leveraged and, absent regulation, will continue to leverage, their privileged positions as gatekeepers to extract payments from backbone and edge providers at the expense of their customers. And the evidence that BIAS providers acted in this manner in the context of interconnection is the best evidence of how they will act in other contexts (e.g., blocking,

---

24 {{[redacted]}}

25 {[redacted]}

26 {{[redacted]}}

27 {[redacted]}}

throttling, paid prioritization). Indeed, it was the Commission's regulation of interconnection arrangements through Title II in the 2015 OIO that largely ended ongoing interconnection disputes. The Commission must retain all of the protections found in the 2015 OIO to prevent BIAS providers from engaging in this type of conduct in the future.

## III. THE NPRM'S PROPOSED CHANGES RISK DESTROYING THE CONDITIONS THAT HAVE ENABLED THE INTERNET TO FLOURISH IN NEW YORK AND ACROSS THE COUNTRY

New York State has approximately 20 million citizens and millions of businesses – including more than 2 million small businesses – that depend on the Internet for everything from their work and entertainment to obtaining essential services such as healthcare. Moreover, the State has one of the country's largest and most vibrant technology sectors. New York City alone is home to approximately 7,500 technology start-ups plus dozens of major tech companies, and more than 110,000 tech workers.[28] These companies bring in billions of dollars in capital investment annually, second only to Silicon Valley for early-stage investments.[29] Overall, New York's technology sector has seen explosive growth since the Commission undertook regulatory efforts to preserve the open Internet, and it has continued to flourish under the 2015 OIO. Meanwhile, broadband infrastructure has continued to improve[30], and major BIAS providers operating in New York have committed to additional infrastructure improvements in the coming years.[31]

---

[28] STARTUP GENOME, GLOBAL STARTUP ECOSYSTEM REPORT (2017) p. 42, http://d1i53wesras4r4.cloudfront.net/reports/GlobalStartupEcosystemReport2017.pdf [hereinafter "STARTUP GENOME 2017 REPORT"]; JONES LANG LASALLE, TECH EMPLOYMENT TRENDS (2016) at p. 4, http://www.us.jll.com/united-states/en-us/Research/US-Tech-Employment-Trends-2016-JLL.pdf [hereinafter "JLL 2016 REPORT"].

[29] STARTUP GENOME 2017 REPORT at p. 42.

[30] AKAMAI, STATE OF THE INTERNET/CONNECTIVITY Q1 2017 REPORT 17–20 (2017), https://content.akamai.com/gl-en-pg9135-q1-soti-connectivity html.

[31] *See, e.g.*, Altice USA, Inc., Annual Report (Form 10-K), at 8 (Apr. 11, 2017)(affirming its commitment to deploy fiber-to-the-home across its entire US footprint); Comments of Matt Ellis, EVP & CFO, Verizon Communications

Despite the record of growth of, and investment in, both edge providers and infrastructure under the Commission's net neutrality regime, the NPRM proposes a stark departure from the status quo without providing any compelling reason to believe that rolling back the protections of the 2015 OIO would provide conditions that would enable edge providers to continue to flourish.

Indeed, the NPRM cites no compelling evidence for its claim that "reversing the Title II classification and restoring broadband Internet access service to a Title I service will increase investment." NPRM ¶ 46. The methodology and conclusions of the study that the NPRM cites for the proposition that investment in infrastructure has decreased since the 2015 OIO was announced have been called into question.[32] Moreover, even assuming – for the sake of argument – that annual investment in infrastructure decreased in the two years after the 2015 OIO was announced, the NPRM cites no evidence that the 2015 OIO was the cause of any such decline, as opposed to natural fluctuations in investment by BIAS providers that are common in the industry. Finally, the NPRM presents no convincing rationale as to why additional revenue that BIAS providers might earn from the rollback of the 2015 OIO rules, e.g., from charging edge providers for paid prioritization, would be invested in network improvements.

Moreover, it is particularly troubling that the NPRM does not address the virtuous cycle – the engine that has driven the remarkable growth of the Internet ecosystem. The Commission has repeatedly recognized the importance of the virtuous cycle[33], finding that it underpins Internet innovation and infrastructure investment and that its positive effects "far outweigh" any

---

Inc., Q4 2016 Verizon Communication Inc. Earnings Call (Jan. 24, 2017)("[W]e are targeting the following for 2017: consolidated capital spending between $16.8 billion and $17.5 billion"); Frontier Communications Corp., Investor Update, Second Quarter 2016 (Aug. 1, 2016) (detailing its plan to upgrade its network over the following year).

[32] S. Derek Turner, *It's Working: How the Internet Access and Online Video Markets Are Thriving in the Title II Era*, FREE PRESS (May 2017), https://www freepress.net/sites/default/files/resources/internet-access-and-online-video-markets-are-thriving-in-title-II-era.pdf.

[33] *In re Preserving the Open Internet*, 25 F.C.C.R. 17905 ¶ 14 (2010); 2015 OIO ¶ 77.

supposed or argued reduction "in providers' investment incentives" from the 2015 OIO.[34] However, the NPRM fails to consider the effect of its proposed changes on each component of the virtuous cycle. Therefore, it risks interrupting the operation of that virtuous cycle, stifling growth and innovation on the edge *and* in the last mile.

In short, the Commission should not jeopardize a flourishing area of the economy without compelling evidence that the result will be at least as good. There is no such evidence.

## IV. PRE-EXISTING LEGAL REGIMES ARE NO SUBSTITUTE FOR CRITICAL PROTECTIONS PROVIDED BY THE 2015 OPEN INTERNET ORDER

The NPRM seeks comments on whether "pre-existing federal and state competition and consumer protection regimes, in addition to private sector initiatives, [are] insufficient to address" the harms targeted by the 2015 OIO. NPRM ¶ 50. While generally-applicable competition and consumer-protection laws play a significant role in regulating BIAS providers, these laws are complements to the 2015 OIO, not substitutes.

Specifically, the 2015 OIO addresses conduct that competition and consumer protection laws do not. For example, consumer protection laws require BIAS providers to be honest about the services they offer, whereas the 2015 OIO regulates the services themselves by prohibiting certain harmful practices, like blocking and throttling. Similarly, while state and federal antitrust laws impose some limits on the behavior of BIAS providers with market power and on restraints that substantially lessen competition, they do not reach some conduct proscribed by the 2015 OIO. To be clear, the role of the states in protecting consumers and competition on the Internet remains critical and necessary. But competition and consumer protection laws alone cannot

[34] 2015 OIO ¶ 410.

provide all of the critical protections for consumers and edge providers that are fundamental to an open Internet.[35]

There would be other drawbacks to a purely *ex post* enforcement regime as well. The *ex ante* rules of the 2015 OIO provide greater certainty to businesses and individuals seeking to develop and invest in edge services than would *ex post* enforcement. Without *ex ante* rules, it would be difficult to predict how BIAS providers would interact with various competitors in a given space. The *ex ante* bright line rules also provide greater certainty to BIAS providers evaluating potential courses of action than would an *ex post* enforcement regime based solely on competition and consumer protection laws of general applicability. Moreover, *ex-post* enforcement is costly and time-consuming, and often moves too slowly to protect innovation among edge providers.[36]

The NPRM also seeks comment on whether other sources of legal authority could support rules in this space in lieu of Title II. NPRM ¶ 100. They cannot. The decision in *Verizon* made clear that the Commission cannot promulgate rules regarding discrimination or blocking of traffic without classifying broadband Internet access as a "telecommunications service" under Title II. If the Commission reverses the reclassification in the 2015 OIO, it risks promulgating ineffectual or *ultra vires* regulations.

---

[35] In NYOAG's pending action against Spectrum-TWC, NYOAG has not alleged that Spectrum-TWC's interconnection practices were themselves illegal. Instead, NYOAG alleged that Spectrum-TWC misled subscribers through advertising that promised reliable access to Netflix streaming video and other content that Spectrum-TWC knew it would be unable to deliver because of its ongoing interconnection disputes with the companies that delivered that content.

[36] *See, e.g.*, Terrell McSweeny, Comm'r, Fed. Trade Comm'n, Remarks at the Open Technology Institute – New America: The Future of Broadband Privacy and the Open Internet: Who Will Protect Consumers?, (Apr. 17, 2017), https://www ftc.gov/system/files/documents/public_statements/1210663/mcsweeny_-_new_americas_open_technology_institute_4-17-17.pdf.

## V. CONCLUSION

The Internet has thrived due to the virtuous cycle of innovation and investment. The 2015 OIO prudently and effectively achieved the Commission's goal of curbing threats to that cycle. The evidence cited above demonstrates that the Commission's efforts were no mere theoretical exercise: BIAS providers have already deliberately degraded their customers' experiences on the Internet to benefit the bottom line and there is no reason to believe they will not continue to do so if current regulation is rolled back. Title II provides the only means for the Commission to combat that threat, which is a critical, targeted enhancement to the generally-applicable competition and consumer-protection laws in place now.

The Commission should stay true to the principles of an open Internet by maintaining the 2015 OIO.