XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>                                 Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>                                Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DECLARATION OF ANDREW MCCOLLUM IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:      The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>                                 Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>                                 Defendant. | |

I, Andrew McCollum, hereby declare and state as follows:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in these consolidated matters.

2. I am the Chief Executive Officer of Philo, a streaming television service based in San Francisco, California. Philo was founded in 2011, and I joined as its CEO in 2014.

3. Philo offers an internet-based streaming television service featuring live TV, DVR, and on-demand services, focused on entertainment, lifestyle and knowledge programming. We offer more than 60 channels, including A&E, AMC, Discovery Channel, HGTV, VH1, and more, starting at $20 per month. Philo does not offer any broadcast or sports channels, which allows us to offer the same lineup of channels to subscribers across the United States. Due to this coverage, and the avoidance of cost driven by channels available only in larger metropolitan centers, a substantial number of Philo's subscribers are located in rural areas. In the future, Philo plans to add social features to its service to allow users to see what their friends are watching and to synchronize viewing so that people in different locations can view content together.

4. One of the bedrock principles of net neutrality is that an ISP must not prioritize its own content or that of paying content providers over other content. Paid prioritization would result in the creation of "fast lanes" and "slow lanes" inside an ISP's network. Philo is a small company and our business model is to provide online access to television content at an affordable price. Bandwidth is already one of our largest expenses and paid prioritization practices would substantially increase those costs. Our competitors include both large network providers (such as AT&T and Comcast) that can prioritize their own services, as well as deep-pocketed technology companies (such as Alphabet and Hulu) that can afford to pay these fees, while we could not. In this scenario, Philo would be relegated to an internet "slow lane," which could render our service practically unusable. Video startup time, quality, and reliability are critical to the streaming experience, and users will not tolerate long load times or frequent video buffering. Even minute differences in load times and buffering can lead to a user abandoning the video — and consequently, the service offering that video — altogether. Live content in particular is very

1

Declaration of Andrew McCollum in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

sensitive to these issues, due the inability to buffer ahead in the stream. Users expect to be able to view an event or program in real time without interruption or delay, and if our service cannot deliver on this promise, they will likely seek another source for that content. Thus, the absence of net neutrality protections against paid prioritization would severely harm Philo.

5. Another principle of net neutrality is that ISPs must not engage in "throttling"—decreasing the bandwidth available to certain servers in order to slow down particular internet traffic. Because live video, compared with many application types on the internet, requires more bandwidth, a reliable connection, and low latency (how long it takes information to travel through a system), services like ours are particularly prone to "throttling" by internet providers — a practice that will no longer be prohibited in the absence of net neutrality protections. Even worse, because Philo directly competes with all of the largest ISPs, which offer their own live TV services with similar content to Philo, these providers have a strong incentive to put their thumbs on the scale in their own favor.

6. To ensure ISPs could not circumvent the ban on blocking and throttling, the FCC's 2015 Open Internet Order explicitly required that when ISPs do have to manage network congestion, they do so via reasonable network management that is as application-agnostic as possible (my understanding is that SB-822 includes a similar requirement). This means that an ISP cannot single out live video services for throttling during peak times, which would have the effect of making competitive services, such as ours, appear unreliable. Instead, an ISP that needs to handle network congestion could do so by reducing data-speeds on a per-user basis.

7. Another potentially anti-competitive practice that net neutrality suggests must be carefully limited is "zero-rating." Zero-rating is the practice of exempting certain data from a user's monthly data cap. My understanding is that SB-822 would prohibit ISPs from zero-rating content services they own while counting all other services against users' data caps unless they agreed to pay fees to the ISP. Zero-rating harms companies like Philo in similar ways to paid prioritization and throttling. If, for example, usage of Philo counts against an AT&T user's data cap while services owned by AT&T (such as AT&T TV NOW and HBO MAX) do not, AT&T is giving its owned media properties a large advantage. Given that many users approach or exceed

2

their data caps in a given month, this can amount to a financial penalty to the customer for using competitive services.

8. Zero-rated content is also more attractive to mobile subscribers even on so-called "Unlimited" plans, since these plans come with "soft caps" where subscribers data speeds are severely limited. For example, AT&T's lowest priced "Unlimited" plan has a soft cap at 22GB/month - if a subscriber goes over that their network speeds are throttled.[1] That means someone on such a plan could watch as little as 6 hours of 1080p video in a month, and then have their connection throttled for the rest of the month.[2] While subscribers don't face a financial penalty, they face a real-life penalty of severely decreased access to the internet until the end of their billing cycle.

9. This is not only an issue on mobile networks — consumers are increasingly running up against and exceeding data caps on their home internet connections, as well. We receive many requests from users for functionality to help them avoid hitting these data caps, leading us to believe that zero-rated content, combined with restrictive data caps, significantly affects consumer choices about what content to watch and their source for that content.

10. Aside from protecting Philo and its subscribers from the effects of zero-rating, a prohibition preventing ISPs from offering zero-rating to outside providers for a fee would also protect new entrants in the market, as this kind of zero-rating works just like paid prioritization — allowing deep-pocket incumbents to block competition by purchasing an advantage small businesses and startups cannot.

11. In the absence of net neutrality protection and in light of the 2018 expiration of the Comcast/NBC Universal merger conditions and AT&T's $104 billion purchase of Time Warner, powerful incumbents have the resources and motive to stifle innovative new over-the top video services like Philo.

---

[1] "We may also slow it after you use more than 50GB or 22GB of data in a single bill period." https://www.att.com/help/wireless/data-usage.html. Archived on June 30, 2020 at https://web.archive.org/web/20200630053702/https://www.att.com/help/wireless/data-usage.html
[2] https://www.androidauthority.com/how-much-data-does-youtube-use-964560/

3

12. As network and content providers have continued to consolidate, the three largest US ISPs — Comcast (with Peacock), Charter (with Spectrum TV Essentials), and AT&T (with AT&T TV and HBO Max) — have all brought their own streaming TV services to market. All of these services overlap in significant parts of their content offering with Philo. AT&T already zero-rates their streaming services on their networks, and while Charter is currently prohibited by consent decree from imposing data caps, they are seeking permission to be exempted from these rules.

13. Zero-rating also threatens to compromise our subscribers' privacy. Philo delivers its data via encrypted links, which, if we were to participate in zero-rating programs, would have to be unmasked to the ISP in order to identify the content and determine whether or not it should be subject to data caps. This would be the case in both paid and free zero-rating programs. The consequence of this would be that the ISP would also be gaining access to information about Philo's subscribers and their viewing choices — information we would strongly prefer to protect and withhold on behalf of our customers. We welcome competition in our space and believe that it will lead to significant benefits and innovation for consumers, but it should be on a level playing field, which we believe the principles of net neutrality represented in SB-822 help to ensure.

14. Net neutrality principles also prohibit ISPs from intentionally inducing congestion at the interconnection points where traffic enters their networks. Without this protection, large ISPs are likely to demand higher and higher interconnection fees for content distribution networks (CDNs), transit providers, and edge providers that deliver content requested by those ISPs' customers. Though Philo uses CDN vendors and does not pay these interconnection fees directly, the costs our CDNs pay ISPs are passed on to Philo. It is important to note that Philo and other online services do not have an alternative to deliver their content to consumers — at some point we or the content distribution network must hand off the data packet carrying our content to the end user's ISP at an interconnection point.

15. Since SB-822 was passed and this lawsuit put on hold until the resolution of the federal case, ISPs have largely refrained from obvious violations of net neutrality principles.

4

Declaration of Andrew McCollum in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

During that same time frame, the U.S. House of Representatives took up, debated, and passed in the spring of 2019 the "Save the Internet Act," which restored the 2015 Open Internet Order. That was then passed to the Senate for its consideration. We believe that the widespread attention to both that lawsuit, this lawsuit and the legislation have kept ISPs from engaging in many behaviors banned by SB-822. We also take ISPs at their word that if they are successful in blocking SB-822, they will find ways to violate net neutrality, including through abusive interconnection practices and harmful zero-rating schemes.

16. The threats to Philo are ongoing. On June 17, 2020, Charter Communications, the second largest cable ISP with 26 million subscribers petitioned the FCC to allow it to begin imposing data caps on subscribers and to begin charging video providers to deliver requested video to Charter subscribers. Charter Communications has been prohibited from doing either due to FCC conditions placed on its merger with Time Warner Cable. Furthermore, in December 2018, Charter Communications paid $174.2M to settle a civil lawsuit brought by the New York Attorney General's office that alleged Charter effectively throttled its customers' video and video games via abusive interconnection practices, while promising subscribers that video and video games would be extremely fast.

17. It should also be noted that Charter has financial motivations to circumvent net neutrality to harm Online Video Providers like Philo. Charter sells cable TV service, so slowing down competing online video providers prevents its cable TV subscribers from "cutting the cord". Additionally, Charter sells its own online video service, currently available only to Charter broadband subscribers, called Stream TV. This service directly competes with Philo.

18. If Charter is allowed to circumvent the principles of net neutrality by engaging in throttling and paid prioritization via abusive interconnection practices where data enters Charter's network, Philo will be materially harmed in the same way as it would be if Charter engaged in these practices inside its network.

19. It is worth noting why the FCC imposed those merger conditions on Charter:
"Cable and fiber BIAS subscribers represent a particularly valuable set of customers for many edge providers. Various edge providers (e.g., high-

5

definition OVDs, real-time gaming, and online backup) offer services that may only function acceptably when delivered over a high-speed connection.

"Due to the lack of alternatives, the most bandwidth-intensive edge provider services face intense pressure to access cable or fiber BIAS subscribers, and thus will be the most susceptible to imbalanced bargaining power with cable or fiber BIAS providers.

"[Charter]'s bargaining power in the interconnection market will increase due to its larger share of BIAS subscribers. As described in the background section above, [Charter] would become the second-largest BIAS provider in the United States, with an 18.4 million residential BIAS customers, over 20 percent of the residential BIAS customers nationwide (and approximately 35% larger than Time Warner Cable and Bright House combined). Our economic analysis suggests that the ability of a BIAS provider to charge for access to subscribers increases with the number of subscribers; the greater the number of subscribers, the more the BIAS provider can charge on a per-subscriber basis. As the nation's second-largest BIAS provider serving over one-fifth of American wired BIAS consumers, edge providers would need access to [Charter] subscribers to remain viable as a business.

"Furthermore, as previously discussed, because [Charter] would face little competition to retain its BIAS subscribers, there is little competitive restraint on its efforts to collect fees for access to its subscribers."[3]

20.    The internet has spurred innovation precisely because it has been an open, level playing field, where barriers to offering new products and services have continually come down over time. In the 1990s, creating a website required first figuring out how to build and set up a web server — no small feat. I was one of the co-founders of Facebook in 2004, which we started on a server we rented for $85 per month without needing any venture capital investment. Today,

---

[3] FCC MEMORANDUM OPINION AND ORDER ¶¶ 114-115 (May 5, 2016), https://transition.fcc.gov/Daily_Releases/Daily_Business/2016/db0510/FCC-16-59A1.pdf.

6

Declaration of Andrew McCollum in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

basic hosting in the cloud can be free for a year or longer, meaning that anyone with an idea has the ability to get it out into the world. However, if we allow last-mile service providers — those who control the delivery of data to end users — to use their exclusive terminating access to erect barriers and tollbooths for reaching their customers, we risk reversing this trend and inhibiting future waves of internet innovation.

I declare the foregoing under penalty of perjury under the laws of the United States of America. Executed this 14th day of September, 2020, at San Francisco, CA.

_____
Andrew McCollum

7

Declaration of Andrew McCollum in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)