XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail: Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California, Governor Gavin C. Newsom, and Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>                  Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>                  Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DECLARATION OF STEVEN RENDEROS IN SUPPORT OF OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:    The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>                  Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>                  Defendant. | |

I, Steven Renderos, hereby declare and state as follows:

1. I make this declaration of my own personal knowledge and if called to testify, I could and would testify competently to the matters stated herein. I declare the following in support of Defendants' Opposition to the Motions for Preliminary Injunction in these consolidated matters.

2. I am the Executive Director of MediaJustice. MJ was founded in 2009 by Malkia Devich Cyril, Amy Sonnie, and Jen Soriano to advance communication rights, access, and power for communities harmed by persistent dehumanization, discrimination and disadvantage. I joined as National Organizer in 2012, and became Executive Director in 2020.

3. MediaJustice is an Oakland-based national grassroots leader for racial, economic and gender justice in communications, fighting for media control, access and power for communities of color.. We host the nation's largest racial justice network for media, technology and cultural change. We have 100 member organizations across the country with 21 of those based here in California.

4. MediaJustice and our network members have advocated for Net Neutrality for the last 10 years, including fighting for the strong protections in the Federal Communication Commission's 2015 Open Internet Order.

5. I file this declaration to the court not just as a long-time advocate for net neutrality protections, but as someone who embodies the promise of an open Internet. I am the child of Salvadoran immigrants, raised by a single mother in Koreatown in Los Angeles so I know the value of opportunity. My mom worked a subpar job, spending 25 years as a garment worker. Her wages only afforded us subpar housing, a 1 bedroom apartment shared with another family. I attended a subpar elementary school which to this day is rated below average in the state. My mother shopped at a subpar grocery store with meats and vegetables nearing their expiration dates. But I was afforded opportunities others in my neighborhood were not. I went from attending a bad school to one of the best schools in the country. Thanks to my mother's sacrifice I was the first person on my block to have a computer with Internet access. That access helped me become the first person in my family to attend college. I know what it means to live a second

1

Declaration of Steven Renderos in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

class existence. But I also know how powerful an open Internet can be to overcome structural barriers to success.

6. MediaJustice fights for net neutrality, not because we care about what happens to bits and bytes, but because in the 21st century, net neutrality is a civil rights struggle.

*For Communities of Color, an Open Internet Is An Indispensable Tool for Social and Political Engagement*

7. For communities of color, net neutrality protections ensure that communities of color preserve their constitutional rights to speak, to assemble and to petition the government, which, as the FCC's 2015 Open Internet Order noted, is "dependent on an open Internet where providers cannot restrict access to ideas and speech by imposing additional costs or by blocking controversial viewpoints."[1] The Internet's lower barrier to entry compared to radio, television and print means that the Internet acts as a platform where communities of color can speak for, on behalf and to our communities and have those voices reach wider audiences." This platform is crucial for communities of color because the voices of people of color are not widely included in traditional media outlets.

8. SB 822 ensures this platform remains open for communities of color in California by prohibiting ISPs from blocking or slowing down the platforms and services our communities use. SB822 ensures that ISPs do not discriminate against political movements and messages they disagree with, and furthermore ensures that those ISPs cannot be coerced by politicians or public pressure to silence voices from communities of color seeking justice.

9. For Black activists tired of seeing unarmed Black bodies being killed by police, be it Stephon Clark in Sacramento, George Floyd in Minneapolis, Breonna Taylor in Louisville, Ahmaud Arbery and Rayshard Brooks in Georgia, Antwon Rose in East Pittsburgh, and Elijah McClain in Aurora, Colorado, the Internet allows our community to mobilize quickly in response to police violence. In the middle of a pandemic, the open Internet has provided a "scale, creativity, and endurance"[2] to social movements that have catalyzed a national conversation about

---

[1] 2015 Open Internet Order, supra note 8, at ¶ 77, n. 118.
[2] https://www.newyorker.com/culture/cultural-comment/the-second-act-of-social-media-activism.

2

structural racism. An open and free internet was not inevitable; it was created by decades of careful work by Republican and Democratic FCC chairs alike, persistent legal work to prevent ISPs from controlling what flowed over the network, and millions of Americans demanding the internet be open to all.

10. An open internet is crucial to all communities seeking justice. For members of queer and trans communities, the Internet is one of the few safe spaces to connect to one another. For those outraged by the continued separation of immigrant families, the Internet is where they channel outrage and move politicians to act.

11. SB 822 comprehensively protects marginalized voices by carefully translating the FCC's 2015 Open Internet Order into state law. California has the right and the moral responsibility to ensure our voices have a chance to be heard.

12. Without an open Internet, the world would not know the names of George Floyd, Breonna Taylor, Ahmaud Arber and Elijah McClain. Without an open internet, no one would have heard their loved ones' howls for justice, and our judicial and political systems could have ignored their killings as they have with too many other Black lives.

***For Communities of Color, an Open Internet Is an Indispensable Tool for Education***

13. While internet access has become increasingly crucial to students over the last 20 years by providing them with supplementary tools such as first-hand research materials, with the Covid-19 pandemic, a quality education relies on a strong internet connection.

14. As we learned this spring, when schools closed their doors to prevent the virus's spread, households with meager connections had to ration online time, trying to figure out who has priority for that bandwidth - working parents needing to be on an online call or kids who have a scheduled online class.

15. While SB822 can't solve all the educational problems of households with subpar internet connections, it includes a number of key protections:

16. One, it prohibits ISPs from singling out particular classes of applications as a way to handle network connections. Thus, an ISP can't simply slow down or block all online video during times of congestion; instead, ISPs must handle such situations in a manner that is as

3

1 application-agnostic as possible. This ensures that if a household's connection gets weak, users in
2 the household, not the ISP, decide how to use that bandwidth.

17. Two, SB822 ensures that ISPs don't evade the core net neutrality protections against blocking, slowing down or speeding up sites at the places where data enters their network. This ensures that ISPs don't find a backdoor way to favor particular services, including ones they own, over others.

18. For instance, SB822 bans ISPs from charging websites and services simply so that ISPs' customers can visit that website or that service. ISPs have long wanted the ability to charge websites so-called "access fees." For example, when Verizon challenged the 2010 Open Internet Order, it told a federal court that it should have the right to charge websites/services whatever fee it would like and block those that did not pay the fee.[3]

19. Without that prohibition, ISPs can use their monopoly over their customers to charge unreasonable fees - and if your school district can't afford that fee, then parents and students that use that ISP to get online can't get to the school's website.

20. In the same vein, SB 822 prohibits Verizon from charging exorbitant fees to the Zoom calling service, popular with school districts that moved to online classes, simply to deliver requested traffic to Verizon customers. Additionally, Verizon is banned from severely limiting the data from Zoom entering the Verizon network. Verizon has a strong motive to do both since it spent $500M in May 2020 to buy BlueJeans Meetings, a video conference service that competes with Zoom.[4]

***For Communities of Color, an Open Internet Is Indispensable for Entrepreneurship and Remote Work***

21. The Internet has become indispensable to every market and business because decades of FCC work to ensure an open Internet has prevented ISPs from picking winners or losers. This has allowed small businesses, startups, and entrepreneurs to compete on a level playing field.

---

[3] Verizon vs. FCC, No. 11-1355, United States Court of Appeals for the District of Columbia, 2014. Video of the charging argument: https://www.youtube.com/watch?v=Srit2ICuG5k (5 mins), https://www.youtube.com/watch?v=l5ut_fKxX9w (12 mins).
[4] https://techcrunch.com/2020/05/18/verizon-wraps-up-bluejeans-acquisition-lickety-split/; https://www.verizonwireless.com/business/articles/business/blue-jeans-verizon-solution-brief/.

4

22. Without an open Internet, broadband service providers could favor their own content or enter into pay-to-play agreements with websites to create fast lanes and slow lanes. Indeed, the FCC has found that broadband service providers have the economic ability and incentive to limit Internet openness.[5]

23. Broadband service providers have exerted their ability to pick winners and losers in the past. In 2005, a DSL provider in North Carolina blocked Vonage, an online calling service, because it took revenue from its landline phone business. The FCC quickly stepped in and ordered the company to stop, setting a precedent against blocking that was enforceable by the FCC until the 2018 repeal.[6] Comcast secretly blocked peer-to-peer applications in 2008, harming competitors to its cable TV service. Again, the FCC stepped in and set a precedent that network management techniques should be as application-agnostic as possible.[7]

24. Later, Verizon blocked many of its customers from using Google Wallet, which competed with its own payment solution.[8] Another instance of blocking involved AT&T and Apple – this time, when AT&T used its control over certain carrier-specific settings on iPhones to prevent FaceTime from working on a mobile connection.[9]

25. Without SB 822, broadband service providers would be free to create a two-tiered system on the Internet using techniques that block, slow down or speed up sites, putting startups, small businesses, and other entrepreneurs at competitive disadvantage, while simultaneously limiting consumer choice.

26. Fast lanes reward those that have the deep pockets to pay those fees, making it impossible for new entrants and those without vast amounts of capital to compete with those that can pay such fees.

27. While the elimination of rules protecting an open Internet would harm consumers and small businesses generally, it would disproportionately harm consumers, business owners, and entrepreneurs of color.

---

[5] 2015 Open Internet Order at ¶¶ 78- 85
[6] https://www.cnet.com/news/telco-agrees-to-stop-blocking-voip-calls/.
[7] https://www.multichannel.com/news/fcc-hammers-comcast-file-sharing-296516
[8] 2015 Open Internet Order at ¶ 96.
[9] 2015 Open Internet Order at ¶ 79, note 123.

5

28.     A comprehensive 2020 study by RateMyInvestor found a majority of investment capital from VCs went to founders who are college-educated white men. Out of the nearly 10,000 founders included in the study, only 1% were black, less than 2% Latin American, and less than 10% identified as female.[10]

29.     While fast lanes and access fees harm all startups and online small businesses, startups that have millions in venture capital have some ability to pay such fees or get around them. Small businesses and startups that do not get VC money simply can't pay such fees.

30.     Additionally, many entrepreneurs of color rely on distributed platforms to help them launch their businesses or create "side hustles" that give them a much needed second income stream. Platforms such as Shopify, Patreon and Etsy provide ways for entrepreneurs of color to launch products that appeal to their community, with those platforms taking a small commission. However, if large ISPs are allowed to charge those platforms for access to the ISP's customers, the platforms will necessarily have to pass that cost onto their customers. That simply means that entrepreneurs of color will be paying taxes to every ISP as a cost of doing business.

31.     That's not a tax that our community can afford and would have the effect of discouraging new entrepreneurs of color from chasing their dreams and enriching their communities.

***Zero Rating's Particular Harm to Communities of Color***

32.     822 prohibits the most egregious forms of an often discriminatory practice known as "zero-rating". Zero-rating is the practice of exempting or not counting certain applications, websites or data from consumers' data caps, while counting all other data against the cap. For instance, AT&T does not count the data used by its subscribers when watching HBO Max videos, but all other data, including that from using other video services, counts against the subscribers' monthly data caps. Like speeding up an application, zero-rating gives the zero-rated content an advantage. That's because people prefer content that doesn't eat up their data over content that does. These harmful zero-rating schemes push Internet customers to use the websites and applications chosen by their Internet Service Provider (ISP). Zero-rated data is only attractive

---

[10] https://ratemyinvestor.com/pdfjs/full?file=%2FDiversityVCReport_Final.pdf.

6

when customers have data caps. So ISPs that use zero-rating keep data caps low and make unlimited plans expensive. Those make zero-rated sites and services attractive, and motivates companies with deep pockets to pay to be exempted from the cap. For example, in the European Union, ISPs that don't offer zero rating give subscribers paying €30 per month 8 times more data than ISPs that zero-rate video.[11]

33. ISPs argue that these zero-rated plans are good for communities of color, who are disproportionately subscribers to plans with meager monthly data caps.

34. I say that discrimination of any form is never good for people of color.

35. Plans like AT&T's zero-rating of its video services, including DirectTV and HBO MAX, are dangerous because they create a second-class experience online and make it harder for our voices, which are not on DirectTV, to be heard. Watching video uses up a lot of data. For example, customers with a 3GB cap can watch about 4½ hours of video per month, or 9 minutes a day before they run out of data.[12] Choosing between accessing content created by people of color and watching Game of Thrones on HBO isn't a real choice if watching a couple hours of the former means you go over your data cap and have your connection slowed down for the rest of the month.

36. It's also worth noting that two of the most prominent Black writers and producers of now zero-rated HBO shows, Issa Rae and Amy Aniobi, were hired by the network after they successfully crowdfunded shows they then wrote and produced independently. Ironically, those shows grew popular on the open internet when the FCC had enforceable net neutrality protections.

37. Running out of data is not an uncommon experience in communities of color. My own cousin, an AT&T customer, routinely runs out of data every month due to overpriced data plans with artificially low caps. The practice of zero-rating only works in an ecosystem that allows discrimination based on data caps. Yet the COVID-19 pandemic has exposed how arbitrary limits on data usage actually are. Every major Internet Service Provider has lifted any

---

[11] http://research.rewheel.fi/insights/2016_dec_pro_tightoligopoly/.
[12] https://cyberlaw.stanford.edu/blog/2016/01/t-mobiles-binge-violates-key-net-neutrality-principles.

7

restrictions relating to data caps, including some like T-Mobile automatically upgrading their customers to unlimited data plans.[13]

38. In countries where self-serving zero-rating schemes are banned, including Canada and India, the introduction of these prohibitions led to cheaper prices per GB for metered plans, while unlimited plans became cheaper. When a Dutch regulator prohibited a mobile ISP from zero-rating its own video service (the Dutch equivalent of AT&T zero-rating HBO MAX), the ISP doubled its data caps without raising prices.[14]

39. Communities of color and low-income communities deserve an equal experience online.

40. Feminist theorist, bell hooks, once said that "when you are thirsty, you want water. It does not matter in that moment whether it's dirty or clean. Our job is not to carry dirty water. It's not to ask communities to choose between a drink or thirst."

41. An Internet where an ISP's own content is zero-rated but our voices are not is dirty water. Net Neutrality protects everyone from a second class experience online. I urge the court to recognize that SB822 helps ensure that the Internet Californians have access to is clean, open and abundant.

42. Finally, it hardly needs highlighting, but California, and the entire country, is in the midst of a deadly pandemic. School and work is now done remotely from our homes, apartments, and sometimes a Taco Bell parking lot. Now more than ever, internet access is vital to our lives. Nearly everything we do has transitioned online, and our connection to the internet is literally our connection to everything. That includes our kids' classes, our mental and physical healthcare, our jobs, and loved ones both near and far.[15]

43. Enjoining SB822 would allow the largest ISPs, who connect millions of Californians to everything, to add to the pandemic's many casualties, using them as pawns to create fast lanes and slow lanes and charge access fees. In this time of crisis, Californians need protection, not predation. I urge the Court to reject the request for a preliminary injunction.

---

[13] https://www.cnet.com/news/carriers-are-suspending-internet-data-caps-during-coronavirus/
[14] http://research.rewheel.fi/downloads/Banning_zerorating_leads_to_higher_volume_caps_06022015.pdf.
[15] https://abc13.com/girls-sit-outside-taco-bell-for-wifi-salinas-eviction-online-school/6407892/

8

Declaration of Steven Renderos in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

I declare the foregoing under penalty of perjury under the laws of the United States of America. Executed this 13 day of September, 2020, in  Oakland, CA .

_____
Steven Renderos

9

Declaration of Steven Renderos in Support of Opposition to Preliminary Injunction Motion
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)