1   Kevin K. Russell, *pro hac vice*
2   GOLDSTEIN & RUSSELL, P.C.
    7475 Wisconsin Avenue, Suite 850
3   Bethesda, MD 20814
    (202) 362-0636
4   krussell@goldsteinrussell.com
    *Counsel for Amici Curiae*
5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11
    | THE UNITED STATES OF AMERICA, | 2:18-cv-02660-JAM-DB |
12  |                                | 2:18-cv-02684-JAM-DB |

                              Plaintiff,

13                                       **BRIEF OF COMMUNICATIONS LAW
                                         SCHOLARS AND MEDIA DEMOCRACY
14          v.                           FUND AS AMICI CURIAE IN SUPPORT
                                         OF DEFENDANTS' OPPOSITION TO
15  THE STATE OF CALIFORNIA, et al.,     PRELIMINARY INJUNCTION MOTIONS**

16                          Defendants.

17                                       Judge:  Hon. John A. Mendez

18  **AMERICAN CABLE ASSOCIATION,
    CTIA – THE WIRELESS ASSOCIATION, et
19  al.,**

20                            Plaintiffs,

21          v.

22  **XAVIER BECERRA, in his official capacity
    as Attorney General of California,**
23
                             Defendant.
24

25

26

27

28

1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF INTEREST OF AMICI CURIAE ................................................................. 1

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 3

I.   There Is No Conflict Between SB-822 And The Communications Act's Limitations On The FCC's Power To Issue Common Carriage Regulations ............................................. 3

II.  SB-822 Is Not Conflict Preempted By The FCC's Failure To Regulate BIAS Or The Agency's Deregulatory Preferences ...................................................................................... 6

     A.  The FCC Lacks Regulatory Authority Over The BIAS Practices Addressed By SB-822 And Therefore Has No Power To Regulate Or Deregulate Them ...................... 7

     B.  There Is No Conflict Preemption Arising From The FCC's Reclassification Decision ...................................................................................................................... 9

     C.  SB-822 Does Not Conflict With The FCC's Exercise Of Ancillary Authority To Impose Modest Reporting Requirements ...................................................................... 11

CONCLUSION .......................................................................................................................... 12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Cases**

*California v. FCC,*
  39 F.3d 919 (9th Cir. 1994) .................................................................... 6, 11

*Chamber of Commerce v. Whiting,*
  563 U.S. 582 (2011) .................................................................................... 5

*Charter Advanced Servs. (MN), LLC v. Lange,*
  903 F.3d 715 (8th Cir. 2018) ................................................................... 11

*City of Dallas v. FCC,*
  165 F.3d 341 (5th Cir. 1999) .................................................................. 4, 5

*Comcast Corp. v. FCC,*
  600 F.3d 642 (D.C. Cir. 2010) .............................................................. 6, 12

*Comput. & Commc'ns Indus. Ass'n v. FCC,*
  693 F.2d 198 (D.C. Cir. 1982) .............................................................. 6, 11

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
  458 U.S. 141 (1982) .................................................................................... 8

*Freightliner Corp. v. Myrick,*
  514 U.S. 280 (1995) .................................................................................... 9

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) .................................................................................... 5

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,*
  471 U.S. 707 (1985) .................................................................................... 8

*Lipschultz v. Charter Advanced Servs. (MN), LLC,*
  140 S. Ct. 6 (2019) .................................................................................... 11

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ............................................................... *passim*

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .................................................................................. 10

*Nat'l Fed'n of the Blind v. United Airlines Inc.,*
  813 F.3d 718 (9th Cir. 2016) .................................................................... 8

*Ray v. Atl. Richfield Co.,*
  435 U.S. 151 (1978) ............................................................................. 7, 8, 9

*Restoring Internet Freedom,*
  33 FCC Rcd. 311 (2018) .............................................................................. 1

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.,*
  474 U.S. 409 (1986) ................................................................................. 4, 5

*Va. Uranium, Inc. v. Warren,*
  139 S. Ct. 1894 (2019) ................................................................................ 8

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ................................................................................. 4, 8

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................................... 8

ii

1

**Statutes**

Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ........................................3, 4

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56...............................4, 5, 12

47 U.S.C. § 152 note .........................................................................................5

47 U.S.C. § 153 ...............................................................................................3

47 U.S.C. § 153(51) ....................................................................................3, 5, 9

47 U.S.C. § 257 ..............................................................................................12

47 U.S.C. § 257(a) ..........................................................................................12

47 U.S.C. § 332(c)(2) ........................................................................................3

47 U.S.C. § 541(b)(1)........................................................................................4

California Internet Consumer Protection and Net Neutrality Act of 2018,
   Cal. Civ. Code §§ 3100-3104 (SB-822)..........................................................*passim*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brief of Amici Curiae Media Democracy Fund et al. (2:18-cv-02660, 2:18-cv-02684)

1

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

2    This brief is submitted on behalf of professors of communications law and the Media and

3    Democracy Fund, a project of New Venture Fund, a catalyst for an open, secure, and equitable

4    Internet.  Amici have an established interest in the outcome of this case and believe that their

5    perspectives will assist the Court in resolving it.  The communications law scholar amici[2] to this

6    brief include:

7    **Yochai Benkler**, Berkman Professor of Entrepreneurial Legal Studies at Harvard Law

8    School, and faculty co-director of the Berkman Klein Center for Internet and Society at Harvard

9    University

10   **John Blevins**, John J. McAulay Distinguished Professor of Law, Loyola University New

11   Orleans College of Law

12   **Rob Frieden**, Pioneers Chair and Professor of Telecommunications and Law at Penn

13   State University

14

15   **Jerry Kang**, Distinguished Professor of Law and Asian American Studies, UCLA

16   **Tim Wu**, Julius Silver Professor of Law, Science and Technology, Columbia University

17   Law School

18

## INTRODUCTION

19   In its *Restoring Internet Freedom* order, 33 FCC Rcd. 311 (2018), the Federal

20   Communications Commission (FCC or Commission) declared that broadband information access

21   service (BIAS) is an information service, akin to email, Twitter, eBay, or Netflix.  The FCC lacks

22   the power to regulate the provision of information services, including the aspects of BIAS governed

23   by the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Civ. Code

24

25   [1] Amici certify that that no counsel for a party authored this brief in whole or in part, and

26   no person other than amici or their counsel made a monetary contribution intended to fund the
preparation or submission of this brief.

27   [2] Affiliations listed for identification alone.  Each scholar is signing in his individual

28   capacity.

1

Brief of Amici Curiae Media Democracy Fund et al. (2:18-cv-02660, 2:18-cv-02684)

§§ 3100-3104 (SB-822).  That is why the Commission repealed its prior net neutrality rules.  The question here is whether States are likewise forbidden from regulating information services like BIAS, such that those services are not subject to meaningful regulation by either the federal government or the States.

Plaintiffs insist States have no such power.  Indeed, the FCC previously attempted to ensure this regulatory void by issuing a rule preempting all state regulation of BIAS provisions, even though the Commission lacked the power to regulate those practices itself.  The D.C. Circuit rejected that argument, concluding that in putting information services outside the FCC's regulatory authority, Congress precluded the Commission from regulating *or* deregulating it.  *Mozilla Corp. v. FCC*, 940 F.3d 1, 75-76, 86 (D.C. Cir. 2019) (per curiam).

Plaintiffs now argue the whole debate in *Mozilla* was beside the point because Congress already preempted the field of interstate communications by wire or radio, a fact they forgot to mention to the D.C. Circuit.  At the very least, the Internet Service Provider (ISP) Plaintiffs argue, Congress forbade the States from imposing common-carriage-type regulations on BIAS providers, although the provisions they point to limit only the powers of the FCC.  Finally, both sets of Plaintiffs argue that any state regulation of BIAS is preempted because it conflicts with the FCC's decision not to impose any regulation on BIAS beyond modest disclosure requirements, even though it had no authority to do anything else.

California and others explained why the field preemption argument is unfounded.  We explain in this brief why SB-822 is not conflict preempted either.  Having made the decision to classify BIAS as an information service in order to avoid any statutory obligation to regulate it, the Commission is stuck with the legal consequences that flow from that decision.  And one of those consequences is that BIAS falls outside of its authority, not only to regulate, but also to shield from state regulation.  If the Commission is unwilling to live with that result, it can revisit its classification decision or seek enhanced authority from Congress.

2

**ARGUMENT**

I.     **There Is No Conflict Between SB-822 And The Communications Act's Limitations On The FCC's Power To Issue Common Carriage Regulations.**

The ISPs—but notably, not the United States—argue that even if the statute does not preempt the entire field of interstate communications, SB-822 at least conflicts with provisions of the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (Communications Act or Act), that restrict the FCC's power to impose common carriage requirements on information service providers.  ISP Br. 15.  That argument has no merit.

The ISPs do not claim that the Act expressly preempts state common carriage requirements.  Instead, they say such state regulation is impliedly preempted by 47 U.S.C. § 153, which defines the term "telecommunications" and states that a "telecommunications carrier shall be treated as a common carrier *under this chapter* only to the extent that it is engaged in providing telecommunications services."  47 U.S.C. § 153(51) (emphasis added); *see* ISP Br. 15 & n.12.  The ISPs also cite a similar provision regarding mobile services that states that a "person engaged in the provision of a service that is [not a commercial mobile service] shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose *under this chapter*."  ISP Br. 15 n.12 (quoting 47 U.S.C. § 332(c)(2)) (emphasis added).

Both provisions unambiguously address only the scope of the FCC's authority under the federal statute (*i.e.*, "under this chapter"), not the States' regulatory authority under state law.  *See Mozilla*, 940 F.3d at 79 (noting that Section 153(51) "is a *limitation* on the Commission's authority").  The ISPs nonetheless argue that state common carrier regulation of information service providers "would 'stand[] as an obstacle' to Congress's decision to immunize these services from such regulation."  ISP Br. 15 (citation omitted).  But that just begs the question of whether in withholding such authority from the Commission, Congress intended to "immunize these services from" all common carriage regulation, or only common carriage regulation by the FCC.

The text and structure of the Act belie the ISPs' inference.  If Congress had intended to preclude both state and federal regulation, it presumably would have said so clearly, as it did

3

Brief of Amici Curiae Media Democracy Fund et al. (2:18-cv-02660, 2:18-cv-02684)

elsewhere in the statute. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (citation omitted); Calif. Br. 13 (discussing presumption against preemption); *id*. 30 (documenting Congress's habit of expressly addressing preemptive effect of various provisions of Communications Act).

The Fifth Circuit rejected a similar claim in *City of Dallas v. FCC*, 165 F.3d 341 (5th Cir. 1999).    There, a provision of the 1996 amendments to the Communications Act (Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56) exempted open video service providers from the statute's requirement that cable operators generally "may not provide cable service without a franchise." 165 F.3d at 347 (quoting 47 U.S.C. § 541(b)(1)).  The FCC reasoned, as the ISPs do here, that any "State or local requirements . . . that seek to impose Title VI 'franchise-like' requirements on an open video system operator would directly conflict with Congress' express direction that open video system operators need not obtain local franchises." *Ibid*. (quoting FCC order) (alteration in original).   The Fifth Circuit rejected that argument, explaining that the provision "results in the deletion of the federal requirement" but "does not eviscerate the *ability* of local authorities to impose franchise requirements." *Ibid*.

The ISPs claim that "the Supreme Court has long held in analogous contexts that, where Congress has prohibited federal regulators from imposing specific obligations, States may not impose such regulation without running afoul of the Supremacy Clause." ISP Br. 16.  But their only support for this claim, *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board of Mississippi*, 474 U.S. 409 (1986), held no such thing.  In that case, "Congress had 'enacted a comprehensive scheme of federal regulation of all wholesales of natural gas in interstate commerce.'" *Id*. at 419 (citation omitted).  The Court thus held that the statute occupied the field and precluded any state regulation of, among other things, interstate pipeline purchases from common gas pools.  *See id*. at 418.  Originally, Congress charged FERC with regulating prices under this exclusive federal regime.  A later statute, however, adopted a market-based system of price regulation and made other changes to FERC's authority. *Id*. at 420-21.  The Supreme Court

held that the changes did not alter the field-preemptive scope of the federal statute.  *Id.* at 423 ("In light of Congress' intent to move toward a less regulated national natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the States to impose additional regulations.").  The case was thus a straight-forward application of field preemption principles that, as California and others have explained, have no application here.

If there were any question about the validity of the ISPs' supposed rule, it would be settled by the Supreme Court's more recent decision in *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011).  There, Congress had required the Secretary of Homeland Security to establish an electronic system for verifying an employee's work authorization status, but had forbidden the Secretary from requiring employers to use it.  *Id.* at 590-91.  Arizona, however, enacted a law requiring its employers to use the system.  *Id.* at 593.  Like Plaintiffs here, the plaintiffs in *Whiting* claimed that by prohibiting the federal agency from imposing a certain regulatory requirement, Congress impliedly preempted any state law that would impose the same obligation.  *Id*. at 608.  The Supreme Court rejected that assertion out of hand.  The federal statute, it observed, "contains no language circumscribing state action."  *Ibid*.  And the provision "constrain[ing] federal action" simply "limits what the Secretary of Homeland Security may do—nothing more."  *Ibid*.

There is another problem as well.  As noted, the ISPs argue that SB-822 conflicts with Section 153(51)'s restrictions on common carriage regulation.  ISP Br. 15 n.12.  That provision was added by Section 3 of the Telecommunications Act of 1996, 110 Stat. at 60.  Section 601(c)(1) of the 1996 Act provides:  "No implied effect.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 110 Stat. at 143 (codified at 47 U.S.C. § 152 note).  In *City of Dallas*, the Fifth Circuit explained that this provision precludes any conflict preemption argument based on provisions of the 1996 Act.  165 F.3d at 347; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000) (conflict preemption is a form of implied preemption).  Section 601(c)(1) thus precludes any argument that Section 153(51) conflict preempts California law.  *See also* ISP Br. 4 (relying on implications from alleged deregulatory policy expressed in 1996 Act).

5

Brief of Amici Curiae Media Democracy Fund et al. (2:18-cv-02660, 2:18-cv-02684)

The ISPs try to claim that even before 1996, the courts "recognized that subjecting information service providers to common carrier regulation would contravene federal law." ISP Br. 16; *see also id*. n.14 (citing *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) and *Computer & Communications Industry Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) (*CCIA*)).  But in *CCIA*, the D.C. Circuit did not address preemption of enhanced services at all, holding only that the FCC validly preempted state tariffing of consumer premises equipment.  *See* 693 F.2d at 214.  In *California v. FCC*, the court considered only certain state structural separation requirements and nonstructural safeguards.  *See* 39 F.3d at 922.  And in neither case did the court invoke a general rule prohibiting state common carriage requirements for enhanced services.  Instead, the courts found that the FCC had ancillary authority to regulate (and, therefore, deregulate) specific practices because of their effects on common carriers subject to pervasive FCC regulation under Title II.  *See California v. FCC*, 39 F.3d at 931; *CCIA*, 693 F.2d at 205; *see also Comcast Corp. v. FCC*, 600 F.3d 642, 656 (D.C. Cir. 2010) (explaining that the "crux of our decision in *CCIA* was that . . . the Commission had linked its exercise of ancillary authority to its Title II responsibility over common carrier rates").  Here, however, the D.C. Circuit has held—and Plaintiffs do not contest in this court—that the FCC lacks ancillary (or any other) power to regulate BIAS.  Neither of Plaintiffs' cases address whether or how States can step into such a void.

## II.   SB-822 Is Not Conflict Preempted By The FCC's Failure To Regulate BIAS Or The Agency's Deregulatory Preferences.

Unable to convince the D.C. Circuit that it had authority to deregulate BIAS through an express rule, Plaintiffs ask this Court to hold that the Commission accomplished the exact same result by *refusing* to regulate BIAS practices in furtherance of the *same* deregulatory objective.  Although they address specific provisions of SB-822, the reason for the alleged preemption is a conflict with the FCC's objective of "restor[ing] a light-touch federal approach to regulating" BIAS, which is the agency's term for complete deregulation of the field.  U.S. Br. 17.  That objective is inconsistent with *any* state regulation of BIAS provision.  If the D.C. Circuit had been convinced that the Commission's rule simply described what preemption law would declare absent the rule—*i.e.*, that the Commission's decision not to regulate BIAS practices like blocking and

6

throttling had the legal effect of prohibiting States from doing so—then *Mozilla* would have upheld the regulation.  Instead, the court left open only challenges to "a specific state regulation" based on "provision-specific arguments," 940 F.3d at 82, 86 (internal quotation marks omitted), which surely does not contemplate the FCC arguing that all state regulation of BIAS is preempted because it conflicts with the agency's deregulatory preferences, *see id.* at 81 (conflict preemption cannot be resolved "in gross").

Plaintiffs arguments are, in any event, foreclosed by settled preemption law.  The Supreme Court "has previously recognized that 'where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation."  *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978) (citations omitted; ellipsis in original).  But that is not what happened here.  Given BIAS's status as an information service, Congress has withheld from the FCC virtually all authority over the practices addressed by SB-822, including blocking, throttling, paid prioritization, etc.  And because the Commission has no power to regulate those activities, it has no power to deregulate them either, whether through an express preemption provision of the sort invalidated in *Mozilla*, or by arguing that state law conflicts with a deregulatory preference it has no authority to enforce through a rule.

### A.   The FCC Lacks Regulatory Authority Over The BIAS Practices Addressed By SB-822 And Therefore Has No Power To Regulate Or Deregulate Them.

The FCC claims that SB-822 conflicts with the Commission's goal of deregulating BIAS. U.S. Br. 15.  And, it insists, a state law is preempted if "there is a conflict between [an agency's] significant objective and the countervailing state law."  *Ibid.*  That is a fair summary of the law when the agency's objectives fall within the scope of its regulatory authority.  But the FCC cannot seriously claim that state law is preempted when it conflicts with objectives that lie outside an agency's lawful power, as BIAS does here.  If, for example, the FCC decided that it lacked authority to regulate the rules of televised Major League Baseball games because the matter falls outside the Commission's regulatory authority—or if the Nuclear Regulatory Commission, rather than the FCC, had decided not to regulate BIAS on the ground that it lacked regulatory authority over the

7

service—no one would take seriously any claim that the agency had made a "deregulatory decision" that could preempt state law.

That is because preemption is an application of the Supremacy Clause, which makes supreme only "the Laws of the United States," not the bare objectives of federal officials. U.S. Const. art. VI, cl. 2; *see, e.g., Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019) (opinion of Gorsuch, J.) (Supremacy Clause does not "elevate abstract and unenacted legislative desires above state law"). Moreover, the Constitution "gives 'supreme' status only to those [federal laws] that are '*made in Pursuance' of '[t]his Constitution*.'" *Wyeth*, 555 U.S. at 585 (Thomas, J., concurring in judgment) (quoting U.S. Const. art. VI, cl. 2) (emphasis added; second alteration in original). Accordingly, a federal statute that attempts to regulate a subject outside of Congress's constitutional authority has no preemptive effect. *See ibid*. Likewise, agency regulations may preempt state law only if the agency has delegated authority over the subject matter. *See, e.g., Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982); *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 738 (9th Cir. 2016).

The same is true when Congress's or an agency's *failure* to regulate is alleged to preempt state law. It is only when the "'failure of . . . federal officials affirmatively to *exercise their full authority* takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' [that] States are not permitted to use their police power to enact such a regulation." *Ray*, 435 U.S. at 178 (emphasis added; citations omitted; ellipsis in original); *see also, e.g., Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985); *Nat'l Fed'n of the Blind*, 813 F.3d at 733, 738. An agency's failure to regulate a practice it lacks the authority to regulate simply shows that it is respecting the limits of its powers; it is not exercising delegated authority to decide whether the matter should be free from state regulation as well.

For example, in *Ray*, Congress had authorized the Coast Guard to regulate the "vessel size and speed limitations" of certain tankers. 435 U.S. at 174 (citation omitted). The Coast Guard had not exercised this power to ban large tankers from Puget Sound, but state law did. The Supreme

8

Court concluded that the Coast Guard's failure "affirmatively to exercise [its] full authority" to impose such a restriction was tantamount to a "ruling that no such regulation is appropriate." *Id.* at 178 (citation omitted). And because Congress had delegated to the Coast Guard responsibility for deciding what size limitations were appropriate, the state law was preempted. *Ibid.*

Conversely, in *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), the Supreme Court rejected a party's claim that state regulation of tractor-trailer brakes was preempted by the Department of Transportation's failure to issue regulations on that topic. The Court explained that "the lack of federal regulation did not result from an affirmative decision of agency officials to refrain from regulating air brakes." *Id.* at 286. "Rather, the lack of a federal standard stemmed from the decision of a federal court that the agency had not compiled sufficient evidence to justify its regulations." *Id.* at 287. The agency's failure to issue regulations it had no authority to issue on the record it had compiled could not displace the States' authority to fill the void.

This case is more like *Freightliner* than *Ray*. Rather than decline to exercise lawful authority over blocking and throttling, the FCC determined that the administrative record it had compiled precluded the agency from regulating those BIAS practices, because the record showed BIAS to be an information service outside the Commission's authority to regulate.

## B.     There Is No Conflict Preemption Arising From The FCC's Reclassification Decision.

Plaintiffs nonetheless argue that the Commission *did* have authority to decide whether BIAS is an information service and that the deregulatory purposes behind *that* decision should have preemptive effect. Not so. *See Mozilla*, 940 F.3d at 82-85 (rejecting similar argument).

Congress could have empowered the FCC to make classification decisions based on its bare policy preferences. In fact, it did so with respect to satellite service. *See* 47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, *except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage*.") (emphasis added). Had Congress given the FCC the same discretion with respect to

9

1  BIAS, it might be fair to say that the classification decision constituted a lawful exercise of authority

2  to decide the appropriate level of regulation for a service.  And that decision might be entitled to

3  preemptive effect.

4      But Congress made a different choice.  For all services other than satellite, Congress made

5  the principal decisions about the appropriate level of regulation itself—it declared that if a service

6  satisfies the definition of a "telecommunication service," it must be regulated as common carriage

7  under Title II, but if it qualifies as an information service, then the FCC cannot regulate its provision

8  at all.  *Mozilla*, 940 F.3d at 17.  The only question for the Commission is whether a service meets

9  the definition of a telecommunications or an information service.  *See Nat'l Cable & Telecomms.*

10  *Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005).  And that question ultimately turns not

11  on the FCC's regulatory or deregulatory preferences, but "on the factual particulars of how Internet

12  technology works and how it is provided."  *Id.* at 991.  Specifically, the classification "question in

13  the context of broadband service required the Commission to determine whether broadband's data-

14  processing and telecommunications components 'are functionally integrated * * * or functionally

15  separate,' and, relatedly, 'what the consumer perceives to be the integrated finished product.'"

16  *Mozilla*, 940 F.3d at 88 (Millett, J., concurring) (quoting *Brand X*, 545 U.S. at 990-91) (alteration

17  in original).

18      It may well be that the FCC's factual determination that BIAS is an information service was

19  driven principally, or even exclusively, by its deregulatory preferences.  But the fact that the agency

20  may have been able to get away with achieving a policy end by gerrymandering its factual findings

21  does not mean that Congress delegated to the agency a discretionary power to decide the appropriate

22  level of state and federal regulation for the service.  Instead, Congress directed the FCC to give an

23  honest answer to a fundamentally factual question, with the regulatory consequences of those

24  determinations flowing from the text of the statute, not the objectives of the agency.  Consequently,

25  the only relevant objectives for conflict preemption purposes are the objectives *Congress* was

26  pursuing when it put information services outside the general authority of the FCC.  And, as shown

27

28

10

Brief of Amici Curiae Media Democracy Fund et al. (2:18-cv-02660, 2:18-cv-02684)

by California and others, there is no basis for concluding that Congress intended to create a regulatory void in which neither the FCC nor the States could regulate BIAS.

Put another way, even if the FCC legitimately allowed its deregulatory agenda to play a role in its classification decision, it was still limited to choosing between the options Congress had provided—it could elect to classify BIAS as a telecommunications service, which would mean common carriage regulation, or as an information service, which, as discussed, meant that the FCC could not regulate it and, therefore, could not deregulate it either. The FCC plainly wishes Congress had given it a third choice to classify BIAS as something neither it nor the States could regulate. But Congress did not give the agency that option and neither can this Court.

### C.    SB-822 Does Not Conflict With The FCC's Exercise Of Ancillary Authority To Impose Modest Reporting Requirements.

The Commission's exercise of ancillary authority to enact limited disclosure rules is no basis for preempting SB-822's regulation of *other* practices, like blocking and throttling, that have nothing to do with the reporting regulations the FCC enacted, the objectives for enacting them, or the source of the Commission's ancillary authority to impose the rules.

The disclosure rules are not founded in any ancillary authority the Commission holds over the BIAS practices generally.[3] Rather, they are a means of gathering information the FCC needs to provide a triennial report to Congress on "market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information

---

[3] In that respect, this case differs critically from cases like *California v. FCC* and *CCIA v. FCC*, in which the Commission had ancillary authority to regulate the specific practices it preempted the States from regulating. *See supra* p. 6. Likewise, in *Charter Advanced Services (MN), LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 6 (2019), the Eighth Circuit held that state regulation of Voice over Internet Protocol (VoIP) services was preempted. That holding may be correct because the FCC may well have ancillary authority over VoIP, given that it is a direct substitute for interstate telephony that is subject to pervasive FCC regulation under Title II. But to the extent the opinion includes broader statements about other information services, that unreasoned dicta is unpersuasive for the reasons discussed in this brief. *See also* 140 S. Ct. at 7 (Thomas, J., joined by Gorsuch, J., concurring in the denial of certiorari) (casting significant doubt on correctness of Eighth Circuit decision).

11

services." 47 U.S.C. § 257(a); *see Mozilla*, 940 F.3d at 47.  The relevant question, then, is whether SB-822 conflicts with the information-gathering objectives and purposes of the disclosure rule.

Plainly, it does not.  Nothing in the State's regulation of BIAS operations—*e.g.*, blocking, throttling, paid prioritization, etc.—has any effect on the Commission's ability to gather the information it needs for its reports to Congress.  Nor does anything in Section 257 suggest that Congress intended to allow the FCC to regulate or deregulate (rather than report on) information services.  *See Comcast*, 600 F.3d at 659-60.  In fact, because Section 257 was enacted as part of the 1996 Act, Section 601(c)(1) expressly precludes any argument that Congress implicitly intended the provision, or the FCC's implementation of the provision, to displace state law.  *See* § 101, 110 Stat. at 77; *supra* p. 5.

The State's limited supplementation of providers' disclosure obligations is not preempted either.  Those provisions do nothing but *enhance* the Commission's ability to fulfill its information-gathering responsibilities.  Plaintiffs do not claim otherwise.  Instead, they say that the state disclosure requirements conflict with the Commission's desire to limit reporting burdens on BIAS providers.  But Congress did not delegate to the Commission authority to decide the appropriate level of disclosure burdens for BIAS providers; it directed the Commission to file a report.  States commonly require disclosures from state businesses beyond those dictated by federal law.  Nothing in Section 257 suggests Congress intended to trench on that state authority.

## CONCLUSION

The Court should deny Plaintiffs' motions for preliminary injunction.

Dated: September 30, 2020

Respectfully submitted,

/s/ Kevin K. Russell
Kevin K. Russell, *pro hac vice*
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
(202) 362-0636
krussell@goldsteinrussell.com
*Counsel for Amici Curiae*

12

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2020, I electronically filed the foregoing via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Kevin K. Russell
Kevin K. Russell, *pro hac vice*