Corynne McSherry (SBN 221504)
corynne@eff.org
Kit Walsh (SBN 303598)
kit@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone: (415) 436-9333
Fax: (415) 436-9993

Christopher J. Conley (SBN 290747)
cconley@aclunc.org
Jacob A. Snow (SBN 270988)
jsnow@aclunc.org
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Fax: (415) 255-8437

*Counsel for Amici[1]*

*Counsel for Amici*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

AMERICAN CABLE ASSOCIATION, CTIA—THE WIRELESS ASSOCIATION, NCTA—THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM—THE BROADBAND ASSOCIATION,

                Plaintiffs,

    v.

XAVIER BECERRA, in his official capacity as Attorney General of California,

                Defendant.

THE UNITED STATES OF AMERICA,

                Plaintiff,

    v.

THE STATE OF CALIFORNIA, GAVIN C NEWSOM, Governor of California, in his Official Capacity, and XAVIER BECERRA, Attorney General of California, in his Official Capacity,

                Defendants.

Case No. 2:18-cv-02684-JAM-DB
Case No. 2:18-cv-02660-JAM-DB

**BRIEF OF CALIFORNIA CONSTITUENTS IN SUPPORT OF DEFENDANTS**

Judge:  Hon. John A. Mendez

---

[1] Additional counsel listed at 16.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................... 1

INTRODUCTION .................................................................................................... 2

ARGUMENT ........................................................................................................... 3

    I.   SB 822 Provides Essential Protections for Vulnerable and Marginalized
        Californians. ...................................................................................................... 3

        A.   Low-Income Communities Need Affordable Access to All Online
             Information. ............................................................................................ 4

        B.   Marginalized and Faith Communities Need an Open Internet to Thrive. ............... 6

        C.   Small Businesses Need Net Neutrality to Grow and Thrive. .................................. 9

        D.   Schools, Libraries and Students Need Online Educational Resources. ................. 11

    II.  The Current Statewide Emergency Reinforces the Need for SB 822's Protections. ..... 13

        A.   All Californians Rely on Online Communications in Emergencies. ..................... 13

        B.   Net Neutrality Protections Are Crucial During the COVID-19 Pandemic. ........... 14

CONCLUSION ...................................................................................................... 15

CERTIFICATE OF COMPLIANCE ..................................................................... 17

CERTIFICATE OF SERVICE .............................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*In the Matter of Preserving the Open Internet*,
  25 F.C.C. Rcd. 17905 (2010) ................................................... 11

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014).................................................. 11

**Statutes**

Cal. Pub. Util. Code § 2898 (2020) .............................................. 13

California Internet Consumer Protection and Net Neutrality Act of 2018, Senate Bill 822,
  Cal. Stats. 2018, Chapter 976 ...........................................*passim*

**Other Authorities**

#GOODMUSLIMBADMUSLIM Podcast.................................................7

Andrea Peterson, *Why the Death of Net Neutrality Would Be a Disaster for Libraries*,
  WASH. POST: THE SWITCH (May 16, 2014)................................... 12

Ashley A. Smith, *California finds solution to save distance learners' financial aid*,
  EDSOURCE (Jul. 28, 2019)..................................................... 11

Barbara van Schewick, *T-Mobile's Binge On Violates Key Net Neutrality Principles*,
  (Jan. 29, 2016) ...................................................................... 4

Becky Chau & Claire Park, *The Cost of Connectivity*, OPEN TECHNOLOGY INSTITUTE
  (July 2020)........................................................................... 2

CALIFORNIA'S NET NEUTRALITY LAW, EFF............................... 3

Carol Kuruvilla, *Why 12 Top Religious Leaders Are Proud To Support Net Neutrality*,
  HUFFPOST (June 12, 2015)....................................................... 9

Darnel Hunt et al., *Hollywood Diversity Report 2018: Five Years of Progress and Missed Chances*,
  UCLA COLLEGE OF SOCIAL SCIENCES, (2018) ............................ 6

*Dorothy Starr Collection*, SAN FRANCISCO PUBLIC LIBRARY ........................ 12

*English Listening*, USA LEARNS ................................................. 12

*Enrollment and Attendance FAQs*, CALIFORNIA VIRTUAL ACADEMIES......................... 12

Etsy, Inc., Comments In the Matter of Open Internet Remand, Framework for Broadband
  Internet Service (July 8, 2014) ................................................. 10

*Fourth Report on Ownership of Broadcast Stations*, MEDIA BUREAU INDUSTRY ANALYSIS
  DIVISION, FEDERAL COMMUNICATIONS COMMISSION, (Feb. 2020) ................ 7

Geoff Weiss, *Hank Green, Fine Brothers, Meg DeAngelis Affirm Support For Net Neutrality In
  Letter To FCC*, TUBEFILTER (JULY 6, 2017) ................................ 10

Harold Feld, *T-Mobile Data Roaming Petition Proves Wireless Data Caps Are About Market Power*, PUBLIC KNOWLEDGE (July 11, 2014) ......................................................... 5, 6

*Internet Connectivity and the "Digital Divide" in California - 2019*, BERKELEY IGS POLL, CALIFORNIA EMERGING TECHNOLOGY FUND, (2019) ................................. 5

Jay Peters, *Senators Criticize AT&T for Not Counting HBO Max Toward Data Caps*, THE VERGE (June 4, 2020) ......................................................................................... 5

Jon Brodkin, *Cox slows Internet speeds in entire neighborhoods to punish any heavy users*, ARS TECHNICA (Jun. 8, 2020) .................................................................. 14

Jon Brodkin, *Verizon throttled fire department's "unlimited" data during Calif, wildfire*. ARS TECHNICA (Aug. 21, 2018) ................................................................ 13

Joseph Torres, *The Voices for Internet Freedom Coalition Urges the Trump FCC to Keep the Net Neutrality Rules*, VOICES FOR INTERNET FREEDOM (Aug. 31, 2017) ................ 8

Julie Moreau, *Internet a 'Lifeline for LGBTQ People': Advocates Slam Net Neutrality Repeal*, NBC NEWS (Dec. 18, 2017) ............................................................... 7

Karl Bode, *Broadband "Zero Rating" Actually Costs Customers More, Study Finds*, VICE (Feb. 7, 2019) ......................................................................................... 5

Karl Bode, *Comcast Suspends Data Caps in Wake of Coronavirus*, VICE (Mar. 13, 2020) ........... 14

Kayla Kumari Upadhyaya, *How Web Series Have Widened TV's Talent Pool*, VICE (Dec. 13, 2016) ......................................................................................... 7

KHAN ACADEMY ............................................................................................... 12

Letter from Open Engine & The Open Tech. Inst. at the New Am. Found. to the FCC (May 7, 2014) ......................................................................................... 10

Letter from the Center for Media Justice to Senator Holly Mitchell (May 29, 2018) ................. 5, 6

Letter from Western Center on Law and Poverty to The Honorable Ricardo Lara (May 22, 2018) ......................................................................................... 4

Lisa Prigozen, CALIFORNIA PUBLIC UTILITIES COMMISSION, RETAIL COMMUNICATIONS SERVICES IN CALIFORNIA: REPORT OF THE COMMUNICATIONS DIVISION PURSUANT TO ORDERING PARAGRAPH 3 OF DECISION 16-12-025 ANALYZING THE CALIFORNIA TELECOMMUNICATIONS MARKET (Dec. 2018) ................................................................................... 2, 3

Luca Belli, *Zero Rating: From Generative Internet to Mobile Minitel*, NET NEUTRALITY RELOADED: ZERO RATING, SPECIALISED SERVICE, AD BLOCKING AND TRAFFIC MANAGEMENT: ANNUAL REPORT OF THE UN IGF DYNAMIC COALITION ON NET NEUTRALITY (2016) ................. 4

Mignon Clyburn, Disenting Statement Re: Destroying Internet Freedom, WC Docket No. 17-108 (Dec. 14, 2017) ......................................................................................... 8

Mike Masnick, *Kickstarter, Etsy and Dwolla All Speak Out On Net Neutrality and Why the FCC's Plan Is Dangerous to Innovation*, TECHDIRT (July 11, 2014) .......................... 10

Mike Robuck, *Frontier Communications drops into Chapter 11 bankruptcy*, FIERCE TELECOM (Apr. 15, 2020) ......................................................................................... 3

iii

*On the Wrong Side of the Digital Divide*, GREENLINING (June 2, 2020) ........................................ 4

Philip M. Napoli & Jonathan A. Obar, *The Emerging Mobile Internet Underclass: A Critique of Mobile Internet Access*, 30 INFORMATION SOCIETY 323 (2014) ...................................................... 4

*Plans*, AT&T ............................................................................................................................ 5

*Preserving an Open Internet for Consumers, Small Businesses, and Free Speech*: Hearing before the H. Comm. on Energy and Commerce, Subcomm. on Communications and Tech., 116th Cong. (Feb. 7, 2019) ........................................................................................................... 8, 9

Rachel Oaks, *Frustrated with Data Caps? Find Out Which Providers Limit Your Data and Why*, CABLETV (Mar. 18, 2020) ..................................................................................................... 5

*Research and Learn*, SAN FRANCISCO PUBLIC LIBRARY ................................................................ 12

Rich Miller, *Internet Exchanges See Record Levels of Network Traffic*, DATA CENTER FRONTIER (Mar. 11, 2020) ...................................................................................................................... 14

Ryan Singel, *Expect Fewer Great Startups if the FCC Kills Net Neutrality*, WIRED (Dec. 12, 2017) ...................................................................................................................... 10

*San Francisco Historical Photograph Collection*, SAN FRANCISCO PUBLIC LIBRARY .................. 12

Steve Blum, *California must take Frontier's bankruptcy as seriously as PG&E's*, TELLUS VENTURE ASSOCIATES: STEVE BLUM'S BLOG (Apr. 15, 2020) ..................................................... 3

Susan Crawford, CAPTIVE AUDIENCE: THE TELECOM INDUSTRY AND MONOPOLY POWER IN THE NEW GILDED AGE (2014) ..................................................................................................... 11

Sydney Johnson, *California makes internet-enabled tablets available to nearly 1 million students*, EDSOURCE (Aug. 5, 2020) ..................................................................................................... 14

*Telus Cuts Access to Pro-Union Website*, CBC NEWS (July 24, 2005) ........................................ 6

*The Net Neutrality Situation in the EU: Evaluation of the First Two Years of Enforcement*, EPICENTER .WORKS, (Jan. 29, 2019) .................................................................... 3

Tom Barrett, *To Censor Pro-Union Web Site, Telus Blocked 766 Others*, THE TYEE (Aug. 4, 2005) ...................................................................................................................... 6

Tom Watson, *Net Neutrality And Social Entrepreneurship: Why Freedom To Create And Share Matters*, FORBES (Jan. 15, 2014) .......................................................................................... 12

Voices for Internet Freedom Coalition, Comment In the Matter of Restoring Internet Freedom (July 19, 2017), WC Docket No. WC- 17-108 ...................................................................... 7, 8

*Why Net Neutrality Matters: Protecting Consumers and Competition through Meaningful Open Internet Rules: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (Sept. 17, 2014) .... 7

WIKIPEDIA ................................................................................................................................. 12

# INTEREST OF AMICUS CURIAE[2]

Amici are public interest advocates, educators, and businesses, predominantly based in California. Listed alphabetically, we are:

Access Humboldt

ACLU Foundation of Northern California

American Sustainable Business Council

Benton Institute for Broadband and Society

Center for Democracy and Technology

Clean Money Campaign

Courage California

Electronic Frontier Foundation

Founder Academy

Fight for the Future

Greenlining Institute

iFixit, Inc.

Media Justice

National Hispanic Media Coalition

Oakland Privacy

Sonic, Inc

Reddit, Inc.

TURN—The Utility Reform Network

Voices for Progress

Writers Guild of America, West, Inc.

---

[2] No party's counsel authored this brief in whole or in part. No party or party's counsel, nor any person besides amici, their members, or their counsel contributed money toward this brief. In the interest of full disclosure, we note that Steven Renderos, Executive Director for amicus Media Justice, and Laura Blum-Smith, Director of Research and Public Policy for amicus Writers Guild of America, West, submitted declarations in support of Defendants in their personal capacities; Media Justice and Writers Guild of America, West, join this brief on their own behalf.

*Amici* have deep experience working with a wide range of Californians, and both we and our communities depend on net neutrality protections to connect, learn, speak and more. We have seen firsthand that stripping away legal protection for net neutrality would inflict serious harm on Californians and on California nonprofits, educators and businesses like *amici*. We offer our experiences and perspectives to assist the Court's consideration of this important issue.

## INTRODUCTION

Net neutrality is one of the most important free speech, equity and innovation issues of the digital age. Internet access is essential to retrieve and share information, find work and resources, and engage in political, civic, and social discourse. But Internet users are at the mercy of their Internet Service Providers ("ISPs") for access to online content and services.[3] Absent effective neutrality rules, ISPs can—and do—act as profiteering gatekeepers rather than neutral conduits, to the detriment of the public interest. And because the Internet service market is dysfunctional, competition cannot deter or remedy such discriminatory practices.

For decades, the Federal Communications Commission ("FCC") adopted and enforced net neutrality protections to help ensure that ISPs would not exploit their gatekeeping power. Under the shelter of these protections, the Internet became the extraordinary platform for speech and commerce that it is today. In 2018, however, the FCC largely abandoned its regulatory role, based on the misguided notion that "transparency" would be enough to spur market competition and protect consumers.

By every objective standard, the FCC's predictions have failed. Americans pay "the highest average monthly prices" in North America, Europe and Asia.[4] Not coincidentally, competitive

---

[3] For a survey of broadband availability in California, *see* Lisa Prigozen, CALIFORNIA PUBLIC UTILITIES COMMISSION, RETAIL COMMUNICATIONS SERVICES IN CALIFORNIA: REPORT OF THE COMMUNICATIONS DIVISION PURSUANT TO ORDERING PARAGRAPH 3 OF DECISION 16-12-025 ANALYZING THE CALIFORNIA TELECOMMUNICATIONS MARKET (Dec. 2018), https://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/UtilitiesIndustries/Communications/Reports_and_Presentations/CD_Mgmt/re/CompetitionReportFinal%20Jan2019.pdf

[4] Becky Chau & Claire Park, *The Cost of Connectivity*, OPEN TECHNOLOGY INSTITUTE 2020 6 (July 2020), https://d1y8sb8igg2f8e.cloudfront.net/documents/The_Cost_of_Connectivity_2020__XatkXnf.pdf.

2

options continue to dwindle.[5] Absent legal or competitive restraints, ISPs have renewed efforts to exert control over how customers use the Internet.

SB 822 protects Californians by filling the gap the FCC created. It preserves the ability of all Californians, including the most vulnerable, to fully participate—economically, socially, and politically—in everyday life. It ensures that ISPs cannot block, throttle, or distort Internet content, and prohibits zero-rating and other paid prioritization schemes so that all Californians have full access to all Internet content and services—at lower prices.[6] And it guarantees that as California faces present and future crises including wildfires and the COVID-19 pandemic, it can rely on an open Internet as a lifeline for essential workers and ordinary residents alike.

The public has a strong and abiding interest in protecting fair access to the Internet and ensuring that the private motivations of local monopolies do not result in systemic harm to Californians. That's why a coalition representing diverse interests campaigned in favor of SB 822's essential protections.[7] Amici urge the Court to deny injunctive relief.

## ARGUMENT

### I.   SB 822 Provides Essential Protections for Vulnerable and Marginalized Californians.

All Californians benefit from the protections of SB 822—but those protections are most needed, and most effective, in protecting the most vulnerable. By ensuring that ISPs cannot favor or disfavor content or applications of the same nature, SB 822 helps ensure that all Californians

---

[5] *See* Prigozen, *supra* note 3 ("All of the State's largest metropolitan markets for fixed broadband Internet service are highly concentrated, with concentration in some markets increasing over the previous year."); *see also* Mike Robuck, *Frontier Communications drops into Chapter 11 bankruptcy*, FIERCE TELECOM (Apr. 15, 2020), https://www.fiercetelecom.com/telecom/frontier-communications-drops-into-chapter-11-bankruptcy (announcing Frontier Communication's bankruptcy); Steve Blum, *California must take Frontier's bankruptcy as seriously as PG&E's*, TELLUS VENTURE ASSOCIATES: STEVE BLUM'S BLOG (Apr. 15, 2020), https://www.tellusventure.com/blog/california-must-take-frontiers-bankruptcy-as-seriously-as-pges (noting that "Frontier has more than two million wireline customers in California, most of whom were acquired from Verizon").

[6] *See The Net Neutrality Situation in the EU: Evaluation of the First Two Years of Enforcement* 30–32, EPICENTER .WORKS, (Jan. 29, 2019), https://en.epicenter.works/sites/default/files/2019_netneutrality_in_eu-epicenter.works-r1.pdf (showing that countries that prohibited zero rating under their network neutrality rules in the same way as SB 822 received lower priced wireless services).

[7] CALIFORNIA'S NET NEUTRALITY LAW, EFF, https://www.eff.org/cases/californias-net-neutrality-law (collecting letters of support and the full list of supporters).

have full access to the social, economic, and political power of the Internet, including those for whom it is a uniquely valuable tool for learning, employment, or personal expression.

**A.     Low-Income Communities Need Affordable Access to All Online Information.**

Low-income Californians, like many others, rely on the open Internet to find jobs, obtain health care, get an education, and otherwise take advantage of public and social services.[8] But "low-cost" plans that prioritize access to selected online content do not address this need.[9] Instead, they "create a second-class experience online," perpetuating structural inequality and increasing barriers to full online participation.[10] As a result, the Western Center on Law and Poverty has concluded that preferential treatment of selected content or applications "harms lower-income Internet users the most."[11]

The problem is especially acute for the many low-income Californians who rely primarily on mobile devices for Internet access.[12] One in five California households with an annual income

---

[8] *See On the Wrong Side of the Digital Divide*, GREENLINING (June 2, 2020), https://greenlining.org/publications/online-resources/2020/on-the-wrong-side-of-the-digital-divide/ (examining the challenges faced by low-income Californians in Fresno and Oakland with no or limited Internet access).

[9] *See*, *e.g.*, Barbara van Schewick, *T-Mobile's Binge On Violates Key Net Neutrality Principles*, (Jan. 29, 2016), https://cyberlaw.stanford.edu/downloads/vanSchewick-2016-Binge-On-Report.pdf (examining T-Mobile's lowest qualifying "Binge On" plan, which caps data usage outside of its selected video streaming services at 3 GB per month, or a mere 9 minutes of video per day).

[10] Declaration of Steven Renderos ¶ 35, D.I. 57-12 ("Renderos Decl.").

[11] Letter from Western Center on Law and Poverty to The Honorable Ricardo Lara. (May 22, 2018), https://www.eff.org/files/2018/06/12/sb822_wclp_letter_on_zero_5-23.pdf. These costs may include monetary costs, as ISP steer customers to products that financially benefit the ISP at the consumer's expense. *See id.* ("For example, an ISP partners with a bank that charges a higher interest rate and so ISP customers are steered in that direction because their data usage is exempted. This can be the same for any predatory partnership that an ISP may choose to engage in."). *See also* Luca Belli*, Zero Rating: From Generative Internet to Mobile Minitel*, in NET NEUTRALITY RELOADED: ZERO RATING, SPECIALISED SERVICE, AD BLOCKING AND TRAFFIC MANAGEMENT: ANNUAL REPORT OF THE UN IGF DYNAMIC COALITION ON NET NEUTRALITY 23, 42 (2016), https://internet-governance.fgv.br/sites/internet-governance.fgv.br/files/publicacoes/net_neutrality_reloaded.pdf (ISPs "create artificial scarcity to direct new or existing users towards a subset of the Internet, so that their attention can be concentrated on zero-rated content and applications and subsequently monetized.").

[12] For a discussion of other ways that mobile Internet users are disadvantaged, *see generally* Philip M. Napoli & Jonathan A. Obar, *The Emerging Mobile Internet Underclass: A Critique of Mobile Internet Access*, 30 INFORMATION SOCIETY 323 (2014).

under $20,000 access the Internet only through smartphones, twice the proportion of the general population.[13] For these families, mobile devices are the only way to access homework, employment, government services, and anything else that requires Internet connectivity. But low-cost mobile plans frequently include highly restrictive data caps[14] accompanied by zero-rating agreements with media companies whose content is exempted from the cap.[15] Thus, while wealthier Californians can access all online content without concern (either with an unlimited wireless data plan or a home Internet connection), low-income Californians that rely on low-cost mobile plans are pushed away from the broader Internet and towards favored content.[16]

Finally, these discriminatory plans fail to provide cost savings for low-income Californians. Instead, paid prioritization and zero rating incentivize ISPs to "jack up" users' overall costs to access other content through artificially low caps to make their preferred content more attractive.[17]

---

[13] *Internet Connectivity and the "Digital Divide" in California - 2019*, Tables 3 & 4e, BERKELEY IGS POLL, CALIFORNIA EMERGING TECHNOLOGY FUND, (2019), https://www.cetfund.org/wp-content/uploads/2019/08/005_003_002_CETF_2019_002_IGS_Poll_CA_Digital_Divide_ppt.pdf. Another 12 percent of Californians lack both home and mobile Internet access. *Id.*

[14] For example, AT&T's lowest-priced mobile plan includes only 4 GB of data per month and does not allow high-definition streaming. *Plans*, AT&T, https://www.att.com/plans/wireless/ (last visited Sept. 28, 2020). In contrast, "[m]ost of AT&T's [fixed] plans" have a data cap of 1,024 GB." Rachel Oaks, *Frustrated with Data Caps? Find Out Which Providers Limit Your Data and Why*, CABLETV (Mar. 18, 2020), https://www.cabletv.com/blog/which-brands-have-data-caps#att.

[15] For example, AT&T exempts HBO Max, owned by subsidiary WarnerMedia, from data caps, "essentially paying itself for the exemption [to] give its content an edge over the competition." Jay Peters, *Senators Criticize AT&T for Not Counting HBO Max Toward Data Caps*, THE VERGE (June 4, 2020), https://www.theverge.com/2020/6/4/21280914/sen-ed-markey-at-t-zero-rating-hbo-max-net-neutrality.

[16] *See, e.g.*, Harold Feld, *T-Mobile Data Roaming Petition Proves Wireless Data Caps Are About Market Power*, PUBLIC KNOWLEDGE (July 11, 2014), https://www.publicknowledge.org/blog/t-mobile-data-roaming-petition-proves-wireless-data-caps-are-about-market-power/ ("T-Mobile has also said that 37% of subscribers don't use streaming media because they fear going over their bandwidth caps.").

[17] *See* Karl Bode, *Broadband "Zero Rating" Actually Costs Customers More, Study Finds*, VICE (Feb. 7, 2019), https://www.vice.com/en_us/article/j575gg/broadband-zero-rating-actually-costs-customers-more-study-finds ("[V]ertically integrated operators may have an incentive to keep data caps artificially low and gigabyte prices artificially high, in order to orient users' preference towards the affiliated zero-rated applications."); *see also* Letter from the Center for Media Justice to Senator Holly Mitchell (May 29, 2018), https://www.eff.org/files/2018/06/12/cmj_support_sb822_to_mitchell.pdf (arguing that discriminatory zero-rating "incentivizes ISPs to keep customers' data caps low in order to motivate deep-pocketed websites to pay to have their sites zero-rated").

The primary effect of these caps is to discourage (non-zero-rated) Internet use, especially among low-income users.[18]

SB 822's prohibitions on such practices are beneficial to all Californians. But for low-income communities, these prohibitions are critical.

### B.   Marginalized and Faith Communities Need an Open Internet to Thrive.

Full membership in modern society requires access to the enormous communicative power of the Internet. As a result, people of color, women and other marginalized communities rely on a fair and open Internet to make their voices heard, whether they seek to entertain or call for justice. Workers need the Internet to organize to improve their conditions.[19] SB 822 helps ensure that marginalized speakers and listeners can connect, rather than being shunted aside by white male-dominated traditional media and wealthy companies with the resources to pay to be heard.

In film and television production, minority and female participants "remained underrepresented on every front" as of 2015–16, frequently by a factor of two, three, or even more.[20] Disparities in ownership are even more stark: according to the FCC, male-owned commercial broadcast stations outnumber female-owned stations by almost 10 to 1, non-Hispanic/Latino-owned commercial broadcast stations outnumber Hispanic/Latino-owned stations

---

[18] *Id*. at 30; *see also* Feld, *supra* note 16 ("T-Mobile provides evidence that users with capped or throttled broadband use 20x–30x less broadband than users with uncapped broadband").

[19] When employees of the Canadian ISP Telus organized for better working conditions, the ISP blocked subscribers from accessing the union website (along with 766 unrelated sites that were hosted on the same server). *Telus Cuts Access to Pro-Union Website*, CBC News (July 24, 2005), https://www.cbc.ca/news/canada/telus-cuts-subscriber-access-to-pro-union-website-1.531166; Tom Barrett, *To Censor Pro-Union Web Site, Telus Blocked 766 Others*, The Tyee (Aug. 4, 2005), https://thetyee.ca/News/2005/08/04/TelusCensor/.

[20] Darnel Hunt et al., *Hollywood Diversity Report 2018: Five Years of Progress and Missed Chances* 3, UCLA College of Social Sciences, (2018), https://socialsciences.ucla.edu/wp-content/uploads/2018/02/UCLA-Hollywood-Diversity-Report-2018-2-27-18.pdf. Minorities were particularly underrepresented as film writers and creators of broadcast and cable scripted shows, by close to or more than 5 to 1, while women were underrepresented by a factor of "more than 7 to 1 among film directors" and "nearly 4 to 1 among film writers." *Id*.

by more than 14 to 1, and white-owned commercial broadcast stations outnumber minority-owned stations by more than 24 to 1.[21]

In response, marginalized creators have turned to the Internet as a way to "write themselves into history," bypassing traditional gatekeepers and connecting directly with their own communities as well as wider audiences.[22] Ruth Livier created Ylse, an award-winning web series after she was rejected by media executives for proposing "a Latina-driven show written by someone with no track record."[23] The podcast #GoodMuslimBadMuslim portrays Muslim feminism in a way that rarely appears in corporate media.[24] LGBTQ communities likewise "found places to thrive [on the Internet] … One could find content quickly and easily, and it wasn't the same kind of hierarchical organization as television or traditional media."[25]

Women and people of color also rely on the open Internet -- including distributed online platforms such as Etsy and Patreon -- to survive and thrive economically. Without enforceable net neutrality requirement, ISPs could essentially demand protection money from those platforms, costs that would be passed on to users or prevent the entry of new competitors altogether.[26]

---

[21] *Fourth Report on Ownership of Broadcast Stations* 4–5, MEDIA BUREAU INDUSTRY ANALYSIS DIVISION, FEDERAL COMMUNICATIONS COMMISSION, (Feb. 2020), https://docs.fcc.gov/public/attachments/DA-20-161A1.pdf.

[22] Voices for Internet Freedom Coalition, Comment In the Matter of Restoring Internet Freedom at 4 (July 19, 2017), WC Docket No. WC-17-108, https://www.freepress.net/sites/default/files/legacypolicy/voices_for_internet_freedom_coalition_comments.pdf; *see also* Kayla Kumari Upadhyaya, *How Web Series Have Widened TV's Talent Pool*, VICE (Dec. 13, 2016), https://www.vice.com/en_us/article/wnd435/how-comedy-central-led-the-charge-in-developing-web-series-for-television ("Women, people of color, and LGBTQ people underrepresented by mainstream media are writing themselves in by creating web shows.").

[23] *Why Net Neutrality Matters: Protecting Consumers and Competition through Meaningful Open Internet Rules: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (Sept. 17, 2014) (statement of Ruth Livier), https://www.govinfo.gov/content/pkg/CHRG-113shrg21221/html/CHRG-113shrg21221.htm.

[24] #GOODMUSLIMBADMUSLIM, http://www.goodmuslimbadmuslim.com/ (last visited Sept. 28, 2020).

[25] Julie Moreau, *Internet a 'Lifeline for LGBTQ People': Advocates Slam Net Neutrality Repeal*, NBC NEWS (Dec. 18, 2017), https://www.nbcnews.com/feature/nbc-out/internet-lifeline-lgbtq-people-advocates-slam-net-neutrality-repeal-n830826.

[26] Renderos Decl. ¶ 30.

1    The Internet is the medium where activists have been able to make their voices heard

2    without fear that an ISP would discriminate against them for their own interests or in response to

3    politicians or public pressure.[27] As FCC Commissioner Mignon Clyburn put it: "It was through

4    social media that the world first heard about Ferguson, Missouri, because legacy news outlets did

5    not consider it important until the hashtag started trending."[28]

6         It is no surprise, then, that marginalized voices have been some of the loudest supporters of

7    the open Internet, and "some of the most vocal critics of the repeal, and for good reason: we have

8    more to lose."[29] The Voices for Internet Freedom Coalition filed comments opposing the FCC's

9    repeal of its Open Internet Rule on behalf of 63 racial and social justice organizations, describing

10   the open Internet as "digital oxygen" for minority communities.[30]

11        SB 822 provides precisely the protections that marginalized communities need to escape the

12   constraints of traditional media and tell their own stories. As Ms. Livier put it:

13        For marginalized communities, our representation—or lack thereof—can be
        a matter of life or death. When we are dehumanized in the media, it makes it
14       easier for immoral individuals and groups to justify their targeted aggressions
        against us. A neutral internet empowers us to virtually walk arm-in-arm—
15

16   _____

17   [27] Renderos Decl. ¶ 10.

18   [28] Mignon Clyburn, Dissenting Statement Re: Destroying Internet Freedom, WC Docket No. 17-108 (Dec. 14, 2017), http://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db1214/DOC-348256A1.pdf.

19   [29] *Preserving an Open Internet for Consumers, Small Businesses, and Free Speech*: Hearing before the H. Comm. on Energy and Commerce, Subcomm. on Communications and Tech., 116th Cong. (Feb. 7, 2019) (Written Testimony of Jessica J. González), https://www.freepress.net/sites/default/files/2019-02/gonzalez_free_press_written_testimony.pdf.

20   [30] Comments of Voices for Internet Freedom Coalition, *supra* note 22, at iii ("We have seen, first-hand, how the open Internet has empowered people of color with new opportunities for self-expression, entrepreneurship, political participation, education, employment, housing, healthcare, racial justice, and many other vital human needs…. [T]he vast majority of mainstream media owners and decision makers are white men, and on those platforms we are not able to control our own narratives, we are often absent or dehumanized, we are criminalized, we are habitually painted as threats and as the 'others'. The open Internet is our digital oxygen in these debates, and the Commission's proposal threatens to take it away."); *see also* Joseph Torres, *The Voices for Internet Freedom Coalition Urges the Trump FCC to Keep the Net Neutrality Rules*, VOICES FOR INTERNET FREEDOM (Aug. 31, 2017), http://www.internetvoices.org/blog/2017/08/31/voices-internet-freedom-coalition-urges-trump-fcc-keep-net-neutrality-rules (discussing the coalition's Reply Comments, signed by 73 groups, filed the following month).

21
22
23
24
25
26
27
28

> with the confidence of knowing that our voices matter and we are not alone, that we are not invisible, and that our experiences are not isolated.[31]

It is essential for these groups that SB 822, and the neutral Internet it promises, be preserved.

The Internet also provides digital oxygen for the many religious communities that depend on online tools to connect, worship, serve, and call others to action. As Valerie Kaur, co-founder of Faithful Internet, explains:

> Today's moral leaders are using the Internet to meet the needs of new generations, speak truth to power, and minister to the underserved . . . They are using online tools to help us hear the call of wisdom traditions, not to violence and exclusion, but to love and service.[32]

That activity depends on a fast connection that can use large amounts of data, for which churches and parishioners are already paying. But they should not be forced to pay a new set of fees, particularly when budgets are already stretched to the brink by the recession.

**C.     Small Businesses Need Net Neutrality to Grow and Thrive.**

The open Internet has enabled an explosion of innovation over the past 25 years. Google, for instance, started as two students with a better search algorithm. If Google had been forced to negotiate deals with ISPs, it might never have overcome the search giants of the time: Excite and Alta Vista. The same holds true for many other innovators, including marketplaces like eBay, Craigslist, and Etsy, and online communication platforms like Facebook and Twitter. They have thrived in large part because neither service providers nor anyone else had an advance economic veto right on new applications, services, or content. SB 822 is necessary to ensure that continues.

Internet "fast lanes" and differential pricing schemes such as zero rating may not harm these now-established businesses—but they will stifle the emergence of the next generation of innovators. Etsy, Inc.—now a major e-commerce website with hundreds of millions of dollars per

---

[31] *Preserving an Open Internet for Consumers, Small Businesses, and Free Speech*: Hearing before the H. Comm. on Energy and Commerce, Subcomm. on Communications and Tech., 116th Cong. (Feb. 7, 2019) (Testimony of Ruth Livier), https://docs.house.gov/meetings/IF/IF16/20190207/108845/HHRG-116-IF16-Wstate-LivierR-20190207.pdf.

[32] Carol Kuruvilla, *Why 12 Top Religious Leaders Are Proud To Support Net Neutrality*, HUFFPOST (June 12, 2015), https://www.huffpost.com/entry/religious-leaders-on-net-neutrality_n_7562454?1434107326.

1 year in revenue—has said that it would likely have failed if it had to pay for priority access to

2 users.[33] Other small businesses, their users, and internet creators have echoed those concerns.[34]

3       As noted above, the loss of net neutrality protections would cause particular harm to

4 traditionally marginalized entrepreneurs, but they will not be the only ones at risk. Writer and

5 entrepreneur Ryan Singel has explained how fast lanes would force "every website, every startup,

6 and every small merchant" to buy in if they want to succeed: "You have to be fast just to compete.

7 Users bounce and customers don't buy if sites or apps are slow to load or feel laggy."[35] Startups

8 would have an untenable choice: either burn through scarce resources to match deep-pocketed

9 incumbents or watch their businesses fail to grow.[36] When they are inevitably forced to pass those

10 costs on to customers, everyone loses.[37]

11       For similar reasons, SB 822 is essential to help new businesses find investors. Without net

12 neutrality protections, entrepreneurs and investors will have to factor in the unpredictability of

13 ISPs' prioritization decisions. "[V]enture capitalists looking to invest in the next big thing now

14 have to consider the possibility that the winners in the marketplace can now be determined by the

15 ISPs that control Internet traffic to their subscribers, not by consumers themselves."[38]

---

16
17 [33] Etsy, Inc., Comments In the Matter of Open Internet Remand, Framework for Broadband Internet Service at 5 (July 8, 2014), GN Docket Nos. 14-28 & 10-127,
18 https://blog.etsy.com/news/files/2014/07/Etsy-Open-Internet-Comments-7.8.14.pdf.

19 [34] *See, e.g.,* Letter from Open Engine & The Open Tech. Inst. at the New Am. Found. to the FCC (May 7, 2014), *available at* http://engine.is/wp-content/uploads/Company-Sign-On-Letter.pdf;
20 Mike Masnick, *Kickstarter, Etsy and Dwolla All Speak Out On Net Neutrality and Why the FCC's Plan Is Dangerous to Innovation*, TECHDIRT (July 11, 2014), https://www.techdirt.com/articles/201
21 40710/17450827845/kick starter-etsy-dwolla-all-speak-out-net-neutrality-why-fccs-plan-is-dangerous-to- innovation.shtml.; Geoff Weiss, *Hank Green, Fine Brothers, Meg DeAngelis Affirm*
22 *Support For Net Neutrality In Letter To FCC*, TUBEFILTER (JULY 6, 2017), https://www.tubefilter.com/2017/07/06/hank-green-fine-brothers-meg-deangelis-net-neutrality-
23 internet-creators-guild/.

24 [35] Ryan Singel, *Expect Fewer Great Startups if the FCC Kills Net Neutrality*, WIRED (Dec. 12, 2017), https://www.wired.com/story/expect-fewer-great-startups-if-the-fcc-kills-net-neutrality/.

25 [36] *Id*.

26 [37] *Id.*; *see also* Declaration of Alexis Ohanian ¶ 9, D.I. 57-11 ("Ohanian Decl.") ("[I]f new startups are unable to get their companies off the ground and offer better products and services than those
27 currently available, consumers . . . will have to be content with whichever products and services ISPs allow them hear about, purchase or download, and use").

28 [38] Ohanian Decl. ¶ 8.

These risks are not hypothetical. ISPs have a record of prioritizing their own financial interests, and a continuing interest in doing so. For example, relying on the FCC's own findings, the D.C. Circuit concluded that Internet access providers "have incentives to interfere with the operation of third-party Internet-based services that compete with the providers' revenue generating telephone and/or pay-telephone services," *Verizon v. FCC*, 740 F.3d 623, 645–46, (D.C. Cir. 2014) (citing *Preserving the Open Internet*, 25 F.C.C. Rcd. 17905 (2010) ("2010 Order")); *see also id.* at 648 ("the threat that broadband providers would utilize their gatekeeper ability to restrict edge-provider traffic is not . . . 'merely theoretical.'" (citing 2010 Order ¶ 35)). Indeed, in the early days of the Internet, telecom providers lobbied the FCC to impose access charges on Internet companies, as is done in some other countries.[39] Today's ISPs would doubtless like to impose those charges themselves.

Clear, focused rules can help ward off these threats. By providing those rules, SB 822 helps support California businesses and their customers. Enjoining it helps no one but powerful ISPs.

**D.   Schools, Libraries and Students Need Online Educational Resources.**

Like small businesses, libraries and schools are justifiably concerned that paid-prioritization schemes will degrade access to material on which students and the public depend. If ISPs favor commercial content, then educational, cultural, and political resources will be harder to reach, limiting the options available to educators and leading some students and other members of the public to abandon their efforts to learn and grow.

Even prior to the COVID-19 pandemic, countless Californians used bandwidth-intensive educational resources that depend on a neutral Internet. In 2019, over 300,000 Californians enrolled in online college programs.[40] Public libraries make large data collections available online, such as the San Francisco Public Library's collection of over 250,000 digitized historical

---

[39] *See* Susan Crawford, CAPTIVE AUDIENCE: THE TELECOM INDUSTRY AND MONOPOLY POWER IN THE NEW GILDED AGE 90–91 (2014) (reviewing the regulatory history behind access charges in the early telecommunications market).

[40] Ashley A. Smith, *California finds solution to save distance learners' financial aid*, EDSOURCE (Jul. 28, 2019), https://edsource.org/2019/california-finds-solution-to-save-distance-learners-financial-aid/615662.

photographs and over 10,000 popular songs from the Dorothy Starr Sheet Music Collection.[41] Non-profits such as the multilingual collaborative online encyclopedia Wikipedia and the free educational site Khan Academy provide reference and learning materials that students, families and teachers rely on daily.[42]

Some resources are particularly critical for learners from vulnerable communities. K-12 students across California, including students experiencing homelessness, access resources provided by California Virtual Academies (CAVA).[43] The Sacramento County Office of Education maintains USA Learns, a free, multimedia system for those learning English that relies on high-quality streaming video so that learners can observe speakers' mouths and body language.[44] Public libraries offer targeted resources for elders, those seeking citizenship and those seeking a high-school diploma.[45]

All of these resources will suffer if ISPs are permitted to hold providers and customers ransom for high-quality data transmission.[46] Absent net neutrality protections, educators (and other not-for-profit enterprises) "will now be forced to compete directly with for profits on the cost of messaging,"[47] Californians will find it harder to leverage the Internet for lifelong learning, and local institutions will find it harder to reach, educate and communicate with their constituents.

---

[41] *San Francisco Historical Photograph Collection*, SAN FRANCISCO PUBLIC LIBRARY, https://sfpl.org/locations/main-library/historical-photographs (last visited Sept. 28, 2020); *Dorothy Starr Collection*, SAN FRANCISCO PUBLIC LIBRARY, https://sfpl.org/locations/main-library/art-music/searching-songs-sfpl/dorothy-starr-collection (last visited Sept. 28, 2020).

[42] *See* WIKIPEDIA, https://en.wikipedia.org/wiki/Wikipedia (last visited Sept. 28, 2020); KHAN ACADEMY, https://www.khanacademy.org/ (last visited Sept. 28, 2020).

[43] *Enrollment and Attendance FAQs*, CALIFORNIA VIRTUAL ACADEMIES, https://cava.k12.com/general-faqs/enrollment-and-attendance-faqs.html (last visited Sept. 28, 2020).

[44] *English Listening*, USA LEARNS, https://www.usalearns.org/listening-to-language (last visited Sept. 28, 2020).

[45] *See, e.g.*, *Research and Learn*, SAN FRANCISCO PUBLIC LIBRARY, https://sfpl.org/research-learn (last visited Sept. 28, 2020).

[46] *See, e.g.*, Andrea Peterson, *Why the Death of Net Neutrality Would Be a Disaster for Libraries*, WASH. POST: THE SWITCH (May 16, 2014), http://www.washingtonpost.com/blogs/the-switch/wp/2014/05/16/why-the-death-of-net-neutrality-would-be-a-disaster-for-libraries (discussing the importance of net neutrality for libraries and their users).

[47] Tom Watson, *Net Neutrality And Social Entrepreneurship: Why Freedom To Create And Share Matters*, FORBES (Jan. 15, 2014), https://www.forbes.com/sites/tomwatson/2014/01/15/net-

## II.     The Current Statewide Emergency Reinforces the Need for SB 822's Protections.

ISPs have shown that they are willing to use emergencies to exploit their gatekeeper power for financial gain. As California faces multiple ongoing public health crises, including climate change-induced wildfires and the COVID-19 pandemic, it is essential that the Internet remain a tool for both rescue workers and affected individuals to connect and seek help without interference. SB 822's foundational protections are critical to enabling California's emergency response.

### A.     All Californians Rely on Online Communications in Emergencies.

The threat of ISPs leveraging their ability to restrict the free flow of information in an emergency is not hypothetical. As discussed in Fire Chief Anthony Bowden's Declaration,[48] Verizon throttled the Santa Clara Fire Department during one of the worst fires in the state's history while attempting to upsell them to more expensive data plans.[49] Verizon understood that such throttling would render the fire department's broadband access useless for any practical application, but the lack of legal protection at the time tied California's hands in stopping unreasonable and harmful conduct.[50]

SB 822 ensures that all Californians retain access to the open Internet so that they can share and obtain essential information in times of crisis.[51] This year's even more devastating fire season, when firefighters and citizen alike are relying on Internet communications to respond to and share developments, only underscore the importance of that power. Californians rely on the Internet to exchange public safety information with the government, but also to track down and connect with loved ones. Without SB 822, Californians could find themselves in the same situation as the Santa

---

neutrality-and-social-entrepreneurship-why-freedom-to-create-and-share-matters/ (quoting Andrew Rasiej, founder of the Personal Democracy Forum).

[48] Declaration of Fire Chief Anthony Bowden ¶¶ 6–11, D.I. 57-1 ("Bowden Decl.").

[49] Jon Brodkin, *Verizon throttled fire department's "unlimited" data during Calif, wildfire*. ARS TECHNICA (Aug. 21, 2018), https://arstechnica.com/tech-policy/2018/08/verizon-throttled-fire-departments-unlimited-data-during-calif-wildfire.

[50] Bowden Decl. ¶ 10.

[51] AB 1699, enacted in 2020, prohibits throttling public safety officials' communications, but does not extend to the general public. Cal. Pub. Util. Code § 2898 (West) (2020).

Clara Fire Department: unable, thanks to data caps or other restrictions, to access information they need or connect with others.

**B.    Net Neutrality Protections Are Crucial During the COVID-19 Pandemic.**

All of the risks SB 822 mitigates are exacerbated by the pandemic, when Californians must rely on the Internet for everything from education to work to food delivery.[52] Many Californians are working from home using Internet-based services like videoconferencing. Nearly 97% of California's 6.2 million students started the school year from their homes and will rely more than ever on online resources.[53] Local businesses have switched to online delivery and services in order to keep employees and customers safe and comply with COVID-19 restrictions. Residents are looking online for public health information to protect their families and communities. All of these groups need an unfettered high-speed connection to keep thriving, or even functioning, in very challenging times.

SB 822 help ensure that they can keep that connection. As discussed above, ISPs artificially limit access to general Internet content to improve budgets, not bandwidth.[54] Although many ISPs initially suspended data caps during the crisis,[55] they are now being restored, with some ISPs even punishing entire neighborhoods for using "too much" Internet.[56] As the economic and public health crisis continues, small businesses may be unable or unwilling to cover costs for remote workers suddenly exceeding unanticipated data caps and incurring costly overage fees. Workers' livelihoods could be even further at risk if they cannot afford to pay for more expensive plans as

---

[52] *See* Rich Miller, *Internet Exchanges See Record Levels of Network Traffic*, DATA CENTER FRONTIER (Mar. 11, 2020), https://datacenterfrontier.com/internet-exchanges-see-record-levels-of-network-traffic/ (discussing the record surge in Internet traffic at the start of the pandemic).

[53] Sydney Johnson, *California makes internet-enabled tablets available to nearly 1 million students*, EDSOURCE (Aug. 5, 2020), https://edsource.org/2020/california-makes-internet-enabled-tablets-available-to-nearly-1-million-students/637773.

[54] *See supra* Part I.A.

[55] Karl Bode, *Comcast Suspends Data Caps in Wake of Coronavirus,* VICE (Mar. 13, 2020), https://www.vice.com/en_us/article/m7qk4n/comcast-suspends-data-caps-in-wake-of-coronavirus.

[56] Jon Brodkin, *Cox slows Internet speeds in entire neighborhoods to punish any heavy users*, ARS TECHNICA (Jun. 8, 2020), https://arstechnica.com/tech-policy/2020/06/cox-slows-internet-speeds-in-entire-neighborhoods-to-punish-any-heavy-users.

they work from home. And students could similarly risk losing access to education, simply by exceeding a data limit.

SB 822 also ensures that large ISPs do not take advantage of increased demand for content and communications during the pandemic to slow or otherwise manipulate Internet traffic in order to squeeze exorbitant fees from content providers and other networks.[57] The New York Attorney General has documented that prior to the FCC's 2015 Open Internet Order, the largest ISPs made a "deliberate business decision to use congestion to strong-arm backbone providers and edge providers into paying for access" to their customers.[58] For the many Californians staying home, that artificial congestion could be catastrophic. The data-intensive apps and services people need to work and connect, such as video conferencing, online telephony, and secure VPN connections, must not be vulnerable to such tactics. SB 822 addresses those risks, preventing ISPs from exploiting the crisis to the detriment of millions of customers who cannot seek nor afford better options. Its protections must not be disturbed.

## CONCLUSION

For the foregoing reasons, amici urge the Court to reject the Plaintiffs' motions for injunctive relief.

DATE: September 30, 2020                    Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　*s/ Corynne McSherry*
　　　　　　　　　　　　　　　　　　　　　Corynne McSherry

　　　　　　　　　　　　　　　　　　　　　Corynne McSherry
　　　　　　　　　　　　　　　　　　　　　ELECTRONIC FRONTIER FOUNDATION

　　　　　　　　　　　　　　　　　　　　　*Counsel for Amici*

---

[57] *See* Declaration of Dave Schaeffer ¶¶ 6–30, D.I. 57-2.

[58] *Id.* ¶ 32 (quoting State of New York, Comments in the Matter of Restoring Internet Freedom at 7 (May 23, 2017), FCC WC Docket No. 17-108, *available at* https://www.fcc.gov/ecfs/filing/10717583023587).

Kit Walsh
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
(415) 436-9333
corynne@eff.org

*Counsel for Amici*

Christopher J. Conley (SBN 290747)
cconley@aclunc.org
Jacob A. Snow (SBN 270988)
jsnow@aclunc.org
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Fax: (415) 255-8437

*Counsel for Amici*

Andrew Jay Schwartzman (*pro hac vice*)
andyschwartzman@gmail.com
BENTON INSTITUTE FOR BROADBAND &
SOCIETY
1341 G Street, NW
Washington, DC 20005
(202) 241-2408

*Of Counsel*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the 15-page limit set forth in the Court's July 30, 2020 scheduling order.

DATE:  September 30, 2020

 *s/ Corynne McSherry*
 Corynne McSherry

17

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2020, I electronically filed the foregoing via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

DATE:  September 30, 2020

_s/ Corynne McSherry_
Corynne McSherry