JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
MATTHEW J. GLOVER
Counsel to the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch
JOSEPH BORSON (Va. Bar No. 85519)
KEVIN SNELL (NY Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Telephone: (202) 305-0924
Fax: (202) 616-8460
E-mail:  Kevin.Snell@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA; GAVIN C. NEWSOM, Governor of California, in his Official Capacity, and XAVIER BECERRA, Attorney General of California, in his Official Capacity,<br><br>Defendants. | Case No. 2:18-cv-2660-JAM-DB<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: The Hon. John A. Mendez<br>Action Filed: Sept. 30, 2018 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

  I.   SB-822 Conflicts with the 2018 Order and is Therefore Preempted. ................................. 2

     1.   *Mozilla* Expressly Left Open Conflict Preemption....................................................... 2

     2.   The FCC Lawfully Exercised its Statutory Authority, and California Cannot
Countermand that Decision............................................................................................. 3

     3.   The 2018 Order Goes Beyond Simply Expressing Policy Preferences by
Establishing a Light-Touch Regulatory Framework Centered Around
Transparency and Rescinding the 2015 Order's Conduct Rules. ................................. 6

     4.   California's Disclosure Provision is Preempted by the 2018 Order. ........................... 9

  II.   SB-822 Is Preempted by the Communications Act. ......................................................... 10

  III.   The Equitable Factors Weigh Heavily in Favor of Injunctive Relief .............................. 13

CONCLUSION.................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACA Connects – Am. Commc'ns Ass'n v. Frey*,
  2020 WL 3799767 (D. Me. July 7, 2020) ................................................................ 7

*Arizona v. United States*,
  567 U.S. 387 (2012) .............................................................................................. 5, 9

*AT&T Corp. v. Core Commc'ns, Inc.*,
  806 F.3d 715 (3d Cir. 2015) ..................................................................................... 10

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*,
  330 U.S. 767 (1947) ................................................................................................... 4

*CITA-The Wireless Ass'n v. City of Berkley*,
  No. 15-cv-02529-EMC (N.D. Cal. Sept. 17, 2020) .................................................. 13

*City of New York v. F.C.C.*,
  486 U.S. 57 (1988) ............................................................................................... 5, 12

*Comcast v. FCC*,
  600 F.3d 642 (D.C. Cir. 2010) ............................................................................... 5, 6

*Cty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................................................... 14

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ....................................................................................... 13

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ............................................................................................. 5, 15

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ............................................................................................. 4, 13

*In re Eastport Assocs.*,
  935 F.2d 1071 (9th Cir. 1991) ................................................................................... 9

*In re FCC 11-161*,
  754 F.3d 1015 (10th Cir. 2014) ................................................................................ 13

*Maryland v. King*,
  133 S. Ct. 1 (2012) ................................................................................................... 14

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ................................................................................................... 4

*MetroPCS California, LLC v. Picker*,
  970 F.3d 1106 (9th Cir. 2020) .................................................................................... 5

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*,

423 F.3d 1056 (9th Cir. 2005) ................................................................................. 11

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) .......................................................................... *passim*

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) .................................................................................. 3, 10, 11

*Nat'l Fed. of the Blind v. United Airlines, Inc.*,
    813 F.3d 718 (9th Cir. 2016) ............................................................................ 11

*Recording Indus. Ass'n of Am. v. Librarian of Cong.*,
    176 F.3d 528 (D.C. Cir. 1999) ............................................................................ 8

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ...................................................................... 14, 15

*United States v. California*,
    314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................................................ 15

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ............................................................................ 14

*United States v. Costanzo*,
    956 F.3d 1088 (9th Cir. 2020) ............................................................................ 4

*Williamson v. Mazda Motor of America*,
    562 U.S. 323 (2011) ..................................................................................... 6, 8

*Wisconsin Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991) ........................................................................................ 11

**Statutes**

47 U.S.C. § 151 ................................................................................................ 4, 12

47 U.S.C. § 152 ..................................................................................................... 12

47 U.S.C. § 152(b) ......................................................................................... 10, 11

47 U.S.C. § 223(f)(2) ............................................................................................ 11

47 U.S.C. § 230(b)(2) ........................................................................................... 15

47 U.S.C. § 230(e)(4) ........................................................................................... 11

47 U.S.C. § 253(a) ................................................................................................ 11

47 U.S.C. § 257 ...................................................................................................... 5

47 U.S.C. § 276(c) ................................................................................................ 11

47 U.S.C. § 332(c)(3) ........................................................................................... 11

47 U.S.C. § 543(a)(1) ................................................................................................ 11

47 USC § 257(a) ........................................................................................................ 10

Cal. Civ. Code § 3100 ................................................................................................. 1

Cal. Civ. Code § 3100(b) ............................................................................................ 3

**Regulations**

47 C.F.R. § 8.1(a) ........................................................................................................ 9

**Other Authorities**

*Restoring Internet Freedom*,
      33 FCC Rcd. 311 (2018) ............................................................................... *passim*

## INTRODUCTION

California does not dispute that the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Civ. Code §§ 3100-3104, enacted through Senate Bill 822 ("SB-822"), conflicts with the light-touch regulatory framework that the Federal Communications Commission ("FCC" or "Commission") adopted in its 2018 Order.  *Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) ("2018 Order").  It also does not meaningfully dispute that SB-822 attempts to regulate interstate broadband.  Instead, it argues that *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), rejected any implied preemption argument and that the FCC lacks the authority to preempt State law.  But California misreads *Mozilla* as well as the FCC's authority.  The D.C. Circuit held that the FCC lawfully exercised its authority when it returned broadband to a market-based regulatory framework, *see Mozilla*, 940 F.3d at 18-74, and explained that "[i]f the Commission can explain how a state practice actually undermines the 2018 Order, then it can invoke conflict preemption," *id.* at 85.  The United States provided that explanation in its opening memorandum and California cannot countermand the Commission's decision with its conflicting State law.  And although the State argues that its law is also not preempted by the Communications Act, that Act commits regulation of interstate communication to the Federal Government, and California's disagreement with that premise at the margins fall short.  SB-822 is therefore preempted pursuant to the Supremacy Clause.

This constitutional infringement alone constitutes irreparable harm, but SB-822 piles on by reinstating rules that the FCC determined have more costs than benefits, and imposing separate state requirements that the FCC found could inhibit broadband investment and increase costs to consumers.  California argues that it needs SB-822, but the State has not enforced the law for more than two years, and its assertions amount to an attempt to relitigate policy decisions that the 2018 Order and *Mozilla* resolved.  The Court enjoin the enforcement of SB-822.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ARGUMENT

**I.     SB-822 Conflicts with the 2018 Order and is Therefore Preempted.**

As the United States explained in its opening memorandum, SB-822 is preempted because it conflicts with the FCC's longstanding and lawful choice to enact a light-touch regulatory framework for broadband Internet.  Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Opening Br.") at 15-22, ECF No. 21-1.  Rather than dispute that its law conflicts with the Commission's light-touch regulatory framework, California claims that the FCC cannot preempt SB-822 for the same reason that *Mozilla* vacated the 2018 Order's Preemption Directive, and that the FCC lacks the authority to preempt and cannot resort to its policy preferences to do so.  But California misreads *Mozilla*, the FCC's statutory authority, and the 2018 Order.  And although California claims its disclosure provision does not necessarily conflict with the FCC's transparency rule, the State's provision may allow more stringent disclosure obligations and thus interferes with the centerpiece of the FCC's regulatory framework.

**1.   *Mozilla* Expressly Left Open Conflict Preemption.**

According to California, the light-touch framework that the FCC crafted and SB-822 thwarts is "conceptually indistinguishable" from the 2018 Order's Preemption Directive that *Mozilla* vacated, and just as that court found the Commission lacked authority for that directive, this Court should find that the FCC lacks authority to preempt California's net neutrality regulations.  Defs.' Opp'n to Prelim. Inj. Mots. ("Opp'n") at 17-19, ECF No. 27.  But *Mozilla*'s preemption analysis addressed only the 2018 Order's Preemption Directive, which was the FCC's attempt to "engage in *express* preemption in the 2018 Order" that went "far beyond conflict preemption." 940 F.3d at 74, 84 (alteration and citation omitted).  Recognizing that the FCC "has no power to act unless and until Congress confers power upon it," *id.* at 74 (internal quotation marks and citation omitted), the Court found that the Commission lacked authority to *expressly* "invalidate[] all state and local laws that the Commission deem[ed] to 'interfere with federal regulatory objectives' or that involve 'any aspect of broadband service address[ed] in the Order,'"

*id.* (citation omitted), including "any and all forms of state regulation of intrastate broadband [that] would inevitably conflict with the 2018 Order," *id.* at 81-82; *see also id.* at 78 (describing Preemption Directive as "tread[ing] into an area—State regulation of intrastate communications—over which Congress expressly deni[ed] the Commission regulatory authority") (internal quotation marks and citation omitted). The Court made clear that it did "not consider whether the remaining portions of the 2018 Order have preemptive effect under principles *of conflict preemption or any other implied-preemption doctrine*," explaining that doing so "would be wholly premature" without any state's law at issue. *Id.* at 85-86 (emphasis added). The United States explained in its opening memorandum how SB-822 undermines the 2018 Order and is therefore preempted, *see* Opening Br. at 15-22 (explaining how the significant objective of the 2018 Order is to return to a light-touch regulatory framework, which SB-822 frustrates), and *Mozilla* is not to the contrary.

## 2. The FCC Lawfully Exercised its Statutory Authority, and California Cannot Countermand that Decision.

Notwithstanding California's assertions to the contrary, the FCC has the regulatory authority to issue the 2018 Order that preempts SB-822. Here, the FCC lawfully exercised its statutorily-conferred authority to reclassify broadband as an information service subject to less regulation and returned broadband to a light-touch regulatory framework, "calibrat[ing] [a] federal regulatory regime based on . . . pro-competitive, deregulatory goals." 2018 Order ¶ 194; *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-82, 986-89 (2005); *Mozilla*, 940 F.3d at 18-21. California cannot dispute that SB-822 tries to regulate interstate communications, as it purports to apply to "broadband internet access service," defined as "a mass-market retail service by wire or radio provided to consumers in California that provides the capability to transmit data to, and receive data from, *all or substantially all Internet endpoints*." SB-822 § 3100(b) (emphasis added). Because all Internet endpoints are not located in California, the law is not confined to any intrastate communication that may exist.[1] And with

---

[1] While ignoring its statutory definition of "broadband internet access service," California disputes that internet service providers ("ISPs") are not able to separate interstate and intrastate broadband. *See* Opp'n at 26, 31 nn. 22, 31. But that is beside the point, as SB-822 is not limited

1  the exception of its disclosure provision, *see infra*, California does not dispute that SB-822

2  conflicts with the 2018 Order's regulatory framework.  The State tries to invoke a presumption

3  against preemption by claiming that "SB 822 is a classic exercise of state police power," Opp'n at

4  13, but California lacks such role or power to directly regulate interstate communications, *see* 47

5  U.S.C. §§ 151, 152, unlike its "traditional role in generally policing such matters as fraud, taxation,

6  and general commercial dealings," 2018 Order ¶ 196.  Thus, that presumption lacks any

7  applicability here.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (explaining that courts

8  "start with assumption that the historic police powers of the States were not meant to be

9  superseded" "particularly in those [cases] in which Congress has legislated . . . in a field which the

10  States have traditionally occupied") (internal quotation marks and citation omitted).

11       That should conclude the analysis, as SB-822 plainly conflicts with the 2018 Order's

12  regulatory framework, *see* Opening Br. at 15-22, and a policy that suggests an intent to deregulate

13  or to afford regulated parties space to shape their conduct has no less preemptive effect than a decision

14  to regulate, *see, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (holding agency's

15  safety standard that gave "auto manufacturers a choice among different kinds of passive restraint

16  devices" preempted state tort law that might interfere or constrain that choice); *Bethlehem Steel

17  Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 774 (1947) (state regulation preempted

18  "where failure of the federal officials affirmatively to exercise their full authority takes on the

19   

20  to any theoretical instance of intrastate broadband.  In any event, the FCC made clear in the 2018
Order—which California cannot second-guess here, *see* Opening Br. at 16—that broadband

21  internet access service is inherently interstate, 2018 Order ¶¶ 199-200.  California thinks this Court
should not credit the 2018 Order's findings because they were in the vacated Preemptive Directive.

22  Opp'n at 26-27 n.22.  But the FCC's finding is consistent with Ninth Circuit precedent.  *See United
States v. Costanzo*, 956 F.3d 1088, 1092 (9th Cir. 2020).  And in any event, the D.C. Circuit did

23  not question those findings—which summarized the Commission's consistent conclusion from
prior orders that Internet access is jurisdictionally interstate—instead holding that the Commission

24  could not ground its Preemption Directive in the inability to separate interstate broadband from
any intrastate broadband.  940 F.3d at 76-78.  Indeed, California did not even challenge in *Mozilla*

25  the FCC's finding that it is impossible or impracticable for ISPs to distinguish between intrastate
and interstate communications.  *See* 940 F.3d at 95-96 (Williams, J., dissenting) (noting that

26  petitioners made no objections in *Mozilla* regarding FCC's determination that "'it is impossible or
impracticable for ISPs to distinguish between intrastate and interstate communications over the

27  Internet or to apply different rules in each circumstance'") (quoting 2018 Order ¶ 200).

28   

character of a ruling that no such regulation is appropriate").

California thinks that this precedent is inapplicable because the cases "involve statutory authority to affirmatively regulate the underlying activity, such that the decision *not* to regulate constituted a valid exercise of statutory power delegated to the agency." Opp'n at 22.  According to California, by reclassifying broadband as an information service, the FCC can now only exercise its ancillary authority under Title I, and that the Commission cannot promulgate conduct rules or preempt SB-822 under such authority.  *See* Br. at 16-17 & n.12, 21-22, 24.

But such assertions ignore the relevant inquiry, which is whether the FCC lawfully exercised its statutory authority in promulgating the 2018 Order that repealed the conduct rules in favor of a transparency-based regime.  "[S]tatutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."  *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988).  Here, the FCC lawfully decided to return broadband to Title I and calibrate a light-touch regulatory framework, *see Mozilla*, 940 F.3d at 18-74, rather than use its "expansive" authority under Title II, *Comcast v. FCC*, 600 F.3d 642, 645 (D.C. Cir. 2010), and also properly used its authority under 47 U.S.C. § 257 to promulgate the transparency rule, *see Mozilla*, 940 F.3d at 46-49.  There is no doubt that the FCC "meant to pre-empt" laws like SB-822, and in reclassifying broadband and calibrating a light-touch framework, the FCC's "action is within the scope of [its] delegated authority."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982); *see MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1117 (9th Cir. 2020) ("Where, as here, we consider whether a federal agency has preempted state regulation, we do not focus on Congress's intent to supersede state law but instead ask whether [federal agency] meant to pre-empt [the state law].") (internal quotation marks and citations omitted).   Because SB-822 "conflict[s] or [is] at cross-purposes" with the FCC's 2018 Order, the Supremacy Clause provides a clear answer here.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Thus, it is irrelevant whether the FCC can now implement conduct rules *after* it decided to reclassify broadband.

California's other attacks on the FCC's authority similarly fail.  Its repeated citations to *Comcast*, 600 F.3d 642, Opp'n at 23, ignore the statutory authority the FCC lawfully exercised; the

1   Commission is not relying on a simple statement of congressional policy divorced from a grant of

2   authority, *see* 600 F.3d at 655, nor is it relying on factual findings that "sweep[] more broadly than the

3   agency's statutory authority," Opp'n at 27.  Also, California cannot minimize the FCC's authority

4   by asserting that reclassifying broadband as an information service does not empower the

5   Commission to promulgate regulations with preemptive effect because it "needs only to determine

6   whether a service meets a particular statutory definition," and that does not entail setting a

7   nationwide policy of the level of regulation.  Opp'n at 18-19.  California's argument lacks any

8   support other than the State's mistaken reliance on *Mozilla*, *see* Opp'n at 19, fails to account for

9   the regulatory framework the FCC established, *see infra*, and would lead to a nonsensical result

10  that a properly promulgated rule of law cannot have preemptive effect despite the Commission's

11  "[then-]contemporaneous explanation of its objectives," *Williamson v. Mazda Motor of America*,

12  562 U.S. 323, 330 (2011), that preemption was necessary to preserve the "calibrated federal

13  regulatory regime" it established in the 2018 Order, *see* 2018 Order ¶ 194.  Although the State

14  thinks it would "produce an anomalous, if not absurd, result[]" for the 2018 Order to preempt SB-

15  822 because the FCC may not "preempt state regulation of services that are *unambiguously*

16  classified under Title I," Opp'n at 20, agencies often use their expertise to resolve statutory

17  ambiguity, and it is unremarkable that Congress left for the Commission the ability to determine

18  the appropriate classification and corresponding level of regulation under Title I or II.

19

20  **3.  The 2018 Order Goes Beyond Simply Expressing Policy Preferences by
    Establishing a Light-Touch Regulatory Framework Centered Around
21  Transparency and Rescinding the 2015 Order's Conduct Rules.**

22          California minimizes the 2018 Order, arguing that the FCC "simply" decided "to 'restore

23  broadband . . . to its Title I information service classification,'" and its decision to implement a

24  light touch framework amounts to no more than a "policy preference" "that is not a basis for

25  conflict preemption," Opp'n at 16, 18.  That argument misconstrues the 2018 Order, as the FCC

26  went beyond reclassifying broadband as a matter of legal interpretation.

27          For reasons independent of its statutory interpretation, the FCC established a light-touch

28  regulatory framework that centrally relies upon the transparency rule that it retained and revised

1   in the 2018 Order.  First, based on its comprehensive review of the administrative record and its

2   policy expertise, the FCC concluded that "the costs of [the repealed] rules to innovation and

3   investment outweigh any benefits they may have," *id*. ¶ 4, and thus their elimination "is more

4   likely to encourage broadband investment and innovation, furthering [the] goal of making

5   broadband available to all Americans and benefitting the entire Internet ecosystem," *id*. ¶ 86; *see*

6   *also id*. ¶ 245 ("[T]he substantial costs [of the 2015 rules] . . . [are] not worth the possible benefits"

7   (footnote omitted)).  Second, the FCC determined that the transparency rule "in combination with

8   [market forces] and the antitrust and consumer protections laws" would "obviate[] the need for

9   conduct rules by achieving comparable benefits at lower cost."  *Id*. ¶ 239; *see id*. ¶¶ 240-66; *see*

10  *also id*. ¶ 86 (explaining that "public policy arguments advanced in the record and economic

11  analysis reinforce[d] its classification decision); *see also Mozilla*, 940 F.3d at 47 ("it is undisputed

12  that the transparency rule is an essential component of the 2018 Order").  The Commission thus

13  calibrated a regulatory framework that hinges on transparency, and in doing so, did not simply

14  "abdicat[e] [its] authority" to regulate broadband.  *ACA Connects – Am. Commc'ns Ass'n v. Frey*,

15  2020 WL 3799767, at *4 (D. Me. July 7, 2020)).  By re-imposing the rescinded rules and adding

16  additional, more stringent requirements, California plainly acted in conflict with the substance of

17  the 2018 Order.  *See* Opp'n at 18.

18      Indeed, the Commission explained how returning to a light-touch framework provided

19  appropriate safeguards.  The transparency rule promotes competition by ensuring informed

20  choices, discourages broadband providers from engaging in harmful practices, and allows the

21  market to prompt broadband providers to take corrective measures for such practices that it brings

22  to light.  2018 Order ¶¶ 209, 216-218, 237, 240-244.  Meanwhile, "[o]ther legal regimes—

23  particularly antitrust law and the [Federal Trade Commission's ("FTC")] authority under Section

24  5 of the FTC Act to prohibit unfair and deceptive practices—provide protection for consumers."

25  *Id*. ¶ 140.  "These long-established and well-understood antitrust and consumer protection laws

26  are well-suited to addressing any openness concerns, because they apply to the whole of the

27  Internet ecosystem, including edge providers . . . ."  *Id*. ¶ 140.  And transparency "amplifies the

power of antitrust law and the FTC Act to deter and where needed remedy behavior that harms consumers." *Id.* ¶ 244.

With these safeguards in place, the FCC explained how the 2015 Order's conduct rules—the same ones imposed by SB-822—were unnecessary. *See id.* ¶ 245 ("[T]he substantial costs" of the 2015 Order's *ex ante* conduct rules—"including costs to consumers in terms of lost innovation as well as monetary costs to" broadband providers—are "not worth the possible benefits."). The FCC found that banning paid prioritization has hindered the introduction of innovative new services and discouraged greater investment in broadband infrastructure, *see id.* ¶¶ 246-62, and that prohibitions on blocking and throttling are unnecessary because any harms they seek to prevent can be better addressed by other mechanisms at lower cost, *id.* ¶¶ 263-66. Further, the Commission repealed the "vague Internet Conduct Standard" that "hinder[ed] investment and innovation," and was "not in the public interest." *Id.* ¶¶ 246-52.

California cannot divorce the FCC's determinations from the reclassification of broadband. Had the FCC solely focused on reclassifying broadband as an information service or on making policy pronouncements, it would not have conducted a costs-and-benefits assessment and designed a light-touch framework anchored by transparency. Indeed, the Commission could not have relied on its statutory interpretation alone to promulgate the 2018 Order. *See Mozilla*, 940 F.3d at 49 (rejecting argument that statutory interpretation alone justified 2018 Order); *cf. Recording Indus. Ass'n of Am. v. Librarian of Cong.*, 176 F.3d 528, 531–32 (D.C. Cir. 1999) (explaining that under *Chevron*, agencies may "make policy choices in interpreting the statute, and such interpretations are entitled to deference"). And the FCC's expressed policy statements only underscore why SB-822 is preempted, as they reflect a "[then-]contemporaneous explanation of its objectives," *Williamson*, 562 U.S. at 330, including its finding that preemption was necessary because the 2018 Order "establishes a calibrated federal regulatory regime based on the pro-competitive, deregulatory goals of the 1996 Act," which separate state requirements "could significantly disrupt," *see* 2018 Order ¶ 194. SB-822 imposes that disruption and is preempted.

**4.  California's Disclosure Provision is Preempted by the 2018 Order.**

In addition to misreading *Mozilla*, the FCC's authority, and the 2018 Order, California singles out SB-822's disclosure provision and argues that it is not preempted. Although that provision resembles a portion of the FCC's transparency rule, 47 C.F.R. § 8.1(a), it fails to address the 2018 Order's detailed guidance regarding disclosures. 2018 Order ¶¶ 215-231. SB-822's imprecise and open-ended language may be interpreted more broadly, thereby allowing more stringent disclosure obligations than those required by the FCC. Such interference is particularly problematic given that the 2018 Order's light-touch regulatory framework centrally relies upon the transparency rule. *See Mozilla*, 940 F.3d at 47 ("it is undisputed that the transparency rule is an essential component of the 2018 Order").

California thinks that "[t]here is no basis for assuming that SB 822's disclosure requirements unmistakably conflict" with the 2018 Order given the similar language between the two, Opp'n at 25, but the State's disclosure provision would be unnecessary if it merely duplicated the 2018 Order. *Cf. In re Eastport Assocs.*, 935 F.2d 1071, 1080 (9th Cir. 1991) ("Generally, statutes should be construed to give their terms meaning and effect, avoiding [i]nterpretive constructions which render some words surplusage.") (internal quotation marks and citation omitted). Invoking *Arizona*, 567 U.S. at 415, California argues that it would be "'inappropriate to assume' that a state law 'will be construed in a way that creates a conflict with federal law.'" Opp'n at 25. But the state provision in *Arizona*—which directed state officers to make a "reasonable attempt" to determine an individual's immigration status upon "reasonable suspicion" in certain circumstances, and required a determination upon arrest—had "limits . . . built into" the law, including that it must be "implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." *Arizona*, 567 U.S. at 411. With those limits in place, the Court found that the state law would not necessarily conflict with Federal law. *Id.* 411-15. By contrast, SB-822 not only lacks any comparable built in limits, it was *designed* to countermand the FCC's light-touch framework. *See* Opening Mem. at 18. And although California insists that SB-822 will not interfere with the congressional reporting called for by the statute the FCC relied upon

in promulgating the transparency rule, Opp'n at 25-26 (citing 47 USC § 257(a), (c)), the transparency rule acts as the centerpiece for the FCC's light-touch framework, with which SB-822 can interfere. *See supra.*

## II. SB-822 Is Preempted by the Communications Act.

As previously explained, the Communications Act divides regulatory authority over telecommunications between the States and the Federal Government: "purely interstate traffic is exclusively committed to the FCC," *AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 727 (3d Cir. 2015), while states have authority over intrastate communications, 47 U.S.C. § 152(b); *see also* Opening Br. at 22 (collecting cases). California does not seriously contest that this dichotomy accurately describes the Communications Act's statutory scheme. Nor does it seriously contest that SB-822 regulates interstate communications. Opening Br. at 23; Opp'n at 31 n.31. Rather, California raises several arguments about why it nevertheless should be permitted to regulate interstate traffic. None ought succeed.

*First*, California argues that even if *some* interstate telecommunications regulation is committed to the Federal Government's exclusive authority, the regulation of Title I interstate information services are not exclusively federal, because the Federal Government "lack[s] . . . power" over such services. *See* Opp'n at 33. In other words, California claims there would be a regulatory "vacuum," where no entity could regulate interstate information services, and field preemption would not apply because such preemption implies significant federal regulatory control. But information services under Title I are *not* subject to mandatory federal regulation, *see Brand X*, 545 U.S. at 973, but rather a more flexible form of regulatory authority. And the Communications Act does not generally provide states power over interstate communications (even though it makes clear that they have authority over intrastate communications). There is no authority for the proposition that Congress's decision to create a category of interstate communication subject to limited federal regulation is actually a decision to subject that same category to extensive state regulation. Moreover, California's conclusion that Title I is devoid of any federal regulatory authorities ignores that both the FTC and FCC play an important role in

1   ensuring a free and open Internet.

2       *Second*, California states that there are numerous savings clauses within the

3   Communications Act. Opp'n at 34. According to California, an express preemption clause (or

4   savings clause) within a field often precludes a field preemption claim, since it demonstrates that

5   Congress did not intended to preclude state authority in the entire field. *Id.* (citing, *e.g.*, *Wisconsin*

6   *Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991); *Metrophones Telecomms., Inc. v. Global*

7   *Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005)). But the mere existence of a

8   savings clause does not defeat a field preemption claim. *See Nat'l Fed. of the Blind v. United*

9   *Airlines, Inc.*, 813 F.3d 718, 722-23 (9th Cir. 2016) ("[T]he inclusion of either a savings clause or

10  an express preemption clause within a statutory scheme does not foreclose the application of

11  ordinary implied preemption principles."). Moreover, the clauses identified by California

12  generally either preserve or explicitly limit States' ability to regulate *intrastate* communications;

13  they do not provide States authority over *interstate* communications. *See* Opp'n at 34; *see, e.g.*,

14  47 U.S.C. § 223(f)(2) (providing that states can set requirements that "govern only intrastate

15  services"); 47 U.S.C. § 230(e)(4) ("Nothing in this section shall be construed to prevent . . . any

16  State law that is consistent with this section."); 47 U.S.C. § 253(a), (d) (prohibiting States from

17  erecting barriers to entry to interstate or intrastate telecommunication services); 47 U.S.C. § 276(c)

18  (prohibiting State requirements that are inconsistent with the Commission's regulations regarding

19  payphones); 47 U.S.C. § 332(c)(3), (7) (limiting States ability to regulate mobile services,

20  notwithstanding 47 U.S.C. §§ 152(b) and 221(b), but confirming that states maintain certain zoning

21  powers over wireless facilities); 47 U.S.C. §§ 543(a)(1), 544(e) (limiting states' ability to regulate

22  cable service). These provisions do not, therefore, show broad congressional authorization for

23  states to regulate interstate communications. While California notes that the Communications Act

24  recognizes that there is "affirmative exercise of State regulatory power," *see* Opp'n at 34, this is

25  with regard to *intrastate* communications; none of those provisions vest States with power over

26  *interstate* communications.

27       Relatedly, California claims that the United States' field preemption argument fails

28

because the Federal Government defines the field too broadly – as all interstate communications, in any context, and that the fact that there may be limited roles for states in certain specific areas precludes such an argument.  But the United States is not trying to preempt all state laws that touch upon or have an incidental effect on interstate communications.  Rather, the United States is arguing that direct regulation of interstate communications, as here, is committed by the Communications Act to the Federal Government.

*Third,* California also claims that the Telecommunications Act (and provisions added by that act to the Communications Act) preclude any implied preemption argument.  As a basis for this conclusion, it cites to the savings clause provided in section 601(c)(1), codified in 47 U.S.C. § 152 note, which states that "[t]his Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or Amendments."  *See* Opp'n at 28.  But by its express terms that clause applies to amendments made by the Telecommunications Act, and SB-822 violates the Communications Act's division of Federal and state regulatory authority over communications services, which predates that act.  *See* Opening Br. at 22-24; *see also* 47 U.S.C. §§ 151, 152.  The clause is thus inapposite.[2]  Moreover, by providing that the Telecommunications Act does not impliedly alter prior "Federal . . . law," section 601(c)(1) precludes any construction of the Telecommunications Act that would divest the FCC of its preexisting power to preempt state law.  *Cf. City of New York v. FCC*, 486 U.S. 57, 56-57 (1988) (statement that "Congress did not intend to 'affect the authority of a franchising authority' to set standards" indicated support for the FCC's preexisting policy of preempting local regulation.")

In any event, as California itself recognizes, courts have repeatedly rejected the argument that section 601(c)(1) precludes implied preemption.  *See id.* at 28 n.26.  "[I]t is a general rule in

---

[2] Similarly wide of the mark, California asserts that the Communications Act does not preempt SB-822 because "the provisions at issue plainly restrict only the FCC's authority to impose common carrier regulation."  California's argument ignores that SB-822 violates the Communications Act's division of Federal and state regulatory authority over communications services.

preemption analysis that a savings provision does not 'bar the ordinary working of conflict pre-emption principles.'"  *Farina v. Nokia Inc.*, 625 F.3d 97, 131 (3d Cir. 2010) (citing *Geier*, 529 U.S. at 869); *see also In re FCC 11-161*, 754 F.3d 1015, 1120 (10th Cir. 2014) (section 601(c)(1) does not preclude implied preemption arguments); *CITA-The Wireless Ass'n v. City of Berkley*, No. 15-cv-02529-EMC (N.D. Cal. Sept. 17, 2020) (same).  Indeed, this case presents the same scenario as in *Farina*: "where the agency's regulations represent a balance, [and] the presence of state-law regulations does not serve as a complement, but rather re-balances the relevant considerations."  625 F.3d at 131.  Under such circumstances "a broad reading of a savings provision could allow the law 'to defeat its own objectives.'"  *Id.* (quoting *Geier*, 529 U.S. at 872).  While California cites a Fifth and Seventh Circuit case, *see* Opp'n at 28-29, neither addresses *Geier*'s recognition that a savings clause, like the one at issue here, does not preclude the application of ordinary preemption provisions.  California doubts the relevance of *Geier*, Opp'n at 29 n.26, but *Geier* remains good law, and California provides no authority establishing otherwise.

*Finally*, California claims that a field preemption argument would mean that interstate communications are not subject to any regulation, either State or Federal.  *See* Opp'n at 36-37.  But this is not so: the Federal Government has oversight over the activities in this sphere, either through direct FCC regulation or the FTC.  States certainly have limited authority over some activities that implicate the use of internet services.  *See id.* at 37; *see also* 2018 Order ¶ 196.  But States do not have primary *regulatory* authority to regulate the direct conduct of interstate communications, a field that has been left to the Federal Government for a century, and California provides no contrary authority.

## III.   The Equitable Factors Weigh Heavily in Favor of Injunctive Relief

As the United States previously explained, SB-822 would negate the Federal Government's regulatory choice and nullify federal law across the country by reinstating the same rules that the FCC repealed and imposing additional requirements.  Opening Br. at 24-25.  California argues that its violation of the Supremacy Clause does not presumptively establish an irreparable injury because such a presumption "is confined to violations of *personal* constitutional rights involving

liberty or dignity interests."  Opp'n at 40.  But "this distinction between personal and structural constitutional rights is not recognized in the Ninth Circuit," *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017), and "an alleged constitutional infringement often alone constitute irreparable harm," *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded on other grounds*, 567 U.S. 387 (2012).  That is especially so here where SB-822 would negate the FCC's lawfully passed Order.  *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (Roberts, C.J.).  California erroneously contends that *United States v. California*, 921 F.3d 865 (9th Cir. 2019), "made clear that more was required to establish irreparable harm."  Opp'n at 41 n.39.  Rather, in addressing the State's argument that "'[t]he balance of equities and public interest weigh strongly against enjoining [its] laws,'" that court noted the relative impact on the State versus the federal agency and "encourage[d] the district court to reexamine the equitable *Winter* factors in light of the evidence in the record."  921 F.3d at 894.  Re-weighing the equitable factors does not suggest a lack of irreparable harm.

In any event, SB-822 additionally "imposes an economic or operational burden." *California*, 921 F.3d at 894.  The FCC found that "the costs of [the repealed] rules to innovation and investment outweigh any benefits they may have," 2018 Order ¶ 4, and thus their elimination "is more likely to encourage broadband investment and innovation, furthering [the] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem," *id.* ¶ 86; *see also id.* ¶¶ 95, 245; *see also Mozilla*, 940 F.3d at 49 ("We find that the agency's position as to the economic benefits of reclassification away from 'public-utility style regulation' . . . is supported by substantial evidence.") (internal quotation marks and citations omitted).  Similarly, the FCC explained that allowing States to impose separate regulatory requirements "could inhibit broadband investment and deployment and would increase costs to consumers," 2018 Order ¶ 194 n.727, and "place an undue burden on the provision of broadband Internet access service," *id.* ¶ 195.  California claims that harm to broadband providers and others "is not the same thing as

harm to the United States," Opp'n at 47, but "[i]t is the policy of the United States" "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services"—including "any information service"—"unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), (f)(2).  The 2018 Order embodies the FCC's considered judgment as to how best fulfill that goal, and SB-822 would nullify that.  And although the State claims once more that broadband providers can comply with different state laws, Opp'n at 47, that again ignores that SB-822 purports to regulate interstate broadband and the FCC conclusively found that the Internet is inherently interstate.  *See supra* n.1.

Moreover, "[i]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law."  *United States v. California*, 314 F. Supp. 3d 1077, 1111 (E.D. Cal. 2018), *aff'd in part, reversed in part and remanded*, 921 F.3d 865 (9th Cir. 2019) (quoting *Arizona*, 641 F.3d at 366).  Although California argues that it needs SB-822 to protect consumers, competition, and the like, *see* Opp'n at 48-50, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail," *Fid. Fed. Sav.*, 458 U.S. at 153.  And, such a purported need is undermined by the fact the State—by its own agreement—has not enforced SB-822 since enactment more than two years ago.  *See* Stipulation, ECF No. 15.  California's argument amounts to a dispute over the best way to regulate interstate broadband.  The 2018 Order and *Mozilla* resolved that dispute.  "Since the Commission first adopted a transparency rule in 2010, 'almost no incidents of harm to Internet openness have arisen.'"  *Mozilla*, 940 F.3d at 56 (quoting 2018 Order ¶ 242 and citing 2018 Order ¶ 241).  "The Commission reasonably concluded that the harms the [2015] Order was designed to prevent did not require" that "Order's regulatory measures but could instead be mitigated—at a lower cost— with transparency requirements, consumer protection, and antitrust enforcement measures."  *Id.* at 55-56.  California's policy dispute provides no reason to allow its unlawful law to take effect.

## **CONCLUSION**

The Court should grant Plaintiffs' motion for preliminary injunction.

Dated:  October 14, 2020                    Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General
                                            Civil Division

                                            MATTHEW J. GLOVER
                                            Counsel to the Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Director, Federal Programs Branch

                                            JACQUELINE COLEMAN SNEAD
                                            Assistant Branch Director, Federal Programs Branch


                                            /s/ Kevin Snell
                                            JOSEPH BORSON (Va. Bar No. 85519)
                                            KEVIN SNELL (NY Bar)
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L St. NW
                                            Washington, DC 20530
                                            Telephone: (202) 305-0924
                                            Fax: (202) 616-8460
                                            E-mail:  Kevin.Snell@usdoj.gov

                                            *Attorneys for the United States*